**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Case No. 1:22-CR-00011 (RJL)** |
| ) | |
| **ALAN FISCHER III,** ) | |
| also known as "AJ," ) | |
| ) | |
| **Defendant.** ) | |

<u>**MR. FISCHER'S MOTION TO REVOKE DETENTION ORDER, AND FOR BAIL**
**MODIFICATION RELEASING DEFENDANT PENDING TRIAL**</u>

Defendant, ALAN FISCHER III, also known as "AJ," by and through undersigned counsel, respectfully moves this Court pursuant to the Bail Reform Act of 1984, 18 U.S.C. 3141 et seq., to review and revoke the magistrate's detention order issued on January 14, 2022; and to release Mr. Fischer with the conditions shown in the proposed order. The Defendant submits the following in support of this request:

**I.        INTRODUCTION**:

The Government agrees to submit its response within a day of entry of this motion.

The charges from this case arise from the events that took place on January 6, 2021 at the U.S. Capitol.  As entered in the 1:22-cr-00011-RJL case docket on February 14, 2022, Mr. Fischer was indicted on serious allegations that involve felonies and misdemeanors, with alleged use of a deadly or dangerous weapon (chair, traffic cone, and pole-like instrument) on the U.S. Capitol grounds. No injury is alleged. Mr. Fischer adamantly denies guilt for the crimes alleged and seeks his day in court at trial.

This motion will not present Mr. Fischer's trial defense for the January 6, 2021 charges because pretrial release under the Bail Reform Act (BRA) is not based on Mr. Fischer proving he

is innocent of the charges. He is presumed innocent. Such a requirement to defend against the actual charges and prove innocence would make the BRA unconstitutional. Likewise, the Government's job is not to try to prove guilt so it can deny Mr. Fischer bail prior to discovery, defense preparation, and a jury trial. If demanding denial of bail through the claim that he presents a prospective danger while awaiting trial, the Government must provide clear and convincing evidence of AJ's dangerousness using the BRA standards. That was not shown on January 14, 2022. If asserting AJ will not show up for court, the Government must show by a preponderance of evidence that he is a flight risk. That was not done on January 14, 2022.  "The Bail Reform Act requires that a pretrial detention order 'include written findings of fact and a written statement of the reasons for the detention.' 18 U.S.C. § 3142(i)(1)." *U.S. v. Nwokoro*, 651 F.3d 108, 109 (D.C. Cir. 2011). As in *Nwokoro*, there is no such magistrate order here that meets standards with reasons for dangerousness or risk of flight, and with reasons why no conditions could mitigate any concerns. Yet Mr. Fischer remains in jail having been denied bail. When the standard for detention is not met, and when incorrect information was used as in the case here, the Court should act to overturn the pretrial detention order. This motion shows that with correct information the Government objectively fails to overcome the Bail Reform Act's presumption against pretrial detention and that Mr. Fischer should be released immediately.

On January 13, 2022 in Florida, over a year after the January 6, 2021 events at the U.S. Capitol in Washington, D.C., Mr. Fischer was notified of his arrest warrant. He voluntarily surrendered. Over the course of that year, AJ committed no crimes against nor threatened anyone, and was peaceful when his home was searched. He made no preparation to flee after January 6, 2021. Mr. Fischer was in a local Proud Boys chapter at the time of January 6, 2021, with the media since then adopting the unproven mantra that all Proud Boys are gang and violent

extremist group members. With the FBI openly hunting down all Proud Boys who went to Washington, D.C. for the rally on January 6, 2021, if Mr. Fischer was a flight risk, he would have made monetary and travel arrangements. He did none of that. All he did was contact an attorney by the summer of 2021 in the expectation that he might be questioned or arrested, where among his concerns were First Amendment protected free association and speech.

Voluntarily surrendering on January 13, 2022 under an individual warrant, Mr. Fischer was added in February 2022 to the indictment previously filed for Mr. Dion Rajewski and Mr. Zachary Johnson. His present co-defendants were arrested and released immediately after appearing together on January 13, 2022.  On January 14, 2022, Mr. Fischer, via video from jail, went before the same U.S. District Court for the Middle District of Florida, with the same magistrate and same AUSA as had Messrs. Johnson and Rajewski the previous day. The charges were in essence the same for all three men with some variation. The AUSA raised no argument of a § 3142 crime of violence or flight risk to deny bail for nearly identical charges against Messrs. Johnson and Rajewski as were argued against release for Mr. Fischer.  At his initial appearance in Tampa, Mr. Fischer was denied bail while Messrs. Rajewski and Johnson were released without any opposition. The arguments and reasons to deny bail did not comport with the requirements of the BRA, and the Government used incomplete if not incorrect information it received to paint Mr. Fischer as a danger. One allegation made that is contradicted by the actual case outcome was that Mr. Fischer who pled to misdemeanor disorderly conduct had committed felony assault against police. Mr. Fischer was alleged to be a flight risk because he faced a sentence of possibly five to seven years if found guilty, had a passport, and had years earlier travelled overseas while on active military duty. Uncounted numbers of January 6 defendants, including Mr. Fischer's co-defendants, have been released even though they face sentences of

seven years or more and have passports. The BRA includes language about considering sentence lengths that start at ten years. Further, no release conditions were ever considered by the magistrate. The magistrate made no findings as to who specifically was endangered and why no release conditions would ensure the safety of the community, should anyone believe there was a threat, and that Mr. Fischer would not appear in court.

At a minimum, Government actions in this case to prevent Mr. Fischer's pretrial release create significant cognitive dissonance among rational people. Worse, the actions raise the specter of unequal justice and a statute that can be applied unequally and unconstitutionally. Chief Judge Howell's six "guideposts" from *United States v. Chrestman*, 525 F. Supp. 3d 14 (D.D.C. 2021) is being used in this District to examine factors that compare defendants' alleged conduct surrounding the alleged January 6 crimes. Use of 18 U.S.C. § 3142 (g) "Factors to Be Considered," with the added guideposts from *Chrestman* for January 6 defendants considered, should result in equal reasoned application of the BRA for similarly situated defendants. That did not happen here. Not only were Mr. Fischer's co-defendants released without challenge for the same charges, but many others facing the same or similar charges as Mr. Fischer were previously released. Nothing in Mr. Fischer's character or background makes him a threat to the community or any person. He is not a flight risk. The apparent cause of this initial rendering of unequal justice is that the Government's argument was centered on incorrect and incomplete input from unknown sources about Mr. Fischer's character and background. This motion will not investigate origination of the incomplete and incorrect input.

Still true today is that "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).  Under the BRA, the government carries the burden to show details of a specific threat

against a certain community or specific person by a defendant that may cause the court to deny bail. Generalizations about possibilities where any person on Earth has the potential to commit some future crime belong in an existing movie script and do not meet the BRA standards. In the BRA, Congress listed very limited serious crimes that lead to a rebuttable presumption that a defendant should not be released. Those crimes do not apply here, and the Government said the presumption did not arise (M.D. Fla. 8:22-mj-01043-JSS, Transcript of Oral Argument for ECF No. 6 at 15: 2-3). (Exhibit A). The BRA also allows the Government to seek pretrial detention when the crime alleged is a "crime of violence," the defendant is likely to obstruct justice, or is a flight risk who will not show up in court. Throughout, the defendant is presumed innocent.

The safeguards written into the BRA call for a full-blown hearing as a right of a defendant when the Government seeks to deny pretrial release. According to § 3142(f)(2): "The hearing shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance." The defendant may have up to five days to prepare. "The person shall be afforded an opportunity to testify, to present witnesses, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise." *Id*. While several docket entries state that Mr. Fischer had a detention hearing, those entries omit the fact that he was never advised of and did not decline his right to have a full-blown hearing after the government objected to his release. Because Mr. Fischer's attorney that he previously engaged did not appear to represent him based on a personal schedule conflict, the court appointed a Public Defender solely for the appearance on January 14, 2022. The attorney spoke with Mr. Fischer and his mother for a brief amount of time before the court appearance. The Public Defender, holding a Pretrial Services Report in his hands that recommended release, requested conditions of release as the only topic the defense wanted to

discuss. (M.D. Fla. 8:22-mj-01043-JSS, Transcript of Oral Argument for ECF No. 6 at 6; 19-21). However, in his role of being appointed for just that day and appearance, the Public Defender was taken by surprise when information not in or contradicting the Pretrial Services Report was presented by the Government in an unexpected oral motion for pretrial detention.

The safeguards deliberately built into the BRA by Congress went missing in action as no person participating in the proceeding asked Mr. Fischer, who was remotely appearing via video from jail, if he wanted up to five days to prepare and then to hold an adversarial hearing as was his right. Mr. Fischer had no idea he even had this right.  When the Government raised objection to bail, the magistrate said, "go ahead" and did not ask the defense, and especially Mr. Fischer, if they wanted a continuance. (M.D. Fla. 8:22-mj-01043-JSS, Transcript of Oral Argument at 7: 12-14). Everyone involved proceeded to argue points as if Mr. Fischer was non-existent. The failure to ask Mr. Fischer if he waived his right may be argued as a casualty of Covid-19 measures, but then who is responsible?  An American's liberty was at issue, and he was delegated to observer status through no fault of his own.

Verbal only allegations by the Government went mostly unchecked given the attorney-client separation and surprising claims, while counterpoints the defense made as able were ignored in the magistrate's decision.  This last statement alone should lead to revocation of the detention order. Mr. Fischer's rights under Fifth Amendment Due Process were violated as he was denied bail based on invalid assertions and without the full-blown hearing as was his right. The magistrate did not prudently ask if the defense, and especially Mr. Fischer, wanted a continuance when it was clear the defense came into the proceeding expecting only to argue release conditions and stated on the record that was all they wanted to do.

The U.S. Attorney added "with a deadly or dangerous weapon" to the misdemeanors, while concurrently charging 18 U.S.C. § 111(a)(1) and (b) for "Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon." The indictment lists five (5) felonies and two (2) misdemeanors where without the added language of "deadly or dangerous weapon," the charges would consist of two felonies and five misdemeanors. All this is legal and within prosecutorial discretion despite what may be considered an inference of coerciveness to avoid trial and force a felony plea. Regardless, the 18 U.S.C. § 111(a)(1) and (b) charge meets criteria for a crime of violence under the BRA based on the crime's elements contained in the statute. However, as stated *supra*, the Government did not consider objecting to release for Mr. Johnson given that he was charged with the same § 111 offense, and Messrs. Johnson and Rajewski were charged with multiple felonies for carrying or using a dangerous weapon. Their releases were like the releases of many others.

The denial of pretrial release here appears to be based on allegations that the evidence was strong when no strong evidence was presented in the courtroom. Allegations without any records or affidavits were accepted as truth. Bail denial came from incorrect assertions about Mr. Fischer's character and criminal background.

Mr. Fischer has one misdemeanor in his history (as properly shown in the Pretrial Services Report dated January 14, 2022 (Exhibit A). In that case, the prosecutor dropped felony charges of assault when he knew that based on evidence Mr. Fischer would be acquitted. Further, the police reputation would have been damaged by the actions of a few. Mr. Fischer pled to a misdemeanor involving no violence by him based on attorney advice so he could move forward with his life. The Government did not have the facts when it stated on January 14, 2022 that Mr. Fischer acted violently toward police and just pled down. The Government did not have the facts

that another person was arrested and accused of felony assault on police at the same time - and had her felony charges dismissed.  All charges against the second defendant (charged separately) dropped after months of legal fees and a county misdemeanor program. The testimony and video evidence for Mr. Fischer showed police misconduct, and no assaults on police or the horse. The complete information by the Government's agents, versus an assumption, would have shown what the County Circuit Court prosecutor knew at the time: no felony.

Mr. Fischer, if afforded the same justice as applied to others similarly situated, would have immediately been released on January 14, 2022.  Within his strength of character, Mr. Fischer retains his trust in the judicial system and the nobility of the courts in their roles in the justice system. This instant review verifies that safeguards for justice under the BRA in fact exist. Mr. Fischer's release should not be controversial. The truth is the truth. Revoking the magistrate's detention order (M.D. Fla. 8:22-mj-01043-JSS at ECF No. 7, also at Exhibit B) and providing release with conditions is justified and just.

The very safeguards that the Supreme Court discussed at length in *Salerno* were violated in this case. Mr. Fischer was denied an adversarial hearing; and his resulting detention was based on incomplete and incorrect facts presented to the court about him. The magistrate's findings denying release are not written in the detail required to support detention in her order. No clear and convincing evidence shows Mr. Fischer as a danger to the community or any person. No legitimate let alone preponderance of evidence shows him to be a flight risk. The magistrate gave no findings or discussion of why no release conditions could be implemented. In this motion, Mr. Fischer simply asks for the law to be justly applied to him, where he remains innocent unless proven guilty before a jury. Mr. Fischer relies on final adjudication of his case by this court and a

jury, and not the media court of opinion that too often ignores the applicable law and the presumption of innocence.

Not an insignificant number of Americans these days ignore U.S. Constitutional rights, natural law decency, and the Lord's teachings about treatment of others. The Golden Rule is too often AWOL. No motion or Court review will result in any near-term change to the external hate towards fellow man and woman that is being sown across our great Nation under God. This Court can protect U.S. Constitutional rights, apply the Bail Reform Act fairly, and correct the injustice served upon Mr. Fischer in the magistrate's denial of his pretrial release. This motion ignores media opinion, contains no politics in its legal analysis, and relies on the law, facts, and fairness in application of the BRA to Mr. Fischer, who is deserving of pretrial release as justice under the law.

## II.        PROCEDURAL HISTORY:

Mr. Fischer voluntarily surrendered to the Tampa FBI office upon notification of an arrest warrant on January 13, 2022 (1:22−mj−00012−GMH−1 at ECF No. 5). The complaint for the arrest warrant was held under seal and is found at 1:22−mj−00012−GMH−1 at ECF No. 1. His initial appearance was on January 14, 2022 (M.D. Fla. 8:22-mj-01043-JSS at ECF No. 6). The Public Defender and Mr. Fischer were not co-located, and remote video was used. The Pretrial Services Report provided to the Public Defender on January 14, 2022 recommended release.[1] (Exhibit A). The co-defendants in this case were arrested, had their joint initial appearance, and were released by Magistrate Sneed on January 13, 2022. (M.D. Fla. 8:22-mj-01039-JSS at ECF No. 8). On January 14, 2022 Magistrate Sneed denied bail and her order

---

[1] The report used on January 14, 2022 is not contained in the Tampa or any DC docket and may be allowed in restricted status. The proceeding transcript shows on page 17, lines 23-24 and page 18 lines 1-2 that Pretrial Services recommended release.

denying Mr. Fischer's release was filed (M.D. Fla. 8:22-mj-01043-JSS at ECF No. 7, also

Exhibit B). A Pretrial Services Report appeared in the case file (restricted) on January 24, 2022

that contradicts the release recommendation from the actual investigator on January 14, 2022;

contains incorrect facts; and involves persons who never investigated locally (1:22-mj-00012-

GMH at ECF No. 7).[2] On January 25, 2022, the Government motion to waive Speedy Trial,

objected to by defense, was granted by minute order. (1:22−mj−00012−GMH−1). Mr. Fischer's

indictment was entered on February 14, 2022 (1:22-cr-00011-RJL-3 at ECF No. 32). Mr. Fischer

remains in the Pinellas County, Florida jail since January 13, 2022.

**Statutory Crimes Charged in the Joint Indictment are**:

**Count 1**:  18 U.S.C. § 231(a)(3) and 2 (Civil Disorder)

**Count 3**:  18 U.S.C. § 111(a)(1) and (b) and 2 (Assaulting, Resisting, or Impeding Certain
            Officers Using a Dangerous Weapon)

**Count 6**:  18 U.S.C. § 1752(a)(1) and (b)(1)(A) and 2 (Entering and Remaining in a Restricted
            Building or Grounds with a Deadly or Dangerous Weapon)
**Count 8**:  18 U.S.C. § 1752(a)(2) and (b)(1)A) and 2 (Disorderly and Disruptive Conduct in a
            Restricted Building or Grounds with a Deadly or Dangerous Weapon)

**Count 11**:  18 U.S.C. § 1752(a)(4) and (b)(1)(A) and 2 (Engaging in Physical Violence in a
             Restricted Building or Grounds with a Deadly or Dangerous Weapon)

**Count 12**:  40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building)

**Count 13**:  40 U.S.C. § 5104(e)(2)(F) (Act of Physical Violence in the Capitol Grounds or
             Buildings)

## III.        LEGAL STANDARD

### A.  The Statutes and Rule That Apply For Pretrial Release Are:

(1) 18 U.S.C. § 3142 (Release or detention of a defendant pending trial);
(2) 18 U.S.C. § 3145 (Review and appeal of a release or detention order); and
(3) 18 U.S.C. § 3156 (Definitions)

---

[2]  The January 24, 2022 Pretrial Services Report and even the Tampa magistrate's order contains administrative
errors that incorrectly show Mr. Fischer's arrest as 1/14; and a wrong incarceration date of 1/24, among the errors.

(4) Fed. R. Crim. P. 5(d)(3) (detention or release must follow the statute).

**B.  The Standards Under the BRA Are**:

Under the Bail Reform Act, 18 U.S.C. §§ 3141 – 3156, "Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are 'the most serious' compared to other federal offenses." *United States v. Singleton*, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting *United States v. Salerno*, 481 U.S. 739, 747 (1987)).

"If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly." 18 U.S.C. § 3145(b).

"Courts in this district review a magistrate judge's release order *de novo*. *See United States v. Beauchamp-Perez*, 822 F.Supp.2d 7, 9 (D.D.C. 2011) (citing *United States v. Hudspeth*, 143 F.Supp.2d 32, 35-36 (D.D.C. 2001) (citing cases))." *United States v. Louallen*, Criminal Action No. 19-66 (JDB), 2 (D.D.C. Feb. 28, 2019). The D.C. Circuit has yet to rule on the review standard but "almost every circuit nationwide has held that a magistrate judge's detention order is subject to *de novo* review by the district court. *See United States. v. Hunt*, 240 F. Supp. 3d 128, 132-33 (D.D.C. 2017) (referencing cases from the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits that support this proposition). This Court has adopted this view." *United States v. Klein*, Crim. No. 21-236 (JDB), at *6 (D.D.C. Apr. 12, 2021). ((*See also United States v. Gieswein*, Crim. No. 21-24 (EGS) (D.D.C. Jul 27, 2021)).

Under the Bail Reform Act, the judge can release a defendant on personal recognizance under subsection (b); release the defendant with conditions as referenced in subsection (c); temporarily detain the defendant for revocation of prior conditional release or deportation under subsection (d); or detain the defendant under subsection (e). 18 U.S.C. § 3142. Although it is at the end of the statute, in subsection (j) Congress wrote that "nothing shall be construed as modifying or limiting the presumption of innocence."

"The arrestee is entitled to a prompt detention hearing, and the maximum length of pretrial detention is limited by the stringent time limitations of the Speedy Trial Act." *United States v. Salerno*, 481 U.S. at 747. The BRA, 18 U.S.C. 3141 et seq., states that a hearing shall be held to determine pretrial detention upon a motion by the government if the defendant is charged with an offense falling in one of five enumerated categories. §§ 3142(f)(1)(A)-(E). A detention hearing shall be held pursuant to § 3142(f)(1)(A) if a defendant is charged with a "crime of violence," or pursuant to § 3142(f)(1)(E) if a defendant is charged with any felony that is not otherwise a crime of violence that involves the possession or use of any dangerous weapon. 18 U.S.C. § 3142(f). "In common parlance, the relevant inquiry is whether the defendant is a flight risk or a danger to the community." *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) (citing *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019)). *Salerno* held that a flight risk alone is sufficient to deny bail.

Sections 3142(f)(1)(A) and (E) apply here based on the indictment alleging a crime of violence and possession of a deadly or dangerous weapon as entered on February 14, 2022. The term "crime of violence" means "(A) an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another."  18 U.S.C. § 3156, Definitions. The Supreme Court defined "physical force" as "force capable of

causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010).

The Bail Reform Act, 18 U.S.C. § 3141 *et seq*., provides that a court shall order a defendant to be detained pending trial if the court determines that *no condition or combination of conditions* exist which will reasonably assure his appearance as required or the safety of the community. 18 U.S.C. § 3142(e) (Emphasis added).

"In a fullblown adversary hearing, the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." *Salerno*, 481 U.S. at 750 ((citing 18 U.S.C. § 3142(f)). "Detainees have a right to counsel at the detention hearing. 18 U.S.C. § 3142(f). They may testify in their own behalf, present information by proffer or otherwise, and cross-examine witnesses who appear at the hearing." *Salerno*, 481 U.S. at 751. "The hearing shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance. Except for good cause, a continuance on motion of such person may not exceed five days . . . ." § 3142.

"The Bail Reform Act requires that a pretrial detention order 'include written findings of fact and a written statement of the reasons for the detention.' 18 U.S.C. § 3142(*i*)(1)." *U.S. v. Nwokoro*, 651 F.3d 108, 109 (D.C. Cir. 2011).

When the basis for pretrial detention is the defendant's danger to the community, the government is required to demonstrate the appropriateness of detention by clear and convincing evidence. § 3142(f). As the D.C. Circuit recently stated, "[t]o justify detention on the basis of dangerousness, the government must prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the

community.'" *United States v. Munchel*, 2021 WL 1149196, at *4 (D.C. Cir. Mar. 26, 2021)

((quoting 18 U.S.C. § 3142(f)).

### **18 U.S.C. § 3142(g) factors that must be considered to assess future dangerousness:**

(1) the nature and circumstances of the offense charged, including whether the offense
is a crime of violence;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person;

A. The person's character, physical and mental condition, family ties, employment,
financial resources, length of residence in the community, community ties, past conduct, history
relating to drug or alcohol abuse, criminal history, and record concerning appearance at court
proceedings; and

B. Whether, at the time of the current offense or arrest, the person was on probation,
on parole, or on other release; and

(4) the nature and seriousness of the danger to any person or the community that would
be posed by his release. § 3142(g); *see also Munchel*, 991 F.3d at 1279–80.

"A defendant's detention based on dangerousness accords with due process only insofar

as the district court determines that the defendant's history, characteristics, and alleged criminal

conduct make clear that he or she poses *a concrete, prospective threat to public safety*." 

*Munchel*, 991 F.3d at 1279-80. (Emphasis added).  Referencing *Salerno*, *Munchel* noted that for

dangerousness the threat must be a continued, identified, and articulable threat to the community

or to another person. "[W]ether a defendant poses a particular threat depends on the nature of

the threat identified and the resources and capabilities of the defendant. *Cf. Nwokoro*, 651 F.3d at

110 –11 (noting that evidence 'favoring appellant's pretrial release' included the fact that

appellant had no assets under his control, no ability to flee the country, and 'no prior criminal

record')." *Munchel*, 991 F.3d at 1283. "Detention cannot be based on a finding that the defendant

is unlikely to comply with conditions of release absent the requisite finding of dangerousness or

risk of flight; otherwise the scope of detention would extend beyond the limits set by Congress." *Id*.

In determining pretrial detention for January 6 defendants, this Court added "guideposts" within § 3142 factors, for "comparative culpability of a given defendant in relation to fellow rioters." *United States v. Chrestman*, 525 F. Supp. 3d 14, 26 (D.D.C. 2021). These are:

(1) "whether a defendant has been charged with felony or misdemeanor offenses." *Id*.

Factors 2 - 3 examine the defendant's conduct before January 6 in furtherance of the offenses charged:

(2) "any indication that a defendant engaged in prior planning before arriving at the Capitol, for example, by obtaining weapons or tactical gear." *Id*.

(3) "a defendant's carrying or use during the riot of a dangerous weapon, whether a firearm, a large pipe, a wooden club, an axe handle, or other offensive-use implement, indicates at least some degree of preparation for the attack and an expectation that the need to engage in violence. . . ."*Id*.

(4) "Evidence of coordination with other participants before, during, or after the riot indicates that a defendant acted deliberately to amplify and assure the success of the breach of the Capitol." *Id*. at 26-27.

(5) "a defendant who assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct. . . ." *Chrestman*, 525 F. Supp. 3d at 26-27.

(6) "a defendant's words and movements during the riot reflect the egregiousness of his conduct.  Did the person threaten or confront law enforcement or celebrate efforts to disrupt the certification of the Electoral College vote? *Id*. at 27.

The AUSA may raise "prior arrests or charges brought against a defendant, even when those actions did not result in convictions . . . the Bail Reform Act permits consideration of evidence suppressed for purposes of trial when assessing 'the nature and seriousness of the danger' to the community that would be posed by the defendant's pretrial release." *United States v. Taylor*, 289 F. Supp. 3d 55, 70 (D.D.C. 2018). While the rules of evidence may not apply, information considered by the court should be *reliable* and relevant. *Id*. (Emphasis added).

### Assessing Flight Risk

Regarding flight risk, the D.C. Circuit "ruled that such a finding need only be supported by a preponderance of the evidence." *U.S. v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987) ((quoting *United States v. Vortis,* 785 F.2d 327, 329 (D.C. Cir. 1986)). To show preponderance of the evidence, the magistrate's memorandum must address significant counterbalancing factors presented by the defense including witnesses or testimony representations such as "family ties, employment, . . . length of residence in the community, community ties, . . . and record concerning appearance at court proceedings . . . that are relevant to the assessment of the risk of flight." *Simpkins*, 826 F.2d at 97. The memorandum cannot just regurgitate the Government statements as meeting preponderance of evidence while ignoring the defense counters.

## IV.      DEFENDANT ALAN FISCHER's BACKGROUND AND JANUARY 6

Mr. **"AJ"** Fischer is a 28-year-old, 100% permanently disabled, decorated USAF veteran. He flew 600+ hours as a C-17 Aircraft Loadmaster Journeyman, deployed overseas and stateside; with over fifty (50) Combat & Combat Support sorties. He is a veteran of Operation Enduring Freedom and Operation Freedom's Sentinel in Afghanistan, as well as Operation Inherent Resolve in Iraq, and Operation United Assistance in Africa. He flew as crew on

16

Aeromedical Evacuation missions, delivering wounded soldiers to Trauma Centers out of the Middle East combat zones. He was also frequently tasked with Phoenix Banner air missions in support of POTUS' movements throughout the US, China, and Cuba. The USAF entrusted him with sensitive materials and equipment.

In his role as a C-17 crew-member, he had significant responsibilities for the safety of the crew and passengers. He inspected, maintained, and performed troubleshooting on many aircraft systems, ranging from auxiliary power units to air turbine motors, including flight controls, landing gear, electrical systems, hydraulics, avionics, navigation, communications, and instrumentation. Among his awards for relevant purposes here is his Good Conduct Medal. After serving four (4) years on active duty, he completed his service contract with an Honorable Discharge in 2017.  AJ began college in NYC in 2017. He did not stay long because his family had relocated to Florida.

Mr. Fischer moved to Florida in 2018 to be close to his family. He was attending a prestigious school in NYC but chose family over that. In his own words, family is home. AJ's mother, stepfather, and sister, as well as his fiancée, are settled and live in the Middle District of Florida. The information presented on January 14, 2022 to Magistrate Judge Sneed that AJ had only lived in Florida for a short number of months, has no ties to the community, and was a flight risk - and as captured in her order denying bail - was wrong.

AJ has deep ties to his family and loves his job in Tampa. He worked while in school and graduated with a bachelor's degree in advertising from the University of Tampa in December of 2020.  He has always been a hard worker, beginning from his employment while in high school. The heartfelt and beautiful letters from AJ's mother and stepfather, whom he calls Dad, and from his sister are at Exhibit C.  His employer, a close co-worker, and a friend provide strong

character references in Exhibit D. He has a kind heart and assists people in need. As a Mortgage Broker, he works closely with Homes for Heroes, which was established shortly after 9/11 to assist firefighters, EMS, law enforcement, military, healthcare professionals and teachers in buying homes. He built an access ramp for a disabled man using his time and resources to help someone in need (Exhibit E).  Mr. Fischer pled guilty to one non-violent misdemeanor that is on his record. AJ is a Christian in spirit, words, and acts. He recently assisted a fellow inmate to climb out of depression and he leads prayer sessions in jail. AJ will comply with all bail requirements and has a strong support group to provide any assistance. He is not a flight risk, and he is not a danger to anyone.

Mr. Fischer can go back to his employment immediately upon release. His health can improve if he is able to return to physical therapy and his daily walking routine with his dog. The back and other injuries that made him 100% disabled by the Veteran's Administration require physical therapy and medication.  He suffers from Mast Cell Activation Syndrome, or MCAS. This is not just "allergies." MCAS causes repeated episodes of anaphylaxis. Worsening of the condition can be life-threatening. Certain foods trigger MCAS and someone with MCAS cannot eat just anything. The lack of physical therapy and the ability to walk miles daily have caused his back pain to progressively worsen such that standing unsupported is difficult if not impossible.

Mr. Fischer went to Washington D.C. where he attended Proud Boy socializing on January 5, 2021, and the rally the next day. He was in attendance of a peaceful assembly in Washington, D.C. - to both have his voice heard and warn fellow, more vulnerable protesters if Antifa and Black Lives Matter anarchists threatened attack. He brought no weapons. He had no plans to go near the U.S. Capitol. He wore no tactical gear. He led nothing. While he was at the

food truck area, people called out that the walking path was open. He entered the grounds behind others, where no signs or barriers indicated he should not enter.

The crowds outside the Capitol included senior citizens, mothers, and children. Mr. Fischer cannot unsee the brutality that arose out of nowhere. Peaceful protestors came under attack. These were not people accosting any police or barricades. The attack included the use of both lethal and non-lethal force against an unsuspecting, patriotic, flag-waving crowd standing away from barricades. He, like others, found himself under the assault of a barrage of flashbang grenades, rubber bullets, and other potentially deadly or dangerous projectiles – from apparently the hands of the Capitol Police. Exhibit F shows Mr. Fischer a way back in the crowd providing aid to a man who sustained a head injury from the police attack. His peaceful attempt to exercise First Amendment rights quickly transformed into what AJ categorizes as resembling being in war zones. Heading toward calls for help, he saw a female victim whose body was viciously beaten until lifeless by apparent police officers. He condones none of the physical violence that day. But Mr. Fischer neither confronted nor threatened any law enforcement officer.

Mr. Fischer was near a fellow lawful protestor when a rubber bullet penetrated and became lodged in the man's cheek – rendering him incapacitated and suffering significant blood loss. As a trained DOD Combat Casualty Care instructor, AJ instinctively began to triage this victim, along with the help of a Capitol Police officer who directed AJ to seek further medical assistance and safe relocation for this injured protestor. Unfortunately, this would not be the only injured protestor who would require AJ's assistance that day. Mr. Fischer's movements were largely related to listening for and responding to cries for help, and to assist injured people. Any portrayal of Mr. Fischer as someone who was trying to enter the Capitol building or attack police

is false. These points will be argued at trial, and require address here only based on the BRA factors and *Chrestman* guideposts.

Mr. Fischer's only plan for January 6 was to peacefully protest. He was unarmed. He did not carry any weapons onto the Capitol grounds. He brought no tactical vest, gas mask, helmet, communications, or gloves. He did not run away when fired upon with non-lethal bullets and chemical agents while he was aiding those around him. AJ's moral Christian character would not let him take the easy route to run away and leave injured people behind. Everyone who knows Mr. Fischer knows he would not riot, storm, crash into police, or assault the US Capitol. Mr. Fischer will show up in court. He will harm nobody.

Mr. Fischer maintains that he is "not guilty" while throughout he is supposed to be presumed innocent. He is a good, decent man who injured no person on January 6, 2021, and instead, came to the aid and assistance of persons injured by apparent excessive force exercised by those appearing to be police. In a normal America, a police officer pushing a man off a wall, where the likelihood was that he would die, would result in murder charges. The brutality that happened on January 6, 2021 cannot be unseen once witnessed. Mr. Fischer makes no excuses for anyone beating up police. He makes no excuses for anyone who damaged and destroyed property inside the building. And he certainly makes no excuses for the police brutality and excessive force he saw that has not been widely reported. He is sorry to have seen what he saw, and he prays for America and Americans.

## V.      ANALYSIS

### A.  Mr. Fischer is Eligible for Pretrial Detention but Should be Released

The indictment charges Mr. Fischer under 18 U.S.C. § 111(a)(1) and (b) for "Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon." The charge

meets criteria for a crime of violence under § 3142(f)(1)(A) based on the crime's elements contained in the statute. Further, the indictment charges 18 U.S.C. § 1752(a)(1) and (b)(1)(A) and 2 (Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon), § 1752(a)(2) and (b)(1)A) and 2 (Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon); and § 1752(a)(4) and (b)(1)(A) and 2 (Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon). Notwithstanding Mr. Fischer's "not guilty" plea and presumption of innocence, the charges also meet the § 3142(f)(1)(E) criteria for detention eligibility. The factors considered *infra* show he should not be detained although eligible.

### B.  Conditions That Alleviate Concerns Allow Release

The attached proposed order is for Mr. Fischer's release on conditions, although he will remain peaceable and show up for court conditions or not. The January 14, 2021 written order that denied bail lacked a showing of any particular, prospective, continuing threat to anyone. The Government in Tampa evoked felony charges that were dropped in a case in 2019 because of the evidence exonerating Mr. Fischer and police misconduct. A little shovel work would have dug these facts up. The Government showed no continuing threat by Mr. Fischer to anyone. Mr. Fischer was described as a violent person when the opposite is true. The magistrate accepted verbal allegations without a full recitation of evidence, gave no consideration to any release conditions, and gave no reasons why every possible release condition imaginable would not mitigate the faulty allegations of dangerousness and flight risk. (M.D. Fla. 8:22-mj-01043-JSS at ECF No. 7).

The character references in exhibits C and D more accurately describe Mr. Fischer. He is a Christian with a close-knit family, fiancée, employer, co-workers, and friends who love him

and see him often. Previously denied the opportunity to call witnesses and counter claims, Mr.

Fischer's exhibits to this motion show the true man rather than the inaccurate presentation made

on January 14, 2022. He requires no conditions for release but will accept and abide by

conditions. He prays this Court will consider his employment, medical appointments, physical

therapy, and the related ability for him to swim and walk to keep his back from near crippling

him as is currently happening in jail. The discussion *infra* contains more details.

### C. <u>The Magistrate's Order for Detention Should be Immediately Revoked</u>

In this case, the detention order fails to meet legal standards under the BRA. The legal

standard for an order denying bail requires that it must be written, contain specifics, and explain

why no conditions can allow bail. The order is deficient. The "hearing" was part of a first

appearance that lasted from 2:09 - 2:36 p.m. It took all of twenty-five (25) minutes to go through

standard initial appearance formalities that included introductions, reading of the charges, asking

the Defendant if he understood, asking the Defendant if he wanted counsel appointed, appointing

counsel, the "hearing" with oral arguments where the defendant was not asked if he wanted a

continuance as a right, supposed consideration of the arguments made by both sides, and the

verbal order by the judge. In twenty-five (25) minutes all actions just mentioned were done, with

the judge ordering the jail bars to be slammed shut on Mr. Fischer.

The requirement was for the magistrate to produce a writing with a particularized,

credible, ongoing, prospective threat to any person or community to show dangerousness. That

did not happen here. (M.D. Fla. 8:22-mj-01043-JSS at ECF No. 7). Flight risk must show various

factors that include lack of community ties, and resources and capability to flee, should the intent

exist. That was not only misrepresented to the court, but the magistrate ignored the defense

counter that Mr. Fischer had lived in the area longer than stated, had family and community ties,

and had no intent, resources, and means to flee. (M.D. Fla. 8:22-mj-01043-JSS, Transcript of

Oral Argument for ECF No. 6 at 13: 3-10). The order denying bail contains a generalized

proclamation, with no consideration of counterpoints made by the defense, and no discussion as

to why no conditions in the entire universe would allow bail. The written order merely stated:

> The weight of the evidence against Defendant, and the history and characteristics
> of Defendant, the Court finds that Defendant should be detained pending the final
> outcome of this case. The charges against Defendant involve allegedly violent
> conduct against law enforcement officers and the evidence proffered by the
> Government appears strong. Additionally, Defendant has resided in the Middle
> District of Florida for a relatively short period of time, possesses a passport, and
> traveled internationally recently. The Government also proffered that Defendant's
> background includes previous acts of violence against law enforcement officers,
> violent threats against others, and the use of illegal narcotics. Thus, the Government
> has met its burden of establishing by clear and convincing evidence that no conditions
> are available to reasonably ensure the safety of the community . . .The Government
> has also met its burden of establishing by a preponderance of the evidence that no
> conditions are available to ensure Defendant's future appearance at trial.

M.D. Fla. 8:22-mj-01043-JSS, ECF No. 7

The government never argued against or mentioned any reasons why release conditions

proffered by the defense would not work. It is false that Mr. Fischer only resided in Tampa for a

short time. He lived in Tampa since 2018. The defense statements and the Pretrial Services

Report together, as of January 14, 2022, made clear that Mr. Fischer lived in the Tampa area

since 2018, has no resources to flee, and has no international contacts. The defense highlighted

that Mr. Fischer's family lives in Tampa, yet the Government alleged AJ has no solid ties to the

area.

Mr. Fischer is not charged with a drug offense. The Government's presentation of

allegations about drug use, not supported by any criminal history, was irrelevant. Yet it was

given weight. The claim made in court was that Mr. Fischer texted someone that he had a

nosebleed, and somehow other texts confirmed drug use. (M.D. Fla. 8:22-mj-01043-JSS,

Transcript of Oral Argument for ECF No. 6 at 10: 10-22). Mr. Fischer had nose surgery due to a past injury and he gets nosebleeds. Now a nosebleed is evidence of cocaine use? How many Americans should be jailed because they get nosebleeds? Mr. Fischer states here that he did not ingest cocaine on January 6, 2021. Mr. Fischer never sold illegal drugs. He was not using cocaine when he turned himself in. No drug test was conducted. But because he could not prove innocence (with the wrong party here assigned the burden of proof), the Government said he must be guilty of using illegal drugs. If Mr. Fischer ever made jokes in private chats about drugs, those must be taken for what they were. But the nosebleed, along with unseen texts that may or may not be real, mentioned drugs and not in a joking way. The Government went on to violate Mr. Fischer's Sixth Amendment rights by alleging in open court that because Mr. Fischer declined to answer the Pretrial Services questions about prior drug use without an attorney present then he must be a drug user. The magistrate administered no admonishment. Although the rules of evidence may not fully apply to what was called "a hearing," the U.S. Constitution was and is not suspended as far as Mr. Fischer is aware.

     The complaint showed minimal evidence. It included screen shots from internet videos that are not authenticated, not reliable, and not credible. The screen shots in the complaint show none of the crimes alleged. Some pictures may show someone who looks like Mr. Fischer. The magistrate only saw the complaint screenshots which at best show Mr. Fischer was present on the Capitol grounds. The magistrate accepted verbal allegations and looked at no video during the proceeding. To the casual viewer, the YouTube videos that sourced the screen shots in the complaint are notably spliced and heavily edited. Sequences are altered and repeated throughout the videos. Pictures that purport to be of Mr. Fischer do not appear to be Mr. Fischer. Incredibly, in this case the "internet" without any question became 100% reliable. Meanwhile, no affidavit

was proffered as to video authenticity, and Mr. Fischer had no opportunity to conduct video forensics or to cross examine any alleged videographer. The claim of strong evidence was not supported by strong evidence.

Although many Americans were stunned in 2021 to watch evidence where  a U.S. Representative showed an altered Tweet on his computer and then submitted the false Tweet into evidence in an impeachment hearing, that is kindergarten play as to what can be done with account hacking, editing, adding and deleting content, and for video: using artificial intelligence and software to alter video. Any reader of this motion can be inserted into live video if there are just a few pictures of them. The January 6 crowd and change in light conditions make altering video from that day a teenaged skill level to insert anyone and change sequences. These matters can be addressed in discovery and at trial. But the claim that "the evidence is strong" is a matter for future determination regarding the internet video, and for that matter, police bodycam. The Government need not argue here any sensitive evidence it holds that will be part of discovery.

All Government evidence on January 14, 2022 consisted of verbal allegations made over the course of a few minutes. The Government wrongly claimed that Mr. Fischer has a violent history with a prior assault on police that included kicking and resisting arrest. Video shows quite the opposite, and the Government's agent should have obtained this. Mr. Fischer has no background of assaulting police officers. There was no past violent threat he made against others. The Government presented Mr. Fischer as having a Proud Boys tattoo, some Proud Boys paraphernalia and associating with Proud Boys to be strong evidence of crime. The First Amendment appears to have been suspended in that courtroom for freedom of speech and association. Government assertions are categorically wrong concerning felony assault; and the pictures at Exhibit G demonstrate why. There is over 250 MB of video that instead lays out

police misconduct and excessive force. The deposition transcripts for the officers and a key witness are at Exhibit H. A bystander who does not know Mr. Fischer submitted a statement (Exhibit I). While some screen shots are in the exhibits, this motion does not require conducting a trial that the County Circuit Court prosecutor dropped for good cause.

  It is not clear what allegations the magistrate used to designate Mr. Fischer as a threat, and which she used to claim flight risk. Did the Proud Boys' coins make him a flight risk? They have no value to fund flight. Or are the coins dangerous and illegal? Is there a law against being Proud Boy, or does the media assertion that members of the group are prone to violence carry evidentiary weight against Mr. Fischer? The government also claimed AJ was a flight risk because he had a passport, could be sentenced to five years, and years ago served on flight crews in the USAF while overseas defending America and it allies. The passport possession was easily remedied - yet no consideration was given by the court to its surrender, despite the defense raising that as a condition.

  The Tampa court proceeding, and the order, made the BRA a nullity (having a passport not recently used will land one in jail; and despite ten years as the BRA standard for serious potential flight risk, now any amount of potential felony prison time means bail should be denied). The order turned the United States into Turkey, where all in the military who travel for duty and may have politically dissenting views in private can be arrested and jailed without bond. The Magistrate gave no consideration to defense objections and counterpoints - which are required to be in the writing that denies bail. The Government and Magistrate never explained why no conditions exist that could allow bail. The legal standards established by *Salerno*, *Munchel*, *Nwokoro*, and others were on holiday outside Florida during the proceeding on January 14, 2022.

D.  **Nature and Circumstances of the Alleged Offense**

It is here the ***Chrestman* guideposts** seem to apply:

1.  The offense charged consists of five felonies and two misdemeanors. The charges for entering and remaining on restricted grounds, where Mr. Fischer was not aware of entry onto restricted grounds, add "with a deadly or dangerous weapon" language.  The "deadly and dangerous weapon" language, added to three misdemeanors to make them felonies for prison time, allege use of a chair, traffic cone, and pole-like object. The charges are serious and Mr. Fischer's claim of "not guilty" is loud. The discussion above and *infra* addresses apparently weak and incorrect verbal evidence claimed to support the charges and denial of bail. Standing alone, the charges in the indictment weigh in the government's favor. But at this time, what the US Attorney presented to sway the grand jury to indict, and the words used inside the grand jury room, remain secret. An indictment alone does not change the presumption of innocence.

2.  Mr. Fischer conducted no planning before arriving at the Capitol. He never intended to go to the Capitol but was among a group at the rally that on the spur of the moment decided to walk the march route. He brought no weapons. His only planning was to schedule travel to and from D.C. He wore no "tactical" gear such as vest, helmet, goggles, gloves, or communications. He was dressed in civilian attire. This guidepost favors Mr. Fischer's for bail.

3.  Mr. Fischer is accused of carrying a deadly or dangerous weapon, but he brought no such thing. He planned nothing besides a peaceful, fun day. He had no expectation that there would be violence on the Capitol grounds because he never expected to be near the capitol grounds. He was concerned that Antifa and BLM might attack the vulnerable marchers because someone set out the rumor days before the rally. There were no attacks he was aware of at the rally. His Proud Boys group march to the Capitol was not to seek violence. His

participation was at most in comradery and additionally was a peaceful form of legal First Amendment speech that can in hindsight (being that it was unplanned) be seen as peaceful deterrence against Antifa and BLM violence. We will never know because Antifa and BLM either never showed up or they were deterred as a matter of fortuity.

Mr. Fischer's march that ended by the food trucks outside the Capitol grounds was a protected form of First Amendment speech. Mr. Fischer is not violent and sought no violence. Mr. Fischer was not out to cause himself further back or neck injury. Instead, while among a peaceful crowd on the Capitol grounds, AJ was attacked by police deadly and dangerous weapons. A police projectile that brushed his ear would likely have killed Mr. Fischer if it had hit him in an eye or in his forehead.  This *Chrestman* area weighs in Mr. Fischer's favor here for release on bail.

4.  Mr. Fischer planned and coordinated nothing regarding the Capitol or entry into it. He ended up on the grounds only because while hanging around the food trucks, groups of people passing by said the path leading onto the grounds was open. In his mind he was nothing but a visitor when he entered - with no signs warning of a restricted area and no barriers blocking the path that led to the grass. He broke no barriers, windows, or doors. He did not enter the Capitol building proper. The only coordination he made was with a law enforcement officer to determine where to move or send an injured man. His speech with the officer was professional and respectful. This *Chrestman* guidepost weighs in Mr. Fischer's favor for release on bail.

5.  There was no leadership, assumed or assigned, by or to Mr. Fischer to assault anyone or encourage violence by or against anyone. He did not yell out telling people to do anything against police or the building. There was no braggadocio by him before, during or after the horrible turn of events. Screen shots and video can be presented at trial showing that Mr.

Fischer spoke out against any violence against Officer Fanone who was pushed into the crowd near Mr. Fischer. Mr. Fischer was amidst peaceful protestors. Then hell broke loose when police began attacking an unsuspecting crowd of seniors, mothers, children, and pet dogs who were with their peaceful owners. Mr. Fischer moved to tell protestors with their children and pet dogs to leave because the chemicals and projectiles could kill or badly injure the children and dogs. He knew adults would make their own decisions for themselves but realized that people with children and dogs were in shock at the attacks on the crowd. His concern continued for providing aid to injured persons. If police and instigators in the crowd working for any part of the government wanted to start a riot, they executed all the needed steps and appear to have succeeded. The police actions on January 6 were the opposite of what a trained and disciplined force would do to maintain order. The police fired randomly into the crowd without warning. They beat unarmed people. The words calling the police traitors and cursing them in videos are presented out of the context where police first used chemical agents, shot at, and beat protestors. Mr. Fischer did not run to any police line to confront or curse them despite their use of excessive unnecessary force. This *Chrestman* guidepost weighs in Mr. Fischer's favor for release on bail.

      6.  Mr. Fischer was a shocked bystander as he observed grenades, rubber bullets and projectiles being fired directly at and injuring innocent people. His movements were to the aid of injured people and the cries for help. During the course of events, he saw a woman being beaten to death. Trained in emergency response, AJ tried to move forward to assist. The press of the crowd made his forward movement difficult and took control of his direction of travel. Mr. Fischer then saw that the woman was dead. He said nothing about attacking anyone or breaking into anywhere. He tried to aid people in distress. AJ was shot at and maced in the face when trying to aid the injured. He never was "on a front line" making threats or physically confronting

any law enforcement officers. Throughout, the police used no loud-speaker system to direct anyone off the grounds. The police on the upper terrace levels acted as if they were at an amusement park shooting gallery when they fired into the crowd that was well back from any police line. That AJ did not run away is not grounds for jailing him. Mr. Fischer was trained to assist, and his training went into effect, amidst the shock from what he was witnessing. Protecting senior citizens, women, and children, and aiding the injured, used to be the norm in America.

Mr. Fischer remained outside the building, and whether he was briefly pushed into a west side tunnel or stepped across an invisible line in responding to cries for help does not alter the fact that he did not attempt to or enter through any broken windows or open doors to go inside the building or walk its hallways. He carried no weapons or dangerous items with him onto the Capitol grounds. He didn't make posts on or after January 6 to Facebook or other social media websites glorifying any actions. He did not livestream any commentary of events. Mr. Fischer has no social media presence. He was only a member of a private Telegram chat group where he said little.  Mr. Fischer cannot unsee the police excessive force he witnessed on January 6 - or the faces of those who were injured and in pain. He should not be held in jail for not running away where he instead maintained his composure to try to reach those needing aid. He glorified none of the horror that happened on January 6, 2021 in posts or comments. This *Chrestman* guidepost weighs in Mr. Fischer's favor for release on bail.

In summary, the alleged charges are serious; the weight of the evidence is arguable; Mr. Fischer is presumed innocent; assessment of the remaining *Chrestman* guideposts all weigh heavily in Mr. Fischer's favor for bail when compared to others; and the rest of the § 3142 factors for consideration are in his favor.  Since *Chrestman* establishes comparative factors, then under

the Fifth Amendment's Equal Protection clause, given bail release of others with past felony

criminal conviction histories and similar or greater charges for January 6, where overall Mr.

Fischer is similarly situated to those released, he can be placed on bail under select § 3142

reasonable conditions contained in the proposed order.  It is fair and just for Mr. Fischer to be

released from jail.

### E.  <u>History and Characteristics of Mr. Fischer</u>

Section IV above addresses many of the characteristics of Mr. Fischer, who is a

Christian by words and deeds.  He has strong family ties in the Middle District of Florida, a

loving fiancée, solid employment, strong community ties, and has resided in the Florida Middle

District for over three and a half years. Despite the allegations made by the Government at the

January 14, 2022 proceeding, he has no recorded drug or alcohol abuse history.  He never sold

illegal drugs. He honorably served this nation in the USAF. He is a 100% disabled veteran.

Unfortunately, while in the service he faced disciplinary action due to a faulty drug test.

He was acquitted and the details of what was wrong with the specimen collection or lab

processing were the military's problem to fix. AJ was subject to regular testing due to his air

crew duties and had a single test problem over his four years of service. Most unit commanders

should know it is not uncommon for such tests to be wrong. Units can control their specimen

collection but there are sometimes problems with chain of custody and contamination anywhere

along the line.  The labs are a different story where time and again false positives have been

returned because of problems if not corruption at labs. The FBI has had multiple forensics and

DNA lab scandals. Drug labs across the country have been caught falsifying test results - where

people went to jail for false positives and lab problems - more than anyone will admit. It would

be deliberately irresponsible for anyone to falsely infer Mr. Fischer had a drug history because of that single event where he was fully exonerated.

The allegation made by the Government that Mr. Fischer's text about a nosebleed being equal to his use of cocaine on January 6 made an unsupported leap of logic. He had a nose injury that required surgery in the past. He gets nosebleeds. Did the chemical agent gas used at the Capitol cause excessive bleeding for a lengthened time? That is as or more likely than the Government's default to a conclusion that a nosebleed must equal cocaine use. The relevance for why this was presented to make AJ a danger or flight risk is unclear. Was the Government hoping the judge would consider Mr. Fischer a dealer who needed to be kept off the streets? Then why were regular drug tests and a curfew among other mitigation conditions not addressed on January 14, 2022? The unproven assertion of drug use had no legitimate purpose besides being unfairly prejudicial.

When Mr. Fischer received notice that he should turn himself in because there was an arrest warrant, he voluntarily surrendered. He has not been convicted of any felonies. He was charged with one felony based on a police report where the officer making the allegations in the police report then admitted in deposition that he did not witness or confirm the events in the police report. The County District Attorney's Office knew the evidence showed AJ would prevail at trial and be acquitted. The District Attorney's Office on the eve of trial offered a misdemeanor plea to Mr. Fischer so that the DA could get out of an embarrassing trial where evidence showed that no felony happened. Mr. Fischer wanted to go to trial. He was swayed by his attorney to move forward with his life and that this would be only a minor thing in his record.

The Government chose on January 14, 2022 to present its own unsupported interpretation that Mr. Fischer was guilty of an incident on July 28, 2019 and was allowed to

plead to a lesser charge. (M.D. Fla. 8:22-mj-01043-JSS, Transcript of Oral Argument for ECF No. 6 at 9: 13-21). Nobody asked Mr. Fischer if he wanted to present evidence or counter the Government's claims. As discussed *supra*, all this took place in mere minutes as if the Government were reading from a verified book of proven facts.

In the case, Mr. Fischer was arrested after a surreal set of events on July 28, 2019 in Ybor City in Tampa. Any legitimate investigation by the Government's agents prior to court presentation would have uncovered Tampa police misconduct, and perjury in a police deposition with false police reports. There were two cases - Mr. Fischer's and one other that contained evidence of the police misconduct at the same time. Both defendants' felony charges were dropped to avoid the spectacle of open court testimony and evidence that showed police misconduct and excessive force while police let thugs batter and nearly kill Mr. Fischer for sport. The prosecutor called the plea deal meeting with Mr. Fischer just prior to the start of jury *voir dire* when the County DA's Office assessed that video evidence and witnesses would exonerate Mr. Fischer. The prosecution knew a trial would show Tampa policemen's excessive force, report falsification, and potentially deposition perjury. The prosecutor did not want to go to trial after witness depositions were taken and video evidence showed Tampa police misconduct and excessive force. The truth is contained in the screen shots of video and where witnesses would testify about brutal police actions against Mr. Fischer. (Exhibits G – I).

The truth is that at the end of July 2019 a Tampa horse-mounted policeman allowed assailants on the street outside a club in Ybor City to choke and beat, Mr. Fischer, who was knocked unconscious and barely able to walk when he partially came to. The horse-mounted policeman claimed he saw Mr. Fischer being ejected from the club but video shows the officer had his back to a ruckus and turned to face it upon hearing noise. The officer said no other police

were present, but two police cars were parked feet from him. The officer rode up to where Mr.
Fischer was being beaten and used his horse to drive AJ into a sign and tree. Mr. Fischer put his
hands out in self-defense against this further assault and grabbed a pole to steady himself. The
mounted officer then rode into the street and watched as four men held, choked, and beat Mr.
Fischer. He intervened again when a crowd formed and began to pull the men off of Mr. Fischer.
The officer again drove his horse into Mr. Fischer who was semi-conscious, and let the assailants
walk away after beating Mr. Fischer in the public space. Video and screenshots show the
brutality subsequent where Mr. Fischer was dragged by the mounted officer across the street,
then was punched by the officer as three to four officers ran up to tackle Mr. Fischer.  Mr.
Fischer was pinned face down to the ground with two policemen putting their weight on his neck
and back/lungs. Mr. Fischer does not appear conscious while he was handcuffed and hog-tied.
The interference with his breathing by the officers lasted for over two minutes and was recorded
on street surveillance camera video.

  In this case, the misdemeanor plea deal was to the benefit of the prosecutor who had
just downgraded all charges against a woman pushed by a policeman and then driven into by the
officer.  The prosecutor needed this police scandal to go away and remain outside of a public
courtroom, especially after a recent September 2019 murder in Ybor City on the same street
where the events involving Mr. Fischer happened.  As backdrop for Government representation
on January 14, 2022 to paint Mr. Fischer as a violent person who assaults police: from 2017 to
2019 the Tampa Police Department (TPD) had a 24% increase in use of force during arrests, and
a 223% increase in the use of chemical agents. TPD had a 28% increase in officers pointing their

guns at people.[3] "Use of severe force, like guns, tasers, and batons against suspects decreased, while the use of less severe measures like punches, takedowns, and chemical agents went up."[4]

When the incident started Mr. Fischer was on a phone call near a club entrance where his girlfriend had entered to look for her sister. He was not drunk. It was near closing time (around 2:00 a.m.). He doesn't remember much clearly because out of the blue he was dragged, beaten, assaulted by a horse, thrown to the ground, choked, and beaten unconscious. In addition to the events in front of the club, after being dragged by the neck of his T-shirt across the street by the horse-mounted officer, upon release AJ started to fall into the horse, was barely conscious and was immediately punched in the head by the officer and dragged to the ground by three to four policemen. Witness video with audio contains witnesses saying the police were going too far and there was no resistance.  The crowd became agitated at watching the excessive force. One man sat on the ground in the street to be able to video the brutality. The mounted officer rode to him and violently ran him over with his horse. The mounted officer's deposition (Exhibit H) stated that he meant to just brush the person's shoulder, but the horse drifted a little too far right. The video shows the deliberate square-on attack with the horse. People who tried to come to AJ's aid were threatened with arrest and yelled at by police. AJ was sprayed in the face with a chemical irritant and was then dragged into a police car after having his breathing restricted by the weight of two policemen on him for over two minutes.

After the depositions, where reportedly the court recorder was taken by emotion at the testimony of AJ's girlfriend, and given the combined video evidence, the prosecutor called the

---

[3] Creative Loafing Report, "Tampa Police Department's worst moments," December 20, 2021, https://www.cltampa.com/news/tampa-police-departments-worst-moments-of-2021-12546813 last checked 3/1/2022.
[4] WFLA News Tampa Florida, "Data shows Tampa Police Dept. use of force on the rise," June 19, 2020 report, https://www.wfla.com/8-on-your-side/data-shows-tampa-police-dept-use-of-force-on-the-rise/ last checked 3/1/2022.

plea deal meeting. He was very clear to Mr. Fischer that he was not willing to prosecute alleged

felony assault. AJ did not want to but agreed to the plea so that he might get on with life.

As a note, and as alluded to above, in September 2019 in the early morning hours on

7th street (the same as where Mr. Fischer's incident happened and near the same time), a

promising and innocent man named Dyante Neal was murdered. "Video from that night showed

Neal talking to two men . . . A man got in his face. Neal appeared to be trying to avoid a conflict

... A crowd began to form. [A man] . . . approached Neal from behind and hit him in the side of

his face. Neal fell, his head striking the pavement."[5] Neal died 5 days later. Perhaps if the police

had stopped the type of assault and battery that happened to Mr. Fischer, instead of piling on and

beating him while openly letting criminals flee, young Dyante Neal would still be alive.

Another mistaken representation presented by the Government on January 14, 2022

was that Mr. Fischer had beaten a man, held a gun to his head, and threatened to kill him in May

2019.  The May 2019 falsely alleged incident was reported by the Government on January 14,

2022 in court as true and wrongly portrayed Mr. Fischer as having committed aggravated assault.

A halfway reasonable person, who would have to dig into Tampa police reports at the precinct to

unearth this fairy tale to begin with, would have seen it as just that - a fabrication that the police

did not waste their time on after the alleged victim sobered up and realized he was going to be in

criminal trouble for submitting a false police report. The affidavit countering the false report is at

Exhibit J. In short, a man at a social gathering at another man's residence was very intoxicated

and humiliated after his drunken advances were turned down. AJ and his fiancée were present

and then left with no violence having occurred. The accusation about a gun is not only

discredited by the fact that neither AJ nor his girlfriend owned or had a gun in their possession,

---

[5] Tampa Bay Times, "One punch in Ybor City homicide nets seven years in prison," May 26, 2021.

but also by the fact that the other witness "Zach" (the tenant whose residence where the tale allegedly happened) never corroborated the story. The police never interviewed the two witnesses that the fake victim said were present.

The tenant for the apartment where the incident was alleged to have occurred was not a world traveler who could not be contacted and interviewed at the time. When the police were unable to contact him the first time, it appears they never tried again. The police never tried to view the doorbell camera video. The police never interviewed Mr. Fischer's girlfriend who was listed by the false accuser as present. January 14, 2022 was the first time that Mr. Fischer and girlfriend were ever aware such a report had been filed.

The Government's presentation of this without allowing the record to be completed, where the person filing the report withdrew it, was irresponsible. It was a stretch to say the complainant withdrew the report while inferring he was afraid of AJ coming after him. The report said the alleged victim was unsure of what to do and was afraid of pressing charges but if he didn't (and the rest is redacted). The Government implied unstated words to convey that AJ was the cause of fear. The fake accuser's fear of going to jail for a false police report was just as likely to the man when sober. The Government stated AJ committed aggravated assault when the police never took it seriously enough to investigate beyond a very bare minimum. The report was not shown to the defense. No affidavit accompanied the allegations.

## F.   Weight of the Evidence is Either Weak or at Best Arguable

The discussion *supra* describes Mr. Fischer's experience at the Capitol grounds. Very serious charges have been levied where no injury is claimed. There are screenshots that at most place Mr. Fischer on the Capitol grounds. If the allegation is that he went into the tunnel, was he trying to respond to cries for help? Was he pushed in? Nothing anywhere shows Mr. Fischer

directly confronting or threatening law enforcement. What has been provided is YouTube video that is worth about two cents of credibility without forensic analysis and videographer authentication under oath. The videos thus far show no assault (where intent is required), and no possession or use of a dangerous weapon by Mr. Fischer. One picture shows Mr. Fischer somewhere about fifty (50) or more feet away from an object in the air, potentially a chair. It is a physical impossibility that Mr. Fischer threw that object that high and that far in the air. In a poor video filled with spliced sequences, one reviewer said the object came from a direction that was at a 90-degree angle from where the person alleged to be Mr. Fischer stood. Mr. Fischer was present in a place initially he saw as allowable to be.

Mr. Fischer initiated no actions against the building or law enforcement.  He aided injured people. The drug use assertion because of a text about a nosebleed is below weak. The assertion in court that after having been arrested AJ would not answer a drug question without an attorney present is a violation of his Sixth Amendment rights. These assertions that were used to deny bail do not square with another January 6 defendant who went inside the building and then threw plastic chairs at police, missed, and then pled to a misdemeanor. In arguendo, with no claim the following is true, if Mr. Fischer threw a chair and hit nobody, why is he charged with multiple felony counts when Mr. Rukstales was not?

The evidence gathered during the search of Mr. Fischer's residence and presented by the Government in the detention hearing conveyed that a tattoo and possession of Proud Boys coins is evidence of crime. The Government statement was definitive in presentation. The magistrate made no objection to secret Government and FBI- created rules, where innocent items and self-expression under the First Amendment are now criminal. Mr. Fischer is not violent and loves America. While American patriotism may be considered unreasonable by globalist media and

political actors, it cannot be a cause for denying bail.  A segment of society that shuns God, makes testosterone in men a bad thing, and denies the biological science proving God created only two genders should not control the narrative whereby it is accepted by rational people that all members of a group formed for peaceful patriotic association are "criminals" and "gang members."

Because of the creation of a violent criminal history for Mr. Fischer where none existed, and the resulting singling him out from those similarly situated to deny him bail, indications are that the evidence is weak or arguable at best.

### G.   There is No Danger to Any Person or the Community That Would Be Posed By Mr. Fischer's Release - The Government Cannot Show Dangerousness to the Standard Required to Deny Bail

"A defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses *a concrete, prospective threat to public safety." Munchel* at 1279-80. (Emphasis added).  Referencing *Salerno*, *Munchel* noted that for dangerousness the threat must be a <u>continued</u>, <u>identified,</u> and <u>articulable</u> <u>threat</u> to the community or to another person. "[W]hether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant. *Cf. Nwokoro*. The Government must prove by "clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community.

In this case the Government used mistaken allegations and incomplete facts during the January 14, 2022 proceeding in Tampa.  Mr. Fischer has no history that portends any continued, identified, articulable danger to police, any authority, or any members of the community. Mr. Fischer respects authority as was shown by his good conduct over four years in the United States

Air Force and his surrender for this case. He discussed two bad interactions with police *supra*. Those do not define his support for the tough mission of police and other law enforcement. He understands from military service that poor unit or individual performance is often the result of poor leadership and training. He issued no threats to police despite two bad encounters and will continue to obey the law and law enforcement. The support letters regarding his upstanding character and peaceable nature are at Exhibits C and D. He wishes nobody ill-will. He trusts this Court will be fair and just so that he may peacefully work, have his physical therapy and attend to his health, be with his loved ones, and participate in his defense.

### H.  <u>There is No Flight Risk and Detention is Unwarranted</u>

The legal standard is a "preponderance of the evidence" showing a risk of flight. Mr. Fischer is willing to surrender his passport even though he has no overseas contacts and no means to flee. He has no "underground Proud Boys railroad."  Mr. Fischer's family, fiancée, loved pet dog, work, close friends, and life is in Florida. He trusts in the justice system. Mr. Fischer prays to God for strength in the days ahead and has no cause to flee instead of doing work in his defense. Those factors outweigh the Government's concern that the possible sentence could in others cause flight. Mr. Fischer will appear in court and will meet the conditions of his release if granted as he prays.

### VI.        SUMMARY

Many January 6 defendants with comparable (or worse) offenses alleged and charged as was Mr. Fischer, and even some with significant criminal histories, have been released on bail. "When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976). This requirement has traditionally been referred to as 'procedural' due

process." *Salerno*, 481 U.S. at 746. Mr. Fischer, presumed innocent, is a candidate for release. Under § 3142(c) the Court has a variety of conditions, including any novel ones it may create, to allow Mr. Fischer to attend to his health through physical therapy and medical appointments, continue his employment, and be engaged in his defense preparation in Florida where his attorney is located should the Court have concerns about safety or flight risk. Denial of bail means the Court must find that curfew; restrictions on travel; mandatory calls to a Pretrial Services officer; relinquishment of passport; consent to relinquish money or assets if any conditions are violated; and any other restriction imaginable will not ensure the defendant's presence or the safety of others. *U.S. v. Simpkins*, 826 F.2d 94 (D.C. Cir. 1987) referencing Section 3142(f).

In the humanity of granting bail, the Speedy Trial Act is essentially suspended due to COVID as the D.D.C. attempts to protect the health and well-being of all parties, judges, staff, witnesses, and juries. A trial now requires three courtrooms instead of one. Under these conditions, jailed defendants face indefinite pretrial detention that was not contemplated in the Bail Reform Act or by the U.S. Supreme Court in *Salerno* where it found the Act contained the safeguard of the Speedy Trial Act. Mr. Fischer is not dangerous and poses no continuing, articulable threat to any member of the community.  He and his family guarantee his presence for proceedings. He is fleeing nowhere. He will remain close to his loving family. Mr. Fischer will remain employed. Mr. Fischer will be able to attend to his health. He will work with his attorney to prepare his defense in Florida.

The dissent in *Salerno*, where the Bail Reform Act was upheld, provides a reminder that our Constitution was written by Founders who fled from the threat of being jailed indefinitely without trial, and that denial of bail must be the exception:

This case brings before the Court for the first time a statute in which Congress declares that a person innocent of any crime may be jailed indefinitely, pending the trial of allegations which are legally presumed to be untrue, if the Government shows to the satisfaction of a judge that the accused is likely to commit crimes, unrelated to the pending charges, at any time in the future. Such statutes, consistent with the usages of tyranny and the excesses of what bitter experience teaches us to call the police state, have long been thought incompatible with the fundamental human rights protected by our Constitution.

*Salerno*, 481 U.S. 739, at 755-56. (J. Marshall, joined by J. Brennan, dissenting).

## VI.        CONCLUSION

WHEREFORE, for the foregoing reasons, and any others which may appear in our reply brief or if the Court wants a hearing to answer questions on this matter, and any others this Court deems just and proper, Defendant Alan Fischer through counsel respectfully requests that he be released with the conditions shown in the proposed order.

Dated March 2, 2022                         Respectfully submitted,

                                            /s/ Carolyn A. Stewart
                                            Carolyn A. Stewart, D.D.C. Bar No. FL0098
                                            Defense Attorney
                                            Stewart Country Law PA
                                            1204 Swilley Rd.
                                            Plant City, FL 33567
                                            Tel: (813) 659-5178
                                            Email: Carolstewart_esq@protonmail.com

**CERTIFICATE OF SERVICE**

On this **2nd** day of March 2022, a copy of the foregoing was served upon all parties as forwarded through the Electronic Case Filing (ECF) System.

/s/ Carolyn A. Stewart
Carolyn A. Stewart
Defense Attorney