# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 1:22-CR-00011 (RJL) |
| ) | |
| ALAN FISCHER III, ) | |
| ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT'S OMNIBUS MOTION TO DISMISS COUNTS ONE, THREE, SIX, NINE, AND THIRTEEN THROUGH SIXTEEN OF THE SUPERSEDING INDICTMENT

COMES NOW the Defendant, ALAN FISCHER III, by and through undersigned counsel, and respectfully moves this Court pursuant to the Federal Rules of Criminal Procedure Rules 7 and 12, to dismiss Counts One, Three, Six, Nine, and Thirteen through Sixteen of the Indictment at ECF No. 54. The Government opposes. Mr. Fischer states the following in support of this request:

## I.    BACKGROUND AND FACTS

The charges from this case arise from the events that took place on January 6, 2021 at the U.S. Capitol. Mr. Fischer was indicted on serious allegations that involve separate counts for felonies and misdemeanors on the U.S. Capitol grounds. Mr. Fischer denies guilt for the crimes alleged.

No trial date is set. Discovery is still in progress (with video, audio, and document discovery still being posted by DOJ's Capitol Siege Unit).

The Court's subsequent minute order on June 30, 2023 directed that all pretrial motions be filed by June 30, 2023.

Defendant Johnson by his attorney and AUSAs Gordon and Lederer signed a plea deal, and on June 20, 2023 requested a plea hearing be set. ECF No. 115.

Mr. Fischer, an Air Force veteran, was and is trained in certain combat lifesaving and first responder skills. He has no prior felonies yet is overcharged with a felony in every count of the Indictment. On January 6, 2021 he entered the west side of the U.S. Capitol grounds where he believed he had permission and a right to be located to exercise his First Amendment right to speech.

Upon his arrival, there were no signs, barriers, or cordons to indicate the west area was closed by the United States Capitol Police (USCP) for any reason. There were no signs, barriers, or cordons to indicate any area was "restricted" under 18 U.S.C. Section 1752 for the U.S. Secret Service's (USSS) protection of anyone, to include the Vice President or his immediate family.

Mr. Fischer saw no USSS or USCP members when entering onto the west grounds of the U.S. Capitol to observe a rally and protest.

He did not see the now infamous Ray Epps crew's breach of the bike racks on the path that was the main artery for grounds' access from the Peace Monument area onto the west side entry path. Video shows a few bike racks that were minimally manned by approximately three to five USCP officers from morning until the 12:53 p.m. breach, even given that the USCP knew at least 30,000 demonstrators would be headed to that point.

There were no signs advising people to go to any approved area or alternate channel for First Amendment speech. The Vice President was not scheduled to be near the west lawn, which is an approved public forum according to the 2012 area demonstration map signed by the USCP board. The entire west lawn is not next to the area for the inauguration build-out.

Construction crews were working on the west side's inauguration build-out until ~12:40 p.m. on January 6, 2021. None went through any USCP or USSS security screening (such as searches, metal detection, or X-ray).

Mr. Fischer did not recall seeing or know that any snow fencing previously standing partway up the west lawn - west of which was an approved demonstration area according to official Capitol maps dating to 2012 - had been cut and pulled down by USCP, affiliates, and other actors as can now be seen on video.

The Vice President was never scheduled to temporarily visit any outdoor area of the U.S. Capitol on January 6, 2021. He was dropped off at a door by 12:45 p.m. and entered the U.S. Capitol building. His motorcade parked under an archway on the east side of the building. The visit schedule transmitted to the USCP from the USSS indicated that Mr. Pence and entourage would only be inside the building.

As occurred at the Ellipse rally, the standard USSS requirement for an outdoor area restricted under 18 U.S.C. Section 1752 for protection of the President, Vice President or other protected persons under the law includes a security screening point with searches and metal detectors.

The USCP leadership approved and permitted (signed by deputy Yogananda Pittman and Chief Sund) six or more rallies and demonstrations both on and next to the U.S. Capitol grounds for January 6, 2021. None of the permits were ever cancelled. "Flyers" for the many rallies were disseminated widely across the internet. No security screening points were established on the outdoor U.S. Capitol grounds by the USCP or USSS for these rally areas or anywhere else.

The "first-come, first-serve" designated press areas on the east and west of the U.S. Capitol grounds remained open (for anyone claiming to be press with no USCP or USSS security screening point) while a large media mob that never went to the Ellipse rally roamed the U.S. Capitol grounds all afternoon on January 6, 2021 without any security screening - and no arrest. A press pass, unverified or not, is not an authorization for access listed in Section 1752.

The USCP issued a press release on September 3, 2020 announcing that the area near the inauguration stage build-out on the west side of the Capitol would be "restricted" until its removal in February 2021. The area involved *was not* "restricted" under 18 U.S.C. Section 1752. Anyone reading the press release would understand that any claim that the months'-long closure equated to a Section 1752 "restriction" for the protection of a USSS *protectee* is an absurdity. The word "restricted" in normal English by any dictionary means "closed." The west grounds "restriction" with an unknown scope to date, was for safety of workers, pedestrians, tourists, and the building.

The USCP Operations channel radio communications (not released to the public and under protective order) included transmissions that bicycle racks had been moved by daily pedestrians or cyclists overnight and by the morning of January 6, 2021. Those locations had not been under guard or observation. The access paths along the entire west side, north, and south sides were not all closed to walkers and joggers during the inauguration stage build-out period prior to January 6, 2021. Nobody was denied access to the east plaza and all paths, and nobody except for January 6 defendants was hunted down and arrested for entry into a Section 1752 restricted area prior to or for allegations about January 6, 2021.

The September 3, 2020 news release stated:

> In preparation for the 59th Presidential Inauguration on January 20, 2021, beginning on Monday, September 7, 2020, access to the West Front of the U.S. Capitol will be restricted to allow for the safe and secure construction of the Inaugural platform, stands, and other infrastructure necessary to support the event. The Capitol Police Board issued a Board Order closing the following areas of the West Front from September 7, 2020 through February 28, 2021. The United States Capitol Police will deny access to anyone not authorized to be within the restricted area.

USCP 2020 Press Release[1]

---

[1] Found at https://www.uscp.gov/media-center/press-releases/access-west-front-us-capitol-restricted-inauguration-platform   (Last visited July 23, 2023).

No press release was issued to close the entire east side of the U.S. Capitol prior to or for January 6, 2021. No area of the U.S. Capitol grounds was ever designated "restricted" by any official authority in either the USCP or USSS prior to January 6, 2021 as being restricted under 18 U.S.C. Section 1752 for protection by the USSS of any protectee.

The entire west side was visibly designated "closed" with little wooden pickets, string, and signs that read, "area closed" prior to 12:53 p.m. on January 6, 2021. Signs and pickets were torn down by unknown persons, shortly after the Ray Epps breach event.

By a deliberate decision by the House Speaker (who was overall responsible for security), no 8 foot fencing was placed anywhere near or around the U.S. Capitol for January 6, 2021. The Speaker had warned Democrat members of the House to use the tunnels from the executive buildings to enter the U.S. Capitol to avoid protestors outside. Protestors were expected, and no House Speaker's or USCP authority's instructions indicated that any protests outside would disrupt the Electoral Count inside. No trial testimony to date indicated protests outside disrupted any specific government business inside. No testimony to date indicated that any protests' sounds made any work impossible. To the contrary, government witness's testimony stated that the door and window breaches, with unsearched protestors inside the building led to Congress's evacuation and Electoral Count time delays.

No dispersal order was ever given to Mr. Fischer or the crowd that was present on the west grounds on the afternoon of January 6, 2021. While he was present, the USCP did not use any existing outdoor public address system, nor did they bring in any effective, loud, public address system to order the crowd to disperse prior to 6:00 p.m. on January 6, 2021. The USCP Operations channel communications (still under protective order) show that on or about 6:00 pm. on January 6, 2021 was the first time the USCP-controlled outdoor public address system was used to order

protestors off the grounds. No USCP officer as much as used a loud megaphone to order dispersal, or took dominion over the photojournalist tower. The "tower commander's" megaphone was never commandeered to order dispersal for the four plus hours he was telling people to go to the building.

The photojournalist tower's multiple, wide-area, CCTV, HD cameras that captured the majority of ground level activity were turned off at 1:05 p.m.

With no dispersal order or justification, the USCP on the upper west terrace began randomly and illegitimately shooting rubber bullets at the heads and upper bodies of peaceful crowd members not near the police line by approximately 1:07 - 1:17 p.m. The USCP also shot flash grenades at peaceful protestors nowhere near the police line, where two men subsequently died of heart attacks or strokes after being targeted. By ~1:30 p.m., crowd members at multiple locations not near the police line had been set afire or suffered penetration wounds from the excessive force use of non-lethal munitions, that were applied outside any legitimate standards.

Yelling and shouting at police ensued. The D.C. Metropolitan Police Department (MPD) who arrived at or after 1:14 p.m. included Lieutenant Thau who ordered continuous non-lethal fires, called for more gas, had one of his subordinates shoot where the tear gas shot was into the wind and covered the unmasked / unprotected police line.

Given crowd line of site and density, only those with visual line of sight or who were shot at could ascertain what had happened. With no dispersal order, and crowd line of sight obstructions, nobody knew what had happened to cause the police to shoot anyone or anywhere.

Previous cases show the government and many judges stated that just smelling tear gas is notice to disperse. There is no such law. Without any dispersal order nobody knew they could not be present. Nobody knew what caused police to start shooting at peaceful protestors.

The USCP and MPD pushed the crowd back from the stage build-out. They established a line right by the photojournalist tower.  By 2:00 p.m., simultaneous things happened to cause the police to stop guarding the ground level and the steps leading to the lower west terrace. LT Thau of the MPD through his associate fired tear gas at the line of unprotected police officers, causing them to have to go decontaminate and regain their orientation. LT Johnson of the USCP on the east side issued a pullback order. USCP Operations from the command center issued a lockdown order and LT Glover of the MPD ordered police officers on the west into the building.

Uncontrolled access to the lower west terrace did not occur until after the near-simultaneous events at ~ 2:00 p.m. There was no building entry by protestors (through broken windows or doors then opened from the inside doors) until ~2:14 p.m. on the west and later on the east side.

Pipe bombs, believed to be and initially reported as operable, were found outside both the RNC and DNC headquarters near the U.S. Capitol on January 6th. The first pipe bomb was discovered around 12:30 p.m., and the second  pipe bomb was found by ~1:30 p.m. No precautionary, outdoor dispersal orders were issued for the U.S. Capitol grounds.

The Vice President's motorcade, on the east front side of the building, lined up (on undisclosed orders) in the center of the plaza by 1:50 p.m. for a departure. The motorcade departed the east plaza by 1:59 p.m. and went to an underground parking garage, with its concrete loading dock under the east plaza on the Senate side. The underground tunnels and parking garages are part of the U.S. Capitol building according to Architect of the Capitol documents.  The Vice President departed the Senate chamber for his office sometime around 1:12 p.m. and subsequently

with family was walked down by the USSS through the building's tunnels to the loading dock starting by around 1:15 p.m.  He never entered the outdoors area of the U.S. Capitol grounds.[2]

No "civil disorder" was ever declared by the USCP or any law enforcement authority on January 6, 2021.  The MPD issued and simulcast a declaration of a "riot." A riot and a civil disorder are two distinct crimes under federal law.  No distinction was made whether the "riot" was called under local D.C. law versus Section 231(a)(3) federal law given that the MPD initiated the declaration.  The federal and local laws for riot, and then for civil disorder, are distinguished by a number of factors. Neither the local nor the federal laws for a riot are the same as the law for a civil disorder.

There was no local or interstate commerce on the Capitol grounds on January 6, 2021.

The DOJ is the only entity who declared a Civil Disorder - after the fact of January 6, 2021 - and arrested and indicted protestors for 18 USC Section 231(a)(3) Civil Disorder. The DOJ indictments do not require the defendant to have committed violence.

The USCP and MPD did not create a dispersal route or issue any instructions to the crowd. Instead, the USCP allowed the man known as "tower commander" and alternately "scaffold commander" to remain in the photojournalist tower (built for the inauguration) for over four hours, starting at 1:00 p.m. The "tower commander" announced regularly for people to move forward, and then after 2:00 p.m. repeatedly stated that help was needed by the lower west terrace, using a megaphone that reportedly was heard all the way back the sidewalks near the Peace Monument.

The USCP have jurisdictional responsibility for the US Capitol grounds, the building, and protection of members of Congress by statutes, (2 U.S.C. § 1901 et seq.) specific to the USCP.

---

[2] The definition of the building and what it includes (underground tunnels, garages, etc.) can be found at https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building/capitol-grounds and related AOC links.

They have no authority for protection of USSS protectees. They have no budget with training to ascertain protection requirements for USSS protectees, whereas USSS statutes and budgets encompass all training and implementation of USSS protectee functions.

Mr. Fischer denies guilt for the crimes alleged.

No trial date is set. Discovery is still in progress (with video, audio, and document discovery still being posted by DOJ's Capitol Siege Unit).

Co-Defendant Johnson by his attorney and AUSAs Gordon and Lederer signed a plea deal, and on June 20, 2023 requested a plea hearing be set. ECF No. 115.

By Court order pretrial motions are due on July 24, 2023.

## II.   <u>LEGAL STANDARD</u>

### A.   <u>Standard for a Rule 12(b) Pretrial Motion to Dismiss a Criminal Indictment</u>.

Rule 7 of the Federal Rules of Criminal Procedure provides that "the indictment or information must be a plain, concise, and definite written statement of the <u>essential facts</u> constituting the offense charged . . ." Fed. R. Crim. P. 7(c)(1). (emphasis added). This rule performs three constitutionally required functions: (1) fulfilling the Sixth Amendment right to be informed of the nature and cause of the accusation; (2) preventing a person from being subject to double jeopardy, as required by the Fifth Amendment; and (3) protecting against prosecution for crimes based on evidence not presented to the grand jury, as required by the Fifth Amendment. See e.g., United States v. Walsh, 194 F.3d 37, 44 (2d Cir. 1999).

A defendant may move to dismiss the pleadings on the basis of a "defect in the indictment or information," including a "lack of specificity" and a "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(iii),(v).

A U.S. Supreme Court's decision held that an indictment must "fairly inform[] a defendant of the charge against which he must defend" and "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Hamling v. United States*, 418 U.S. 87, 117-18 (1974).

**B.  The Law as Applied: The Indictment Must Sufficiently Allege Facts Regarding All Essential Elements Which If Proven Would Constitute A Crime Under the Relevant Criminal Statute(s).**

A defendant should receive Sixth Amendment notice of what they must defend ((*Hamling v. United States*, 418 U.S. 87, 117 (1974)); and in accordance with the Fifth Amendment should not be subjected to double jeopardy. *Stirone v. United States*, 361 U.S. 212, 218 (1960). The standard applied in this Circuit requires that an indictment: "sufficiently apprise the defendant of what he must be prepared to meet." *United States v. Pickett*, 353 F.3d 62,67 (D.C. Cir. 2004). "The government must state the essential elements of the crime **and allegations of 'overt acts [constituting the offense] with sufficient specificity**.'" *United States v. Childress*, 58 F.3d 693, 720 (D.C. Cir. 1995). (Emphasis added).

When considering a motion to dismiss an indictment, a court must assume the truth of the factual allegations in the indictment. *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015).

Where an indictment is defective for failing to state an offense, a pretrial motion to dismiss the defective indictment is warranted, and the Court must dismiss an indictment which fails to state all essential elements of the crime charged. Fed. R. Crim. P. 12 (b)(3)(B)(v). **The indictment must be plain, concise, and clear as to the facts of the offense charged**. Fed. R. Crim. P. 7(c)(1).

**An indictment may be dismissed as constitutionally insufficient when it does not join the elements with factual allegations**. See *Russell v. United States*, 369 U.S. 749, 763-771 (1962); *United States v. Hillie*, 227 F. Supp. 3d 57 (D.D.C. Jan. 5, 2017).

The Supreme Court explained: "[The second object of an indictment is] to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction. For this, **facts are to be stated, not conclusions of law alone**." *United States v. Cruikshank*, 92 U.S. 542, 558 (1875). The indictment "must descend to particulars." *Cruikshank*, 92 U.S. at 558.

> [T]he universal rule, on this subject, is, that all the material facts and circumstances embraced in the definition of the offence must be stated, or the indictment will be defective. **No essential element of the crime can be omitted without destroying the whole pleading. The omission cannot be supplied by intendment, or implication**, and the charge must be made directly and not inferentially, or by way of recital.

*United States v. Hess*, 124 U.S. 483, 486 (1888). (Emphasis added).

The Hunter Court held that the defendants in that case being charged with unlawful assembly by crowding a sidewalk (and with merely the date and statute language) could have engaged in a number of acts that fell outside the scope of the statute, and thus, by failing to specify the defendants' particular conduct, the indictment was "too vague, general, and uncertain to meet the requirements of the established rules of criminal pleading," which in turn rendered it "insufficient in law." *Hunter v. District of Columbia*, 47 App. D.C. 406, 409-10 (D.C. Cir. 1918).

"Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute." *Russell v. United States*, 369 U.S. 749, 764 (1962).

> [A]n accusation which lacks any particular fact which the law makes essential to the punishment is . . . no accusation within the requirements of the common law, and it is no accusation in reason." 1 Bishop, Criminal Procedure § 87, at 55. See *id*., § 88, at 56 (notice and indictment requirements ensure that before "persons held for crimes . . . shall be convicted, there shall be an allegation made against them of every element of crime which the law makes essential to the punishment to

11

be inflicted").

*Apprendi v. New Jersey*, 530 U.S. 466, 511 (2000)

The as-applied standard is that the indictment has to contain facts for the elements of the crime that a jury could use to support a conviction, and for the Defendant to know the facts he must defend against and not be further subjected to double jeopardy. The indictment cannot eliminate facts related to essential elements of the crime charged. Restating the statute with a date or location alone does not meet the application standards for an indicted charge.

III.   **DISCUSSION / ARGUMENT**

   A.   **Count One, Section 231(a)(3) Civil Disorder and Section 2 Aiding and Abetting Should be Dismissed Because It is a Generic Multiplicitous Version of the Count 16 Charge, and here it Lacks Specificity and Failure to State an Offense.**

The crime of Section 231(a)(3) Civil Disorder is:

> Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function

   1.   **The elements require three prongs with four activities**:

   Prong 1.  A defendant commits or attempts and act to obstruct, impede or interfere with a fireman or law enforcement officer.

   Prong 2.  Where the law enforcement officer ***is performing*** official duties incident to and during a civil disorder.

   Prong 3. The civil disorder in any way obstructs, delays, or adversely affects commerce or articles moving in commerce OR a federally protected function.

The above three prongs occur simultaneously. For January 6 charges, the Defendant in the present tense must obstruct, impede, or interfere with law enforcement who in the present tense who are officially responding to a civil disorder, and the civil disorder in the present tense must adversely affect commerce or the movement of goods or a federally protected function.

In addition to the three prongs as elements, the underlying, inferred activity is that a civil disorder must exist and be declared at the time because everything in the statute is written in the present tense related to the civil disorder. Officers act on orders and direction. An authority has to declare a civil disorder at the time, and the officers have to be officially responding to a present tense civil disorder of violence that in the present tense is negatively affecting commerce when a defendant impedes them. All the prongs are simultaneous in the present tense as the law is written.

2.  The **Section 231 statute's definitions**:

> (1) **"civil disorder"** means any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual.
> (2) The term **"commerce"** means commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; or (C) wholly within the District of Columbia.
> (3) The term **"federally protected function"** means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof; and such term shall specifically include, but not be limited to, the collection and distribution of the United States mails.

3.  **Section 6 of 18 USC Defines Departments and Agencies**.

The term **"department" means one of the executive departments enumerated in section 1 of Title 5** . . . .  Congress does not fall under Title 5. <u>Further, the USCP fall under the Legislature and not the executive Title 5.</u> <u>The MPD do not fall under U.S. executive departments</u>.

The term **"agency"** includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the

United States has a proprietary interest, unless the context shows that such term was intended

to be used in a more limited sense.  <u>The USCP are not an agency and not a federal function</u>. The

MPD are not an agency of the U.S. or U.S. federal function.

Because they do not meet the criteria, the Congress, the USCP, and the MPD are not

federally protected functions.

**4.   The Court Must Use the Statute as Intended and as Written When Considering Whether an Indictment is Sufficient, and Whether a Jury Could Convict Given the Facts in the Indictment**.

"The government must state the essential elements of the crime **and allegations of 'overt**

**acts [constituting the offense] with sufficient specificity**.'" *United States v. Childress*, 58 F.3d

693, 720 (D.C. Cir. 1995). (Emphasis added). "For this, **facts are to be stated, not conclusions**

**of law alone**." *United States v. Cruikshank*, 92 U.S. 542, 558 (1875). Because this count ignores

the requirement for facts, a jury could not convict based on the dearth of facts in the indictment,

and it must be dismissed.

The government has been misapplying the Section 231 statute in pleas and at trials, where

they are fabricating commerce interruptions from locations where there was no present or

impending violence that could be called a civil disorder. This Court must determine the legislative

intent of a law, and "always, [ ] begin with the text of the statute." *Am. Fed'n of Gov't Emps., AFL-*

*CIO, Local 3669 v. Shinseki*, 709 F.3d 29, 33 (D.C. Cir. 2013). "It is elementary that the meaning

of a statute must, in the first instance, be sought in the language in which the act is framed, and if

that is plain . . . the sole function of the courts is to enforce it according to its terms." *United States*

*v. Hite*, 769 F.3d 1154, 1160 (D.C. Cir. 2014) (quoting *Caminetti v. United States*, 242 U.S. 470,

485 (1917) (internal quotes omitted)). "The search for the meaning of the statute must also include

an examination of the statute's context and history." *Hite, 769 F.3d at 1160* (citing *Bailey v. United*

*States*, 516 U.S. 137, 144-45 (1995)). Importantly, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997), 461 U.S. 352, 358 (1983)). Yet such novel construction has been repeatedly happening for January 6 cases where the government calls a missed sale of a hamburger at 10:00 p.m. on the night of January 6, 2021 during the D.C. mayor's curfew hours a substantial impact on interstate commerce. The government even goes so far as to classify little burps in retail sales at night as substantial impacts on interstate commerce. These sales of toothbrushes and hotdogs at a few locations that closed due to management decisions were not situated in time and space simultaneous with any civil disorder violence that police were in the present time trying to quell in order to restore the flow of commerce.

18 U.S.C Section 231 was written after the 1960's and particularly 1967 violent and destructive riots across many cities in the U.S. Many involved anti-war protests, with looting and burning. The intent of the law was to give notice that such group activity was criminalized, while giving federal law enforcement a tool for arresting violators where federal commerce interests were impacted. The 1967 riots had interfered with the operation of the U.S. mail, interstate highways, tunnels and bridges, and ports. Despite its applicability, neither the police in Portland. Oregon declared or requested federal law enforcement assistance for civil disorder. The local mayor as well as some in Congress declared it a "Summer of Love, and local law enforcement were ordered in the summer of 2020 to not enter and to abandon the "Chaz" zone that blocked commerce in a multi-block area while incidents of violence ebbed and flowed.

The intent of Congress was clear, and the law was not written to prevent peaceful protests. There had to be a nexus of interference with law enforcement or firemen, where multiple people

were violent and the overall civil disorder somehow obstructed interstate commerce. It was not written for a local riot at a local park where local riot laws would apply. That is clear through Section 233 - Preemption, which states:

> Nothing contained in this chapter shall be construed as indicating an intent on the part of Congress to occupy the field in which any provisions of the chapter operate to the exclusion of State or local laws on the same subject matter, nor shall any provision of this chapter be construed to invalidate any provision of State law unless such provision is inconsistent with any of the purposes of this chapter or any provision thereof.

18 U.S.C. § 233

Given the elements of the statute as written and intended, where no civil disorder was declared by the USCP, and because there was no simultaneous nexus between violence the police were responding to and an obstruction of commerce; and because the federal law does not preempt local law where the local MPD declared a riot presumably under local D.C. law, the Court must dismiss Count One.

And further, because neither the jurisdictional authority of the USCP nor the MPD referred any charges of 18 U.S.C. Section 231, Count One to the FBI or DOJ, the Count must be dismissed. There was no civil disorder under the law as written and intended, and the DOJ created charges on its own when no jurisdictional element formally ceded investigation authority or referred charges.

**5. Investigation Needs to Determine Whether the USCP, MPD and Other "reinforcements" Provoked the Violence by Operating Under Color of Law**.

True investigation of the events has yet to get past nascency. Nobody wants to blame law enforcement. But if they lacked training, proper supervision, and appropriate equipment; and illegitimately used non-lethal weaponry as reported with much video supporting evidence, then the police involved were not acting in an official capacity. This reportedly led to self-defense violence, as well as harm (such as tear gassing) to fellow officers. The USCP on the east mostly

exhibited professionalism, and used de-escalation techniques against provocateurs - and that area remained peaceful outside, with the exception of provocateurs on the rotunda door's steps. Meanwhile, peaceful prayer and protest on the west side turned violent when indiscriminate, no notice firing by police  was admitted by an MPD officer to be causing anger. Whether anyone was impeding police acting in official capacity within the law requires identification of what specific police were impeded when and where. Because the indictment lacks any facts, and fails to state an offense outside of restating the statute, Count One must be dismissed. And because questions remain as to which law enforcement were acting under color of law, any victim and obstruction accusations have to be tabled until a true investigation occurs.

**6.  Because Count One of Indictment Lacks Specificity and Fails to State Facts for an Offense under Section 231(a)(3) and Section 2 Aiding and Abetting - It Must be Dismissed.**

This section incorporates the legal standards from Section II B above, and the paragraphs supra.

For Section 231 and Section 2, the government provided no essential facts to identify acts, law enforcement victims, commerce impacted, who specifically was aided or abetted, and when and where. There are not even any words about Aiding and Abetting in the grand jury charge. The government stuck Section 2 in the listed charges as if it is a lesser included offense - which it is not.  The indictment ignores the Federal Rules of Criminal Procedure Rule 7, as well as the caselaw as contained in Section II.B. above, and the wealth of caselaw as applied in every U.S. circuit.

The caselaw is clear: facts must be stated with specificity. A date and location are insufficient as the only facts to accompany the statute's wording. "Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute." *Russell v. United States*, 369 U.S. 749, 764 (1962). See also *Apprendi*, *Hess*, and *Hunter supra*. The government's Indictment is very

similar to the problems found by the Hunter court. It states the statute and a couple of facts. But it lacks specificity to determine what conduct fell within the scope of the statute. The indictment Count One is never going to meet standards for facts because there was no obstruction of any commerce while no civil disorder was declared for police to respond to, and no acts against any specific police impeded a response to a non-existent civil disorder. There was no commerce on the U.S. capitol grounds to be obstructed at the alleged time of the alleged civil disorder.

The Indictment merely states:

> On or about January 6, 2021, at or around 3:15 p.m. to 4:15 p.m., within the District of Columbia, ZACHARY JOHNSON, DION RAJEWSKI, **ALAN FISCHER III,** also known as "AJ," BRIAN BOELE, and JAMES BRETT IV committed and attempted to commit an act to obstruct, impede, and interfere with law enforcement officers guarding the Lower West Terrace of the U.S. Capitol who were lawfully engaged in the lawful performance of their official duties incident to and during the commission of a civil disorder which in any way and degree obstructed, delayed, and adversely affected commerce and the movement of any article and commodity in commerce and the conduct and performance of any federally protected function.

As is obvious above, there is no mention of any person aided and abetted, how, and when.

The co-defendants were not part of any joint endeavor. They may have been within yards of each other at times based on crowd movement. They were not present on the grounds as a group. Mr. Boele was not a Proud Boy during the events. Mr. Boele and Mr. Fischer as father and son were together at many points during the day and evening (plus the prior evening) in peaceful gatherings and scheduled rallies, but they did nothing with the named co-defendants except pray and march in a group somewhat near each other in the morning.

**B.   The Dangerous Weapon Charge and Enhancement in Every Count Should Be Dismissed Because No Facts Meeting the Standard for a Dangerous Weapon are Contained in the Counts, and this is Multiplicitous Charging**

Each count that lists a deadly or dangerous weapon merely regurgitates the statute's language. There are not facts about use - the who, what and where. There are no facts about the

required intent as shown through use - the object must be used with the intent to cause serious bodily injury. The allegation of the chair, traffic cone, and pipe do provide facts or anything about use. There is no way to defend where double jeopardy is precluded. Every alleged misdemeanor has the dangerous weapon enhancement as the same alleged act across the counts.

"An indictment is defective, if a single offense is alleged in a number of counts, unfairly increasing a defendant's exposure to criminal sanctions." United States v. Harris, 959 F.2d 246, 250 (D.C. Cir. 1992). Because that is the case in this indictment, all counts should be dismissed because the prosecution is malicious and coercive, with the same enhancement and allegation of a dangerous weapon repeatedly charged, and because the indictment lacks specificity.

### C.  Counts Three, Nine, Thirteen, Fourteen, and Fifteen Should be Dismissed for Failure to State an Offense and Lack of Specificity.

The Indictment does not list facts in these counts. Incorporating Section II. and III. A, the indictment fails to include essential facts. **An indictment may be dismissed as constitutionally insufficient when it does not join the elements with factual allegations**. See *Russell v. United States*, 369 U.S. 749, 763-771 (1962); *United States v. Hillie*, 227 F. Supp. 3d 57 (D.D.C. Jan. 5, 2017). "The government must state the essential elements of the crime **and allegations of 'overt acts [constituting the offense] with sufficient specificity**.'" *United States v. Childress*, 58 F.3d 693, 720 (D.C. Cir. 1995). (Emphasis added). "For this, **facts are to be stated, not conclusions of law alone**." *United States v. Cruikshank*, 92 U.S. 542, 558 (1875). Because the counts listed here just state the law as a legal conclusion without facts, a jury could not convict based on the dearth of facts, Mr. Fischer cannot defend and ensure against double jeopardy, and the counts must be dismissed.

**D.   The 18 U.S.C. § 2 Charge that is Windowsill Dressing for Counts One, Three, Fourteen, Fifteen, and Sixteen and the Counts Must be Dismissed for Lack of Specificity and Failure to State an Offense.**

There is not a mention of 18 U.S.C. § 2, Aiding and Abetting, in the charge portion in any of these counts of the indictment. There is not even a statement of the law as a conclusion in the indictment. The government is treating 18 U.S.C. § 2 as if it is the lesser included crime as would be "attempt."  However, this is incorrect and the Counts must be dismissed because 18 U.S.C. § 2 is its own distinct law, with specific elements, that require specific facts. The Court cannot change the counts by striking 18 U.S.C. § 2.

Section 2 states as the crime:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2

None of the counts list a single fact about who was aided and abetted, where, how, or when. There are no facts about the essential elements of commanding, inducing, or procuring. It is settled law that in order to commit a crime, the attempt must be made. There is no analogy when it comes to aiding and abetting. Someone who pays another to commit a crime then aids and abets. Someone who knowingly purchases the equipment to commit a crime can be charged as the principle. The list of examples can go on but there is no doubt that 18 U.S.C. § 2 is a distinct crime with elements that must each be proven beyond a reasonable doubt.  It is not windowsill dressing. It requires specificity which is totally lacking in each count listed above.

Using only the words in the indictment ensures a defendant is prosecuted upon the facts presented to the grand jury. *United States v. Apodaca*, 275 F. Supp. 3d 123, 153 (D.D.C. 2017) ((citing *Russell v. United States*, 369 U.S. 749 1962); *Stirone v. United States*, 361 U.S. 212

(1960)). See also *Hamling v. United States*, 418 U.S. 87, 117 (1974). "Omissions in an indictment cannot be supplied by intendment or implication . . . and every ingredient of which it is composed must be clearly and accurately set forth." *United States v. Hess*, 124 U.S. 483; *Pettibone v. United States*, 148 U.S. 197; *Ledbetter v. United States*, 170 U.S. 606; Morse on Banks, 4th ed., 138, 139-162; *Pape v. Capitol Bank*, 20 Kan. 440; *Merritt v. Todd*, 23 N.Y. 28 (N.Y.1861); *United States v. Heinze*, 218 U.S. 532, 536 (1910).

Because the elements of the 18 U.S.C. § 2 crime are not listed and there are no facts at all about this crime in the indictment, no jury could convict or acquit based on the indictment, Mr. Fischer cannot defend, and he cannot preclude double jeopardy. The Court must dismiss each Count because it cannot change an indictment aside from scrivener's error and 18 U.S.C. § 2 inclusion in these counts mean they all lack specificity and fail to state an offense.

## IV.   **CONCLUSION**

Because the Indictment at ECF No. 54 is wholly inadequate in providing specificity, facts, and stating offenses that can be defended against and preclude double jeopardy, Counts One, Three, Six, Nine, and Thirteen through Sixteen of the superseding indictment must be dismissed.

Wherefore, for good cause shown, and for any other reasons the Court may decide, Mr. Fischer requests that the Court issue the attached proposed order that  dismisses the counts listed.

Dated July 25, 2023                          Respectfully submitted,

                                             /s/ Carolyn A. Stewart
                                             Carolyn A. Stewart, D.D.C. Bar No. FL0098
                                             Defense Attorney
                                             Stewart Country Law PA
                                             1204 Swilley Rd.
                                             Plant City, FL 33567
                                             Tel: (813) 659-5178
                                             Email: Carolstewart_esq@protonmail.com

### CERTIFICATE OF SERVICE

On this 25th day of July 2023, a copy of the foregoing was served upon all parties as

forwarded through the Electronic Case Filing (ECF) System.

                                             /s/ Carolyn A. Stewart
                                             Carolyn A. Stewart
                                             Defense Attorney