# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-175 (TJK)** |
| | : | |
| **ETHAN NORDEAN,** | : | |
| **JOSEPH BIGGS,** | : | |
| **ZACHARY REHL,** | : | |
| **ENRIQUE TARRIO, and** | : | |
| **DOMINIC PEZZOLA,** | : | |
| | : | |
| **Defendants.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States respectfully submits this omnibus Sentencing Memorandum for defendants Enrique Tarrio, Joseph Biggs, Ethan Nordean, Zachary Rehl, and Dominic Pezzola. This Sentencing Memorandum addresses those factors that are common to all defendants, a hearing on which is set for August 29, 2023. Additional support for the government's sentencing recommendations for each defendant are discussed in Attachment A (Tarrio), Attachment B (Nordean), Attachment C (Biggs), Attachment D (Rehl), and Attachment E (Pezzola).

The government's Sentencing Memorandum reflects the seriousness of the defendants' conduct and crimes, as reflected in the jury's verdict after a four-month trial. After adopting the PSRs' factual findings,[1] Chapter Two specific offense characteristics, and Chapter Three adjustments, including the application of Section 3A1.4 to the defendants' federal crimes of terrorism, the Court should apply the following Guidelines ranges and impose the following terms of incarceration:

---

[1] As of the date of this filing, final presentence reports (PSRs) are not available. All references to the PSRs herein refer to the drafts that were filed on the docket at ECF 835 – 839.

| Defendant | Offense Level after application of Terrorism adjustment (§3A1.4) | Role adjustment (§ 3B1.1) | Obstruction adjustment (§ 3C1.1) | Adjusted offense level | Criminal History Category | Guidelines Range (in months) | Sentence in years (and months) |
|---|---|---|---|---|---|---|---|
| Tarrio | 32 | 4 | 2 | **38** | **VI** | **360 - life** | **33 years (396)** |
| Biggs | 32 | 4 | 2 | **38** | **VI** | **360 - life** | **33 years (396)** |
| Nordean | 32 | 4 | | **36** | **VI** | **324 - 405** | **27 years (324)** |
| Rehl | 32 | 3 | 2 | **37** | **VI** | **360 - life** | **30 years (360)** |
| Pezzola | 32 | - | - | **32** | **VI** | **210 - 262** | **20 years (240)** |

## Table of Contents

I.     FACTUAL BACKGROUND ......................................................................... 5

    A.   Summary of Evidence ............................................................................ 5

    B.   Victims ................................................................................................... 7

    C.   Scope of the Conspiracy ...................................................................... 14

II.     CHARGES AND STATUTORY PENALTIES ..................................... 15

III.    LEGAL STANDARDS ......................................................................... 16

    A.   Preponderance of the evidence ........................................................... 16

    B.   Relevant conduct and definition of "offense" ................................... 17

IV.    CHAPTER TWO – OFFENSE CONDUCT ........................................ 19

    A.   Counts One – Four: Obstruction of Justice (U.S.S.G. §2J1.2) ......... 19

       1.   Base Offense Level for Counts One - Four ................................... 20

       2.   "Administration of justice" specific offense characteristics (Counts One – Four) .... 22

          a)   Legal applicability ................................................................... 22

          b)   Section 2J1.2(b)(1)(B) (causing or threatening injury or damage) ........................ 29

          c)   Section 2J1.2(b)(2) (substantial interference with administration of justice) ......... 33

       3.   "Extensive scope, planning, or preparation" specific offense characteristic ............. 35

    B.   Count Five ............................................................................................ 39

       1.   Base Offense Level for Count Five ............................................... 39

       2.   "More than minimal planning" specific offense conduct ............. 40

    C.   Counts Six and Seven. ......................................................................... 40

    D.   Count Nine ........................................................................................... 43

    E.   Count Ten ............................................................................................. 43

V.     CHAPTER THREE: ADJUSTMENTS FOR CRIMES OF TERRORISM ............. 43

    A.   All Offenses of Conviction Were Calculated to Influence and Affect the Conduct of Government by Intimidation and Coercion, and to Retaliate Against Government Conduct. ......................................................... 44

       1.   Legal Standard ............................................................................... 44

       2.   Analysis ......................................................................................... 45

    B.   The Defendants' Convictions on Counts Six and Seven are Qualifying Offenses for the Section 3A1.4 Adjustment ........................................ 52

    C.   An Upward Departure Pursuant to Note 4 Applies to Defendants' Other Convictions ... 53

VI.    CHAPTER THREE: OTHER ADJUSTMENTS ................................ 57

    A.   Section 3B1.1 (aggravating role) ........................................................ 57

B.  Section 3C1.1 (obstruction of justice) .............................................................. 64

C.  Section 3E1.1 (no acceptance of responsibility)............................................... 65

**VII.  GROUPING ANALYSIS ......................................................................... 67**

**VIII.  UPWARD DEPARTURES ..................................................................... 70**

**IX.  SECTION 3553(A) FACTORS APPLICABLE TO ALL DEFENDANTS ............... 71**

A.  Nature and Circumstances of the Offense and Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law ................................. 71

B.  Need for the Sentence to Afford Adequate General Deterrence...................................... 74

C.  Need to Avoid Unwarranted Sentencing Disparities ......................................................... 75

**X.  CONCLUSION ............................................................................ 79**

# I.    FACTUAL BACKGROUND

## A. Summary of Evidence

Having already ravaged the streets of Washington, D.C. with violence on two prior occasions in the fall of 2020, Tarrio, Biggs, Nordean, and Rehl hand-selected "rally boys," including Pezzola, for their return on January 6, 2021. They established a chain of command in which the directives of leadership would be followed without question. They chose the time and place for action—leading their men to a vulnerable entrance on the west front of the Capitol when most other rally-goers were focused on then-President Donald Trump's speech almost a mile away. They arrived shortly before 1 p.m.—the appointed hour for the Certification to begin. These defendants and the men in their command saw themselves as the foot soldiers of the right—they were prepared to use, and they did use, force to stop the "traitors" from stealing the election. On May 4, 2023, twelve jurors found each defendant guilty for their calculated efforts to oppose the lawful transfer of presidential power.

The defendants and the men they recruited and led participated in every consequential breach at the Capitol on January 6. They began their assault that day at 10 a.m., when Nordean, Biggs and Rehl marched an assembled group of nearly 200 individuals away from the speeches at the Ellipse and directly to the Capitol. They arrived at the First Street gate at 12:50 p.m., and Biggs led the crowd in chants of "Whose Capitol? Our Capitol!" and "Whose house? Our house!" Within three minutes, Nordean, Biggs, Rehl, and Pezzola helped lead the charge up the first street walkway with their men throwing aside bike racks and laying waste to anything that stood in their path. As Biggs proudly declared, "we've gone through every barricade thus far." When the police attempted to reform a line, Nordean and Biggs moved to the front and again led the way. They violently tore down a black metal fence and continued their assault on the Capitol. Nearly an hour

5

later, at approximately 1:30 p.m., when law enforcement appeared to have successfully controlled the crowd by pushing them back, the men again pushed forward. Nordean, Biggs, and Pezzola gathered at the base of the concrete stairs that led to the doors and windows of the Capitol with many of their co-conspirators and other men they had led to the Capitol. They again surged toward the Capitol and overwhelmed officers that had been battling the crowd for nearly an hour. Rehl sprayed an officer in the face. Pezzola smashed open a window, allowing the first rioters to enter the Capitol at 2:11 p.m., and Biggs entered close behind him with some of his men.

The defendants' leadership role was no accident. They viewed themselves as revolutionaries, and they believed fully in their cause. From the start of the riot, the defendants and their co-conspirators celebrated their achievement. Tarrio, who was monitoring the attack on the Capitol from afar as it unfolded, posted encouraging messages to his tens of thousands of social media followers, including the following messages: "Proud of my boys and my country," and "Don't fucking leave." Tarrio privately claimed credit for the riot at the Capitol, telling Proud Boys senior leadership, "Make no mistake . . . we did this." Biggs and Nordean posed with other Proud Boys on the west lawn of the Capitol for a celebratory video in which Biggs stated that "January 6 will be a day in infamy." Rehl made social media posts calling January 6 a "historical day," and he told his mother he was "so fucking proud" of the Proud Boys' "raid of the capitol." Pezzola, once inside the building, filmed a video of himself having a "victory smoke in the Capitol," and stating, "I knew we could take this motherfucker over if we just tried hard enough… Proud of your motherfucking boy."

The defendants' celebratory statements continued in the days that followed. On January 7, Tarrio addressed the Ministry of Self-Defense (MOSD) members, telling them he was "proud of y'all." Rehl likewise told the MOSD members he was "proud as fuck what we accomplished

6

yesterday." Biggs recorded a podcast-style interview in which he called January 6 a "warning shot" to the government that showed them "how weak they truly are" after being "bitch-slapped . . . on their own home turf." Biggs explained that "January 7th was warning shot to the government – look, we started this country this way and we'll fuckin' save it this way." Nordean recorded a video of himself describing an encounter with a woman at the bar; in the video he faulted the woman for not appreciating that he "was part of fucking storming the Capitol of the most powerful country in the fucking world… 1776, bitch."

Their own words leave no doubt. The defendants understood the stakes, and they embraced their role in bringing about a "revolution." They unleashed a force on the Capitol that was calculated to exert their political will on elected officials by force and to undo the results of a democratic election. The foot soldiers of the right aimed to keep their leader in power. They failed. They are not heroes; they are criminals.

### B. Victims

"*January 6th will be a day in infamy.*"
– Joe Biggs, January 6, 2021, 1:27 p.m.

"*To those who wreaked havoc in our Capitol today, you did not win. Violence never wins. Freedom wins . . . As we reconvene in this chamber, the world will again witness the resilience and strength of our democracy . . . The elected representatives of the people of the United States have assembled again, on the very same day, to support and defend the Constitution of the United States . . . Let's get back to work.*"
–Vice President Mike Pence, January 6, 2021, 8:06 p.m.

In his 1981 Inaugural Address, President Ronald Reagan remarked that the peaceful and orderly transfer of power called for by the Constitution is viewed by the rest of the world as "nothing less than a miracle." These defendants and their followers attempted to subvert that two-centuries old tradition. And while freedom, democracy, and the Constitution prevailed on January 6th, it was not without cost. Alongside the enduring legacy of bravery and honor by those who

7

defended our country, a harsh reality has emerged—political violence is not some foreign concept that exists only in faraway lands, it exists here too.

The actions of these defendants threatened the bedrock principles of our country—democracy and the rule of law. These defendants sought out and embraced their role as the purveyors of street violence to achieve their political objectives. They loudly and publicly declared themselves the face of the insurgency in the wake of the Presidential Election, and they encouraged others to follow them. These defendants sought out to attack and did attack our democracy, and they publicly led the way on January 6th.The defendants' crimes also directly harmed individuals on January 6: Congress, legislators, the staffers working inside the Capitol building, and the hundreds of law enforcement officers from across the region valiantly trying to protect the building, the people, and the constitutional process.

Congress was the public face of the peaceful transfer of presidential power and, in these defendants' eyes, they were "traitors." Public accounts by many of these Members of Congress illustrate some of the emotional and physical toll these people suffered, and continue to suffer, at the hands of these defendants. And that is precisely what these defendants aimed to accomplish—Tarrio posted a picture of Representatives hiding in the gallery and rejoiced at the government "fearing" the people; Biggs later giddily recounted that the attack left elected representatives "shaking" and in fear.

Some Representatives were initially stranded in the gallery of the House of Representatives after the other members had been evacuated from the floor. One Representative stated, "I really thought, we're not going to be evacuated. We're going to die here," and because of the slim political majority, the rioters "could at any point take any three members either hostage or kill any

three members, and that would have prevented us from certifying the election."[2] Another Representative expressed that, "[i]t was terrifying," because they "didn't know if the doors could be locked. And so I was focused on planning my escape if I had to get out." "That's what I was concerned about," she added, "were we going to get out? Were we going to survive? Were they going to come after us?"[3] A third explained that the noise from the rioters "sounded like a battering ram trying to beat down the doors."[4] This is not an after-the-fact embellishment, Inspector Thomas Loyd testified that when he arrived at the House gallery to evacuate the Representatives, officers initially resisted opening the doors out of concern that Inspector Loyd may have "been held hostage or had a gun to [his] head." Tr. 3628:1-24 (Loyd).

Yet another Representative noted that he hadn't "felt that way in over 15 years, since I was a Ranger in Iraq and Afghanistan."[5] "I had this realization that we were trapped," the Representative said, so he "started to kind of view this in a tactical way," explaining the "need to get everyone together, need to get in a defensive position. You don't want people spread out. You don't want people to be able to be pulled away from a mob—you need to get in a tight group."[6] And a Representative with a law enforcement background noted that her "police career flashed

---

[2]  apnews.com/article/joe-biden-donald-trump-peter-welch-congress-a308bf2a296018e08a3ed5b 27b00dbf9 (Jan. 5, 2022); apnews.com/article/jan-6-capitol-siege-lawmakers-trauma-04e 29724aa6017180259385642c1b990 (Jan. 5, 2022).

[3]  *Id.*

[4]  lohud.com/in-depth/news/2022/01/04/january-6-capitol-protest-congress-members-recall-escap e/6493506001 (Jan. 4, 2022).

[5]  *Id.*

[6]  apnews.com/article/joe-biden-donald-trump-peter-welch-congress-a308bf2a296018e08a3ed5b 27b00dbf9 (Jan. 5, 2022); apnews.com/article/jan-6-capitol-siege-lawmakers-trauma-04e 29724aa6017180259385642c1b990 (Jan. 5, 2022).

through my mind because I came from a job where I went to work every day thinking I might not make it back home." She continued, "to be there in that moment and thinking—really in the midst of complete chaos—I reserved myself to the fact that, yeah, I could die today. But I'm just like a cop. I'm here doing the right thing, protecting and serving my nation by being here for this process, a peaceful transfer of power."[7]

The threat these defendants and other rioters presented to the Members of Congress continued long after the rioters breached the building. Even when they were finally found and later evacuated, they still feared for their lives. One Representative who had served in the military explained that during the evacuation, "I remember the hallways were quiet (when we were evacuating). I was listening so carefully because I was so afraid that we would turn a corner and there would be the rioters."[8]

Elected legislators were not the only individuals harmed by the defendants' conduct. The defendants also specifically targeted and vilified law enforcement in public and private messages in the leadup to January 6. Even after January 6, Nordean continued to vilify police, posting an altered photograph of a law enforcement officer deploying mace against a rioter while referring to law enforcement as the "honorable oath breakers" and telling the public that if they "feel bad for the police, [they] are part of the problem." Ex. 601-41.

Words on the page will never full capture the horror and heroism that defined the experience of law enforcement on January 6. Radio transmissions between officers on January 6, introduced at trial as Government Exhibits 359 to 398, provide a rare window into the conditions

---

[7] *Id.*

[8] *Id.*

that law enforcement faced that day and the professionalism with which they responded. Sworn law enforcement officers risked their lives to protect not only the Capitol building and the legislators inside, but also the constitutional process itself. Officer David Riggleman stayed in the fight because even though the officers were "greatly outnumbered," he was committed to protecting the Members of Congress and other stakeholders in the building. Tr. 11645 (Riggleman). Despite all the chaos and terror of the day, Inspector Loyd expressed pride that the U.S. Capitol Police officers carried out their mission—"despite all the chaos that we were involved with, none of the members of Congress sustained physical injuries." Tr. 3690:21-23 (Loyd).

The Court and the jury heard firsthand from just a fraction of the officers who faced the relentless force of the defendants that day. Officer Shae Cooney described hearing the radio call of a breach, and she testified that the terror that she heard in that transmission caused her to run to the west front. Tr. 6996:12-24 (Cooney). When she saw that rioters had advanced to the black fence, "a little panic came through" because Cooney knew they "weren't going to have enough" officers. *Id.* at 6999:1-7. The panic was briefly "paralyzing," but Cooney promptly joined her outnumbered officers on the line and got in the fight. *Id.* Officer Cooney came face-to-face with Ethan Nordean just after he tore down the black metal fence. Nordean and Biggs ignored her command to stop as they and others poured into the West Plaza. *See*, *e.g.*, *id.* at 7088. Cooney explained that once the rioters were in the west plaza, they were "taking the individual poles on the fence and throwing those at us." As Officer Cooney battled rioters in the West Plaza, she was personally hit by water bottles and hit in the head with poles and flags, including the American flag. *Id.* at 7074:9-16. Officer Cooney completed a twenty-hour shift and returned to the Capitol on January 7 after only two hours of sleep.

Officer Mark Ode responded to calls of a breach on the west front, and he arrived shortly after Nordean and Biggs tore down the black fence. Just like Officer Cooney, Officer Ode saw officers being assaulted, hit with punches, and having things thrown at them. Tr. 7484:19 – 25 (Ode). Officer Ode recalled the crowd calling law enforcement "traitors." *Id.* at 7485:6-11. When Officer Ode attempted to assist another officer who was being assaulted, Pezzola and other rioters "violently and forcefully grabbed" his shield and pulled him to the ground. *Id.* at 7487:10 – 7488:22. Officer Ode was sprayed with a chemical substance, and Officer Ode fell to the ground with multiple people on top of him. *Id.* An individual on top of Officer Ode was using his helmet strap to choke him. *Id.* Officer Ode struggled to breathe, and he believed that he would not make it out of the pile alive. *Id.* Officer Ode left the front line to decontaminate his eyes and immediately returned to the West Plaza. *Id.* at 7501-02. The situation was becoming "more intense" and "more officers were intentionally being pulled out and singled out" by the rioters. *Id.* at 7503:6-13. Officer Ode watched one officer get pulled into the crowd by rioters, and Officer Ode saw "fear in her eyes" as she became separated from her colleagues. *Id.* at 7503:22-25. Officer Ode eventually responded to the Rotunda where he fought to push rioters such as Nordean out of the building. *Id.* at 7505-06. Officer Ode did not get home until 2 a.m. *Id.*.

Officer Riggleman responded to the West Plaza shortly before the defendants surged forward up the concrete stairs toward the Upper West Terrace. When he arrived, Officer Riggleman encountered an "enormous crowd" that was "aggressive" and outfitted in tactical helmets and plate carriers. Tr. 11637:14-25 (Riggleman). Officer Riggleman joined officers under the scaffolding and attempted to hold them back from advancing further. *Id.* at 11641. The crowd surged toward officers, and Officer Riggleman was hit in the face by pepper spray from Barry Ramey, a man who marched with Nordean and Biggs from the Washington Monument. *Id.* at

12

11641. The spray disabled Officer Riggleman's vision and forced him to retreat to safety while guarding his service weapon. After decontaminating himself, Officer Riggleman got back in the fight even though he was still suffering from blurred vision and a burning sensation and having trouble breathing. *Id.* at 11644:5-9. Riggleman responded to the Crypt where an outnumbered group of officers again attempted to stop the crowd from advancing. While in the Crypt, rioters such as Gabriel Garcia (a man hand-selected by Tarrio) called the police "traitors." *Id.* at 11648. The crowd again surged forward, and Riggleman was pressed against the wall by the force of the rioters, and he was unable to move. *Id.* at 11651.

Officer Marc Carrion was one of two officers who relentlessly fought for control over the Columbus Doors against overwhelming odds. As Biggs prepared for his second entry through the Columbus Doors, Officer Carrion and a handful of officers had their backs against the Columbus Doors and were trying to keep the mobs of rioters at bay. Officer Carrion recalled calls for help over the radio, yelling and chanting by the crowd, and he described a feeling that all five senses were overwhelmed in that moment. Tr. 14302 (Carrion). Eventually, there were only "five or six [officers] left at the door" and they were being sprayed by rioters, including by James Haffner (whom Nordean and Biggs led to the Capitol). *Id.* at 14308:2-7. Some of the officers were hit in the eyes, which created the "dangerous situation" for them to be fighting blind. *Id.* at 14309-10. Officer Carrion testified that the crowd was "hitting us with flagpoles, throwing batteries at us, throwing frozen water bottles at us, all in the hopes of getting us out of there so they could access the door." *Id.* at 14308:2-7. Eventually, only Officer Carrion and one colleague, Officer Ryan Salke, remained. They fought to hold the door despite the waves of rioters that continued to push past them. Officer Carrion explained that even though he and Officer Salke had been completely overrun, they continued to work, "just trying to put our bodies in the way, if we can, to minimize

13

the amount of people coming in." *Id.* at 14315-316. After literally sacrificing his body to the effort, Officer Carrion completed his shift at 11 p.m., went home and washed his uniform, and returned at 7 a.m. *Id.* at 14320-321.

The officers' heroism shined through in their testimony, but that heroism came at a tremendous cost. These officers, like countless others, carry with them the physical and mental scars of January 6, and the government anticipates that the Court will hear a more fulsome description of the experience of law enforcement and congressional workers during the omnibus hearing on August 29, 2023.

## C. Scope of the Conspiracy

The scope of the defendants' conspiracy is vast. The defendants organized and directed a force of nearly 200 to attack the heart of our democracy. Other leaders of the conspiracy, including Jeremy Bertino and Charles Donohoe, have pleaded guilty. Dozens of individuals who the defendants commanded or led to the Capitol await trial or have pled guilty.[9]

The scope of the conspiracy impacts many aspects of sentencing, including each defendant's culpability for "relevant conduct," U.S.S.G. § 1B1.3, the Guidelines' specific offense characteristic for an offense that is extensive in scope, *id.* § 2J1.2(b)(3), the Guidelines' adjustment

---

[9] Other charged defendants include: Matthew Greene and William Pepe (No. 21-cr-52 (TJK)); Arthur Jackman, Paul Rae, Edward George, Kevin Tuck, Nathaniel Tuck (No. 21-cr-378 (TJK)); Christopher Kuehne, Louis Colon, Felicia Konold, Cory Konold, William Chrestman, and Ryan Ashlock (No. 21-cr-160 (TJK), Isiah Giddings (No. 22-cr-389 (TJK)), Brian Healion (No. 23-cr-230 (TJK)), Freedom Vy (No. 21-mj-689), Ronald Loehrke and James Haffner (No. 21-mj-672), Christopher Worrell and Daniel Lyons Scott (No. 21-cr-292 (RCL)), Barry Ramey (No. 22-cr-184 (DLF)), Zachary Johnson, Dion Rajewski, Alan "AJ" Fischer, Brian Boele, and James Brett (No. 22-cr-11 (RJL)), Gilbert Fonticoba (No. 21-cr-638 (TJK)), Gabriel Garcia (No. 21-cr-129 (ABJ)), Nicholas Kennedy (No.21-cr-487 (CKK)), Steven Miles and Matthew Lebrun (No. 22-cr-136 (JMC)), Jeffrey Finley (No. 21-cr-526 (TSC)), Marc Bru (No. 21-cr-352 (JEB)), Robert Gieswein (No. 21-cr-24 (TNM)); Tucker Weston (No. 23-cr-174 (RBW)).

for aggravating roles in the offense, *id.* § 3B1.1, the Guidelines' adjustment for "terrorism" in relation to defendants' qualifying offenses, *id.* § 3A1.4(a) and (b), the Guidelines' recommended upward departure for "terrorism," *id.* § 3A1.4, cmt. n.4, and the need to avoid unwarranted sentence disparities, 18 U.S.C. § 3553(a)(6). As explained below, the scope of the conspiracy helps illustrate why the leaders and major participants must receive significant sentences of incarceration.

## II.     CHARGES AND STATUTORY PENALTIES

As set forth below, Tarrio, Nordean, Biggs, and Rehl were found guilty of Counts One through Six; and Pezzola was found guilty of Counts Three through Seven, Nine, and Ten, which crimes carry the maximum statutory penalties set forth below:

- **Count One**, seditious conspiracy, 20 years of incarceration;

- **Count Two**, conspiracy to obstruct an official proceeding, 20 years of incarceration;

- **Count Three**, obstruction of an official proceeding, 20 years of incarceration;

- **Count Four**, conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties, 6 years of incarceration;

- **Count Five**, interference with law enforcement officers during a civil disorder: 5 years of incarceration;

- **Counts Six and Seven**[10] destruction of federal property: 10 years of incarceration;

- **Count Nine,** assaulting federal officers: 8 years of incarceration; and

- **Count Ten,** robbery of personal property of the United States: 15 years of incarceration.

---

[10] Counts Six and Seven, destruction of federal property in violation of 18 U.S.C. § 1361, are specifically enumerated crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5) and as applied in U.S.S.G. §3A1.4.

The government respectfully requests that the Court sentence Tarrio, Nordean, Biggs, and Rehl to terms of incarceration greater than 20 years, meaning that at least some of the counts would run consecutively to one another. The Court may sentence a defendant to a total term of incarceration greater than 20 years—*i.e.*, run the terms consecutively—if the Court determines that such a sentence is necessary to comply with the factors in 18 U.S.C. § 3553(a)(2), that, is, to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant. U.S.S.G. § 5G1.2(b), (d) ("If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, . . . the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment."); 18 U.S.C. § 3584(b); *see also United States v. Lafayette*, 337 F.3d 1043, 1050 & n.11 (D.C. Cir. 2003) (explaining that a court may impose consecutive or "stack[ed]" sentences to achieve a total sentence in excess of the statutory maximum on a single count).

## III. LEGAL STANDARDS

### A. Preponderance of the evidence

To apply a provision of the Guidelines that the jury did not, by virtue of its guilty verdicts, necessarily already find beyond a reasonable doubt, the Court must make a finding by a preponderance of the evidence. *United States v. Watts*, 519 U.S. 148, 154 (1997); *see also United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997) ("[I]t is the Government's burden to demonstrate by a fair preponderance of the evidence that an enhancement is warranted."); U.S.S.G. § 6A1.3, cmt ("The Commission believes that use of a preponderance of the evidence standard is appropriate. . . ."). The Court may consider any relevant information, without regard to whether

16

the information would be admissible at trial. 18 U.S.C. § 3661. The Court may also consider

acquitted conduct, *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008), including an

acquittal of a conspiracy charge, *United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014).

## B. Relevant conduct and definition of "offense"

In applying the Guidelines, the Court must consider all "relevant conduct." And especially

in a conspiracy case,[11] "relevant conduct" is "broadly defined." *United States v. Khatallah*, 41

F.4th 608, 645 n.23 (D.C. Cir. 2022). Under Section 1B1.3(a)(1)(A), a defendant's "relevant

conduct" encompasses both the defendant's own acts and those that the defendant aided, abetted,

counseled, commanded, induced, procured, or willfully caused. And under Section

1B1.3(a)(1)(B), in a "jointly undertaken criminal activity," such as a conspiracy, a defendant is

responsible for all acts of others that were "within the scope of the jointly undertaken criminal

activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that

criminal activity." Finally, a defendant's "relevant conduct" under the Guidelines includes "all

harm that resulted" from the defendant's acts or the acts of others engaged in the jointly undertaken

criminal activity. U.S.S.G. §1B1.3(a)(3).

All of these defendants were convicted of being participants in at least one conspiracy, and

thus, by virtue of the jury's verdict, they are responsible for actions of their conspirators that fall

within the parameters of Section 1B1.3(a)(1)(B). It is true that "the scope of the 'jointly undertaken

---

[11] As Judge Mehta observed at sentencing in *United States v. Elmer Stewart Rhodes, et al.*, No. 22-cr-15 (APM), the Supreme Court has found that "collective criminal agreement, partnership in crime presents a greater potential threat to the public than individual dealings. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." Rhodes Sentencing Transcript (May 25, 2023) at 111 (quoting *Callanan v. United States*, 364 U.S. 587 (1961)).

criminal activity' is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." U.S.S.G. §1B1.3, cmt. n.3(B). But given the nature of the conspiracies here and the conspiracy convictions for these five defendants, each defendant's "relevant conduct" supports application of each of the Guideline provisions discussed below. *See United States v. Khatallah*, 314 F. Supp. 3d 179, 189 (D.D.C. 2018) (broadly applying Section 1B1.3 because, in part, "'[o]nce the conspiracy and the defendant's knowing participation in it have been established beyond a reasonable doubt, the defendant will be vicariously liable for the substantive acts committed in furtherance of the conspiracy by his coconspirators'") (quoting *United States v. Sampol*, 636 F.2d 621, 676 (D.C. Cir. 1980)).

As discussed in greater detail above, the jury found that these five defendants joined a conspiracy, the aims of which included opposing the government through the use of force, obstructing Congress' certification of the electoral college, and/or using force, intimidation, or threat to prevent members of Congress from discharging their duties that day. Each defendant should thus be liable for his own conduct *plus* the conduct of all his co-conspirators on the afternoon of January 6, to include the actual or threatened property damage and injury to others caused by those who breached the Capitol. Each of these defendants joined the conspiracy prior to January 6. For example, Tarrio, Nordean, Biggs, Rehl, and other leaders of the Proud Boys organization formed the "Ministry of Self Defense" in the days following former President Trump's announcement of an election-related rally in Washington, D.C. on January 6. These leaders intentionally recruited men who would follow their top-down leadership and who were prepared to engage in physical violence, if necessary. One of those recruits was Dominic Pezzola, who enthusiastically joined the MOSD on January 2, 2021, and committed to carrying out the

18

objective of the leaders. Tarrio, Nordean, Biggs, and Rehl organized the Proud Boys return to Washington, D.C., which guidance included what to wear (*e.g.*, no colors), what to bring (*e.g.*, protective gear and communication equipment), and what to do (*e.g.*, fit in or fuck off). Thus, each defendant also bears responsibility for certain conduct by their co-conspirators prior to January 6.

For all of these reasons, the relevant conduct in this case is much broader than a typical January 6-related case.

## IV.    CHAPTER TWO – OFFENSE CONDUCT

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point" for determining a defendant's sentence. *Id.* Pursuant to the order of operations set forth in Section 1B1.1(a) of the Guidelines, the operation generally proceeds with a calculation for each offense of the Base Offense Level and Specific Offense Characteristics in Chapter Two, then to any Adjustments and Grouping of counts in Chapter Three, then to Criminal History in Chapter Four, and finally to the determination of the sentence under Chapter Five. These operations are presented in order herein.

### A.  Counts One – Four: Obstruction of Justice (U.S.S.G. §2J1.2)

The PSRs correctly determine that the appropriate Chapter Two offense guideline for Counts One, Two, Three, and Four is Section 2J1.2 (Obstruction of Justice). All five of the defendants were convicted of multiple crimes for which the Obstruction of Justice guideline applies. As explained herein, there are several Specific Offense Characteristics that apply to the defendants' convictions. First, an eight-level increase under Section 2J1.2(b)(1)(B) applies because the offense involved property destruction or its threat "in order to obstruct the

19

administration of justice." Second, a separate three-level increase under Section 2J1.2(b)(2) applies because "the offense resulted in substantial interference with the administration of justice." Because both of these characteristics concern the "administration of justice," they are addressed together herein. Finally, an additional two-level increase under Section 2J1.2(b)(3) applies because the offense was "extensive in scope, planning, or preparation." As explained below, these Specific Offense Characteristics combine for a total Offense Level of 27 for Counts One – Four.

### 1. Base Offense Level for Counts One - Four

The applicable Chapter Two Guideline for each of Counts One – Four is Section 2J1.2 (Obstruction of Justice).

*Count One (Seditious Conspiracy)*. Under Section 2X1.1, cmt. n.3, for a conspiracy conviction for which the substantive offense is not covered by a specific guideline, use Section 2X5.1. Under Section 2X5.1, since there is no applicable Chapter Two Guideline for an offense of sedition in the Statutory Appendix, use "the most analogous guideline." Here, that is Section 2M1.1, "Treason."[12] Under Section 2M1.1(a)(2), if a defendant's conduct was not "tantamount to waging war against the United States,"[13] use "the offense level applicable to the most analogous offense," which is Section 2J1.2, "Obstruction of Justice."

---

[12] *See United States v. Rahman*, 189 F.3d 88, 150-54 (2d Cir. 1999) (affirming that the most analogous offense guideline for seditious conspiracy, in violation of 18 U.S.C. § 2384, is Section 2M1.1); *see also United States v. Ford*, 216 Fed. App'x 652, 652-53 (9th Cir. 2007) (rejecting a habeas claim that counsel was ineffective for agreeing to stipulate to the use of Section 2M1.1); *see also United States v. Elmer Stewart Rhodes III, et al.*, No. 22-cr-15 (APM) (May 25, 2023), Sent. Tr. at 82 (applying 2J1.2 to Rhodes's conviction for Seditious Conspiracy).

[13] As noted in Part IX.C, *infra*, for almost every seditious conspiracy conviction (on the "levying war" and "opposing the government by force" prongs) since the advent of the Sentencing Guidelines, the court appears to have applied the Treason Guideline and found that the defendants' conduct *was* "tantamount to waging war against the United States." *See* U.S.S.G. § 2M1.1(a)(1).

*Count Two (Conspiracy to Obstruct an Official Proceeding)*. Under Section 2X1.1, the base offense for a conspiracy conviction is the guideline for the substantive offense, which is 18 U.S.C. § 1512(c)(2). The applicable Chapter Two Guideline for this offense is Section 2J1.2, "Obstruction of Justice." U.S.S.G. Appendix A.

*Count Three (Obstruction of an Official Proceeding)*. The applicable Chapter Two Guideline for this offense is Section 2J1.2, "Obstruction of Justice." U.S.S.G. Appendix A.

*Count Four (Conspiracy to Prevent Officers of the United States from Discharging Their Duties)*. Under Section 2X1.1, cmt. n.3, for a conspiracy conviction for which the substantive offense is not covered by a specific guideline, use Section 2X5.1. Under Section 2X5.1, since there is no applicable Chapter Two Guideline for an offense of preventing officers of the United States from discharging their duties in the Statutory Appendix, use "the most analogous guideline." The "officers" of the United States who were the victims of this count were the Members of Congress and law enforcement officers. *See* Jury Instructions (ECF No. 767 at 25) (listing "Members of Congress" and "law enforcement officers" as the victims); *see also* Verdict Form (ECF No. 804) (same). Because the object of the defendants' conspiracy—preventing Members of Congress from performing their constitutional duties at the Capitol on January 6—was designed to obstruct the administration of justice, the most analogous guideline is Section 2J1.2, "Obstruction of Justice."[14]

---

[14] The common criminal objective among the members of the conspiracy was to obstruct the certification of the electoral college proceeding. The victims of this effort—Members of Congress and the federal law enforcement who were protecting them—are indistinguishable for this purpose. Indeed, Judge Mehta applied §2J1.2 to violations of 18 U.S.C. § 372 by members of the Oath Keepers. *See United States v. Elmer Stewart Rhodes, et al.*, No. 22-cr-15 (APM). And the First Circuit agreed that §2J1.2, rather than §2A2.4, was the most analogous guideline for a defendant convicted of violating 18 U.S.C. § 372, when the defendant's conviction was premised on the defendant conspiring to prevent federal officers from arresting other people, and thus "obstructed the administration of justice." *United States v. Gerhard*, 615 F.3d 7, 33 (1st Cir. 2010); *see also*

## 2. "Administration of justice" specific offense characteristics (Counts One – Four)

Congress's Joint Session on January 6 related to the "administration of justice" as used in the Sentencing Guidelines. *See United States v. Jensen*, No. 21-cr-6 (TJK) (Dec. 16, 2022), Sent. Tr. at 13-16 (holding that the applicable definitions and structure of 2J1.2 apply to the Official Proceeding); *see also United States v. Matthew Wood*, No. 21-cr-223 (APM) (Nov. 28, 2022), Sent. Tr. at 35-38 (holding that the "administration of justice" in Section 2J1.2 is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), including a "proceeding before the Congress"). Accordingly, the Specific Offense Characteristics set forth at Section 2J1.2(b)(1)(B) (causing or threatening injury or damage) and Section 2J1.2(b)(2) (substantial interference with administration of justice) apply to Counts One – Four. *Id.*

### a) <u>Legal applicability</u>

#### i. <u>The Electoral College vote involved the administration of justice as defined broadly in the Guidelines.</u>

Section 2J1.2 applies to a variety of obstruction offenses, including all offenses under 18 U.S.C. § 1512 and eleven other statutes found in Chapter 73 of Title 18. *See* U.S.S.G. § 2J1.2 cmt.; U.S.S.G. Appendix A. The eight-level increase under Section 2J1.2(b)(1)(B) applies if the offense involved property destruction or its threat "in order to obstruct the administration of justice." A separate three-level increase under Section 2J1.2(b)(2) applies "if the offense resulted in substantial interference with the administration of justice."

---

*United States v. Rakes*, 510 F.3d 1280, 1290 (10th Cir. 2007) (acknowledging that a § 372 conviction for conspiring to impede and thwart the prosecution of other people would constitute "imped[ing] the due administration of the law," and thus would warrant application of §2J1.2 rather than §2A2.4).

22

Section 2J1.2's text, purpose, and commentary all support the conclusion that conduct that obstructs Congress's certification of the electoral vote interferes with the "administration of justice" for purposes of the guideline. Administration of justice, in its broadest sense, refers to the proper administration of law by all three branches of government. Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice." Black's Law Dictionary (11th ed. 2019); *see also* Ballentine's Law Dictionary 696 (3d ed. 1969) (defining justice to include "exact conformity to some obligatory law"). When defining "contempt" to include "[c]onduct that defies the authority or dignity of a court *or legislature*," Black's Law Dictionary observes that "such conduct interferes with the administration of justice." Black's Law Dictionary (11th ed. 2019) (emphasis added). And courts have defined "administration of justice" to mean "the performance of acts or duties required by law," *Rosner v. United States*, 10 F.2d 675, 676 (2d Cir. 1926) (quotation omitted), or "the performance of acts required by law in the discharge of duties," *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977).

To be sure, the term "administration of justice" is most commonly used in a narrower sense to refer to "interference with the pendency of some sort of judicial proceedings." *In re Kendall*, 712 F.3d 814, 828 (3d Cir. 2013); *see In re McConnell*, 370 U.S. 230, 234, 236 (1962) (defining the term in the contempt context as relating to "the performance of judicial duty"); *United States v. Aguilar*, 515 U.S. 593, 599 (1995) (stating that the "omnibus clause" of 18 U.S.C. § 1503, which criminalizes obstruction of the "due administration of justice," requires proof of "an intent to influence judicial or grand jury proceedings"). But there are compelling reasons for concluding that "administration of justice" bears its broader (albeit less common) meaning in Section 2J1.2.

23

*First*, Section 2J1.2's context and purpose support the broader reading of "administration of justice" in both subsections (b)(2) and (b)(1)(B). Section 2J1.2 applies to an array of obstruction statutes, including a number that do *not* involve the "administration of justice" in the narrow sense (*i.e.*, relating to judicial or quasi-judicial proceedings). *See* U.S.S.G. § 2J1.2, cmt. (listing covered statutes); U.S.S.G. Appendix A (statutory index). Those offenses include concealing or destroying invoices or papers relating to imported merchandise, 18 U.S.C. § 551; obstructing an investigation under the Workforce Innovation and Opportunity Act, 18 U.S.C. § 665(c); obstruction of proceedings before departments, agencies, and committees, 18 U.S.C. § 1505; obstruction of enforcement of state gambling laws, 18 U.S.C. § 1511; obstruction of official proceedings, 18 U.S.C. § 1512; obstruction of a federal audit, 18 U.S.C. § 1516; destruction of documents in agency investigations, 18 U.S.C. § 1519; and interfering with the administration of the Internal Revenue Code, 26 U.S.C. § 7212. Yet under a narrow interpretation of the guideline, the enhancements under subsection (b) would not apply to those statutes. That is good reason to reject such a reading. *Cf. United States v. Castleman*, 572 U.S. 572 U.S. 157, 167 (2014) (rejecting a reading of 18 U.S.C. § 922(g)(9) that "would have rendered [it] inoperative in many States at the time of its enactment").

Section 2J1.2's background indicates that the Sentencing Commission intended the enhancements to reach the type of violent and dangerous conduct at issue in this case. The background notes that Section 2J1.2 broadly covers crimes "of varying seriousness," including offenses that involve intercepting grand jury deliberations, interfering with an illegal gambling investigation, or obstructing "a civil or administrative proceeding," and that the underlying conduct may "range from a mere threat to an act of extreme violence." U.S.S.G. § 2J1.2, cmt. bkgd. Within that range, the enhancements "reflect the more serious forms of obstruction." *Id.* The

24

Commission thus crafted the enhancements in Section 2J1.2 to cover the most egregious *conduct* knowing that obstruction-of-justice offenses are not limited solely to interference with judicial proceedings.

Relatedly, limiting subsection (b)'s enhancements to obstruction of judicial proceedings would undermine the purpose of the Guidelines. "A principal purpose of the Sentencing Guidelines is to promote uniformity in sentencing imposed by different federal courts for similar criminal conduct." *Hughes v. United States*, 138 S. Ct. 1765, 1774 (2018). The Guidelines therefore seek to achieve "a strong connection between the sentence imposed and the offender's real conduct." *United States v. Booker*, 543 U.S. 220, 246 (2005). The Sentencing Commission reasonably determined, for example, that "causing or threatening physical injury to a person, or property damage, in order to obstruct the administration of justice" is more serious than obstruction not involving such injury or threats and should be punished more severely. U.S.S.G. § 2J1.2(b)(1)(B). And the seriousness of the threatening or injurious conduct does not depend on whether the obstructed proceeding is judicial, legislative, or executive. There is no sound basis for assigning a significantly higher offense level to someone who violently interferes with a court proceeding than someone who violently interferes with a congressional proceeding. *See United States v. Rubenacker,* No. 21-cr-193 (May 26, 2022), Sent. Tr. at 69 ("There is simply no indication in guideline Section 2J1.2 that the [specific offense characteristics] containing the phrase 'administration of justice' were meant to apply to only some of the statutes referenced to this guideline and not to apply to all of the cases involving obstruction of proceedings taking place outside of courts or grand juries; that simply doesn't make sense.").

Likewise, the history and context of Section 2J1.2 support the broad application. When originally promulgated, Section 2J1.2 encompassed 18 U.S.C. § 1512, which included obstructive

25

conduct directed at a witness or victim in connection with proceedings before the Congress. *See United States v. Elmer Stewart Rhodes III, et al.,* No. 22-cr-15 (APM) (May 24, 2023), Sent. Tr. at 171-177. The Sentencing Commission then included enhancements to Section 2J1.2 to address the most serious conduct, "including obstructive conduct before an official proceeding, which [] would include a proceeding before Congress. *Id.* (applying the specific offense characteristics related to "administration of justice" to all members of the Oath Keepers and explaining that the Sentencing Commission intended for the original 2J1.2 Guideline to be "coextensive with the conduct that is captured in 1503 through 1513").

*Second*, Section 2J1.2's commentary provides a broad definition of "administration of justice." It defines "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; or *the unnecessary expenditure of substantial governmental or court resources*." U.S.S.G. § 2J1.2, cmt. n.1 (emphasis added). This definition includes interference not only with "court" resources, but also with any "governmental" resources, a term that includes congressional resources. The Supreme Court has held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). Because this commentary is consistent with the plain text of the Guideline, which uses the broad term "administration of justice," it is authoritative.

It is true that the commentary defines only the term "substantial interference with the administration of justice," which serves as the basis for the three-level enhancement in Section 2J1.2(b)(2) and does not specifically define the term "in order to obstruct the administration of

26

justice," which serves as the basis for the eight-level enhancement in Section 2J1.2(b)(1)(B). But the relevant term "administration of justice" is identical and should be given the same interpretation in both enhancements. The operative verbs "interfere[]" and "obstruct" carry the same meaning in this context. And the adjective "substantial" in Section 2J1.2(b) does not change the meaning of "administration of justice," especially since the commentary repeats the word, requiring "the unnecessary expenditure of *substantial* governmental . . . resources." U.S.S.G. § 2J1.2, cmt. n.1 (emphasis added). Thus, the term "in order to obstruct the administration of justice" in Section 2J1.2(b)(1)(B) should be read to include obstructive conduct aimed at nonjudicial governmental activities. A different conclusion would lead to the incongruous result of giving two different meanings to the term "administration of justice" within the same guideline. *See Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.").

The Electoral College certification vote on January 6 falls comfortably within the meaning of "administration of justice" as used in Section 2J1.2 because it involved Congress's performance of duties required by law. Specifically, Congress's certification of the Electoral College vote was an official proceeding required by both the Constitution and federal statutes. *See* Dec. 28, 2021, Mem. Op. (ECF 263) at Part III.A.1. ("Congress's Certification of the Electoral College Vote Was an 'Official Proceeding.' Under Section 1512(c)(2)"). Application of both Sections 2J1.2(b)(1)(B) and (b)(2) is therefore appropriate here.

        ii. <u>Courts, including judges on this Court in January 6 cases,</u>
            <u>have correctly held that non-judicial proceedings can</u>
            <u>involve the administration of justice.</u>

Other courts have appropriately applied the "administration of justice" enhancements in

Section 2J1.2(b)(2) to efforts to obstruct a wide range of governmental functions, not limited to

judicial or grand jury proceedings. *See United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017)

(defendant "substantially interfered with the administration of justice" by causing government to

expend resources to recover children he had kidnapped and transported internationally in violation

of child custody order); *United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180,

205-08 (D.N.J. 2009) (defendant interfered with OSHA investigations into a workplace accident);

*United States v. Weissman*, 22 F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998) (defendant withheld

subpoenaed documents from a congressional subcommittee).

Moreover, fourteen judges in this District (including this Court in *Pruitt* and *Jensen*, Nos.

21-cr-6 and 21-cr-23), have applied at least one of Section 2J1.2's "administration of justice"

enhancements in cases arising from the Capitol breach on January 6: then-Chief Judge Howell

(*Rubenacker*, No. 21-cr-193); Judge Mehta (*Wood*, No. 21-cr-223); Judge Contreras (*Andries*, No.

21-cr-93); Judge Cooper (*Robertson*, No. 21-cr-34); Judge Chutkan (*Priola*, No. 22-cr-242); Judge

Moss (*Miller*, No. 21-cr-75); Judge Jackson (*Rodriguez*, No. 21-cr-246); Judge Friedrich (*Reffitt*,

No. 21-cr-32); Judge Hogan (*Tenney*, No. 21-cr-640); Judge Lamberth (*Fairlamb*, No. 21-cr-120);

Judge Friedman (*Puma*, No. 21-cr-454); Judge Bates (*Brock*, No. 21-cr-140); and Judge Kollar-

Kotelly (*Allen*, No. 21-cr-64).[15] And because this Court already held that Congress' certification

of the election qualifies as "quasi-adjudicative or quasi-judicial," Dec. 28, 2021, Mem. Op. (ECF

---

[15] Although some judges have handled multiple such cases, only one case is listed per judge.

263), at 12, it should give no weight to the reasoning of the two judges who, after concluding the certification proceeding was "ministerial" or was not "a proceeding that determines rights or obligations," found Section 2J1.2's "administration of justice" enhancements inapplicable. *See Seefried*, No. 21-cr-287, ECF 123 (Oct. 29, 2022) (Judge McFadden); *Watson*, No. 21-cr-513 (March 9, 2023), Sent. Tr. at 23-25 (Judge Walton).

The Court should find that Section 2J1.2's "administration of justice" specific offense characteristics apply here as a matter of law.

> b)    <u>Section 2J1.2(b)(1)(B) (causing or threatening injury or damage)</u>

The PSRs correctly apply this eight-level enhancement to all of the defendants here because the defendants' relevant conduct "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B). Indeed, each of the cooperating defendants who pled guilty to being a member of this conspiracy, including Jeremy Bertino and Charles Donohoe, agreed to the applicability of the Section 2J1.2(b)(1)(B) characteristic.

*First*, the conspirators, in being among the first wave of rioters to breach the Capitol grounds and building at 12:53 p.m., were part of a mob that caused injuries to Capitol Police officers guarding the outer perimeter at First Street. Among other things, one officer was "knocked unconscious" and a second officer "suffered an almost career-ending leg injury when the bike rack was pinned against her leg." Tr. 3529:15-24 (Loyd). Pezzola and Rehl were among the first across the trampled barricade, with Nordean and Biggs following closely behind. Ex. 445Cx.

*Second*, the conspirators, including Biggs and Nordean, tore apart a black metal fence on Capitol grounds at 12:56 p.m., which allowed the first wave of rioters to continue advancing onto Capitol grounds and towards the Capitol building. *See*, *e.g.*, Ex. 445-Bx, 492-G. The fence posts

were screwed into the concrete and "it takes a pretty good amount of force" to detach the fence. Tr. 7149:2-11 (Cooney).

*Third*, after tearing down the fence, Biggs, Nordean, and Rehl immediately moved forward toward the line of officers. After destroying the fence, Nordean moved intentionally forward toward a line of outnumbered officers—a threatening action. Ex. 417x at 0:52; Ex. 445-Bx at 1:35. Nordean and Biggs then surged forward with Biggs waving the crowd forward. Ex. 417x at 0:52 – 1:05; Ex. 445-By. Just to their right, Rehl rushed past the trampled fence and joined Nordean and Biggs at the front of the advancing crowd. Ex. 445-By.

*Fourth,* Pezzola, engaged in hand-to-hand combat with law enforcement officers who were guarding the Capitol. Officer Ode described the assault by Pezzola, which was captured on photos and videos, and testified that the picture showed "two individuals grabbing my shield or my arm and forcefully attempting to take it away from me." Tr. 7491:8-23 (Ode). Officer Ode described that individuals in the crowd "violently and forcefully grabbed [his] shield and pulled [him] down to the ground." *Id.* at 7487:10 – 7488:22. Pezzola himself admitted that he grabbed Officer Ode's shield while it was still in Officer Ode's hand and tried to "take it from his possession." Tr. 19375:8-19 (Pezzola); *see also id.* at 19376:3-19377:7 (describing grabbing and pulling the shield with intent "to take possession of it.").[16]

_____

[16] Although the other defendants were acquitted of this count, the Court can and should still find by a preponderance that their "relevant conduct" includes the actions of Pezzola because the jury convicted these defendants of conspiracy. The jury's "not guilty" verdicts on this count does not preclude such a finding. "[A defendant] was not 'acquitted' for conduct unless the jury necessarily determined that the facts underlying a charge or enhancement were not proved beyond a reasonable doubt." *United States v. Khatallah*, 41 F.4th 608, 648 (D.C. Cir. 2022), *cert. denied*, No. 22-7065, 2023 WL 4163280 (U.S. June 26, 2023). It is difficult to reconcile the jury's acquittal of four defendants for Pezzola's assault at Count Nine, given that these same defendants were both convicted of a conspiracy to use force, intimidation, or threats to interfere with officers (Count

*Fifth*, evidence at trial included violent acts carried out by the men who followed Nordean and Biggs onto Capitol grounds, including the spray assaults by Trevor McDonald (Ex. 261; Tr. 12365:1-12366:10 (Miller)) and Haffner (Tr. 12562), and the coordinated efforts to physically break through a line of officers in the lower west tunnel by A.J. Fischer (*id.* at 12674-75).

*Sixth*, Rehl assaulted a law enforcement officer with an irritant spray before quickly retreating into the crowd on the West Plaza. Ex. 2003, 2004, and 2008.

*Seventh,* various conspirators, including Biggs and Pezzola, overwhelmed a line of officers at the base of the concrete stairs that led to the U.S. Capitol building. Dozens of Proud Boys reunited at the base of the concrete stairs shortly before 1:44 p.m. Daniel Lyons Scott, a Proud Boy who had marched behind Nordean, Biggs, and Rehl to the Capitol (and the same man who had earlier yelled out, "let's take the fucking Capitol"), initiated a push by shoving two officers and pushing them up the stairs. Tr. 12467:6-9 (Miller); Ex. 451x. Almost instantaneously thereafter, the crowd overwhelmed the officers and pushed up the scaffolding. Pezzola, Donohoe, and Biggs were among the surge of rioters to move up the concrete stair behind Scott. Tr. 12467:12-12470:16 (Miller); Ex. 451x and 476x.

*Eighth,* Pezzola continued up the stairs with a mass of other rioters. He threatened officers manning a barricade at the top of the stairs, telling them: "You better be fucking scared. Yeah, you

---

Four), and the jury was instructed on *Pinkerton* liability. Courts have long cautioned against trying to reconcile "inconsistent verdicts." *See, e.g., United States v. Dykes*, 406 F.3d 717, 722 (D.C. Cir. 2005) ("We do not know what went through the jurors' minds. . . . But even if the [verdicts were inconsistent], a 'criminal defendant convicted by a jury on one count [cannot] attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count.'") (quoting *United States v. Powell*, 469 U.S. 57, 58 (1984)). In any event, because of the guilty verdicts on multiple conspiracy counts, it is not the case that "the jury necessarily determined that the facts underlying [that] charge . . . were not proved beyond a reasonable doubt." *Khatallah*, 41 F.4th at 648.

better be fucking scared. ….We ain't fucking stopping . . . You better decide what side you're on motherfuckers. You think Antifa's fucking bad? Just you wait." Ex. 429-Cx.

*Ninth*, Pezzola broke windows to access the Capitol building and achieve the objective of stopping the certification. *See*, *e.g.*, Ex. 425. Pezzola's admitted goal in smashing the window was for someone inside the building to hear him, and he believed that this was a way to get the government to listen to him. Tr. 19409:23 – 19410:25 (Pezzola).[17]

*Tenth*, the conspirators, including Biggs, used force to push past law enforcement officers who were guarding the doors of the Capitol in order to gain entry to the Capitol and stop the certification. Biggs made his second entry as part of a tactical line of four Proud Boys immediately after the crowd overwhelmed officers guarding the door. Ex. 433-C. Biggs' group pushed directly past those officers, with Biggs brushing up against one. Ex. 172x. Officer Carrion described his efforts to guard the door and the assaultive conduct that he endured before Biggs rushed inside, including rioters "hitting [officers] with flagpoles, throwing batteries . . ., throwing frozen water bottles . . ., all in the hopes of getting [officers] out of there so they could access the door." Tr. 14308:2-7 (Carrion). Officer Carrion fought against "waves and waves" of rioters by "just trying to put [his] body in the way . . . to minimize the amount of people coming in." *Id.* at 14316:1-3; 14317:12-18.

---

[17] Although the jury did not reach a verdict on Count Seven for the other defendants, the Court can and should still find by a preponderance that their "relevant conduct" includes the actions of Pezzola because the jury convicted all five defendants of conspiracy to use force, intimidation, or threats to prevent officers (i.e., law enforcement and Members of Congress) from discharging their duties. Pezzola's own admission that he was taking the action to get the government to listen to him provides further support for the conclusion that the destruction of the window was a "harm that resulted" from the jointly undertaken criminal activity. *See* U.S.S.G. §1B1.3(a)(3).

      c)    Section 2J1.2(b)(2) (substantial interference with administration of justice)

This specific offense characteristic applies because the defendants' relevant conduct "*resulted in* substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2) (emphasis added). As an initial matter, it is hard to imagine a more substantial interference with the administration of justice than what took place on January 6. The defendants' relevant conduct resulted in the incapacitation of an entire branch of the federal government and the suspension of a congressional proceeding that was required by the Constitution and federal statute to take place at a certain date, time, and location so that our country could peacefully transfer presidential power from one person to the next. Indeed, Pezzola and Biggs were among the first rioters in the building, which act forced the Senate into emergency recess. *E.g.*, Tr. 11862:7-12 (McCumber); Ex. 910 at 5:20-5:30 (Aide: "protesters are in the building"). Biggs owed his entrance into the Capitol to Pezzola's destruction of the window at 2:11 p.m. Ex. 425. The first rioters into the building entered through that window. Tr. 12516:4-6 (Miller).

Moreover, the Guidelines define the term "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; *or the unnecessary expenditure of substantial governmental or court resources*." U.S.S.G. § 2J1.2, cmt. n.1 (emphasis added). The defendants' offenses "*resulted in*" substantial interference with the administration of justice because the offenses caused the unnecessary expenditure of substantial governmental resources.

That commonsense view finds support in the case law. *See, e.g.*, *Ali*, 864 F.3d at 574 (numerous federal agents "worked for several days around the clock"); *Atlantic States Cast Iron*

*Pipe*, 627 F. Supp. 2d at 205-08 (defendant interfered with OSHA investigations into a workplace accident); *Weissman*, 22 F. Supp. 2d at 194-98 (defendant withheld subpoenaed documents from a congressional subcommittee). The Eleventh Circuit recently cited affirmatively to another case in which it found Section 2J1.2(b)(2) applicable where, as a result of the defendant's false grand jury testimony, the government was forced to identify and interview several other witnesses, review the defendant's records, and reconvene the grand jury. *See United States v. Pegg*, 812 F. App'x 851, 860 (11th Cir. 2020) (citing *United States v. Johnson*, 485 F.3d 1264, 1271-72 (11th Cir. 2007)). Indeed, many appellate courts have affirmed the application of the enhancement because significant "government" resources were invested to resolve an attempt to obstruct a judicial proceeding. *See, e.g.*, *United States v. Meredith*, 602 F. App'x 102, 103 (4th Cir. 2015); *United States v. Tankersley*, 296 F.3d 620, 623-24 (7th Cir. 2002); *United States v. Harrington*, 82 F.3d 83, 87 n.2 (5th Cir. 1996); *United States v. Voss*, 82 F.3d 1521, 1532 (10th Cir. 1996).

The events of January 6 indisputably resulted in the "unnecessary expenditure of substantial governmental . . . resources," with the latest estimate of damages from entities responsible for the United States Capitol[18] totaling more than $2.9 million. And the conspirators' offenses contributed to that "unnecessary expenditure" of substantial governmental resources: the deployment of hundreds of law enforcement officers to defend and then clear the Capitol building and grounds of those—such as the defendants here—whose conduct caused the evacuation of hundreds of lawmakers and the suspension of the certification proceedings. The repair and clean-up costs were similarly extensive, and certainly "substantial."

---

[18] These entities include the Architect of the Capitol, the Office of the Chief Administrative Officer of the United States House of Representatives, the Office of the Secretary of the United States Senate, the Senate Sergeant at Arms, and the United States Capitol Police.

By the government's count, of the sixteen judges in this District who have handled a sentencing hearing for a January 6 defendant convicted of violating 18 U.S.C. § 1512, fourteen found that the specific offense characteristic in Section 2J1.2(b)(2) applied because the defendant's conduct "resulted in substantial interference with the administration of justice," that being disruption to Congress' certification of the Electoral College vote and the attendant government response to the riot.[19] Moreover, all of the cooperating defendants who pled guilty to being a member of this conspiracy, including Jeremy Bertino and Charles Donohoe, agreed to the application of Section 2J1.2(b)(2) based on their "relevant conduct."

The evidence established that the conspirators' conduct obstructed Congress's certification (delaying it by several hours, for example) and impeded the ability of the staff working for the Vice President (see the testimony of Secret Service Inspector Lanelle Hawa), and Congressional staff (see the testimony of Kevin McCumber), among others, to complete their work related to that certification. That delay caused the unnecessary expenditure of substantial governmental resources. Therefore, the three-level enhancement under Section 2J1.2(b)(2) applies.

### 3. "Extensive scope, planning, or preparation" specific offense characteristic

Section 2J1.2(b)(3) provides a two-level enhancement if the offense (A) involved the destruction of a substantial number of records; (B) involved the selection of an especially probative record to destroy; or (C) "was otherwise extensive in scope, planning, or preparation." While all three components of subsection (C) apply here, based on the subsection's use of the disjunctive

---

[19] *See* Part IV.B.2.a.ii, *supra* (listing judges and cases). And even the two judges who have declined to apply the characteristic based their reasoning on the phrase "administration of justice" rather than the substantiality of the interference with the proceeding.

"or," the Court need only find that the defendants' relevant conduct was extensive in scope, planning, *or* preparation. *See United States v. Petruk*, 836 F.3d 974, 977 (8th Cir. 2016).

The structure of this Guideline subsection is similar to the structure of 18 U.S.C. § 1512(c); both lay out a particular means of obstruction related to a tangible object or record and then include a "catchall" (or "residual" or "omnibus" clause) that begins with the phrase "or . . . otherwise." As the D.C. Circuit explained when interpreting 18 U.S.C. § 1512(c), the word "otherwise" should be "given its common meaning of "in a different manner.'" *United States v. Fischer*, 64 F.4th 329, 336-37 n.2 (D.C. Cir. 2023). In other words, Section 2J1.2(b)(3)(C) provides for a two-level enhancement if the defendant's relevant conduct, *in a manner other than* destroying a substantial number of records or a particularly probative record, was extensive in scope, extensive in planning, and/or extensive in preparation.

While the phrase "otherwise extensive" is not defined in the Guidelines, "there are a number of factors relevant to the extensiveness determination, including the length and scope of the criminal activity as well as the number of persons involved." *United States v. Holland*, 22 F.3d 1040, 1046 (11th Cir. 1994). And while the D.C. Circuit has not yet had occasion to rule on this enhancement, multiple courts of appeals have affirmed its application by district courts. In *United States v. Pegg*, 812 F. App'x 851, 860 (11th Cir. 2020) (per curiam), the Eleventh Circuit found that the defendant's conviction for conspiracy to obstruct justice, which was done in secret from prison, directing several people through numerous coded phone calls and emails, was "extensive in scope and planning" because it was part of a "scheme [that] involved an elaborate gathering together of lies and misrepresentations." Similarly, in *Petruk*, 836 F.3d at 977, the Eighth Circuit concluded that the obstructive conduct of the defendant—who, while incarcerated, solicited his girlfriend to find someone else to falsely claim on a recorded line to be the perpetrator of the

36

underlying crime—was extensive in planning and preparation (though not in scope). In *United States v. Jensen*, 248 F. App'x 849, 851 (10th Cir. 2007), the Tenth Circuit agreed that a correctional officer's helping inmates avoid or pass urinalysis tests, which "was far from an isolated occurrence," was "extensive in scope." In *United States v. Rodriguez*, 499 Fed. App'x 904, 907-09 (11th Cir. 2012), the Eleventh Circuit agreed that an incarcerated defendant's use of her boyfriend's semen to frame a correctional officer, which involved the "gathering together of lies and misrepresentations," was extensive in "scope, planning, *and* preparation." Finally, in *United States v. Bakhtiari*, 714 F.3d 1057, 1062 (8th Cir. 2013), the Eighth Circuit agreed that a defendant-lawyer's efforts to intimidate an opposing lawyer and his family, including doctoring photographs and creating a fake email account, were crimes that were extensive in scope, planning, and preparation.

In addition to these appellate decisions affirming application of this enhancement, judges in this district have applied the enhancement to defendants' crimes related to the attack on the Capitol. In *Scott*, over the defendant's objection, Judge Lamberth found that the enhancement applied because "the whole idea that as Proud Boys leaders they were going to communicate and wearing the technical gear, bringing the communications equipment, being prepared for pepper spray" all supported the application. No. 21-cr-292, Sent. Tr. 2-7. Likewise, Judge Friedrich applied the enhancement in two separate cases. In *Reffitt*, over the defendant's objection, Judge Friedrich found that the enhancement applied both because of the defendant's extensive efforts in "planning and preparation" *and* the extensive "scope" of what the defendant intended to accomplish. No. 21-cr-32, Sent. Tr. at 46-47. She found that there was "enough evidence of planning and preparation here in terms of organizing the trip, in terms of gathering together this wide range of sophisticated gear, not just firearms, but a helmet, bulletproof vest, flex cuffs, radios,

and megaphones. There was a lot of thought and planning that went into this offense." *Id.* And the defendant's "stated intentions" were "hugely extensive in scope": forcibly removing and then replacing legislators. *Id.* at 46. In *Sandlin*, the defendant agreed to the application of the enhancement in his plea agreement, and Judge Friedrich applied it during his sentencing. No. 21-cr-88 (Dec. 9, 2022), Sent. Tr. at 36. According to the agreed-upon statement of offense, Sandlin traveled to D.C. with two co-conspirators and multiple weapons, including two firearms. ECF 85 at ¶ 15.

Here, all of the co-conspirators who pled guilty to being a member of this conspiracy, including Jeremy Bertino and Charles Donohoe, agreed to the application of Section 2J1.2(b)(3), because their relevant conduct was extensive in scope, planning, and preparation.

These defendants' relevant conduct shows that their offense was extensive in scope, planning, and preparation. The seditious conspiracy began at least as early as December 19, 2020. Tarrio, Nordean, Biggs, Rehl, and other leaders of the Proud Boys organization intentionally recruited men prepared to engage in physical violence, if necessary. They organized a return to Washington, D.C., which guidance included what to wear (*e.g.*, no colors), what to bring (*e.g.*, protective gear and communication equipment), and what to do (*e.g.*, fit in or fuck off). They coordinated with men from across the country using encrypted messaging applications. Once on the ground, they continued to organize and direct the "boots on the ground" using a top-down command and control structure. They surveilled the Capitol and then lay in wait for approximately 30 minutes until just before the certification was to commence. They marched scores of men to the west front of the Capitol at 12:50 p.m. and within three minutes, they led the charge of those men onto the Capitol grounds. Finally, the scope of the conspiracy's objective was itself enormous:

to forcibly prevent an entire branch of the federal government from performing its constitutional and statutory duties.

### B. Count Five

#### 1. Base Offense Level for Count Five

All five defendants were convicted of Count Five - Interference with Law Enforcement Officers During a Civil Disorder. There is no applicable Chapter Two Guideline for this offense in the Statutory Appendix. Accordingly, under §2X5.1, the Court is to use "the most analogous guideline." Here, that is §2A2.4, "Obstructing or Impeding Officers;" however, when the conduct "constitute[s] aggravated assault" the Guidelines direct that Section 2A2.2 be applied.

Here, the offense conduct involving interference with officers constitutes "aggravated assault." *See* U.S.S.G. §2A2.2, n.1 (Aggravated assault "means a felonious assault that involved … an intent to commit another felony.") Among other things, the offense conduct involved jointly undertaken criminal activity in furtherance of an effort to obstruct the certification of the Electoral College vote and to use force to prevent officers of the United States from discharging their duties. Obstructing and impeding officers in violation of Count Five was within the scope of the criminal activity, in furtherance of the criminal activity, and reasonably foreseeable in connection with the criminal activity. *See* U.S.S.G. §1B1.3, n.3. Such actions taken in furtherance of the jointly undertaken criminal activity include (1) Rehl's assault on law enforcement with irritant spray, (2) Pezzola's assault on Officer Ode, (3) Donohoe's assault by throwing water bottles at a line of officers, (4) Biggs, Pezzola, Donohoe, Greene, and others' participation in the assault by Daniel Lyons Scott and others in their push up the concrete stairs toward the Capitol, (5) Biggs and others' push past law enforcement to re-enter the building through the Columbus Doors, and (6) the

destruction of the black metal fence by Nordean, Biggs, and others, which allowed the Proud Boys and other rioters to surge toward officers and engage in assaults.

### 2. "More than minimal planning" specific offense conduct

Section 2A2.2(b)(1) provides a two-level increase when the assault included "more than minimal planning," which means "more planning than is typical for commission of the offense in simple form." U.S.S.G. §2A2.2, cmt n.2. Here, the defendants' interference with law enforcement was part of the means by which they carried out the conspiracies charged at Counts One, Two and Four. In particular, the defendants' preparation to organize and prepare a group to travel across the country, leadership in directing a group of more than 100 men to the Capitol just prior to the start of the certification, and direction to the men to advance on the Capitol by following the lead of the boots on the ground were all part of this plan. Moreover, the defendants' preparation included a hand-selected assemblage of "rally boys," many of whom donned helmets and vests in anticipation of conflict.[20] As laid bare by the defendants' own words before and on January 6, the defendants' preparation for conflict was not focused on Antifa—it was the preparation for conflict with law enforcement and government officials who they had declared traitors. *See, e.g.*, Ex. 603-33 (Biggs post about "treat[ing] your think [*sic*] blue line like we do antifa"); Ex. 501-50 (conspirators discussing police: "#fucktheblue" … [T]hey chose their fucking side so let's get this done.").

### C. Counts Six and Seven.

The applicable Chapter Two Guideline for Count Six is §2B1.1, "Larceny, Embezzlement, and Other Forms of Theft," and for Count Seven is §2B1.5, "Theft of, Damage to, or Destruction

---

[20] In applying Section 2A2.2(b)(1) to defendant Christopher Alberts over his objection, Judge Cooper noted that Alberts's decision to bring a gas mask showed more planning than is typical of the commission of the offense in its simple form. *United States v. Christopher Alberts*, 21-cr-26 (CRC) (July 19, 2023).

of, cultural Heritage Resources or Paleontological Resources." As described herein, the applicable Chapter Two Guidelines for Count Six differs from Count Seven because the government property destroyed at Count Seven (i.e., the Capitol window) is a "cultural heritage resource." The distinction increases the base offense level by two points. No Specific Offense Characteristics apply to either Count Six or Seven.

The distinction between Counts Six and Seven is largely rendered moot due to the application of the Chapter Three adjustment for a "federal crime of terrorism," which applies to the defendants' convictions for destruction of federal property. The defendants' convictions for a federal crime of terrorism result in a Guidelines calculation of *at least* offense level 32 and the application of criminal history Category VI. U.S.S.G. §3A1.4(a) and (b).[21] Accordingly, and as explored more fully below at Part V, the application of the adjustment for a federal crime of terrorism renders the distinction moot because the offense level will increase to level 32 for both Counts Six and Seven. Nonetheless, for sake of completeness, the memorandum addresses the distinction here.

The damaged window at the Senate Wing door was part of the United States Capitol, which was designated as a National Historic Landmark in December 1960 and the National Park Service continues to recognize that designation to this day.[22] The United States Capitol is thus a "historic

---

[21] Pursuant to the Sentencing Guidelines, the application of §3A1.4 requires an increase in offense level by +12, but if the resulting offense level is less than 32, the offense level should be raised to 32. U.S.S.G. §3A1.4(a). Since the offense level for Counts Six and Seven will be less than 32 even after increasing the base offense level for those counts by +12, §3A1.4 requires that the offense level for both counts be increased to level 32. In addition to the increase in offense level, the defendant's criminal history shall be increased to Category VI. U.S.S.G. §3A1.4(b).

[22] *See* List of NHLs by State - National Historic Landmarks (U.S. National Park Service) (nps.gov), https://www.nps.gov/subjects/nationalhistoriclandmarks/list-of-nhls-by-state.htm (last visited September 9, 2022) (listing the United States Capitol as a National Historic Landmark and

property" and accordingly a cultural heritage resource, pursuant to Application Note 1(A)(i) for

U.S.S.G. §2B1.5. Accordingly, the destruction of the Capitol window at Count Seven provides for

a base offense level of 8, as opposed to the level 6 provided under § 2B1.1(a)(2) for the destruction

of the black fence at Count Six.

Application Note 1(A)(i) of the Sentencing Guidelines refers to 54 U.S.C. § 300308, which

defines a "historic property" as "any prehistoric or historic district, site, building, structure, or

object included on, or *eligible for inclusion on*, the National Register [of Historic Places]..." 54

U.S.C. § 300308 (emphasis added). While the United States Capitol is not included on the National

Register, as it is exempt from inclusion on the National Register and other attendant regulations in

54 U.S.C. § 300101 et. seq. pursuant to 54 U.S.C. § 307104, it would otherwise be eligible for

inclusion on the National Register.[23]

An additional two points is added for the destruction of the Capitol window under Section

2B1.5(b)(2) because the Capitol is a National Historic Landmark. The Capitol was designated as

a National Historic Landmark in December 1960, and the National Park Service continues to

recognize that designation to this day.[24]

---

noting its December 1960 designation date); *see also* 36 CFR § 65.1(c) ("The National Park
Service (NPS) administers the National Historic Landmarks Program on behalf of the Secretary").

[23] Section 16(l) of 36 C.F.R. pt. 800 clarifies that "eligible for inclusion" in the National Register
includes "both properties formally determined as such in accordance with regulations of the
Secretary of the Interior and *all other properties that meet the National Register criteria*." 36
C.F.R. § 800.16(l)(2) (emphasis added). The National Register criteria can be found at 36 CFR
§ 60.4 and focuses on the historical significance of the property, and the property's associations
with historical events, significant historical figures, historical styles and artistic value, and
important historical information.

[24] See List of NHLs by State - National Historic Landmarks (U.S. National Park Service)
(nps.gov), https://www.nps.gov/subjects/nationalhistoriclandmarks/list-of-nhls-by-state.htm (last
visited Aug. 16, 2023) (listing the United States Capitol as a National Historic Landmark and

### D. Count Nine

The applicable Chapter Two Guideline for this offense is §2A2.2, "Aggravated Assault." U.S.S.G. Appendix A. Pursuant to Application Note 1 of Section 2A2.2, "aggravated assault means a felonious assault that involved . . . an intent to commit another felony." Here, the evidence at trial showed that Dominic Pezzola's assault on Officer Ode was directly related to his commission of multiple other felonies, including the robbery of Officer Ode's police riot shield in violation of 18 U.S.C. § 2112 (Count Ten). Moreover, the evidence at trial showed the Dominic Pezzola's assault was also part of a larger endeavor that included interference with law enforcement officers during a civil disorder (18 U.S.C. § 231), conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties (18 U.S.C. § 372), and obstruction of an official proceeding (18 U.S.C. § 1512(c)(2)).

No Specific Offense Characteristics apply to Count Nine.

### E. Count Ten

The applicable Chapter Two Guideline for this offense is §2B3.1, "Robbery, Extortion, and Blackmail." U.S.S.G. Appendix A. No Specific Offense Characteristics apply to Count Ten.

## V. CHAPTER THREE: ADJUSTMENTS FOR CRIMES OF TERRORISM

Section 3A1.4 of the Guidelines provides for an enhanced offense level and increased criminal history category when the offense was "a felony that involved, or was intended to promote, a federal crime of terrorism" as that term is defined by 18 U.S.C. § 2332b(g)(5). That statutory definition, in turn, involves two requirements: (1) that the offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against

---

noting its December 1960 designation date); see also 36 CFR § 65.1(c) ("The National Park Service (NPS) administers the National Historic Landmarks Program on behalf of the Secretary").

government conduct"; and (2) that the offense is one of the enumerated crimes listed in 18 U.S.C. § 2332b(g)(5)(B). Both of those criteria are met here as to each defendant; consequently, the Section 3A1.4 adjustment must apply to their convictions on Count Six (all defendants) and Count Seven (Pezzola).

Separate and apart from the Section 3A1.4 adjustment to Counts Six and Seven and other enhancement sought by the government herein, the government notes that an upward departure under §3A1.4 cmt. n.4(A) ("Note 4"), would be also warranted for all five defendants for these counts or for their other counts of conviction.

### A. All Offenses of Conviction Were Calculated to Influence and Affect the Conduct of Government by Intimidation and Coercion, and to Retaliate Against Government Conduct.

#### 1. Legal Standard

A defendant's offense is "calculated" to influence government or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct, as required by Section 3A1.4, if the offense was specifically intended to have the effect of influencing, affecting, or retaliating against government by force or the threat of force. *See, e.g., United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012) (defendant's narcoterrorism offense had requisite "calculation" where evidence showed defendant "specifically intend[ed] to use the commission from the drug sales to purchase a car to facilitate attacks against U.S. and foreign forces in Afghanistan"). While they are related, "calculation" for the Section 3A1.4 enhancement is distinct from a defendant's particular "motive" and a defendant need not be "personally motivated by a desire to influence or affect the conduct of government," so long as the predicate crime was "calculated to have such an effect." *Khatallah*, 314 F. Supp. 3d at 199. Although "calculation may often serve motive," the enhancement's "calculation" requirement is satisfied if

44

a defendant's offense was "planned—for whatever reason or motive—to achieve the stated object." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (Section 3A1.4 applied to defendant motivated by "prestige and potential influence obtained by associating with" another terrorist, even if defendant did not share the specific political motivation of that terrorist). Moreover, a defendant's intent to influence government conduct or retaliate against the government need not have been his "sole" or "primary" purpose and the "calculation" requirement may be satisfied even if a defendant's relevant conduct sought to "accomplish other goals simultaneously." *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018); *see also United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014) (defendant's "money-raising goals obviously do not preclude a finding of intent to influence government policy," even if raising money was defendant's "primary purpose").

Indeed, Section 3A1.4 is applicable regardless of the defendants' claims that they believed that they were stopping a fraudulent election and aimed to stop communists from taking over the United States. *See United States v. Christianson*, 586 F.3d 532, 539 (7th Cir. 2009) (affirming application of the adjustment for defendants who professed to try to "sav[e] our earth," because "the purpose behind defendants' actions was to further [their] political agenda: the end to industrial society"). As the Seventh Circuit explained, "it doesn't matter why the defendants oppose capitalism and the United States government—if they use violence and intimidation to further their views, they are terrorists." *Id.* So to with these defendants.

### 2. Analysis

In addition to being convicted for their destruction of government property for tearing down the fence on the Capitol grounds (Count Six), an offense enumerated under 18 U.S.C. § 2332b(g)(5)(B), Tarrio, Biggs, Nordean, and Rehl were each convicted of seditious conspiracy

45

(Count One), conspiracy to obstruct an official proceeding (Count Two), obstruction of an official proceeding (Count Three), conspiracy to prevent officers of the United States from discharging their duties (Count Four), and/or interference with law enforcement officers during a civil disorder (Count Five). Pezzola was convicted on Counts Three, Four, and Five, as well as on Count Seven, an enumerated offense, for smashing the Capitol building window in an effort to break into the building and intimidate the congressmen and other government officials inside. Counts One through Five are not enumerated offenses under 18 U.S.C. § 2332b(g)(5)(B). But as the relevant conduct underlying all of these convictions reflects, the defendants conspired to, attempted to, and temporarily did prevent Congress from certifying the 2020 Electoral College vote and to physically prevent Members of Congress from performing their constitutional duties inside the Capitol building, all through the planned, threatened, and actual use of force. As Nordean cogently explained, "the only thing left is force" when other avenues are foreclosed. Ex. 608-C. Force—in the form of street fighting—was a means that these defendants were well-versed in.

The jury's guilty verdicts with respect to Count One (seditious conspiracy) are accompanied by the specific finding—beyond a reasonable doubt—that Tarrio, Nordean, Biggs, and Rehl "conspired or agreed with at least one other person with the goal of opposing by force the authority of the Government of the United States, or preventing, hindering, or delaying the execution of any law of the United States by force." ECF 767 (Jury Instruction) at 21; ECF 804 (Verdict Form) at 1. The jury's finding plainly establishes that the defendants' crimes were calculated to influence or retaliate against the government by force or coercion. *See United States v. Dowell*, 430 F.3d 1100, 1110 (10th Cir. 2005) (holding that the jury made the factual finding that defendant had requisite intent to influence or affect the conduct of government by intimidation or coercion necessary for application of the Section 3A1.4 enhancement when the jury convicted

defendant of attempting to interfere with IRS, having been instructed that an element of the offense was that defendant knowingly and intentionally "endeavored to obstruct or impede the due administration of the Internal Revenue laws by the use of force").

Similarly, the jury's guilty verdicts with respect to Counts Two and Three[25] (conspiracy to obstruct and obstruction of an official proceeding) carry with them the finding that all five defendants acted on January 6 with intent to obstruct or impede the certification proceeding. *See* ECF 767 (Jury Instructions) at 24-25 and 30-31. Likewise, the jury's guilty verdicts with respect to Count Five (interference with law enforcement officers during a civil disorder) carries the finding that defendants intended to obstruct, impede, or interfere with law enforcement. *Id.* at 32-33.

And the jury's guilty verdicts with respect to Count Four (conspiracy to prevent officers from discharging their duties) necessarily mean the jury found that all of the defendants knowingly agreed to use of force or intimidation to stop Members of Congress or law enforcement officers from discharging their duties, thereby inducing law enforcement officers to abandon efforts to guard the building or inducing Members of Congress to flee the House and Senate floors where the certification proceeding had been underway. *See* ECF 767 (Jury Instructions), at 24-25 (instructing jury that defendants must have agreed "to, by force, intimidation or threat, (1) prevent a Member of Congress or federal law enforcement officer from discharging a duty as a Member

---

[25] Pezzola was found guilty of Count Three (obstruction of an official proceeding), but not Count Two (conspiracy to obstruct an official proceeding). The jury thus found that, through his actions on January 6, Pezzola intended to obstruct the Certification of the Electoral College even if it determined that the government had not proven that Pezzola was a part of that conspiracy beyond a reasonable doubt.

of Congress, or (2) induce a Member of Congress or federal law enforcement officer to leave the place where that person's duties are required to be performed").

For the following reasons, the jury's verdict reflects the ample evidence that the defendants' offenses were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. §3A1.4, n.1 (cross referencing 18 U.S.C. § 2332b(g)(5)).

Finally, the defendants' convictions for the destruction of government property in Counts Six and Seven reflect the jury's finding that defendants shared the conspiratorial objective of perpetrating a physical assault on the Capitol, overrunning the fences on the Capitol grounds and ransacking the Capitol building, all in order to intimidate, coerce, and retaliate against the government officials involved in the certification proceedings within those walls.

The government's evidence showed that all five defendants were motivated to use force to stop the certification proceedings in order to keep former President Donald J. Trump in power. On November 16, Tarrio vowed that "[i]f Biden steals this election" the Proud Boys would not "go quietly[.]" Biggs announced that the left was "radicalizing" people by stealing the election and said it was "time for fucking War if they steal this shit." Nordean asserted that the Democrats were "trying to steal the election" and later announced that the "spirit of 1776 had resurfaced" in the Proud Boys. Rehl tracked the election results closely and told his followers that he hoped that "firing squads" would be used "for the traitors that are trying to steal the election from the American people." Pezzola viewed the country as one locked in a "battle between good & evil" and "freedom vs. tyranny" and vowed to "fight" to his "last breath" to avoid a communist takeover.

In the leadup to January 6, the men undertook extensive efforts to deploy a force against the Capitol. Notwithstanding the Proud Boys' frequent use of street violence in cities across

America, Biggs told Tarrio on December 19 that it was time to get "radical" and get "real men." Tarrio, Biggs, and Nordean then oversaw an effort to recruit a gang of "real men"—in the form of the MOSD—to return to Washington, D.C. on January 6. In the private, encrypted chatrooms for the MOSD, the men they had selected discussed the use of force, including force against the Capitol. Their men declared that they were ready to "kick the fuck ass when [it came] time to kick ass." And their men plainly anticipated violence in connection with the certification proceeding on January 6—one of Tarrio's hand-selected members announced that it was "time to stack those bodies in front of Capitol Hill."

Tarrio, Nordean, Biggs, and Rehl had in mind a specific objective for January 6. Tarrio had in his possession a nine-page strategic plan to "storm" government buildings on January 6 for the purpose of getting the government to overturn the election results. In the days before January 6, Nordean announced that he was prepared to use "force against the government" because when "government officials are breaking the law . . . you have to use force." Biggs declared that every "law maker[] who breaks their own stupid Fucking laws should be dragged out of office and hung" and declared that the "government should fear the people." Rehl echoed the same sentiment on January 6, noting that the storming of the Capitol was "what patriotism looks like" and asserting that the when the government "fears its people, you have freedom."

The defendants personally deployed force against the government on January 6. Nordean and Biggs combined their conspirators and others to rip down a black metal fence, which served to unleash the mob into the West Plaza of the Capitol. Pezzola assaulted an officer and stole a riot shield. Rehl fired an aerosol spray against officers. Biggs, Pezzola and their conspirators surged with the crowd up the concrete stairs toward the Capitol. Pezzola used a stolen riot shield to break a window. And the men they led to the Capitol joined in the assaultive and destructive action.

49

These were not random acts—they were intentional acts done for the overarching purpose of influencing government action. After telling his followers, "don't fucking leave," Tarrio posted a picture of rioters in the Senate Chamber with the caption "1776." He referred to the rioters as "revolutionaries." Upon seeing a video of Pezzola smashing the Capitol windows, Tarrio compared the rioters to "George Washington[,] Sam Adams[,] and Franklin." From the lawn of the Capitol while standing with Nordean, Biggs made their objective clear—"we just stormed the fucking Capitol; took the motherfucking place back." He then declared January 6 to be a "day in infamy." Nordean menaced an officer in the Rotunda, telling him that the "thin blue line was dead." Pezzola recorded himself inside the Capitol stating that he "knew" they could "take this motherfucker over if we just tried hard enough." Pezzola closed the recording with his mention of the gang, "Proud of your motherfucking boy."

After breaching the Capitol and halting the Certification, the defendants' statements indicate that their intent had been to coerce and intimidate the government—and that they sought to continue doing so. For instance, on the evening of January 6:

- Tarrio posted a message that read, "I don't want what happened today to continue to happen. But it is up to our elected officials to listen...Because things can get ugly."

- Tarrio posted a message that said that Biden had launched a "war" against "us" and that as "crazy as [January] 6th was, It shows . . . DON'T FUCKING TREAD ON US."

- Nordean posted a message calling the Capitol police "oath breakers" and said that if you "feel bad" for them, "you are part of the problem." Nordean claimed that "they care more about federal property . . . than serving the people."

- Nordean recorded a video of himself describing an encounter with a woman at the bar; in the video he faulted the woman for not appreciating that "I was part of fucking storming the Capitol of the most powerful country in the fucking world… 1776, bitch."

- Biggs recorded a podcast where he proudly declared that the government "just found out how weak they really are." Biggs went on to explain that January 6 was a "warning shot to the government" that the people "started the country this way" and they would "save it this way."

- Rehl announced that January 6 was a "historical day." He declared himself "so fucking proud" that "our raid of the capital [sic] set off a chain reaction of events throughout the country."

These are just a sample of the numerous statements made by the defendants indicating their coercive, intimidating intent.

Finally, the defendants' choice of target, itself—the Capitol building, where Congress was in session—further evidences their intent to intimidate and affect the government. A defendant's specific intent to influence and retaliate against government conduct for purposes of Section 3A1.4 can often "be inferred from the defendant's choice of target." *Abu Khatallah*, 314 F. Supp. 3d at 198. Attacking a government facility that is "a physical manifestation of the U.S. government . . . suggests a desire to retaliate against or influence that government." *Id.* at 199. That is why, "[u]nsurprisingly . . . , several courts have applied and upheld the terrorism enhancement for defendants who targeted government facilities." *Id.* (citing cases). Clearly, attacking the seat of our government while the entire complement of legislators and the Vice President of the United States are inside performing their constitutional and statutory duties is a strong indication of intent to influence or affect the government.

In short, all of defendants' offenses displayed a clear, shared intent to stop Congress from certifying the results of the election through the organized use of physical force and property destruction. That conduct is a quintessential example of an intent to influence and retaliate against

government conduct through intimidation or coercion and warrants the application of the terrorism enhancement pursuant to Section 3A1.4.[26]

### B. The Defendants' Convictions on Counts Six and Seven are Qualifying Offenses for the Section 3A1.4 Adjustment

The second requirement for the Section 3A1.4 adjustment is that the offense was "involved, or was intended to promote," one of the enumerated offenses listed at 18 U.S.C. § 2332b(g)(5)(B).

"[A] defendant's offense 'involves' a federal crime of terrorism when his offense includes such a crime, *i.e.*, the defendant committed, attempted, or conspired to commit a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5), or his relevant conduct includes such a crime." *United States v. Awan*, 607 F.3d 306, 313–14 (2d Cir. 2010); *see also United States v. Arnaout*, 431 F.3d 994, 1001 (7th Cir. 2005) ("the word 'involved,' as used in § 3A1.4, signifies that where a defendant's offense or relevant conduct includes a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5)(B), then § 3A1.4 is triggered"); *United States v. Fidse*, 862 F.3d 516, 522 (5th Cir. 2017) (same); *United States v. Arcila Ramirez*, 16 F.4th 844, 850 (11th Cir. 2021) (same).

Count Six, on which all defendants were convicted, and Count Seven, on which Pezzola was convicted, charged felony Destruction of Government Property in violation of 18 U.S.C. § 1361. This offense is listed in 18 U.S.C. § 2332b(g)(5)(B)(i). Accordingly, because the intent requirement is satisfied as explained above, the defendants' convictions on Counts Six and Seven qualify as "federal crimes of terrorism" and the Section 3A1.4 adjustment applies.

---

[26] These facts also support the application of Note 4 of Section 3A1.4, which is discussed herein at Part V.C. In short, Note 4 authorizes a departure when the commission of an offense not specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B) is nonetheless "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. §3A1.4, cmt. n.4.

**C. An Upward Departure Pursuant to Note 4 Applies to Defendants' Other Convictions**

Significantly, an upward departure under Note 4 is also warranted for defendants' convictions. The upward departure is unnecessary because the adjustment applies, but even if one applied the departure rather than the adjustment, the result would be the same: the aggravating factors described above would warrant offense levels commensurate with those reached by applying the Section 3A1.4 adjustment and the other enhancements sought by the government.

Note 4 states that even where defendants are not convicted of an offense enumerated in 18 U.S.C. § 2332b(g)(5), an upward departure is "warranted" if the defendants' "offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Id.*, cmt. n.4(A). When it adopted Note 4, the Sentencing Commission explained that it is "an *encouraged, structured upward departure,*" the purpose of which is to provide courts with "a viable tool to account for the harm involved during the commission of these offenses on a case-by-case basis" and to "make[] it possible to impose punishment equal in severity to that which would have been imposed if the § 3A1.4 adjustment actually applied." Sentencing Guidelines, App. C, amend. 637 (2002) (emphasis added).

The defendants' offenses of seditious conspiracy (Count One), conspiracy to obstruct an official proceeding (Count Two), obstruction of an official proceeding (Count Three), conspiracy to prevent officers of the United States from discharging their duties (Count Four), and/or interference with law enforcement officers during a civil disorder (Count Five) are not enumerated under 18 U.S.C. § 2332b(g)(5), but—as introduced immediately above—these offenses were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4, cmt. n.4(A). As their convictions and the underlying evidence reflects, the defendants conspired to, attempted to, and temporarily did

53

prevent Congress from certifying the 2020 Electoral College vote and to physically prevent Members of Congress from performing their constitutional duties inside the Capitol building, all through the planned, threatened, and actual use of force.

Application of Note 4 to these defendants' conduct is consistent with the application of Note 4 in this district and by other courts around the country. Judge Mehta applied upward departures ranging from one to six levels under Note 4 to all eight of the Oath Keepers defendants he has sentenced to date in *United States v. Rhodes, et al.*, No. 22-cr-15.[27] Even more recently, Judge Mehta applied a one level upward departure under Note 4 to Audrey Southard-Rumsey, who was convicted of interfering with law enforcement officers during the commission of a of civil disorder, assaulting law enforcement officers, and obstructing an official proceeding in connection with her rampage through the Capitol on January 6. *United States v. Southard-Rumsey*, No. 21-cr-387.

Other courts have applied Note 4 and, specifically, Note 4(A)—relating to offenses that are not enumerated in 18 U.S.C. § 2332b(g)(5)(B) but are "calculated" to influence or retaliate against the government—in different contexts. In *United States v. Doggart*, the sentencing court imposed

---

[27] None of the defendants in the *Rhodes* and *Minuta* cases (21-cr-28 (APM)) were convicted of a specifically enumerated crime under 18 U.S.C. § 2332b(g)(5)(B). Judge Mehta nonetheless found that the crimes committed by members of the Oath Keepers conspiracy were calculated to influence and retaliate against government conduct and applied upward departures under Note 4 to those defendants' crimes of conviction, *e.g.*, Seditious Conspiracy and Obstruction of an Official Proceeding. By contrast, four Oath Keepers co-conspirators in the *Parker* case (22-cr-28 (APM)) were convicted of felony destruction of government property, in violation of 18 U.S.C. § 1361. While those defendants have not yet been sentenced, the government has taken the position that, although the Section 3A1.4 adjustment might apply, the *Parker* defendants are less culpable than their *Rhodes* and *Minuta* co-conspirators. The government therefore asked the Court to use the same methodology for the *Parker* defendants that it used with the *Rhodes* and *Minuta* co-conspirators, and to find that the appropriate Guidelines range is the one determined after application of the Note 4 upward departure.

a Note 4(A) upward departure where the defendant was convicted of soliciting the destruction of religious property in connection with his plan to burn down buildings in a Muslim community, seeking to "set[] in motion an armed insurrection against the government of the United States that would force the government of the United States either to respond to" the defendant's planned attacks, "or to give in and capitulate." No. 15-cr-39-CLC-SKL (E.D. Tenn. Sep. 16, 2020), ECF 343 at 6. The Sixth Circuit affirmed, agreeing that the defendant's offense was "calculated to influence or affect government conduct by intimidation or coercion." *United States v. Doggart*, No. 20-6128, 2021 WL 5111912, at *2-4 (6th Cir. Nov. 3, 2021). There, the sentencing court upwardly departed from an otherwise applicable guidelines range that called for 51 to 63 months of imprisonment (equivalent to offense level 24 at Criminal History Category I) to a range of 324 to 405 months of imprisonment (equivalent to offense level 41 at Criminal History Category I).[28] *Id*. After departing upward, the court sentenced the defendant to the statutory maximum for his sole offense of conviction, ten years of imprisonment. *Id.* at *1.

In a separate case in the District of Oregon, the sentencing court applied Note 4 when sentencing multiple co-conspirators convicted of violations under 18 U.S.C. § 372 and related offenses for their roles as part of Ammon Bundy's 2016 armed occupation of the Malheur National Wildlife Refuge, based on their disagreement with federal land management policies. These co-conspirators, some of whom were armed, formed a convoy, entered the Malheur refuge, and then set up a perimeter blocking the entrance of personnel from the Fish and Wildlife Service and other

---

[28] Since the Court may upwardly depart under Note 4 to impose a sentence that does not "exceed the top of the guideline range that would have resulted if the adjustment under this guideline at been applied," cmt. n.4, the Court is not limited to an offense level increase of 12 steps as contemplated in Section 3A1.4(a), but can depart higher because Section 3A1.4(b) also calls for an increase of the defendant's Criminal History Category to Level VI.

federal agencies. As they indicated in public statements, the occupiers aimed to "adversely possess" the federal land at the Malheur refuge and to compel the release of two other ranchers who had been convicted of arson on federal land. Although some defendants involved in the occupation claimed their actions were peaceful, certain defendants carried firearms as they patrolled the refuge, including in a fire watchtower where they stood guard, and one of the defendants was a member of the "Washington III%" militia. The court applied a Note 4 upward departure to eleven of the thirteen defendants who had pled guilty (some of whom had agreed to the application of the departure in their plea agreements), departing upward two offense levels (one defendant), three offense levels (four defendants), five offense levels (three defendants), and ten offense levels (one defendant). *See United States v. Patrick*, No. 16-cr-51-BR-9 (D. Or. Feb. 18, 2018), Sent. Tr. at 43-45. The court then applied four- and two-level departures to two defendants convicted at trial. *Id.* at 46; *United States v. Thorn*, No. 16-cr-51-BR (D. Or. Nov. 21, 2017), Sent. Tr. at 12.

Other sentencing courts have also upwardly departed under Note 4, although under Note 4(B), a different subsection than the government relies on here, where defendants' convictions "involved, or were intended to promote" an enumerated offense under 18 U.S.C. § 2332b(g)(5)(B) but the "terrorist motive was to intimidate or coerce a civilian population" rather than to influence or retaliate against government conduct. *See United States v. Harpham*, 11-cr-42 (E.D. Wash.), applied in *United States v. Harpham*, 2012 WL 220276 (E.D. Wash. Jan. 25, 2012) (three offense-level Note 4(B) departure applied to defendant who placed explosive device along the Martin Luther King, Jr. Day parade targeting parade participants); *United States v. Cottrell*, 04-cr-279 (C.D. Cal.), *aff'd*, *United States v. Cottrell*, 312 F. App'x 979, 981 (9th Cir. 2009) (per curiam), *superseded on other grounds* in 333 F. App'x 213 (9th Cir. 2009) (per curiam) (after application

of Note 4(B), defendant sentenced to 100 months of imprisonment for participating in conspiracy to commit vandalism and arson of SUVs in connection with environmental extremist organization); *United States v. Jordi*, 03-cr-60259 (S.D. Fla.), *aff'd*, *United States v. Jordi*, 418 F.3d 1212 (11th Cir. 2005) (after application of Note 4(B), defendant sentenced to 10 years of imprisonment in connection with conviction for planned bombing of abortion clinics meant to dissuade doctors from performing abortions); *see also United States v. Holzer*, 19-cr-488 (D. Colo.), ECF 101 at 1-5 (finding that Note 4(B) applied to defendant convicted of attempted arson of a synagogue, but describing 235-month sentence of imprisonment as the result of an upward "variance").

Here, the Section 3A1.4 adjustment applies to the defendants' convictions for the federal destruction of property. The Court could also reach the same result by departing upward pursuant to Note 4, in lieu of applying the Section 3A1.4 adjustment and other sentencing enhancements, as the government submits that the appropriate upward departure would result in the same offense levels. The Court need not consider a Note 4 adjustment, though, because the Note 4 equities are adequately addressed by the Section 3A1.4 adjustment and other sentencing enhancements.

## VI. CHAPTER THREE: OTHER ADJUSTMENTS

The PSRs apply the appropriate adjustments, given the defendants' relevant conduct.

### A. Section 3B1.1 (aggravating role)

The Guidelines provide for an increase in the offense level if the defendant played an aggravated role in the offense, as an "organizer" or "leader" (four levels) or "manager" or "supervisor" (three levels) of a criminal activity that involved five or more participants. U.S.S.G. § 3B1.1(a), (b). The PSRs correctly apply the aggravating role adjustment by assigning a four level

adjustment to Tarrio, Biggs, and Nordean as organizers/leaders and a three level adjustment to Rehl for his role as a supervisor.

The following non-exhaustive factors are instructive in determining whether to apply the adjustment and, if so, whether to add three or four levels:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014) (quoting U.S.S.G. § 3B1.1, cmt. n.4). "No single factor is dispositive." *Id.* While the court must examine the degree of "control" the defendant exercised over other criminally culpable individuals, *id.*, this factor "alone does not determine whether the sentence can be increased" pursuant to Section 3B1.1, *United States v. Kelley*, 36 F.3d 1118, 1129 (D.C. Cir. 1994); *see also United States v. Brodie*, 524 F.3d 259, 270-71 (D.C. Cir. 2008) (noting the "several" factors that must be considered *in addition* to "control").

The Circuit has further explained that it understands "control" to "connote some sort of hierarchical relationship" among the participants in the criminal enterprise. *Olejiya*, 754 F.3d at 990. "When confronted with a heavily stratified conspiracy, a court must superimpose the § 3B1.1 framework over the organizational chart of the conspiracy and, using the factors [in the commentary in Note 4 to the Guideline], decide where to draw the two relevant lines that determine who qualifies for a § 3B1.1 enhancement." *United States v. Graham*, 162 F.3d 1180, 1185 (D.C. Cir. 1998). In this way, the three-point enhancement in Section 3B1.1(b) is a "middle-rung enhancement." *United States v. Otunyo*, 63 F.4th 948, 958 (D.C. Cir. 2023).

The aggravating-role adjustment applies to a defendant who "managed" or "supervised" merely one other person, so long as the larger criminal activity that constituted the "relevant

conduct" involved five or more participants. U.S.S.G. § 3B1.1(a), cmt. n.2. Multiple defendants can qualify as a "leader" or "organizer" of the same criminal conspiracy, subjecting them to the same four-level adjustment. *Id.*, cmt. n. 4.

The D.C. Circuit has "found the requisite hierarchical relationship" in several cases. *See, e.g., Olejiya*, 754 F.3d at 991 (recruited some members and supervised others in check-cashing scheme); *Brodie*, 524 F.3d at 270-71 (recruited members and "coordinated the group's efforts"); *United States v. Wilson*, 240 F.3d 39, 46-47 (D.C. Cir. 2001) (recruited and directed others in bank fraud scheme); *United States v. Norman*, 926 F.3d 804, 812 (D.C. Cir. 2019) ("recruited, managed-supervised, and took a large share of proceeds"). And when the Circuit has found the "hierarchical relationship" lacking, it is often because the defendant had a different type of relationship with his accomplice. *See, e.g., United States v. Johnson*, 64 F.4th 1348, 1352-53 (D.C. Cir. 2023) (finding that defendant did not have the requisite hierarchal relationship and control over his estranged wife, particularly given the spousal relationship and that she agreed to help him *despite* her anger with him).

Moreover, the Circuit has found that a defendant's leadership position in a workplace, even for a defendant who did not recruit others or "initiate[]" the scheme, can support this managerial-role adjustment if the crime is related to the work. *See, e.g.*, *United States v. Bras*, 483 F.3d 103, 113-14 (D.C. Cir. 2007) (defendant was manager at construction company and part of conspiracy to bribe government inspectors); *United States v. Bikundi*, 926 F.3d 761, 801 (D.C. Cir. 2019) (per curiam) (defendant was owner of home health care company and part of conspiracy to alter employee and patient records related to fraudulently obtaining government reimbursements).

The Circuit has also found the adjustment applicable for a defendant's conviction for conspiring to violate 18 U.S.C. § 1512 based on his conduct, as a federal official, to solicit

kickbacks and then conceal his activities. *Kelley*, 36 F.3d at 1129. The defendant "sought out both knowing and unwitting accomplices," instructing them on what to do and how to do it. *Id.*

Importantly, the Circuit recently reiterated that this Chapter 3 role adjustment is determined by looking broadly at all relevant conduct rather than simply the offense of conviction. *Otunyo*, 63 F.4th at 958-59.; *see also United States v. Olibrices*, 979 F.2d 1557, 1560–61 (D.C. Cir. 1992) (holding that a sentencing judge should "take into account the contours of the entire conspiracy," rather than merely the offense of conviction, when determining whether a Chapter Three adjustment applies to a defendant's role in the criminal activity). In other words, a defendant should receive the adjustment even if he is not at the top of the hierarchy, so long as he played a managerial or supervisory role anywhere within the criminal activity.

Notably, to qualify for the adjustment, the defendant must have managed or led one or more *participants* in the scheme, rather than simply controlled the scheme itself. *Bapack*, 129 F.3d at 1324. However, there is no requirement that, to qualify as a "participant," a person be "culpable in the same crime of which the supervising defendant was convicted." *Id.* at 1325. And indeed, the "participant" need not have been convicted, or even charged. *Id.* In *Bapack*, the Circuit affirmed the imposition of the role-adjustment under Section 3B1.1, explaining that the adjustment does *not* require a finding that a defendant "supervised 'participants' who were unindicted co-conspirators or accessories in the crimes of which she was convicted. Rather, it is enough that the 'participants' she supervised were culpably involved in uncharged crimes 'that were part of the same course of conduct or common scheme or plan as the offense of conviction.'" *Id.* (quoting U.S.S.G. § 1B1.3(a)(2)). Thus, the adjustment was correctly applied to a defendant who supervised nurses in creating a false document, because those nurses violated 18 U.S.C. § 1001, and even though neither the nurses nor the defendant were charged with that crime, it was part of the defendant's "course

60

of conduct or common scheme" of conspiring to defraud the government by submitting false Medicare and Medicaid claims. *Id.*

The evidence showed that Tarrio, Biggs, Nordean, and Rehl formed an agreement in advance of January 6 that was characterized by a degree of structure and organization that was uncharacteristic of the Proud Boys. The structure and organization centered on the MOSD. It was conceived of and created by Tarrio, who selected Nordean and Biggs as his top lieutenants. Rehl was hand-picked for a leadership role in the chain of command. Tarrio created an encrypted Telegram group chat for the leaders of the MOSD. Ex. 501-1. Those leaders in the chat group (the "MOSD Leaders" group) included Tarrio, Biggs, Nordean, and Rehl, as well as co-conspirators Charles Donohoe, Jeremy Bertino, and John Stewart.[29]  *Id.*

Tarrio implemented a set of rules, which were enforced by his deputies. First, the group would be made up exclusively of "hand selected" members who were specifically chosen by the MOSD leadership. Ex. 500-69. Second, the group was subject to strict secrecy requirements, with members forbidden from discussing it with outsiders or even with other Proud Boys. Ex. 613-P. Third, the members were required to observe the chain of command both by following direct orders without question (in one leader's words, "turn your brains off and follow") and by conforming at all times to the general norms and expectations set by leadership ("fit in or fuck off"). Ex. 613-E and 503-3.

These rules were introduced and implemented to the hand-selected men of the MOSD. Tarrio, Nordean, Biggs, and Rehl each selected men for the MOSD, and the men were invited into an encrypted message group for MOSD members that had been created by Tarrio. The hand-

---

[29] The plea agreement of Charles Donohoe included a three-level adjustment for his role as manager of the conspiracy. *United States v. Charles Donohoe*, 21-cr-175-4 (TJK).

selected men were valued for their willingness to follow-orders and ability to dole out street-level violence. Once included in the MOSD, subordinate members of MOSD affirmed their eagerness to use violence as part of the group, sending messages to the chat about intentions to "log into minecraft," Ex. 503-5, "beat the motherfuck" out of Antifa, Ex. 503-17, "break some legs," *id.*, "kick ass when… it's time to kick ass," Ex. 503-23, "storm everyone's capitols," Ex. 503-13, "let the bodies hit the floor," Ex. 507-11, and "stack those bodies in front of Capitol hill," Ex. 507-10. MOSD's leaders never expressed any disapproval about such remarks, including those that specifically mentioned violence directed at the Capitol. *See* Tr. 8515-8517 (Dubrowski).

As January 6 approached, Tarrio was arrested for his public destruction of property on December 12.[30] After Tarrio's arrest, Nordean and Biggs assumed direct operational control over the MOSD, and they assured their subordinates that "the rally's continuing" and that they had formed a "plan" about which they had consulted Tarrio. Ex. 510-9 and -23. In a private, encrypted message, Nordean instructed his men to meet at the Washington Monument at 10 a.m. and that "from there" the men would be "marching to the Capitol." Ex. 551. The call to meet at 10 a.m. at the Washington Monument was also broadcast by other MOSD leaders to the MOSD members and Boots on Ground participants. Ex. 510-24 and 512-5.

The men met at the Washington Monument as instructed. Tr. 5482:11-15 (Greene). Consistent with the directives of Biggs, Tarrio, and other leadership, the assembled men were not wearing Proud Boys colors, but many wore tactical equipment such as helmets and plate carriers.

---

[30] While the evidence was excluded under Fed. R. Evid. 403 at trial, Tarrio had bragged about the crimes and taunted law enforcement on social media—unequivocally sending a public message to his men that crimes in furtherance of the Proud Boys' objectives were fully endorsed by the Chairman. *See* Tr. 4023-30, 4063-75 (Oral argument on Jan. 18, 2023, concerning the admission of Tarrio's Parler exhibits).

*Id.* at 5481:20-22 (Greene); *see also* Ex. 1000 at 00:25-3:05. Nordean and Biggs prominently took control of the march, and Nordean and Biggs frequently addressed the men through a megaphone—telling them that in their view the police and government had failed them. *E.g.*, Ex. 1000 at 4:10-5:33. On the march, Rehl played an integral organizational role, using his radio to ensure that the group of approximately 200 stayed together as it marched towards the Capitol. *Id.* at 8:15-8:30. He also communicated with co-conspirators who were not present, but who were monitoring events in Washington remotely, about how things were going on the ground. Ex. 509-29.

Nordean, Biggs, and Rehl maintained control over the group as they marched them away from the featured speakers at the Ellipse and, as planned, toward the Capitol. At 12:45 p.m., fifteen minutes before the certification of the Electoral College vote was scheduled to start, Nordean mustered the men into a column and marched them to the First Street side of the Capitol. Ex. 1000 at 19:05-19:20, Ex. 1001 at 00:50-1:15. Nordean, Biggs, and Rehl led the men away from then-President Trump's speech, which was ongoing. Biggs, Nordean, Rehl, and their men played an integral role in the first breach of the restricted perimeter on January 6. At 12:53 p.m., approximately one minute after Biggs led a "Whose Capitol? Our Capitol!" chant, the crowd surged forward towards a police barricade manned by five officers. Ex. 1001 at 8:07. As the crowd surged forward, Nordean and Biggs attempted to organize the men to stay with and follow them. *Id.* at 8:18-8:37. Rehl moved to the front of the crowd while yelling, "Fuck them! Storm the Capitol!" *Id.* at 10:01-10:20; Tr. 12246:5-10 (Miller).

Even as the chaos unfolded, the men maintained command and control through the predetermined rule—follow the commands of leadership or as known in Proud Boys parlance, fit in or fuck off. As acknowledged by defense witness Travis Nugent, the men simply fell back on

the chain of command and followed leadership in their assault on the Capitol. Tr. at 14643:24-14645:4 (Nugent).

The leaders' command and control persisted throughout the siege. Nordean and Biggs led a smaller group around the grounds of the Capitol until the final push to the building, and Biggs continued to lead a smaller group of men as he twice rampaged through the Capitol. Rehl first asked, then led his group into the Capitol where they entered a private office where Rehl smoked and posed for pictures while flashing the Proud Boys hand gesture. Tr. 12635:8-23, 12639:16 – 12640:24 (Miller); Ex. 115x, 415x and 402-B. Nordean moved around the Rotunda with other Proud Boys, including a Proud Boys member who had twice entered the building with Biggs. And, watching from afar, Tarrio privately took credit for his accomplishment (*e.g.*, "Make no mistake . . . we did this." (500-84)) and publicly encouraged his men and the crowd to continue the attack (*e.g.*, ""Proud of my boys and my country," and "Don't fucking leave." (Ex. 600-59)).

The Court should therefore apply the PSR's suggested adjustments to Tarrio, Nordean, Biggs, and Rehl, for an aggravating role.

## B. Section 3C1.1 (obstruction of justice)

The PSRs correctly apply Section 3C1.1's two-level enhancement for obstruction of justice to Tarrio, Biggs, and Rehl. This enhancement applies if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." U.S.S.G. § 3C1.1. The commentary to the Guidelines includes a non-exhaustive list of some of the ways that a defendant can obstruct justice. *See, e.g.*, U.S.S.G. § 3C1.1, cmt. n.4(B) (committing perjury); cmt. n. 4(D) (deleting evidence or instructing others to

64

do so, or attempting to do so); *see also United States v. Dunnigan*, 507 U.S. 87, 92-95 (1993) (confirming that perjury merits the obstruction enhancement under Section 3C1.1); *United States v. Mellen*, 89 F. App'x 268, 270 (D.C. Cir. 2004) (affirming application of the enhancement for "advis[ing]" someone else to destroy property to avoid detection, and then destroying the evidence himself). Each of the defendants' obstruction manifested itself in different ways, and because the facts and circumstances of each defendants' obstructive conduct was different, the bases for the adjustments are detailed in the sentencing addendums specific to each defendant.  *See* Attachment A (Tarrio), Attachment B (Nordean), Attachment C (Biggs), Attachment D (Rehl), and Attachment E (Pezzola).

## C. **Section 3E1.1 (no acceptance of responsibility)**

The PSRs correctly reject the defendants' claims to an entitlement to a reduction in offense level based on any alleged acceptance of responsibility. Notably, Pezzola offered to provide pretrial services with a letter that would detail Pezzola's "partial" acceptance of responsibility. That letter has not materialized. In any event, any such *post-facto* "partial" acceptance does not make an "acceptance of responsibility" reduction available to the defendants. The Guidelines commentary makes clear that an acceptance reduction "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, cmt. n.2. It will be "rare" for a defendant who proceeds to trial to receive this adjustment. *Id.* That "rare" situation is when a defendant proceeds to trial to "preserve issues that do not relate to factual guilt." *Id.* That is not the case here.

Regardless of any facts conceded by any defendant prior to or during trial, each defendant contested that the government proved the necessary *mens rea* for the defendant to commit the

conspiracy or obstruction of justice offenses. Each defendant, therefore, denied an essential factual element of guilt: his or her own intent. Indeed, in a different Capitol riot case, Judge Walton rejected this precise argument, holding that a defendant who went to trial and testified about his conduct but denied possessing the necessary *mens rea* to corruptly obstruct the official proceeding would "absolutely" not be entitled to a reduction for acceptance of responsibility. *United States v. Thompson*, 21-cr-161 (Nov. 18, 2022), Sent. Tr. at 64. Judge Walton's conclusion echoes that of circuit courts, which routinely find that district judges do not abuse their discretion or clearly err in denying the acceptance-of-responsibility adjustment for defendants who proceed to trial in obstruction cases contesting whether they possessed the requisite corrupt intent. *See, e.g.*, *United States v. Marinello*, 839 F.3d 209, 226-27 (2d Cir. 2016), *reversed and remanded on other grounds*, 138 S. Ct. 1101 (2018); *United States v. Petruk*, 836 F.3d 974, 977-78 (8th Cir. 2016). A defendant who admits his physical actions but denies his intent necessarily denies his "factual guilt" under Section 3E1.1. *See United States v. Jaynes*, 75 F.3d 1493 (10th Cir. 1996) (affirming inapplicability of this adjustment for defendant who admitted conduct constituting forgeries but denied any intent to defraud government); *United States v. Burns*, 781 F.3d 688 (4th Cir. 2015) (affirming inapplicability of this adjustment for defendant who admitted to shooting into car but denied possessing intent to kill).

Moreover, the defendants who testified at trial made it abundantly clear that they have no remorse for their actions. At the conclusion of his testimony, including his lies to the jury about his assault on law enforcement, Rehl summed up his attitude about his conduct with a textbook non-apology, "[i]f you believe that I did anything wrong that day, I really do truly apologize." The "I'm sorry you feel that way" apology communicates no remorse and accepts no responsibility. During his testimony, Pezzola played the same song with different lyrics. He laid the blame for his

violent and assaultive conduct on the officers who were attempting to protect themselves and control Pezzola and the other rioters. He blamed COVID lockdowns; he blamed his military training; he blamed everyone but the person who was responsible for his actions.

Indeed, even in their PSR interviews, not a single defendant acknowledged their guilty conduct. None of them has "accepted responsibility" for their criminal actions.

## VII. GROUPING ANALYSIS

As the PSRs correctly conclude, for each defendant, all counts of conviction should group. Under §3D1.2, "closely related counts" group. All the counts of conviction for each defendant should be placed into one group, as described more fully below.

*Counts One, Two, Three, Six, and Seven*. Under §3D1.2(b), the counts that "involve the same victim" and "two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan" group. Counts One (seditious conspiracy), Two (conspiracy to obstruct an official proceeding), Three (obstruction of an official proceeding) involve the same victim (Congress or the government itself) and are part of the same common criminal objective: to oppose by force the authority of the United States by preventing Congress from meeting. Counts One, Two, and Three therefore group under §3D1.2(b). Similarly, Counts Six and Seven (destruction of government property) involve the same victim (Congress or the government itself) and were connected by a common criminal objective: to oppose by force the authority of the United States by preventing Congress from meeting. Were Counts Six and Seven determined to involve a different victim (*e.g.*, the Architect of the Capitol), Counts Six and Seven would still group because they embody conduct that is treated as a specific offense characteristic in Counts One, Two and Three (*i.e.*, §2J1.2(b)(1)(B) ("threatening to cause physical injury to a

person . . . in order to obstruct the administration of justice.")) *See* U.S.S.G. §3D1.2(c); *see also*, discussion, *infra*.

*Count Four.* Under §3D1.2(c), a count that "embodies conduct that is treated as a specific offense characteristic in" another guideline groups with the guideline for that count. Count Four (conspiracy to prevent officers of the United States from discharging their duties) embodies conduct that is treated as a specific offense characteristic in §2J1.2(b)(1)(B). In Count Four, the jury found the defendants guilty of conspiring to use "force, intimidation, or threat" to prevent Members of Congress and federal law enforcement officers from discharging duties. Those same elements – force, intimidation, or threat – support application of the specific offense characteristic in §2J1.2(b)(1)(B) of "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice."

*Count Five.* Just as with Count Four, under §3D1.2(c), a count that "embodies conduct that is treated as a specific offense characteristic in" another guideline groups with the guideline for that count. In Count Five, the jury found all five defendants guilty of interference with law enforcement officers during a civil disorder. That conduct supports application of the specific offense characteristic in §2J1.2(b)(1)(B) of "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." *See* discussion, *supra* at Part IV.A.2.

*Count Nine.* In Count Nine, the jury found Pezzola guilty of assault. As with Counts Four and Five, Pezzola's assault also supports application of the specific offense characteristic in §2J1.2(b)(1)(B) of "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice" to Counts One, Two, and Three. Accordingly, Count Nine groups with Counts One through Three under U.S.S.G. §3D1.2(c).

68

In the alternative, the applicable guideline for Count Nine is §2A2.2 (and not §2A2.4) because the assault involved "an intent to commit another felony." U.S.S.G. §2A2.2 n.1. Accordingly, if evaluated from the opposite direction, Count Nine groups with Counts Three, Four, and Five because those other felonies form the basis for the adjustment in the guidelines for Count Nine, *i.e.*, the other felonies "embod[y] conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to" Count Nine.

*Count Ten*. In Count Ten, the jury found Pezzola guilty of robbery. As with Counts Four, Five, and Nine, Pezzola's robbery also supports application of the specific offense characteristic in §2J1.2(b)(1)(B) of "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice" to Counts One, Two, and Three. Accordingly, Count Ten groups with Counts One through Three under U.S.S.G. §3D1.2(c).

In addition, under §3D1.2(b), the counts that "involve the same victim" and "two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan" group. The assault charged in Count Nine involved the same officer from whom the property was robbed, *i.e.*, Officer Mark Ode. Counts Nine and Ten were carried out as part of the same common criminal objective. Accordingly, the Counts Nine and Ten group, and for the reasons explained herein, *supra*, Counts Nine and Ten group with the other counts of conviction.

Were the Court to determine that any of the specific offense characteristics or the adjustment for obstruction of justice do *not* apply to a particular defendant, then not all counts of conviction would group, and the Court would need to adjust the offense level according to the analysis in Part D of Chapter 3.

## VIII.   UPWARD DEPARTURES

The Court should depart upward from the Guidelines range for each of the defendants'

relevant conduct in this case for the bases explained below and in the sentencing allocution section

for each defendant. Specifically, in addition to the application of an upward departure for a federal

crime of terrorism under Note 4 of Section 3A1.4, other provisions in the Sentencing Guidelines

provide independent bases for the Court to depart upwards from each defendant's Guidelines

range.

First, Section 5K2.7 provides that "[i]f the defendant's conduct resulted in a significant

disruption of a governmental function, the court may increase the sentence above the authorized

guideline range to reflect the nature and extent of the disruption and the importance of the

governmental function affected." U.S.S.G. § 5K2.7. This departure "ordinarily would not be

justified when the offense of conviction is . . . obstruction of justice . . . unless the circumstances

are unusual." *Id.; see also* § 3A1.2, cmt. n.5; § 2A2.4, cmt. n.3 (regarding additional relevant bases

for applying Section 5K2.7). Here, both the circumstances and the offense are unusual: the

defendants sought to disrupt a government function that is integral to our democracy and is

mandated by the Constitution itself—the Certification of the votes of the Electoral College. *See*

U.S. Const. amend. XII. Further, seditious conspiracy is an egregious offense for which defendants

are rarely convicted and sentenced—and very few defendants have been sentenced since the advent

of the Sentencing Guidelines. But when defendants are sentenced for a seditious conspiracy

conviction, they typically receive lengthy terms of incarceration. *See* Part IX.C (recounting other

sentences for seditious conspiracy).

Second, an upward departure is equally appropriate under Section 5K2.0(a)(3) to account

for the defendants' "intent to frighten, intimidate, and coerce" federal lawmakers in manner that is

not otherwise accounted for in the Guidelines. *United States v. Tankersley*, 537 F.3d 1100, 1116 (9th Cir. 2008); *see id.* at 1112-14 (upholding 12-level upward departure under Section 5K2.0 after the district court concluded that Section 3A1.4 did not apply). As explained in detail at Part V, the defendants intended to and did use force to oppose the government; and they took these actions in order to influence or affect the conduct of government by intimidation or coercion. Absent an application of the adjustment for a federal crime of terrorism, the Guidelines would not otherwise accurately reflect the seriousness of the defendants' conduct.

## IX.    SECTION 3553(a) FACTORS APPLICABLE TO ALL DEFENDANTS

The Court's sentence must be guided by the factors in 18 U.S.C. § 3553(a). The following factors are applicable to all five defendants: the nature and circumstances of the offense, § 3553(a)(1); the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate general deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). These factors support the government's requested sentences, through the Guidelines analysis (including an upward departure) and/or an upward variance. The remaining 3553(a) factors are discussed in the sentencing addendums specific to each defendant, *see* Attachment A (Tarrio), Attachment B (Nordean), Attachment C (Biggs), Attachment D (Rehl), and Attachment E (Pezzola).

### A.  Nature and Circumstances of the Offense and Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

These defendants each played a role in an unprecedented conspiracy to oppose the transfer of presidential power. The attack on the U.S. Capitol on January 6 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile

71

forces—a fact that Biggs noted with pride in the days after January 6. Ex. 611B (Biggs: "The last time that happened was the 1800s, and it was by the British").

These defendants planned for and launched an attack on the heart of our democracy. This was the "war" that they envisioned; the "revolution" that they had aimed to lead. As January 6 approached, Tarrio called for revolution, posting messages that read, "Let's ring in this year with one word in mind. Revolt." And "New Years Revolution." Ex. 600-52 and -54. During a podcast on December 28, 2020, Nordean called for the use of force against law enforcement and government officials, explaining that "the only thing left is force." Ex. 608-C. Nordean went on to explain that he didn't "want" to use force against the government "because the repercussions are unknown" but that he was prepared to "prepare an army" that will "literally replace" the government officials in charge. *Id.* A few days later, on December 31, 2020, during a podcast recorded with co-conspirator Jeremy Bertino. Nordean explained that "when police officers or government officials are breaking the law . . . you have to use force." Ex. 609-B. Per Nordean, "this [wa]s the organized militia part of our constitution," and force is "literally the foundation of every prominent country." *Id.* Biggs echoed the same sentiment, when on December 23, 2020, he told another user that he was not "gonna say things that'll put me in jail tonight" but that "[w]e all know what needs to be done." Ex. 603-39. Biggs was more explicit on January 2, 2021, when he posted a message that read, "Every law makers who breaks their own stupid Fucking laws should be dragged out of office and hung. The government should fear the people. Not the other way around. You work for us. You don't have ruling power over me. We only allow you to have that privilege. FAFO[.]" Ex. 603-55.

As events at the Capitol unfolded, Tarrio plainly revealed his objective. In a private message with Bertino, Tarrio declared, "this is it" and then referenced the "Winter Palace"—a plan

that discussed storming of government buildings. Tarrio remarked to Bertino that the video of Pezzola breaking the window looked like "George Washington, Sam Adams, and Franklin." Ex. 530-7. Biggs and Nordean posed with other Proud Boys on the west lawn of the Capitol for a celebratory video in which Biggs stated that "January 6 will be a day in infamy." Ex. 400-LL and 500-84. Pezzola, once inside the building, filmed a video of himself having a "victory smoke in the Capitol," and stating, "I knew we could take this motherfucker over if we just tried hard enough… Proud of your motherfucking boy." Ex. 403-G.

In the days that immediately followed, the defendants continued to bask in the glory of their attack on democracy and attempt at a revolution. They called it precisely what it was. Biggs recorded a podcast-style interview in which he called January 6 a "warning shot" to the government that showed them "how weak they truly are" after being "bitch-slapped . . . on their own home turf." Ex. 611-B. Biggs explained that "January 7th was warning shot to the government – look, we started this country this way and we'll fuckin' save it this way." Ex. 611-D. Nordean recorded a video of himself describing an encounter with a woman at the bar; in the video he faulted the woman for not appreciating that he "was part of fucking storming the Capitol of the most powerful country in the fucking world… 1776, bitch." Ex. 470-B and -C. Rehl made social media posts calling January 6 a "historical day," and he told his mother he was "so fucking proud" of the Proud Boys' "raid of the capitol." Ex. 602-52, 545-3.

None of this was mere happenstance or accident. In the months leading up to January 6, 2021, they had brought their army of violence to Portland, Kalamazoo, and Washington, D.C. And then they brought that army of violence to the Capitol to exert their political will. In doing so, these defendants attempted to silence millions of Americans who had placed their vote for a different candidate, to ignore the variety of legal and judicial mechanisms that lawfully scrutinized the

electoral process leading up to and on January 6, and to shatter the democratic system of governance enshrined in our laws and in our Constitution.

For years, these defendants intentionally positioned themselves at the vanguard of political violence in this country. They brought that violence to the Capitol on January 6 in an effort to change the course of American history, and the sentences imposed by this Court should reflect the seriousness of their offenses.

**B. Need for the Sentence to Afford Adequate General Deterrence**

A significant sentence is necessary "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). Here, the need to deter others is especially strong because these defendants engaged in acts that were intended to influence the government through intimidation or coercion—in other words, terrorism. And they were leaders of such efforts. Because these defendants not only contributed to the attack on the Capitol but helped to organize it, their sentences will be noted by those who would foment such political violence in the future.

The attack on the Capitol on January 6 was calculated to interfere with, and did interfere with, one of the most important democratic processes we have: the peaceful transfer of power. As noted by Judge Moss during a different sentencing hearing,

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

*United States v. Hodgkins*, No. 21-cr-188, Sent. Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was [before January 6] for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of

74

us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The justice system's response to January 6 will impact whether January 6 becomes an outlier or a watershed moment. "By nearly every measure, political violence is seen as more acceptable today than it was five years ago." Adrienne LaFrance, *The New Anarchy: America faces a type of extremist violence it does not know how to stop*, THE ATLANTIC, Mar. 6, 2023 (citing a 2022 UC Davis poll[31] that found one in five Americans believes political violence would be "at least sometimes" justified, and one in 10 believes it would be justified if it meant the return of President Trump). Left unchecked, this impulse threatens our democracy.

The defendants in this case sought to capitalize on this undercurrent in our society to change the result of a presidential election. They called for using force, intimidation, and violence to get political leaders to stop the certification of the election. They recruited others to this mission. They organized and participated in encrypted messaging groups and meetings to further their plans. Such conduct in leading and instigating an attack like January 6 demands deterrence. It is critical that this Court impose significant sentences of incarceration on all the defendants in this case to convey to those who would mobilize such political violence in the future that their actions will have consequences.

### C. Need to Avoid Unwarranted Sentencing Disparities

The crimes these defendants committed align closely with acts of terrorism for which courts have imposed lengthy sentences in other seditious conspiracy cases. And, these defendants are distinct from all other January 6 defendants, including the Oath Keepers, because of their role

---

[31] health.ucdavis.edu/vprp/pdf/Political-Violence-Fact-Sheet%201_7-21-22.pdf

in coordinating and instigating the attack on the Capital with their large numbers. Sentencing these defendants to significant sentences of incarceration will not run afoul of Section 3553(a)(6).

### 1. Defendants sentenced for seditious conspiracy in other contexts

Since the advent of the Sentencing Guidelines, there have only been a handful of cases in which defendants were sentenced for committing seditious conspiracy in violation of 18 U.S.C. § 2384. In each of these cases, courts imposed lengthy sentences, often imposing the maximum sentence of 20 years of incarceration on this count and finding the conduct was tantamount to waging war against the United States under Section 2M1.1(a)(1). For instance, in *United States v. Rahman*, ten defendants were found guilty of seditious conspiracy in connection with terror plots related to the 1993 World Trade Center bombing and additional plans to bomb other locations and murder the Egyptian president. Each of the ten defendants, while receiving overall sentences ranging from 25 years to life imprisonment, was sentenced under the Treason guidelines to 20 years for their conviction of 18 U.S.C. § 2384. *See* 189 F.3d 88 (2d Cir. 1999) (affirming these sentences).

In *United States v. Battle*, No. 02-cr-399 (D. Or. 2004), the court adopted the sentencing guidelines for Treason and sentenced two co-defendants to 18 years of incarceration after they pled guilty to seditious conspiracy and admitted that the purpose of their conspiracy was to travel to Afghanistan to fight alongside al Qaeda and the Taliban against American and allied forces. *See* No. 02-cr-399, ECF 373, 374, 537 at 2.

In *United States v. Batiste*, No. 06-cr-20373 (S.D. Fla. 2009), the defendant was convicted of multiple charges, to include seditious conspiracy, for providing material support to the planning of attacks on federal and civilian targets in the United States. *See* No. 06-cr-20373, ECF 1451 (Gov. Sent. Memo). Despite never collecting any weapons or harming any victims, the court

76

adopted the sentencing guidelines for Treason and sentenced Batiste to 13-and-a-half years for his conviction under Section 2384. *See* No. 06-cr-20373, Sent. Tr. at 46-47, 148.

In *United States v. Khan*, No. 03-cr-296-2 (E.D. Va. 2004), the defendant was originally sentenced to the statutory maximum of 20 years for violating Section 2384, and life imprisonment overall. In *Khan*, the defendant attended a terrorist training camp after September 11, 2001, with the intent to proceed to Afghanistan and fight for the Taliban and Al-Qaeda against United States troops. *See United States v. Khan*, 309 F. Supp. 2d 789, 801-18 (E.D. Va. 2004), *aff'd in part, remanded in part on other grounds*, 461 F.3d 477 (4th Cir. 2006); *see also Khan*, No. 03-cr-296-2, ECF 602 (explaining procedural history, including that the incarceration term for the Section 2384 count was later decreased on resentencing after *Booker* and *Dimaya*).

In *United States v. Al-Timimi*, No. 04-cr-385 (E.D. Va. 2004), the defendant was convicted of violating Section 2384 among other charges for encouraging individuals to travel to Pakistan to receive military training from Lashkar-e-Taibi, a designated foreign terrorist group, in order to fight U.S. troops in Afghanistan. The defendant was sentenced to life in prison, including 10 years for violating Section 2384. ECF 132.

These other seditious conspiracy cases show that courts have imposed decades-long sentences of incarceration even for planning and preparing for violence (but not using actual violence) against the United States government. Indeed, the seditious conspiracy statute was created to address such existential threats to our system of government. *See* Dec. 11, 2022 Mem. Op. (ECF 586) at 4-5 (explaining that the predecessor to the seditious conspiracy statute was enacted at the outset of the Civil War; reenacted the statute in 1871 to "combat private violence by the Ku Klux Klan and like organizations," and Congress raised the maximum penalty to twenty years after an attack on the Capitol in 1954.); *see also United States v. Ali*, 528 F.3d 210, 265 (4th

Cir. 2008) ("[T]hough the district court accurately noted that [the defendant] never 'injured any people' and 'no victim was injured in the United States[,]' this should not trivialize the severity of his offenses. . . . [W]e cannot wait until there are victims of terrorist attacks to fully enforce the nation's criminal laws against terrorism."). Here, the defendants, in fact, acted on their seditious agreement—causing and threatening injury and harm on January 6, and damage to the country's faith in our electoral process. To avoid unwarranted disparities with other seditious conspiracy cases, the defendants' sentences should be lengthy.

## 2. Defendants sentenced in other January 6 cases

These defendants stand out among other January 6 defendants because they literally led the attack on the Capitol—contributing to four pivotal breach points in the first 80 minutes of the riot. The defendants executed these crimes as a result of the steps that they had taken in advance to bring a fighting force to the Capitol on January 6. No other group of defendants had a bigger impact on the events of January 6 than these defendants and the men in their command.

Perhaps the closest corollary to these defendants are the Oath Keeper defendants, who were recently sentenced by Judge Amit Mehta to between three and 18 years of incarceration. Those who led the Oath Keeper defendants repeatedly advocated for civil war—both before and after January 6, 2021—amassed a stockpile of weapons that they brought to the Capitol region, and ultimately directed their members to storm the Capitol, with more than a dozen of their members heeding the call. This conduct warrants sentences consistent with the kinds of sentences historically imposed when defendants are convicted of seditious conspiracy. The conduct of these defendants is more egregious than that of the Oath Keeper defendants and warrants greater sentences. By the time that Stewart Rhodes mustered his group to begin marching towards the Capitol at 1:25 pm (sending the Signal message "Pence is doing nothing. As I predicted."), these

defendants had already stormed the First Street gates, destroyed the black metal fence, entered the West Plaza, assaulted Officer Ode and robbed him of his shield, and regrouped on the lawn, where Nordean and Biggs took a video of themselves boasting that they had "just stormed the Capitol" and taken the "motherfucking place back." By 2:32 pm, when Kelly Meggs directed 12 members of Stack One to begin climbing the steps on the east side of the Capitol, these defendants had already pushed through a line of officers to climb the concrete stairs under the scaffolding, Rehl had sprayed an officer in the face, Pezzola had broken open the window at the Senate Wing Door with his stolen riot shield, Biggs had entered and exited the Capitol, and Nordean had ascended to the Upper West Terrace. And unlike the Oath Keeper defendants, whose numbers were limited to a core group of roughly two dozen men and women, these defendants led nearly 200 like-minded men onto Capitol grounds, who also engaged in violent attacks on law enforcement and destruction of government property, thus enabling the defendant's calculated attempt to forcibly stop the lawful transfer of power.

Any disparity between these defendants and others sentenced for crimes on January 6, including members of the Oath Keepers, is fully warranted based on the defendants' conspiracy and conduct.

## X.    CONCLUSION

For the reasons set forth above and further supported by the memoranda filed herewith, the government recommends that the Court impose a lengthy sentence of imprisonment on each defendant. Specifically, Enrique Tarrio should serve 33 years in prison; Joseph Biggs and Zachary Rehl, 30 years; Ethan Nordean, 27 years; and Dominic Pezzola, 20 years. Additional support for these sentencing recommendations is set forth in Attachment A (Tarrio), Attachment B (Nordean), Attachment C (Biggs), Attachment D (Rehl), and Attachment E (Pezzola).

Respectfully Submitted,


MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Jason B.A. McCullough*
JASON B.A. MCCULLOUGH
         NY Bar No. 4544953
ERIK M. KENERSON, OH Bar No. 82960
NADIA E. MOORE, NY Bar No. 4826566
         On Detail to the District of Columbia
Assistant United States Attorneys
601 D Street NW
Washington, D.C. 20530

*/s/ Conor Mulroe*
CONOR MULROE, NY Bar No. 5289640
Trial Attorney
U.S. Department of Justice, Criminal Division
1301 New York Ave. NW, Suite 700
Washington, D.C. 20530
(202) 330-1788
Conor.Mulroe@usdoj.gov

<u>**Enrique Tarrio Additional Sentencing Arguments**</u>

The evidence at trial showed Tarrio to be a naturally charismatic leader, a savvy propagandist, and the celebrity Chairman of the national Proud Boys organization. In that capacity, he had influence over countless subordinate members of his group and members of the general public, and he used that influence to organize and execute the conspiracy to forcibly stop the peaceful democratic transfer of power. His guidelines range rightly reflects the seriousness of that offense and his unique leading role in it. Tarrio's conduct warrants a sentence of 33 years (396 months) of incarceration.

## I.      Sentencing Guidelines Analysis

Tarrio was convicted of Counts One through Six. The Sentencing Guidelines are applied for each of the convictions as follows:

***Count One***       **(Seditious Conspiracy)**
***Count Two***       **(Conspiracy to Obstruct an Official Proceeding)**
***Count Three***   **(Obstruction of an Official Proceeding)**
***Count Four***     **(Conspiracy to Use Force, Intimidation, or Threats to Prevent Officers of the United States from Discharging Their Duties)**

| Base Offense Level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction) |
| Total | 33 | |

***Count Five***     **(Interference with Law Enforcement During a Civil Disorder)**

| Base Offense Level: | 14 | §2A2.4(c) → §2A2.2 |
|---|---|---|
| Specific Offense Characteristic | +2 | §2A2.2(b)(1) (more than minimal planning) |
| Specific Offense Characteristic | +6 | §3A1.2(b) (official victim) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction) |
| Total | 28 | |

***Count Six***     **(Destruction of Government Property)**

| Base Offense Level: | 6 | §2B1.1 |
|---|---|---|
| Adjustment | +26 → 32 | §3A1.4 (terrorism) (increase by +12 or to level 32) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction) |
| Total | 38 | |

All the counts of conviction group. Tarrio PSR ¶¶ 111, 112. Tarrio's total adjusted offense level is therefore the highest of the offense levels from the six counts, which is 38 and a guidelines sentence of 360 months to life.

### A. Additional factual support for terrorism enhancement

Tarrio's individual conduct fortifies the conclusion that his offense was calculated to influence or affect the conduct of government by intimidation or coercion. In his references to the event, he constantly reaffirmed that he regarded the siege of the Capitol as a justified attack *on the government* to force it into compliance with his wishes or to punish it for failing to comply.

That was never clearer than during the afternoon of January 6, when Tarrio posted encouragement to his tens of thousands of followers on Parler.[1] He referred approvingly to the

---

[1] Defense counsel's suggestion that Tarrio was not in touch with his men on January 6 is belied by the evidence. In fact, among other contacts, Tarrio exchanged messages with other MOSD leaders concerning "live feeds" that others were using to monitor the conditions on the ground in Washington, D.C. Ex. 509-28.

rioters (including his co-conspirators) as "Revolutionaries," echoing his frequent invocation of the phrase "1776" in the weeks leading up to event. Ex. 600-61. Shortly thereafter, he posted that "liberty" comes "[w]hen the government fears the people."[2] Ex. 600-63. When he wrote those words, Tarrio was not referring to politicians' fear of being voted out of office. He was speaking concretely and approvingly about what the members of Congress and their staffs were experiencing that very afternoon: fear of injury and death at the hands of a vicious mob that included Tarrio's own hand-picked soldiers. To erase any doubt, Tarrio accompanied the post with a photograph of terrified legislators cowering in the gallery of the House chamber. *Id.* Later that evening, Tarrio claimed he did not want the day's events to "continue to happen," but that the "elected officials" who had "created the problem" had better "listen… Because things can get ugly." Ex. 600-65. This veiled threat of further violence is the political version of an extortionate shakedown: *Nice democracy you've got there; be a shame if something were to happen to it.*

To Tarrio, January 6 was an act of revolution. Indeed, Tarrio had been consumed with revolution in the weeks leading up to January 6. Shortly before New Year's Eve, Tarrio received a document from a girlfriend—titled "1776 Returns"—that contained plans calling for the occupation of government buildings in Washington, D.C. to protest the election results. Ex. 528-1. The document called for groups of people to amass outside government buildings and overwhelm the defenses with a sudden surge of the crowd. Ex. 528-1A.[3] Tarrio's girlfriend told

---

[2] Although the quotation is sometimes attributed to Thomas Jefferson, *e.g.*, Tr. 18025 (Rehl), there is no evidence Jefferson ever said or wrote any variation of it. *See* Thomas Jefferson Foundation, "When government fears the people, there is liberty… (Spurious Quotation)," *available at* https://www.monticello.org/research-education/thomas-jefferson-encyclopedia/ when-government-fears-people-there-liberty-spurious-quotation/.

[3] The document referred to this effort as storming the "Winter Palace," which referenced the Russian Revolution, and which obscure reference would later be invoked by Tarrio in private

him that the "revolution is more important than anything," to which Tarrio replied, "[t]hat's what every waking moment consists of." Ex. 523-1. Tarrio then assured his girlfriend that he was "not playing games." *Id.*

In the weeks following the riot, Tarrio continued to describe the offense in the same terms. On January 9, in a message later deleted, he invoked revolutionary language again, saying that the riot sent the message "DON'T FUCKING TREAD ON US." Ex. 600-72. And he made clear that he regarded the attack on the Capitol as politically justified, posting messages to his followers like "NEVER APOLOGIZE. YOU ARE THE RESISTANCE… NEVER STOP FIGHTING," Ex. 600-66, "I'm not denouncing shit," Ex. 600-75, and "FUCK THE SYSTEM," Ex. 600-67. Amplifying his portrayal of the federal government as the enemy of the people, Tarrio scorned the legitimacy of its efforts to investigate what was self-evidently a serious crime, calling law enforcement authorities "Gestapo forces," Ex. 600-69, and describing suspects as being "hunted by the tyrannical government," Ex. 600-67. *See also* Ex. 514-57 (Tarrio: "In the gulag we'll be heroes.").

All this rhetoric from Tarrio, as leader of the conspiracy, underscores the common-sense conclusion that the crimes committed by him and his co-defendants on January 6 were calculated to influence or affect the conduct of government by intimidation or coercion.

### B. Factual support for role enhancement

Tarrio's conduct warrants an adjustment to reflect his clear leadership role. Tarrio's role as primary organizer is most evident from his creation of and command over the Ministry of Self Defense, which was the primary instrument through which the defendants planned and prepared

---

messages as the riot unfolded on January 6. *Id.*; *see also* Ex. 530-5. Tarrio thereafter Googled "Winter Palace," and interacted with the document on his phone. Tr. 12966:11 – 12967:1 (Miller).

for January 6. However, Tarrio's pernicious, violence-oriented leadership predated his creation of MOSD. Following a July 4 rally in 2020, Tarrio posted on Parler, "[W]e were whooping Antifa and BLM ass at the Washington monument while fireworks were going off. Best Independence Day EVER!" Tarrio Ex. 1. And after the election, Tarrio's violent rhetoric only intensified. Most vividly, on November 25 he posted the "Bad Company" propaganda video that portrayed the Proud Boys as vigilante warriors in a physical battle of good against evil. Ex. 600-22. Content like this, from a figure as prominent as Tarrio, had the natural and intended effect of recruiting and radicalizing members who would be eager for violence. Tr. 5336-37 (Greene discussing "propaganda video[s]" that "appeal[ed] to [him] at the time"); Tr. 14575 (Nugent admitting violent videos helped with recruitment)

The importance of Tarrio's leadership was evident in how his co-conspirators and other subordinates responded to his temporary absence upon his arrest. One MOSD member asked whether "our task" would be "aborted" now that Tarrio was unavailable. Ex. 510-8. While Biggs, Nordean, and Rehl each stepped up to exercise authority (see their respective Attachments accompanying this filing), the group still felt Tarrio's absence acutely, with Donohoe asking, "Hey who's boots on ground with a plan RN… Guys are asking." Ex. 509-23. Biggs assured the other leaders that he had "[j]ust spoke with Enrique," *id.*, and Bertino reasoned that Tarrio could "take the reigns back" as soon as he obtained "a burner phone." Ex. 509-21. Tarrio did, in fact, take the reins back immediately upon his release, moving quickly to reset his Telegram account and obtain a burner phone. *See, e.g.*, Ex. 490A at 3:16 – 5:30 (Tarrio instructing sister on how to remotely access his Telegram); Tr. 4515 (Quested: "[H]e expressed a need to communicate with his colleagues."); Tr. 4517 (Quested: "[L]ater that evening, we went to buy a phone at a drug store in Baltimore."). Before leaving Washington, D.C., Tarrio met with the leader of the Oath Keepers in

an underground garage and assured others that law enforcement would not be able to access his phone. *See* Ex. 490-F (Tarrio exchange with Bianca Gracia explaining his security settings).

The period after January 6 included still more evidence of Tarrio's unequaled influence over other participants in the offense, and his use of that influence to condone and promote violence. In the uncertainty following the riot, an MOSD member implored that Tarrio "need[ed] to speak," with another agreeing, "Yeah a good pick me up would be good for the boys." Ex. 510-50. In response, Tarrio — who had been quiet on the chat — emerged to provide approval ("Proud of y'all"), warning ("we're going to be the fuckdolls of the government for a little"), and direction ("Let's chill our for a sec while we reassess"). Ex. 510-51. Likewise, in the late afternoon of January 6 when the riot was waning, an upper-echelon Proud Boy "Elder" wanted to know "what do we do now?" Ex 500-86. It was Tarrio who answered: "Do it again." *Id.*

Based on all the foregoing, a four-point increase is necessary to account for Tarrio's role as the organizer and leader of the conspiracy.

### C. Tarrio obstructed justice by seeking to conceal and destroy evidence, directing Pezzola to lie to authorities, and discouraging other subordinates from cooperating with law enforcement.

The PSR correctly applies a two-point adjustment for obstruction of justice. Tarrio PSR ¶ 96. This adjustment is appropriate because Tarrio sought to conceal his group's communications from law enforcement, he instructed Pezzola to provide materially false information to law enforcement and/or a court, and he used his leadership influence to discourage potential witnesses from providing information to the government,.

When Tarrio was arrested, his lieutenants' immediate reaction was to destroy their communications in an attempt to prevent law enforcement from obtaining them. *See, e.g.*, Ex. 501-62. This was in accordance with Tarrio's continuous emphasis on secrecy and operational security,

6

or "OPSEC." *See, e.g.*, Ex. 613-A (MOSD video briefing, with discussion of "OPSEC"); Ex. 503-1 (welcome message for MOSD members chat, prohibiting "[S]creenshots or the sharing of information outside of this chat" on penalty of "instant disavowal out of the chapter. NO EXCEPTIONS"). Tarrio's own actions were similar: Within minutes of his release from custody, he spoke with his sister on a borrowed cell phone and (in a conversation he asked not to be recorded) instructed her on how to log out of his devices. Ex. 490A at 3:16 – 5:30. Shortly thereafter, he assured another worried associate that the chats on his seized phone would not be accessed by law enforcement because "I cleared that out… They couldn't get in there… 'cause I have two steps." Ex. 490F at 8:15 – 8:45. Likewise, after the riot when Proud Boys leaders learned that Nordean would soon be arrested, Tarrio assured them that had just spoken to Nordean and "[h]e's keeping his phone away but we need to remove em."[4] Ex.500-107. All these were willful attempts to conceal and destroy evidence related to the offenses of conviction, justifying the application of the obstruction guideline. *See* U.S.S.G. § 3C1.1, Application Note 4(D).

In addition, after Pezzola was arrested, Tarrio recorded a voice note directing that Pezzola state he was not affiliated with the Proud Boys. Tr. 19253 (Pezzola testimony). The message was transmitted to Pezzola by way of co-conspirator Jeremy Bertino as an intermediary; Bertino forwarded the message, and Pezzola received and listened to it. *Id.* In this message, clearly intended to shield the group and its leadership from legal exposure, Tarrio was attempting to corruptly influence Pezzola at best and to suborn perjury at worst; regardless of how the conduct is characterized, the enhancement applies. *See* U.S.S.G. § 3C1.1, Application Notes 4(A); 4(B). Such effort was likely to succeed, as shown by another exchange from roughly the same timeframe

---

[4] Nordean did not, in fact, successfully keep his phone away from law enforcement, and it was the source of many incriminating messages introduced at trial.

that illustrates the loyalty Tarrio commanded from lower-level subordinates, even those facing serious charges. Tarrio forwarded to the Elders a message from "one of the two in the news" (i.e., one of the Proud Boys who had recently been charged with conspiracy offenses)[5] in which the sender provided assurance, "I'm a Proud Boy for life boss and I'm with you 100%. Uhuhu." Ex. 500-105.

Finally, Tarrio broadcast a voice message to a Proud Boys group in which he discouraged anyone from cooperating with law enforcement. Disputing the truth of media reporting that Rehl had been "talking or cooperating with the feds," Tarrio assured his listeners that Rehl would "hold fast." Tarrio went on to explain that "guys that are in prison right now" — i.e., Biggs, Nordean, Rehl, and Pezzola — were "holding onto hope" that everyone was "fucking staying put because they didn't do anything wrong." Elaborating, Tarrio made clear that "staying put" meant refusing to cooperate with the ongoing investigation: "The moment that they think that one of the guys flipped, it throws everything off, and it makes everybody turn on each other, and that's what we're trying to fucking avoid. Until I don't see hard evidence of one of these guys fucking flipping on the others… Like, dudes, we gotta support these guys a hundred and fucking fifty percent." Tarrio Ex. 13; *see also* Reuters, "EXCLUSIVE Proud Boys leader urged group not to 'turn on each other' in riot probe" (September 9, 2021), *available at* https://www.reuters.com/ world/us/exclusive-proud-boys-leader-urged-group-not-turn-each-other-riot-probe-2021-09-09/ (reporting on audio message, including response by Tarrio). The obstructive intent is clear on the face of the messages, but coming from Tarrio—who previously cooperated with the government—that obstructive intent

---

[5] Based on the name of the attorney identified in the message, the sender appears to be Pezzola's original co-defendant, William Pepe.

is clear as can be. In a subsequent message to the group, Tarrio complained that whoever had shared the message with the press had potentially put him in "felony territory." *Id.*

Based on the totality of Tarrio's conduct, the obstruction adjustment is warranted.

## II.     Section 3553(a) Factors

The government's specific recommendation for Tarrio of a sentence of 33 years of incarceration is further justified by the nature and circumstances of Tarrio's individualized conduct, his personal history and characteristics, and the need to protect the public from future crimes by Tarrio.

### A.     *Nature and Circumstances of Tarrio's Conduct.*

Tarrio is unique among his co-defendants in that he was not present at the Capitol on January 6. That fact, however, does not significantly mitigate his culpability when viewed against the totality of the circumstances. The only reason Tarrio did not march alongside the others is because he was arrested upon his arrival in Washington, DC and placed under a court order to leave the District. *See generally* Tr. 4212-14 (Koble). As demonstrated by his messages with fellow MOSD leaders and with a Metropolitan Police Department officer, Tarrio knew full well that he would be arrested if he came to D.C., but he did so anyway, all while using his social media account to taunt law enforcement. Tarrio Ex. 2 ("Come get me if you feel like what I did was wrong. We'll let the public decide.").

Those same messages, and his social media activity, suggest that Tarrio strategically calculated his arrest as a means to inspire a reaction by his followers. *See* Ex. 503-40 (MOSD leaders discussing likely responses by "our guys" and "the normies," with Tarrio explaining he was "pushing for" the arrest to happen "on the 6th"); Tarrio Ex. 2 ("[L]et the public decide."). The arrest did, in fact, serve the Proud Boys' strategic interests on January 6: both Biggs and Nordean delivered speeches to the marching group in which they portrayed Tarrio's arrest as an injustice

demanding a response. *See* Ex. 1000 at 4:10 (Nordean: "Enrique shows up and gets detained… For what? … [T]hese people put us in jail. Well, I'm tired of it. It's time to just say no. Back the yellow."); *id.* at 5:00 (Biggs: "[A]fter what they did to our boy Enrique, we're gonna let D.C. fucking know we're goddamn here."). Clearly there was some pre-planning to this aspect of the rally, because although Tarrio was arrested less than 48 hours before the Proud Boys marching group assembled on the morning of January 6, various members arrived wearing custom "ENRIQUE TARRIO DID NOTHING WRONG" t-shirts. *See generally id.*

Moreover, if Tarrio *had* been able to accompany his subordinates during the attack on the Capitol, there is every reason to believe he would have been an active and enthusiastic participant. In the Proud Boys Presidents Chat, he said "They should have sat in. God didn't put me there for a reason. We would still be there." Ex. 514-59. And as Jeremy Bertino testified, Tarrio told Bertino after the fact that he would have been waving the crowd forward while urging "Go. Go. Go." if he had been there. Tr. 10224.

In short, Tarrio's physical absence does nothing to detract from the severity of his conduct, because (as argued above) he was a general rather than a soldier. By provoking a desire for political violence among his followers, creating MOSD, filling it with men he could trust to "fit in or fuck off," inflaming the group with rage against law enforcement, and then turning it loose on the Capitol, Tarrio did far more harm than he could have as an individual rioter. His sentence should reflect that.

### B.  Tarrio's Personal History and Characteristics

Tarrio is an individual of uncommon ability. He is intelligent, charming, creative, and articulate — a gifted communicator who excels at attracting followers and "creat[ing] compelling spectacles." Trial. Trans. 6451 (Special Agent Camiliere, quoting from "laws of power" referenced

in Tarrio Parler post). Regrettably, Tarrio has used those talents to inflame and radicalize untold numbers of followers, promoting political violence in general and orchestrating the charged conspiracies in particular.

Nor is this Tarrio's first serious criminal offense. In 2012, Tarrio was charged with, and ultimately pleaded guilty to, offenses related to a scheme to misbrand, mishandle, and fraudulently sell large quantities of stolen diabetic testing supplies. *See* Tarrio PSR ¶ 127.[6] As the prosecutor on that case explained, that offense — like this one — drew upon Tarrio's marketing skills, with him acting as the conspiracy's "savvy" and "sophisticated" "lead salesperson." Tarrio Ex. 5 at 10; *see also id.* at 13 (Tarrio's counsel not disputing mass-marketing guideline enhancement).

More recently, Tarrio participated in the burning of a Black Lives Matter banner that subordinate Proud Boys had stolen from a historic Black church in Washington, D.C. In accordance with the Court's pretrial rulings, this episode appeared at trial only in sanitized form and for narrow purposes. Now at the sentencing stage, however, the Court should consider the incident for all it shows about Tarrio's respect for the law, his supposed tolerance of opposing viewpoints, his malign influence on his followers, his likelihood of reoffending, and his overall character.

Just as telling as the banner burning itself are Tarrio's public statements about it, which displayed a total lack of remorse and a brazen contempt for law enforcement and the victims. Roughly a week after committing the crime, after his "Come get me" post cited above, Tarrio posted a screenshot of a news headline referencing his "burning the Black Lives Matter banner of a historic Black church"; he accompanied it with the caption "I'M DAMN PROUD I DID IT!"

---

[6] The loss amount for that offense was calculated at roughly $1.1 million. *See* Tarrio Ex. 5 at 37.

Tarrio Ex. 3. Several days later, on December 22, he posted the following meme, mocking the notion that he had committed a "hate crime" and announcing "I"LL FUCKING DO IT AGAIN":



Tarrio Ex. 4. Tarrio added the caption, "Ayo… Pass me the lighter." *Id.* This behavior, which took place while Tarrio was actively recruiting co-conspirators for the instant offense, was a show of total disdain for the rule of law and an explicit approval of criminal action in furtherance of the Proud Boys' goals.

To the extent Tarrio expresses remorse during his sentencing allocution at the upcoming hearing, the Court should be mindful that he has done so before. At his sentencing on the stolen test strips case, Tarrio expressed his "sincerest apology" for what he called a "lapse in judgment," and he professed to have developed "a better sense of responsibility, a better sense of community" as a result of the experience. *See* Tarrio Ex. 5 at 61-62. Similarly, at sentencing for the more recent banner burning and magazine possession, Tarrio purported to "profusely apologize" for what he called a "very, very, very bad mistake." Tarrio Ex. 6 at 16. Although the transcript of his allocution is somewhat hard to follow, he appears to portray his early public admissions to having burned the banner (e.g., "I'LL FUCKING DO IT AGAIN") as a sincere effort to take responsibility and "do what is right." *See id.* ("I did consult a media post and at that time I didn't see the consequences of what I did because I believe that was just two or three days after the events of December 12th

and to give you context on that, I did see it and I did see what I did was wrong and that's why before I got anything -- before I got Congress on the case, anything, any pictures of anything, I needed to do what is right and to do what is right was to plead guilty to this case.").

False contrition would be entirely consistent with Tarrio's broader pattern of duplicity and double-dealing. Examples abound: Tarrio told the House Select Committee under oath that "with almost 100 percent certainty… if I would've been on the ground on January 6th, there would be absolutely zero Proud Boys that got arrested," Tarrio Ex. 7 at 173, but he told the Proud Boys Presidents Chat that, if he had been present, "We would still be there," Ex. 514-59. When Gavin McInnes, the founder of the Proud Boys, raised concern that a member was generating controversy by wearing a t-shirt emblazoned "6MWE" (a grotesque reference to the Holocaust, standing for "six million wasn't enough"), Tarrio proposed to falsely claim it meant "6 man weapon and equipment." Tarrio Ex. 8 at 1.[7] Tarrio publicly accused a media outlet of intentionally publishing a "false" and "EXTREMELY dangerous" report that Proud Boys were wearing orange hats, Tarrio Ex. 9, but numerous photos and videos from the event prominently show the orange hats worn by members of the marching group from the Arizona chapter, *e.g.*, Tarrio Ex. 10. On an episode of his "War Boys" podcast, he told his audience that they should attend the inauguration "in Biden gear" and "turn [it] into a fucking circus, a sign of resistance, a sign of revolution.," Tarrio Ex. 11; then, responding to media coverage that quoted the statement verbatim, Tarrio took to Parler to deny ever having said it, Ex. 604-14. All this flows from Tarrio's apparent worldview, in which "all politics revolves around half-truths and some lies," Ex. 490K at ~8:32, and in which

---

[7] In an apparent effort to placate McInnes, Tarrio also falsely denied that he had "any more rallies planned" as of December 22. *See* Tarrio Ex. 8 at 2.

"Goebbels" is flip shorthand for the use of "misinformation" to deceive the public and "cultivate[] fear," Ex. 514-47.

In sum, Tarrio's personal history and characteristics provide every reason to impose a substantial sentence.

### C. *The Need to Protect the Public from Further Crimes by Tarrio*

Tarrio was able to orchestrate a conspiracy — one that very nearly succeeded in provoking a constitutional crisis — thanks to his powerful influence over others, both associates and strangers.  One defense witness described Tarrio as "like a movie star." Tr. 15786 ("Aaron"). Another witness, called by Tarrio, noted Tarrio's "great leadership skills" before going on to reaffirm his belief that January 6 was a "glorious event" that was "the most patriotic act in this country in the last hundred years." Tr. 15426-27 (Meza).

In fact, even while the jury was deliberating on his case, Tarrio gave an interview from jail that was heard by more than 26,000 people. *See* Tarrio Ex. 12, *available at* https://twitter.com/i/web/status/1651015232741945345. On the interview, Tarrio echoed the positions of his testifying co-defendants, stating "we know we're innocent," *id.* at 33:27, and accusing the government of "manipulat[ing]" the Proud Boys' "locker room" talk in an effort to wrongly convict him, *id.* at 30:15 – 31:15. *See also id.* at 44:10 (Tarrio: "The Proud Boys did nothing wrong.").

Using his powerful platform, Tarrio has repeatedly and publicly indicated that he has no regrets about what he helped make happen on January 6. As summarized above, his post-riot social media activity and internal communications have described the rioters as the patriotic "resistance" and the government as a "tyrannical" oppressor using "Gestapo forces" to "hunt" the revolutionary "heroes." There is no reason to believe this violent anti-government sentiment has abated at

present: during his interview from jail while the verdict was pending, Tarrio explained that ever since his incarceration for the banner burning, his "priorities have changed" from "God, family, and *country*" to "God, family, and *tribe*." (emphasis added)). Tarrio Ex. 12 at 45:44 - 46:35.

In sum, Tarrio continues to possess the same motive (a belief the government is illegitimately infringing his rights) and the same means (massive popular influence, including over those willing to embrace political violence) that led to the offenses of conviction. For the sake of specific deterrence, and to limit his ability to recruit and direct followers, a significant sentence is necessary.

## Ethan Nordean Additional Sentencing Arguments

The evidence at trial showed that Ethan Nordean embraced his role as the leader of the "rally boys" in the leadup to January 6 and, critically, following Tarrio's arrest on January 4. Nordean's prominence in the group was the result of his large stature and reputation for doling out physical violence. Nordean embraced that reputation.

Nordean led a group of nearly 200 men to the Capitol and onto Capitol grounds. He immediately moved to the front of the throng and took action by tearing down the fence, which permitted the rioters to proceed further into the restricted area. He defied law enforcement's calls to disperse, and he ignored calls from his own men to leave. Nordean was there to use force against the government and lead what he viewed as a second American Revolution—or as Nordean would call it, "seventeen-seventy-fucking-six."

Nordean's guidelines range—after the application of the adjustment for Nordean's crime of terrorism—rightly reflects the seriousness of his assault on our government and Nordean's leadership role in it. If the Court were to calculate the guidelines differently (by, for example, declining to apply the Terrorism adjustment under U.S.S.G. §3A1.4), it should depart and vary upward to impose a sentence that complies with the law as set forth in 18 U.S.C. § 3553(a). Nordean's conduct warrants a sentence of 27 years of incarceration.

## I.    Sentencing Guidelines Analysis

Nordean was convicted of Counts One through Six. The Sentencing Guidelines are applied for each of the convictions as follows:

**Count One**    **(Seditious Conspiracy)**
**Count Two**    **(Conspiracy to Obstruct an Official Proceeding)**
**Count Three**  **(Obstruction of an Official Proceeding)**
**Count Four**   **(Conspiracy to Use Force, Intimidation, or Threats to Prevent Officers of the United States from Discharging Their Duties)**

| Base Offense Level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Total | 31 | |

**Count Five**    **(Interference with Law Enforcement During a Civil Disorder)**

| Base Offense Level: | 14 | §2A2.4(c) → §2A2.2 |
|---|---|---|
| Specific Offense Characteristic | +2 | §2A2.2(b)(1) (more than minimal planning) |
| Specific Offense Characteristic | +6 | §3A1.2(b) (official victim) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Total | 26 | |

**Count Six**    **(Destruction of Government Property)**

| Base Offense Level: | 6 | §2B1.1 |
|---|---|---|
| Adjustment | +26 → 32 | §3A1.4 (terrorism) (increase by +12 or to level 32) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Total | 36 | |

All of these counts group. Accordingly, the total adjusted offense level for Nordean is 36 for the federal crime of terrorism in Count Six. As explained in the Government's Sentencing Memorandum, under Section 3A1.4(b), Nordean's Criminal History Category is increased to VI, which results in Guidelines range of 324 – 405 months (27 – 33.75 years) of incarceration.

The application of the terrorism enhancement under Section 3A1.4 captures the severity of Nordean's actions and the danger posed by Nordean and his co-conspirators' conduct on January 6. A sentence within these Guidelines would be justified and entirely appropriate.

### A. Nordean's Sentence Should Reflect the Adjustment for a Federal Crime of Terrorism

Nordean's crimes were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. §3A1.4. Nordean arrived at the Capitol to lead a revolution against a government that he viewed as illegitimate. Like Tarrio and Biggs, Nordean viewed himself and his movement as a second American revolution where he and the other "patriots" would retake the government by force.

The jury's guilty verdicts on Count One (seditious conspiracy) constitute a specific finding—beyond a reasonable doubt—that Tarrio, Nordean, Biggs, and Rehl "conspired or agreed with at least one other person with the goal of opposing by force the authority of the Government of the United States" *and* of "preventing, hindering, or delaying the execution of any law of the United States by force." ECF 767 (Jury Instructions) at 21; ECF 804 (Verdict Form) at 1. This finding, consistent with the facts accurately summarized in the draft presentence report, plainly establishes that the defendants' crimes were calculated to influence or retaliate against the government by force or coercion. *See United States v. Dowell*, 430 F.3d 1100, 1110 (10th Cir. 2005).

Nordean's radicalization did not happen overnight. Nordean steadily built towards a call for revolt against the government on January 6. On October 4, 2020, Nordean suggested to his fellow Elders that it was time for the Proud Boys to "fash the fuck out." Ex. 500-15. Nordean went on to explain that "Politics ain't workin . . . the left [i]s destroying our culture and mind fucking our children, our rights are being stripped away . . . our cities are burning down . . . it's time to

fuckin rage, not play tea time with rhinos." *Id*. Nordean espoused this same view in his public comments after the election. On November 11, 2020, Nordean expressed frustration with "traditional party labels" and advocated for a new party—the Rebels of America Party—that would "privatize everything and limit the government to protection of its citizens only." Ex. 601-1. When an individual told Nordean that he would sign up if "all politicians we ha[v]e currently are lynched on your inauguration day and all bureaucrats are summarily shot on sight," Nordean replied "Deal." *Id.*

Nordean's approval of political violence was not an aberration. Just one week later, during an episode of the "Warboys" podcast with Tarrio and Biggs, Biggs demonized the "party" that was telling the public to accept the result of the election. Biggs closed his diatribe by saying that "they are evil scum and they all deserve to die a traitor's death." Nordean Ex. 1. Nordean calmly leaned toward his microphone and said, "the day of the rope." *Id.* Nordean's suggestion of violence is plain on its face; however, the term "day of the rope" has a deeper meaning, which originated in novel, *The Turner Diaries*. The "day of the rope" refers to the day when enemies of the movement are hanged. *See* Encyclopedia Britannica, *The Turner Diaries*, *available at* https://www.britannica.com/topic/The-Turner-Diaries (accessed Aug. 17, 2023).

Nordean's threats to the perceived "traitors" of the country continued throughout the fall. On the day after Thanksgiving, Nordean posted a menacing message on his social media in which he declared that the "spirit of 1776 has resurfaced and has created groups like the Proudboys." Ex. 601-10. Nordean declared that they were "unstoppable, unrelenting and now…unforgiving." *Id.* Nordean closed his message by wishing "good luck to all you traitors of this country we so deeply love . . . you're going to need it." *Id.* In the following months, in the wake of the banner burning and stabbings on December 12, Nordean continued to voice his anger at the "government."

Nordean posted a message advising the police to "think hard and long about why they joined and if what they are being ordered to do is 'protecting and serving.'" Ex. 601-22. Nordean went on to declare that "[o]ur government puts more priority on protecting federal property[] than they do it's own people." *Id.*

In the final countdown to January 6, Nordean began to advocate for the use of force against the government more openly. On December 28, 2020, Nordean released an episode of his podcast in which he explained that when negotiation with the government fails, "the only thing left is force." Ex. 608-C. Nordean explained that he did not want to have to "use force against the government" because the "repercussions" were "unknown." *Id.* But Nordean made clear that he was ready to do it, saying "here's the thing, we will replace you . . . we will assemble an army that will literally just replace you like that." *Id.* Just three days later, Nordean repeated this call in a second podcast. This time, Nordean was even more explicit: "When police officers or government officials are breaking the law, what are we supposed to do as the people? Discourse? [] are we supposed to debate? No. you have to use force. This is the organized militia part of our Constitution here." Ex. 609-B.

These statements reflect Nordean's mindset—the time for force had arrived. Nordean's calls for the use of "force" against government officials and law enforcement who were, he claimed, "breaking the law," were not simply rhetoric from a keyboard warrior. When Nordean was making those statements, he knew that he was returning to Washington, D.C. on January 6 with a group of violent, hand-selected "rally boys" who had sworn to follow the commands of leadership. Nordean knew that he was leading those men into a conflict with the government itself.

Nordean's comments in the days before January 6 left no doubt as to the nature of the fight and the nature of the enemy, and it was not Antifa. On December 31, 2020, Nordean posted a

video to social media that featured images of the Proud Boys with a caption on the video that read, "Back the YELLOW" (as opposed to back the blue). Ex. 601-36. Nordean added the comment, "Let them remember the day they decided to make war with us." *Id.* Here again, the "them" was an arm of government, *i.e.*, law enforcement. On January 4, 2021, Nordean again called for action again the government, telling his followers that "[i]t is apparent now more than ever, that if you are a patriot, you will be targeted and they will come after you, funny thing is that they don't realize is, is we are coming for them." Ex. 601-40.

The man who posted these calls to violence on his influential Parler account led a group of nearly 200, *away* from the speeches on the Ellipse on January 6 and directly to the Capitol where a joint session of Congress was underway. Nordean's goal and purpose on January 6 was clear as he mustered the men at the food trucks and directed them to the Peace Monument at 1 p.m. Nordean was prepared to use any means necessary, including force, to stop the peaceful transition of power in this county. And Nordean personally brought that force to bear on the Capitol.

Throughout the march to the Capitol, Nordean repeatedly identified the enemy for his men. The enemy on January 6 was not Antifa, it was the government and law enforcement that Nordean viewed as traitors:

- At approximately 10:43 a.m., Nordean told his men that they had put their "lives and [] safety and everything on the line and *these people* put us in jail" and then Nordean encouraged his men to "back the yellow." Ex. 1000 at 4:05 et seq. (emphasis added)
- As they crossed approached the Peace Monument the first time that day, Nordean declared that "real men are here" and that those men know that the "oath" is to "defend the Constitution . . . against foreign enemies and domestic." Nordean directed his men to "remind those who have forgotten what that means." Ex. 1000 at 10:20 et seq.
- As they approached the east side of the Capitol, Nordean directed a comment at law enforcement, telling the officers that they "took our boy in and [] let the stabber go" and that they needed to "prove your shit to us now." Ex. 1000 at 12:35.

6

- As Nordean marched the Proud Boys onto the lawn on the east side of the Capitol at approximately 11:33 a.m., Nordean directed another comment at law enforcement, telling them that "we don't owe you anything" and that law enforcement's "job is to protect and serve the people, not property or bureaucrats." Ex. 1000 at 13:21 et seq.

When the time for action came, at 12:53 p.m., Nordean led his men across the trampled barricades. Ex. 1001 at 11:57. Nordean charged up the Pennsylvania Walkway and flashed the Proud Boys sign at Biggs. Ex. 1001 at 12:30. Nordean and Biggs moved to the front of their men and stood opposite a line of officers who were fighting to restore order. Nordean stalked the front of the line, marching back and forth as though he was the general of an army. *See, e.g.*, Nordean Ex. 2; Ex. 447 at 13:10, 13:55 et seq. He and Biggs congratulated one another with a high five. Ex. 145-Ax at 0:18. None of this was a mistake. None of this was simply a misunderstanding. Nordean later summed up his assault on the Capitol by declaring it, "Seventeen-seventy-fucking-six, bitch!" Ex. 407-B and -C.

For Nordean, the fight did not end on January 6. In the weeks after January 6 and before his arrest, Nordean celebrated the attack and encouraged continued action against the government. On January 11, Nordean posted a private, encrypted message to other Proud Boys presidents in which he told them, "I might get arrested when I land, but I regret nothing." Ex. 514-60. Just a few days later, on January 13, 2021, former President Trump release a five-minute long statement concerning what he called the "political violence" at the Capitol, which included the following condemnation of those who had committed crimes:[1]

> No true supporter of mine could ever endorse political violence. No true supporter of mine could ever disrespect law enforcement or our great American flag. No true supporter of mine could ever threaten

---

[1] *Available at* https://millercenter.org/the-presidency/presidential-speeches/january-13-2021-statement-about-violence-capitol#:~:text=Every%20American%20deserves%20to%20have,the%20instructions%20of%20law%20enforcement.

or harass their fellow Americans. If you do any of these things, you
are not supporting our movement. You are attacking it, and you are
attacking our country.

Nordean disagreed. In a private, encrypted communication with a small group of those he had

attacked the Capitol with, Nordean remarked, "No excuse for violence? Ever? Nah I'm good[.]"

Ex. 515-4. Nordean also recorded a video of himself mocking former President Trump's words

with an unflattering imitation of the speech in which Nordean said, "I condemn the actions of the

few last week and the violence. We are a nation of laws." Ex. 407-D. Nordean then went on to

make a noise like he was vomiting. As most of the country reacted in horror at the lawlessness of

January 6, Nordean rejected one of the foundational principles of our country.

When others in the Proud Boys encouraged Nordean to cease his activities, Nordean told

his men that he would never stop and he explained the stakes. In a message to other Proud Boys

presidents on January 12, 2021, Nordean put it plainly—they needed to continue their fight against

the government:

Ok so let's let the *government* take our lives away and do
nothing...stunning and Brave[.] *They're* coming for you no matter
what you [guys]. Wake the hell up. I'm not gunna be sitting on my
ass waiting for the end[.]

Nordean Ex. 3 (emphasis added). The fight to Nordean was always about bringing force to bear

against the government to advance his political views.

Nordean committed a crime of terrorism on January 6, and the Court should not hesitate to

impose a sentence that reflects the seriousness of the crime and its threat to our nation—as reflected

in the Sentencing Guidelines.

### B. Nordean's Sentence Should Reflect a Four Point Leadership Adjustment

The Court has ample evidence to apply a four-level enhancement to Nordean as a leader of

the criminal enterprise. Tarrio hand-selected Nordean and Biggs to act as the leaders of the newly-

8

created Ministry of Self Defense. Nordean and Biggs took command of the MOSD following Tarrio's arrest, with Nordean providing guidance about scrubbing chats that involved Tarrio and encouraging the group to stick together.

More importantly, Nordean understood that he was the leader and embraced that role in the organization. And Nordean understood the power that his position wielded. Indeed, in his podcast just a week before January 6, Nordean recounted squaring off against a line of officers in Washington, D.C. Nordean explained that he and the other "monsters" on the front line were prepared to storm through the line of law enforcement. As Nordean explained, "You're putting me in a position as a leader with almost 1,000 people that I'm responsible for behind me" and those people would be wondering why Nordean was not doing anything. Ex. 608-B.

Nordean and Biggs were the unequivocal leaders on the ground on January 6. In advance of the events, he issued a message to the men that they were going to meet at the Washington Monument and then "from there" they would be "marching to the Capitol." Ex. 551. The next day, he organized his men into formation and marched them away from the speeches and directly to the Capitol. Nordean was very clear in his instruction—nobody goes past me. Ex. 1000 at 1:55.

Nordean chose the time and the place for the attack—directing his men back to the First Street gate shortly before 1 p.m. Ex. 1000 at 19:05 et seq. As the crowd became violent, Nordean calmly put his fist in the air. He gathered his men, and he led his men onto Capitol grounds. Ex. 1001 at 8:10 et seq. As Travis Nugent explained at trial, when the crowd became violent, he and the men in the marching group simply fell back on the chain of command—just as they had been instructed by Nordean and the other leaders. Tr. 14643:24-14645:4 (Nugent). And Nordean, knowing that he had a force of nearly 200 with him, led his men in an assault on the Capitol and democracy itself.

9

## II.     The Section 3553(a) Factors Counsel in Favor of a Sentence Consistent with the Terrorism Enhancement

### A.  Nature and Circumstances of the Offense

The nature and the circumstances of the offense are the most serious that this Court will encounter in relation to January 6. Nordean and his co-conspirators planned and led an attack on the Capitol on January 6. As Nordean explained in the leadup to January 6, Nordean did so because he believed that "government officials" and "law enforcement" were "breaking the law." Nordean led a force to the Capitol for the purpose of taking the fight to the people that he viewed as the "traitors" who were stealing the election—the lawfully elected representatives of the people of the United States.

Nordean organized and led an act of political violence. Nordean did not go the Capitol to engage in "discourse" and he did not come to Washington, D.C. to "debate"—as he saw it, the only thing left for Nordean was "force" or what Nordean called the "organized militia part of our Constitution." Nordean's calculated action to bring violence against the government threatened the foundation of our country.

### B.  Nordean's History and Characteristics

Since at least as early as 2018, Nordean has held himself out as a man ready to dole out violence to anyone who opposes him. Nordean embraced this role. Well before the violence of summer 2020 and the stabbing of Jeremy Bertino in December 2020, Nordean was presenting himself at public rallies outfitted for battle. Here, Nordean is shown at a rally in 2017 dressed in combat attire with the word, "Uhuru" on his plate carrier.



Nordean became known above all else for violence. After joining the Proud Boys in 2017, Nordean rose to national prominence for his role in an altercation, a video of which went viral in June 2018. During a rally in Portland, Oregon that devolved into a melee, Nordean knocked multiple counter-protestors unconscious with one punch. In a media appearance on InfoWars, a site operated by Alex Jones, following his dramatic punch, Alex Jones referred to Nordean as a "folk hero." Nordean Ex. 4 at 2:44. When asked how he felt when he saw the other man's head hit the pavement, Nordean invoked the words of the Proud Boys founder, "like Gavin McInnes says, [] violence isn't great, but justified violence is amazing." *Id.* at 6:20 et seq.[2] Nordean was celebrated for this action, and he was thereafter promoted to a role in the Proud Boys "Elders." *See* Ex. 500 et seq. Nordean embraced this role and relied on it in his self-promotion. For example,

---

[2] *See also* The Guardian, Who are the Proud Boys, 'western chauvinists' involved in political violence?, *available at* https://www.theguardian.com/world/2018/jul/14/proud-boys-far-right-portland-oregon (last accessed Aug. 17, 2023).

11

on his Parler page, Nordean prominently displayed "Punch heard around the world" as part of his bio. Ex. 600-C.

Nordean's street violence was not limited to that single punch. During another altercation in Portland, Nordean and his men advanced on counter protestors; Nordean then charged forward and punched a retreating man to the ground.[3] Nordean Ex. 5 at 3:00 *et seq.* Nordean and his men continued to advance on the retreating crowd with Nordean and others continuing their attack. *Id.* On August 9, 2020, Nordean responded to a private message from his friend, Paul Rae, who posted a story about "leftist rioters" who "fucked around and found out." Nordean responded, "I got bear maced real good, but I put one in the hospital[.]" Nordean Ex. 6.

Nordean embraced this life despite a wealth of other options. Nordean had a comfortable childhood in what he called a "peaceful and rural" environment. Throughout his childhood, Nordean's parents operated restaurants that were well-known in the suburbs of Seattle, Washington. From 2016 to 2019, Nordean was a manager at his parents' restaurant, where he earned a comfortable living. However, Nordean's involvement with the Proud Boys generated controversy for the restaurant. Forced to choose between his family and his newfound fame, Nordean chose the Proud Boys.

By 2020, Nordean's father came to "recognize how radical and violent the group" was, and Nordean's father issued a public announcement that Nordean no longer worked at the family

---

[3] Battle of Portland, *available at* https://www.youtube.com/watch?v=-pvf8ftpRWg (last accessed Aug. 17, 2023).

restaurants. Nordean Ex. 7.[4] Nordean's father told the public that was "disappointed and appalled that [Nordean] had chosen this path."

Nordean continued on his path, and even after January 6, Nordean vowed that he would never quit. Nordean saw firsthand the violence that law enforcement had withstood. But even with those images fresh in his mind, Nordean continued to celebrate January 6 as a glorious event. Just two days after the attack, Nordean posted an altered photograph[5] of a law enforcement officer deploying mace against a rioter. Ex. 601-41. Nordean then directed a comment at the "honorable oath breakers" and told the public that if they "feel bad for the police, [they] are part of the problem." *Id.*

Nordean encouraged his fellow Proud Boys to continue the fight after January 6. By January 12, 2021, individuals in the group advocated for a "stand down" for rallies. Nordean rejected those calls, emphasizing that he "would not be sitting on [his] ass waiting for the end." Rather, Nodean vowed that he would "never stop":

> Ok so let's let the government take our lives away and do nothing...stunning and Brave
>
> They're coming for you no matter what you [guys]. Wake the hell up. I'm not gunna be sitting on my ass waiting for the end
>
> I'm gunna press on with some smart level headed non emotional guys and create a game plan for how to approach this year, we aren't gunna stop getting involved in the community, especially with the momentum we have and if your worried about getting arrested and think that doing nothing will remove that threat you're fooling yourselves. I've had this conversation with guys like this for 3 years and every year you all get worked up and wanna hide. We can be

---

[4] *See also* LATimes.com, A Proud Boys leader, shame of his town, available at https://enewspaper.latimes.com/infinity/article_share.aspx?guid=6515565e-bf1c-4330-8904-ae4af7d97e4d (last accessed Aug. 17, 2023).

[5] The photograph was altered to make it appear that the officer that deployed the spray was grinning. Tr. 13990 – 13992 (Dubrowski).

> smarter, train, plan etc...but we will never stop. Get on board
> or move aside.

Nordean Ex. 3.

During this same time period, Nordean was making plans to meet with his chapter to discuss future plans. Writing on January 20, 2021, Nordean set out an agenda for a proposed meeting on February 6 and noted that "we are on the brink of absolute war." Nordean Ex. 8. On January 21, Nordean proposed a bulk order of equipment that would include "Med kits, boots, pants, shirts (stab proof) vests, gloves(cut proof) masks etc[.]" Nordean Ex. 9. On January 27, Nordean listed the agenda items for the upcoming officer's meeting as: "Pictures and video of activity[,] Setting up regional training every 3 months[,] Regional bulk orders of gear[,] Communications[,] Rally's[,] Uniform[,] SHTF protocol [Sh** Hits The Fan protocol]." Nordean Ex. 10.

These communications plainly show that Nordean was not deterred by the events of January 6—he was emboldened. Nordean continued planning for a "war." Finally, in the days before his arrest, Nordean declared that his parents had given him an ultimatum once again to discontinue his activities as a member of the Proud Boys. In response, Nordean posted a message to Proud Boys in which he shared his plan to "cut[] ties with everyone in [his] family and move away." Nordean Ex. 11. Nordean was prepared to leave his parents, leave his wife, and leave his daughter behind in Washington state because Nordean was committed to remaining a member of the Proud Boys.

Nordean's choices underscore the need for a lengthy period of incarceration. Nordean's history and characteristics indicate that he will relentlessly pursue his misguided objectives even at great personal cost. True to his word, Nordean is "unstoppable, unrelenting and now...unforgiving."

### C. *Need for the Sentence to Afford Adequate Deterrence and the Protect the Public from Further Crimes of the Defendant*

As this Court recognized from the outset of this case, the election may be over, but all politics is not. Free and democratic elections are a bedrock principle of this country, and a significant sentence furthers legitimate goals of general and specific deterrence of political violence. An organized assault like the one led by Nordean cannot simply be treated like all other crimes on January 6. By intentionally and systematically overwhelming officers with their force, Nordean and his co-conspirators re-established the outer limit for political violence. Any individual or group that would consider an organized attack on our government in the future must know that these are crimes that will result in a significant prison sentence.

Likewise, there is a need to deter Nordean individually. Nordean has demonstrated a relentless commitment to his cause even in the face of the threat of arrest for his actions on January 6. Indeed, *after* January 6, Nordean was making plans to accumulate tactical gear and engage in regional "training" every three months in anticipation of a "war."

As a leader on January 6, Nordean played a central role in unleashing the violence and destruction at the U.S. Capitol. Nordean's ability and willingness to lead others to engage in political violence, and his continued commitment to the same beliefs that animated that leadership and led to that violence on January 6, pose a continuing threat to our nation.

### Conclusion

Considering all of the factors and the nature and circumstances of Nordean's crime, Nordean should be sentenced to 27 years of incarceration.

15

## Joseph Biggs Additional Sentencing Arguments

The evidence at trial demonstrated that Biggs was a vocal leader and influential proponent of the group's shift toward political violence. Biggs's close relationship with Tarrio made him among the most trusted of the MOSD leaders, and Biggs's outsized public profile provided a platform from which the conspirators could project their message and rally support. Biggs employed his military experience to direct and control large groups of men under his command.

Biggs brought all of these talents to bear as he prepared for and led a revolt against the government in an effort to stop the peaceful transfer of power. More than perhaps any other, Biggs appreciated the tactical advantage that his force had that day, and he understood the significance of his actions against his own government. Biggs understood that the outnumbered forces attempting to hold the Capitol would be powerless due to his side's overwhelming numbers. And he exploited that advantage over and over again at Breaches 1, 2, 3, and 4. Biggs recognized his own actions in the days following January 6 for what they were—an act of terrorism. *See* Ex. 611-D (In a podcast filmed days after the event, Biggs explained that January 6th was a "warning shot to the government – look, we started this country this way and we'll fuckin' save it this way" and he went on to explain that people forget that the founding fathers were "considered terrorists.").

Biggs's guidelines range—after the application of the adjustment for Biggs's crime of terrorism—rightly reflects the seriousness of his assault on our government and Biggs's leading role in it. Biggs's conduct warrants a sentence of 33 years of incarceration.

## I.    Sentencing Guidelines Analysis

Joeseph Biggs was convicted of Counts One through Six. The Sentencing Guidelines are applied for each of the convictions as follows:

**Count One**    **(Seditious Conspiracy)**
**Count Two**    **(Conspiracy to Obstruct an Official Proceeding)**
**Count Three**  **(Obstruction of an Official Proceeding)**
**Count Four**   **(Conspiracy to Use Force, Intimidation, or Threats to Prevent Officers of the United States from Discharging Their Duties)**

| Base Offense Level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction) |
| Total | 33 | |

**Count Five**    **(Interference with Law Enforcement During a Civil Disorder)**

| Base Offense Level: | 14 | §2A2.4(c) → §2A2.2 |
|---|---|---|
| Specific Offense Characteristic | +2 | §2A2.2(b)(1) (more than minimal planning) |
| Specific Offense Characteristic | +6 | §3A1.2(b) (official victim) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction) |
| Total | 28 | |

**Count Six**    **(Destruction of Government Property)**

| Base Offense Level: | 6 | §2B1.1 |
|---|---|---|
| Adjustment | +26 → 32 | §3A1.4 (terrorism) (increase by +12 or to level 32) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction) |
| Total | 38 | |

All of these counts group. Accordingly, the total adjusted offense level for Biggs is 38 for the federal crime of terrorism in Count Six. As explained in the government's Sentencing

Memorandum , under Section 3A1.4(b), Biggs's Criminal History Category is increased to VI, which results in Guidelines range of 360 months to life of incarceration.

The application of the terrorism enhancement under Section 3A1.4 captures the severity of Biggs's actions and the danger posed by Biggs and his co-conspirators' conduct on January 6. A sentence within these Guidelines would be justified and entirely appropriate.

### A. Biggs's Sentence Should Reflect the Adjustment for a Federal Crime of Terrorism

Biggs's crimes were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. §3A1.4. Biggs arrived at the Capitol to lead a revolution against a government that he viewed as illegitimate. Like Tarrio and Nordean, Biggs viewed himself and his movement as a second American revolution where he and the other "patriots" would retake the government by force.

The jury's guilty verdicts on Count One (seditious conspiracy) constitute a specific finding—beyond a reasonable doubt—that Tarrio, Nordean, Biggs, and Rehl "conspired or agreed with at least one other person with the goal of opposing by force the authority of the Government of the United States" *and* of "preventing, hindering, or delaying the execution of any law of the United States by force." ECF 767 (Jury Instruction) at 21; ECF 804 (Verdict Form) at 1. This finding, consistent with the facts accurately summarized in the draft presentence report, plainly establishes that the defendants' crimes were calculated to influence or retaliate against the government by force or coercion. *See United States v. Dowell*, 430 F.3d 1100, 1110 (10th Cir. 2005).

Perhaps more than any other defendant, Biggs promoted the use of force against the government. Beginning in the days after the election, Biggs declared that the country could face "civil war" because the "left" was "radicalizing people by stealing th[e] election." Ex. 603-1 and

3

-2. Biggs told his followers that it was "time for fucking War if they steal this shit." Ex. 603-4. Biggs steadily escalated his calls for political violence. During an episode of the "Warboys" podcast with Tarrio and Nordean in late November, Biggs demonized the "party" that was telling the public to accept the result of the election. Biggs closed his diatribe by saying that "they are evil scum and they all deserve to die a traitor's death." Biggs Ex. 1. Biggs's comment prompted Nordean to calmly lean toward his microphone and say, "the day of the rope." *Id.*

Biggs's calls for political violence escalated throughout the fall, and he consistently called for war while characterizing his enemies (which included government actors such as the police) as traitors. The critical issue to Biggs was the stolen election, and he tied his calls to violence to the election. For example, in late November, in a post on his social media, Biggs warned officers in Michigan (a state won by Biden) that if they stopped electors from casting a vote for Trump, the people would "treat your thin[] blue line like we do antifa . . . get in our way and get walked over." Ex. 603-33. Biggs declared that the officers would be "tried for treason" and that "[w]e aren['t here to play games. This is war." *Id.*

Throughout the fall, Biggs celebrated election-related violence by the Proud Boys. In November, Biggs posted a video of a woman being knocked unconscious with a helmet to the face and he separately proclaimed that the Proud Boys had "one hell of a day" in which they had "whipped commie ass." Ex. 603-13 and -14. In the leadup to the December rally, which Biggs attended, Biggs posted that he was "ready to rumble." Ex. 603-27. Immediately after the rally, Biggs declared that the Proud Boys had "whooped their asses." Ex. 603-32. Biggs then complained about the vilification of the Proud Boys, and he called for action: "The time is now. Will you submit. Obey and kneel. Or will you stand with us and fight back. We are the future. We are 1776." Ex. 603-32.

4

Biggs's calls for action accelerated as January 6 approached, and Biggs well understood the pivotal importance of January 6 to the election process. Ex. 603-44, -50, and -53 (commenting on anticipated objections to the certification). Biggs encouraged Tarrio to "get radical and get real men" just hours after former President Trump announced plans for a rally on January 6. After episode upon episode of violence by the Proud Boys, Biggs knew that taking on the government would require "real men." Ex. 525-5.

With the Ministry of Self Defense and those "real men" in place, Biggs encouraged action against the government. In an exchange with other leaders of the Ministry of Self Defense on January 1, other leaders called for the Proud Boys to re-evaluate their "disposition toward the police" with another leader saying he was "ready for the escalation." Ex. 501-50. In a chilling comment given the attack that Biggs would soon lead, Biggs agreed with others that the Proud Boys could have "ran [police] the fuck over" during their last visit to D.C. *Id.* Biggs told the others that he wanted to "fuck shit up" and that he was "ready to just be the Zamboni [and] roll over mother fuckers." *Id.* The very next day, Biggs was again on social media expressing vitriol at "most law enforcement departments in metropolitan areas" that were not on the side "of the people." Ex. 603-54. Biggs said those law enforcement were protecting left-wingers and "enforce[ing] tyranny." *Id.*

Biggs's comments were not limited to the police, and he hinted at something larger. In an exchange on December 23, 2020, he told another user that he was not "gonna say things that'll put me in jail tonight" but that "[w]e all know what needs to be done." Ex. 603-39. Shortly after the new year, Biggs announced on social media that 2021 was the year that "we take back America." The next day, Biggs expressed his anger at every law makers that breaks their own laws, Biggs

stated that they "should be dragged out of office and hung." Biggs declared that the "government should fear the people. Not the other way around." Ex. 603-55.

On January 6, Biggs played a central role in the attack. As Nordean, Biggs, and Rehl led the men to the Capitol, Biggs and Nordean addressed the men through a megaphone—telling them that the police and their government had failed them. *E.g.*, Ex. 1000 at 4:10-5:33. Nordean, Biggs, and Rehl led the men to Peace Circle, at the edge of the restricted portion of Capitol grounds, at approximately 12:50 p.m. Prior to their arrival, Peace Circle was uncrowded and relatively peaceful. Ex. 1001 at 00:10-00:32. Biggs led the crowd in chants that included "Whose house? Our house!" and "Whose Capitol? Our Capitol!" *Id.* at 4:17-4:40 & 6:25 *et seq*. These chants had not been used on January 6 by the defendants prior to that moment. *E.g.*, Tr. 5493:11-14 (Greene); *see also* Nordean Ex. 301.

Biggs acted as the tip of the spear throughout the attack on January 6. He was among the first wave across the First Street barrier, he tore down the fence at Breach 2, he repositioned himself and charged up the scaffolding at Breach 3, and he was among the first rioters into the Capitol at Breach 4. And his effort did not end there. It is particularly noteworthy that Biggs re-entered a second time through the Columbus Doors on the east side of the Capitol and traveled directly to the Senate Chamber on his second entry. Finding the Chamber empty of Senators, Biggs must have believed it was mission accomplished. It was not until later that night, when Congress resumed, that Biggs acknowledged the failure of his actions—he posted on social media "R.I.P. America 1776 – 2021." Ex. 603-64.

Were there any remaining doubt as to Biggs's intent during the attack, Biggs recorded a podcast-style interview that he had saved as "CivilWar.mp4" in which he made clear that his actions were intended to send a message to the government. Biggs called January 6 a "warning

6

shot" to the government that showed them "how weak they truly are" after being "bitch-slapped on their own home turf." Ex. 611-B and -D. Biggs reiterated that it had been "a warning shot to the government – look, we started this country this way and we'll fuckin' save it this way" and he went on to explain that people forget that the founding fathers were "considered terrorists." Ex. 611-D. And Biggs also acknowledged the brilliance of the strategy in storming the Capitol with a large crowd—explicitly rejecting that police had let people in. Ex. 611-B. Biggs explained that "when you're holding a position like a fort and you're being overrun . . . and you're outnumbered 100 to 1" the best thing you can do is stand aside. *Id.*

Biggs committed a crime of terrorism on January 6, and the Court should not hesitate to impose a sentence that reflects the seriousness of the crime and its threat to our nation—as reflected in the Sentencing Guidelines.

### B. Biggs's Sentence Should Reflect a Four Point Leadership Adjustment

The Court has ample evidence to apply a four-level enhancement to Biggs as a leader of the criminal enterprise. Tarrio hand-selected Nordean and Biggs to act as the leaders of the newly created Ministry of Self Defense ("MOSD"). Nordean and Biggs took command of the MOSD following Tarrio's arrest. Biggs told the other leaders that he was organizing the men on the ground and had just spoken with Tarrio. Ex. 509-23 ("We just had a meeting w[i]th a lot of guys"; "I was able to rally everyone here together who came *where I said*" (emphasis added)). And Biggs assured the other leaders that Tarrio's phone was secure. *Id.*

Biggs maintained his leadership position throughout the day on January 6. He and Nordean were the unequivocal leaders on the ground. Biggs and Nordean held sway over not only their men, but also members of the public revered them and saw them as heroes. *See* Tr. 14791 (Block) ("People in the conservative movement . . . have certain things that we appeal . . .[like] big strong men."). As Biggs and Nordean marched their men away from the planned speeches on the Mall,

Biggs used the megaphone to rally his men to action. Biggs encouraged his men to march through "this fucking city that's our goddamn city," and Biggs directed "let's go fucking kick some goddamn ass." Ex. 1000 at 5:00 *et. seq.* The march culminated at the Capitol at 12:50 p.m., where Biggs again took the megaphone and led the angry crowd in chants: "Whose Capitol? Our Capitol!" Ex. 1001 at 6:25 *et. seq.*

Biggs continued to lead the men on the grounds of the Capitol. He led them up the First Street walkway. *See* Ex. 404-D. He led them in destroying the black metal fence. Ex. 445-Bx at 0:30 *et. seq.* (calling out to "Rufio" to join him to tear apart the fence). He led them to regroup on the lawn. Ex. 404-LL; Tr. 12378:2 – 12379:10 (Miller). He climbed the concrete stairs and then turned to face Nordean and others on the lawn, waving and pointing for them to come up using the same stairs. Ex. 414-Ax. Biggs then led two other Proud Boys into the building. Biggs exited and took selfies with a group of other Proud Boys and filmed a video in which he declared, "we've taken the Capitol." *See*, *e.g.*, Ex. 405-I. Biggs then made a second entry into the Capitol through the Columbus Doors as part of a tactical line with other Proud Boys. Ex. 433-C, 172x. Biggs led his men to the Senate Gallery. Tr. 12577-579 (Miller).

Biggs served as an instigator and leader of his men in the attack on the Capitol. Throughout the attack, Biggs maintained command over others and led them in a relentless effort to send a "message" to the government that he and his men were prepared to "save" the country by force. Through his actions in preparing for and carrying out the attack, Biggs earned a four-point leadership adjustment under §3B1.1(a).

### C. Biggs obstructed justice by lying to federal officers about his conduct at the Capitol

The PSR correctly applies a two point adjustment for obstruction of justice. Biggs PSR ¶ 100. Biggs engaged in two separate interviews with the FBI prior to his arrest on January 20,

2021. He flagrantly lied to protect himself and others from prosecution, and his lies were purposefully calculated to obstruct the investigation.

During his first interview with the FBI on January 8, 2021, which was summarized in an FBI 302, Biggs acknowledged that he was present at the protests, but claimed that he never made entry inside the Capitol building itself. Biggs Ex. 2. In fact, Biggs entered the Capitol twice.

On January 17, 2021, a tranche of videos that were taken during the attack and posted to the social media site Parler were made public.[1] One of those videos showed Biggs's entry into the Capitol and recorded him saying, "this is awesome!" Ex. 448. Biggs contacted the FBI on January 18, 2021, and made plans to meet with the FBI the same day.

The interview on January 18 was audio recorded. Biggs Ex. 3. Biggs was explicitly advised that lying to a federal officer is a crime. *Id.* at 0:45 *et. seq.* Biggs lied repeatedly to protect himself and others:

- Biggs denied being with anyone he knew while he was inside the Capitol. *Id.* at 19:50 *et. seq.* (Q: "were you with anybody?" A: "No. I was lost. Like I didn't know where to fucking go. I was by myself and I was scared shitless.").

- Biggs was asked again later in the interview whether there was anyone else with him. Biggs again claimed that he was separated and didn't see anyone else he knew until after he left the Capitol. *Id.* at 25:45 *et. seq.* (Q: "Was there anyone else in your group that was in the Capitol?" A: [Pause] "Um, I mean, there had to have been." Q: "You said you got separated, right?" A: "Yeah. I got separated. I didn't see people until afterwards. I finally found people scraggling [sic] around running, you know, looking for people like me.")

- After initially denying breaking anything, Biggs was asked again whether there was anything else that was "worth sharing." Twenty-four minutes into the interview, Biggs acknowledged "shaking" a black metal fence, but he claimed that he was only doing it because people were getting "pinned [] against it." *Id.* at 24:25 *et. seq.* (Biggs: "I was shaking [the fence] at one point to get it loose so people could move and wouldn't get pinned up against it" Biggs: "There was one guy who was pinned up against the fence like literally screaming; the pole was dug into his belly, and there was so much force

---

[1] ProPublica, What Parler Saw During the Attack on the Capitol (Jan. 17, 2021), *available at* https://projects.propublica.org/parler-capitol-videos/ (last accessed Aug. 17, 2023).

from all the people around him, he couldn't even breath . . . I thought that dude was gonna get hurt bad.")

## II. Section 3553(a) Factors

The government's specific recommendation for Biggs of a sentence of 33 years of incarceration is further justified by the nature and circumstances of Biggs's individualized conduct, his personal history and characteristics, and the need to protect the public from future crimes by Biggs.

### A. Nature and Circumstances of Biggs's Conduct.

As explained above, Biggs was a leader of the charged conspiracies and deserves a 4-point enhancement for his role in the offense. This guideline application, however, only partially captures the aggravated role that Biggs played in the overall events of January 6.

Apart from being a leader of MOSD, Biggs also played a critical role in the broader riot. Video footage from moments before the first breach shows Biggs with a megaphone leading the crowd in chants like "Whose Capitol? Our Capitol!" *See* Ex. 1001 at 6:25 *et. seq.* His subsequent actions show that this was not metaphor. As the riot progressed, Biggs continued to play a leading role in propelling the crowd forward. He, along with Nordean and others, tore down the black metal fence that cleared the way to lower west terrace at Breach 2. Then, with the fence trampled underfoot and the crowd surging forward, Biggs moved toward the building while waving his right hand forward in a sign of encouragement. *See* Ex. 417x at 1:00:



Similarly, after reaching the upper west terrace in the wake of Breach 3, Biggs moved to top of the wall where he triumphantly raised his fists and signaled to the cheering crowd below

what route they should take to join him up there. *See* Ex. 414-Ax; Tr. 12505 (Agent Miller: "He's pointing in the direction of the same set of stairs he just climbed.").



Biggs is the only defendant in this case who entered the building twice: first on the heels of the initial wave of rioters to enter at the Senate Connecting Corridor, and then again as part of the violent breach of the Columbus Doors on the east side. During that second entry he brushed past a Capitol Police officer, showing zero regard for the members of law enforcement who were trying desperately to stem the flow of rioters into the building. Biggs is also the only defendant in this case to enter one of the legislative chambers: he entered the Senate gallery with a group of his men and took a "selfie" photo to commemorate their achievement. *See* Ex. 405-AA.

In his travels through the building, Biggs continuously showed callous disrespect for the symbol of our democracy. Almost immediately upon entering, he stole an energy drink from an unattended cantina area. Ex. 409-A. Later, while moving through a corridor, he casually knocked down a rope barrier while walking past it. Ex. 129x. And, much like Nordean, he joined with his accomplices to steal a flag: in Biggs's case an American flag from outside the Senate Chaplain's office. Ex. 130. These instances of theft and vandalism are not defining features of the offense—

far from it—but they do speak volumes about Biggs's disdain for the Capitol building and the government that it represents.

### B. Biggs's Personal History and Characteristics

One of the core aspects of Biggs's biography (and a central part of his trial presentation[2]) is his military service. *See* Joint Ex. 1 (Stipulation Regarding Joseph Biggs Biographical Details); Biggs PSR ¶ 163. Service to one's country deserves recognition, and when the Court considers Biggs's personal history and characteristics, it can rightly consider the sacrifices and contributions he once made as a member of the armed forces.

By the same token, however, the Court must give due consideration to the ways Biggs's military record aggravates his culpability. For starters, and to put it bluntly, Biggs should have known better. Regardless of one's background, seditious conspiracy represents a betrayal of country, but that treachery is even more grave when the perpetrator once swore to "support and defend the Constitution of the United States" and "bear true faith and allegiance to the same." 10 U.S.C. § 502 (enlistment oath). Biggs was once entrusted to use of deadly force to defend Americans' freedoms, and he spent formative years absorbing the civic virtues that come with military training and experience. Biggs knew firsthand that a heavy price is exacted, generation after generation, for the preservation this country's democratic institutions. And he knew the value of those institutions, having served in countries less fortunate than our own—places where the use of politically motivated violence has sadly been endemic. It was with this perspective that Biggs likened his group's actions at the Capitol to one of the most notorious episodes in American history, the attack on Pearl Harbor, when he twice described January 6 as a day that would live in infamy. *See* Exs. 509-37; 404-LL.

---

[2] *See, e.g.*, Tr. 14380 – 14381 (opening statement: "Joe Biggs put his life on the line for [pointing at jurors] you, for you, for you, for you, for each and every person in this room.").

Biggs's military background also conferred on him status and abilities that made him a more effective participant in this offense. More than most of his accomplices, Biggs understood the tactical aspects of moving in groups and leveraging strength in numbers. *See* Ex. 611-B (Biggs describing impossibility of "holding a position, like a fort" when "you're outnumbered 100 to 1").

It was also evident from his self-presentation, and from others' reactions to him, that Biggs's Army service gave him substantial cachet within the Proud Boys. In the words of defense witness Hendrick Block, Biggs was "a very big deal. . . . He's an American hero." Tr. 14997. Biggs used this prominence to spread inflammatory, pro-violence rhetoric—often to the chagrin of other members of the group. Along with the many examples cited above, the trial evidence included Biggs's public response to the "stand back and stand by" comment, which he took as a directive from the President to "go fuck [Antifa] up!" Ex. 603-66. Almost immediately, multiple Proud Boy Elders expressed serious concern that Biggs needed to "shut up or guys are gonna get hurt." Ex. 500-3; *see also* Ex. 500-8 ("I'm worried about guys having to explain Biggs."). Despite the membership's continuing unease toward Biggs, *e.g.* Ex. 514-36, Tarrio chose him as one of MOSD's senior leaders. This decision was not without cost: one of the Elders predicted, "I can see you getting a shit load of pushback and drama if you stick biggs near those positions," Ex. 500-69, and another explained, "I voted no on the chapter because of Biggs," Ex. 500-72. But Tarrio persisted, defending his selection: "Biggs helps me organize…always has… While we're at events I depend on him and Rufio to make decisions." Ex. 514-37.[3] The elevation of Biggs to MOSD's top-tier leadership, especially in the face of so much opposition, sent an unmistakable message

---

[3] Tarrio had previously defended Biggs's promotion of violence as the same "shit we've always said." Ex. 500-8.

about the new chapter's purposes and expectations. When prospective members were told to "fit in or fuck off," it was Biggs's pro-violence philosophy that they were meant to "fit in" with.

### C.  The Need to Protect the Public from Further Crimes by Biggs

The weeks preceding and following January 6 showed an unmistakable pattern of radicalization on Biggs's part; in fact, he himself used the word—"Let's get radical"—in his planning talks with Tarrio on the eve of MOSD's formation. Ex. 525-5. More than any of his co-defendants, Biggs constantly invoked the language of "war," and in one such discussion with Tarrio about being "ready to war," Biggs boasted that he possessed "thousands of rounds and guns." Ex. 525-1. Although Biggs's actions on January 6 thankfully did not involve firearms, they nonetheless show that his near-constant advocacy of violence in the leadup to the certification was not idle talk. When the opportunity came for Biggs to act, he did so.

After the attack on the Capitol, there is no indication that Biggs reversed his commitment to political violence; indeed, the opposite seems to be true. In the "CivilWar.mp4" interview discussed above, he made described January 6 as a "warning shot" that portended worse violence to come. Ex. 611-D. Moments later, Biggs glorified the "founding fathers" while observing that they "were considered terrorists" in their day. *Id.* For Biggs, history's lesson was simple: sometimes "st[anding] up for what [you] believe[] is right" means "kill[ing] a bunch of fucking retards," even if doing so causes your contemporaries to regard you as "the worst of the worst." *Id.* This brief monologue encapsulates Biggs's terribly misguided—and demonstrably dangerous—attitude toward the use of political violence. And it shows why specific deterrence will be so difficult in his case. A conviction for serious felonies, and the accompanying substantial prison sentence, might unfortunately only redouble Biggs's commitment to embracing extreme measures to achieve his political aims. The Court must accordingly impose a sentence long enough

14

to prevent Biggs from leading another violent conspiracy against the government while he is still motivated and equipped to do so.

## Conclusion

Considering all of the factors and the nature and circumstances of Biggs's crime, Biggs should be sentenced to 33 years of incarceration.

## Zachary Rehl Additional Sentencing Arguments

Zachary Rehl should serve 30 years (360 months) in prison for his role in advancing a seditious conspiracy to oppose by force the lawful transfer of Presidential power. Rehl drove from Philadelphia to Washington and led—along with Biggs and Nordean—a march of approximately 200 from the Washington Monument to the Capitol, where on the way he served a key logistical role and communicated with other co-conspirators who were not in the District of Columbia, passing them information about the conditions on the ground. Rehl encouraged rioters at the initial breach, yelling "fuck them! Storm the Capitol!" While on Capitol grounds, Rehl—the son and grandson of Philadelphia police officers—personally assaulted law enforcement officers with a chemical irritant spray. He then lied about that assault while under oath and testifying in his own defense at trial.

### I.    Sentencing Guidelines Analysis

Zachary Rehl was convicted of Counts One through Six. The Sentencing Guidelines are applied for each of the convictions as follows:

**Count One      (Seditious Conspiracy)**
**Count Two      (Conspiracy to Obstruct an Official Proceeding)**
**Count Three   (Obstruction of an Official Proceeding)**
**Count Four     (Conspiracy to Use Force, Intimidation, or Threats to Prevent Officers of the United States from Discharging Their Duties)**

| Base Offense Level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +3 | §3B1.1(b) (aggravating role—manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 32 | |

1

*Count Five*     **(Interference with Law Enforcement During a Civil Disorder)**

| Base Offense Level: | 14 | §2A2.4(c) → §2A2.2 |
|---|---|---|
| Specific Offense Characteristic | +2 | §2A2.2(b)(1) (more than minimal planning) |
| Specific Offense Characteristic | +6 | §3A1.2(b) (official victim) |
| Adjustment | +3 | §3B1.1(b) (aggravating role—manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 26 | |

*Count Six*     **(Destruction of Government Property)**

| Base Offense Level: | 6 | §2B1.1 |
|---|---|---|
| Adjustment | +26 → 32 | §3A1.4 (terrorism) (increase by +12 or to level 32) |
| Adjustment | +3 | §3B1.1(b) (aggravating role—manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 37 | |

All of these counts group. Accordingly, the total adjusted offense level for Rehl is 37 for the federal crime of terrorism in Count Six. As explained in the government's Sentencing Memorandum , under Section 3A1.4(b), Rehl's Criminal History Category is increased to VI, which results in a Guidelines range of 360 months (30 years) to life of incarceration.

The application of the terrorism enhancement under Section 3A1.4 captures the severity of the Rehl's actions and the danger posed by Rehl and his co-conspirators' conduct on January 6. A sentence within these Guidelines would be justified and entirely appropriate.

### A. Zach Rehl's Conduct Mandates Application of the Terrorism Enhancement

Rehl's crimes were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. §3A1.4. The jury's guilty verdicts on Count One (seditious conspiracy) constitute a specific finding—beyond a reasonable doubt—that Tarrio, Nordean, Biggs, and Rehl "conspired or agreed with at least one other person with the goal of opposing by force the authority of the Government of the United States" *and* of "preventing, hindering, or delaying the execution of any law of the United States

2

by force." ECF 767 (Jury Instruction) at 21; ECF 804 (Verdict Form) at 1. This finding, consistent with the facts accurately summarized in the draft presentence report, plainly establishes that the defendants' crimes were calculated to influence or retaliate against the government by force or coercion. *See United States v. Dowell*, 430 F.3d 1100, 1110 (10th Cir. 2005) (holding that the jury made the factual finding that defendant had requisite intent to influence or affect the conduct of government by intimidation or coercion necessary for application of the Section 3A1.4 enhancement when the jury convicted defendant of attempting to interfere with IRS, having been instructed that an element of the offense was that defendant knowingly and intentionally "endeavored to obstruct or impede the due administration of the Internal Revenue laws by the use of force").

Rehl spent his time as president of the Philadelphia Proud Boys trying to present a legitimate-looking front while behind the scenes amassing an army that was ready and willing to fight. For example, Rehl organized and participated in rallies in his native Philadelphia, and in private conversations going back to 2019, he acknowledged that he wanted to mobilize politically, and that winning elections would make or break them, but that "throwing down [violence] from time to time helps . . . it just can't be the only thing we're about." Ex. 561-1. Rehl wanted his guys to be "jacked" and fast-tracked one who was "ready to crack skulls." Ex. 560-4-5.

By the fall of 2020, Rehl was openly using violence committed by Proud Boys at rallies to recruit new members to the club and tying that violence to attempts to overturn the election result. He posted graphic videos of Proud Boys committing violence on the streets of Washington, D.C. to Parler, including multiple angles of a woman being knocked unconscious by a member of the Proud Boys. Ex. 602-10, 602-17. Rehl publicly celebrated Proud Boys getting "hype," then "finish[ing]" Antifa, and he likened Proud Boys violence to standing up for America. Ex. 602-9.

3

Another post from the early morning hours of November 15, 2020, showcased a video Proud Boys violence, including superimposed text that read, "KILL THEM," along with the election-related hashtags "#releasethekraken" and "#releasethecracken." Ex. 602-12. In a subsequent post, Rehl indicated that these attacks were coordinated using "the same tactics" that the men had learned in the military. Ex. 602-14. Within hours of posting the videos glorifying violence committed by the Proud Boys at an election-related rally, Rehl posted a message to that same account with links for how to join the Proud Boys, and two days later, he praised the Philadelphia Proud Boys vetting chat for what Proud Boys generally, and Philadelphia members specifically, did in D.C. Ex. 602-15, 571-3.

As January 6 drew nearer, Rehl manifested both knowledge of the importance of the day and the violence that would be required if politicians did not do what he and his cohorts wanted them to do. For example, on Parler, he answered a question posted by another user about the importance of January 6 by informing the user that January 6 is "the day where Congress gets to argue the legitimacy of the electoral college votes." Ex. 602.40. He also posted, on November 30, 2022, "[p]eople are waiting until the courts play out, we would rather let the constitution do its thing and not go apeshit if we dont have to." Ex. 602-33. Rehl believed that the time for "standing by" was over, a reference to President Trump's "stand back, stand by" comments. Rehl Ex. 1.

Rehl's words and actions reveal his intent on January 6—he was there to use force and violence to influence his government and lead a civil war. As Rehl charged forward at the first street gates, he encouraged others with his cry, "Fuck them! Storm the Capitol!" As the riot was unfolding, Rehl texted his friends while battling in the West Plaza. Rehl told them that "[e]veryone raided the Capitol," and described rioters being at a "standstill" with the police (*i.e.*, rioters were being held back from overrunning the building). Rehl personally acted to break this "standstill" by

assaulting officers with irritant spray. *See* discussion, *infra*, at Part I.C. Once Rehl reached the Upper West Terrace, he proudly declared that the "Civil war started." Ex. 547-5.

Rehl's messages after the riot erase any doubt that he had intended to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. After learning that state capitals had also been stormed on January 6, Rehl told his mother, "Seems like our raid of the capital set off a chain reaction of events throughout the country. i'm so fucking proud." Ex. 557-29. On January 7, he texted the same group he had previously informed about the "standstill" and the "Civil war" and lamented that "We lost our country, we shoulda held the capital." Rehl added that he "was hoping we all sent a message yesterday, I guess that was the message to ben[d] the knee, its depressing." Ex. 547-8. Through their actions, Rehl and his co-conspirators sought to send a message—to use their force to influence and intimidate the government to obtain their desired political outcome.

Rehl committed a crime of terrorism on January 6, and the Court should not hesitate to impose a sentence that reflects the seriousness of the crime and its threat to our nation—as reflected in the Sentencing Guidelines.

### B. Rehl was a Manager or Supervisor Under Section 3B1.1

As a manager or supervisor of other individuals across the conspiracy to oppose the transfer of presidential power by force, Rehl deserves a three-level upward adjustment for his aggravating role in the offense. U.S.S.G. § 3B1.1(b). The PSR correctly applied this role.

Rehl was one of the operations leaders of the Ministry of Self Defense. The operations section was designated by Tarrio as an "upper tier" of MOSD leadership, and in the same message Tarrio emphasized that the section had a "top-down" structure. Ex. 503-18. Co-conspirator Jeremy Bertino explained that the job of the marketing section was to decide the mission they wanted to

accomplish, and it was the operation section's job to figure out how to accomplish that mission. Tr. 10012:4-14 (Bertino).

Rehl embraced and filled that leadership role. On January 6, Rehl led—along with Biggs and Nordean—the assembled Proud Boys who had gathered at the Washington Monument at 10:00 a.m. He led them away from the Washington Monument and towards the Capitol as the President was still speaking. Shortly after Nordean announced that he was going to begin developing the front line of that march, Rehl instructed those present to "make sure no press is around." Ex. 1000 at 1:30-1:45. As Biggs and Nordean attempted to rile up their charges by referencing Bertino's stabbing and Tarrio's arrest, Rehl stood nearby, facing the men, radio in hand. Ex. 1000 at 4:09-5:49. He later used that radio to ensure that the back of the group stayed with the front of the group. *See*, *e.g.*, Ex. 1000 at 8:27-8:40; Tr. 17831:1-12 (Rehl). In addition to bringing his own radio, Rehl transported five additional radios to Washington for the group's use. Ex. 509-18. Rehl's leadership helped ensure that the group of nearly 200 men he helped lead away from the Washington Monument and towards the Capitol stayed at nearly 200 as it approached and circled the building.

During the march, Rehl maintained contact with his fellow leaders and provided updates to his co-conspirators monitoring what was happening from afar. Rehl assured other leaders that the MOSD members who showed up were "doing our thing" and staying together. Ex. 509-29. Rehl also reported to co-conspirator and fellow MOSD leader Bertino that there was not much Antifa presence, but that the Proud Boys were outed by the media almost immediately. *Id.*

After the group stopped for approximately 45 minutes at the food trucks for lunch, Nordean organized them into a column, and Rehl again led the men, with Nordean and Biggs, from the food trucks to the Peace Circle. *E.g.*, Ex. 1001 at 1:42 (Rehl and Nordean stopping the group with hand gestures). Rehl, along with Nordean and Biggs, was at the front of the column of Proud Boys who

changed the atmosphere at the Peace Circle from peaceful to rowdy. *E.g.*, Ex. 1001 at 4:18. As the MOSD leaders and their men surged forward towards rioters assaulting the police guarding the Pennsylvania Walkway, Rehl exhorted the crowd, "Fuck them! Storm the Capitol!" Ex. 1001 at 10:07.

When the time came to enter the building, Rehl led at least three of his men into the Capitol and into a Senator's office. The men celebrated their group accomplishment and posed for pictures flashing the Proud Boys hand gesture.

After leaving the building, Rehl looked to celebrate the group's achievements not with those he traveled with from Philadelphia, but with his fellow MOSD leaders. Rehl specifically asked where Biggs and Nordean were at 6:37 p.m. on January 6, and after Biggs told Rehl he had already left, Rehl lamented, "Ah shit forgot you had to roll, was hoping to have some celebratory beers with yall after this epic fuckin day, I'll drink one for ya." Ex. 509-37.

### C. Rehl Obstructed Justice with his Perjured Trial Testimony

Rehl should receive a two-level upward adjustment for obstruction of justice under U.S.S.G. § 3C1.1. Rehl perjured himself no fewer than *15 times* in the course of his testimony regarding whether he assaulted anyone on January 6.[1] The commission of perjury is a clearly delineated basis to apply this adjustment. *Id.*, Application Note 4(B). On cross-examination, Rehl was confronted with undeniable video evidence that he assaulted law enforcement on January 6. He denied it. Before he realized what was coming, Rehl admitted that he wore a chevron-patterned gaiter, a black jacket, black goggles, and a camouflage hat with orange writing on January 6. Ex. 2003; Tr. 18394:22-18395:9 (Rehl).



**Image 1: Ex. 2003, Rehl Circled**

When shown a video of himself wearing this exact outfit and spraying at officers on January 6, Rehl suddenly could not tell whether that was him. *E.g.*, Tr. 18398:5-18400:19 (Rehl). Rehl continued to claim he could not see the camouflage hat or goggles in Ex. 2004, and—despite

---

[1] Tr. 17811:2-5; 17827:20-21 & 22-24; 17839:15-17 & 22-23; 18053:6-9, 10-11, 15-18, 19-21, 22-25; 18053:13-17: 18054:1-4, 5-8, 9-12, 13-17, 18411:10-15 (Rehl)

having been there—unequivocally denied assaulting any law enforcement ("I did not assault anyone"), even after having watched the video. Tr. 18411:10-15 (Rehl). He even denied being able to see that the person in the video had something dark in his hand. *Id.* at 18410:9-21.



**Image 2: Still shot from Ex. 2004 showing Rehl with camouflage hat, hand extended, holding a black canister**

Perhaps intending to rely on what he claimed was the blurriness of Ex. 2004, Rehl asked for a better angle. *Id.* at 18409:11-12 (Rehl). The government obliged that request. Just prior to being confronted with this second angle, Rehl's answer about assaulting law enforcement changed from an unequivocal no to a conspicuous, "Not that I recall." *Id.* at 18740:4-7 (Rehl). Rehl still would not agree to what was obvious to everyone in the courtroom, namely that the person in the chevron-patterned gaiter, black goggles, and camouflage MAGA hat was him. He instead claimed

that the attire of the person assaulting law enforcement was "close" to what he wore, and went as far as to glibly remark, "not saying that's not me." *E.g.*, *id.* at 18741:1-16 (Rehl). It was him:



**Image 3: Rehl, spraying at law enforcement officers**

In the above screenshot from Ex. 2008, which was taken from a police officer's body-worn camera, Rehl is depicted spraying a substance at law enforcement from the black canister whose existence he denied the day before. Rehl, the son and grandson of Philadelphia police officers, assaulted law enforcement on the West Plaza on January 6. He perjured himself about that fact 14 times on direct examination and once on cross-examination before claiming he did not recall and continuing to attempt to lie his way out of the hole he dug himself when confronted with irrefutable video evidence.

Rehl did not confine his evasive and/or incredible testimony to his assaults on law enforcement on the West Plaza. During his direct examination, he stated that he thought that the rioters committing the Peace Circle breach were just looking for stages–a statement so absurd that he was compelled to explain it to his own lawyer, "And, like, look, sorry – you're giving me this look like – but it's the honest God truth." Tr. 17976:4-16 (Rehl). Rehl was evasive during cross-examination—on one occasion, he refused to answer a question six times. *Id.* at 18533:22 – 18537:25. On another, it took four tries. *Id.* at 18718:19 – 18721:6. Rehl testified that he ran his chapter to "make better men," *Id.* at 17785:8-10, when in fact he was shown to be fast-tracking people he thought would crack skulls. *Id.* at 18483:12-17; 18679:17-23. Rehl testified that he sent a video with text he sent at 2:28 p.m. on January 6, "Civil war started," in an attempt to say that he made the statement to mock the media. *Id.* at 18842:22-18847:9. The Cellebrite report of the forensic extraction of Rehl's phone does not show that he sent *any* video along with the "Civil war started" text. Rehl Ex. 2 (partial extraction report showing the text with no accompanying file or trace of a file). He testified that after being able to sit down and go through his phone, he learned that January 6 was a "terrible day" and that he didn't agree with what happened and did not want to associate himself with it, *id.* at 18847:13-19, 18848:7-23, but his contemporaneous messages belie that testimony. *E.g.*, Ex. 510-52 (Rehl informing MOSD members that he was "proud as fuck what we accomplished yesterday"); 544-3-4 (messages to Philadelphia Proud Boys executive board on January 7: "Looking back, it sucked, we shoulda held the capital. After trump conceding today, it all seemed like a waste . . . Everyone shoulda showed up armed and took the country back the right way").

Rehl's obstructive testimony deserves a two-point upward adjustment under U.S.S.G. § 3C1.1, and for the reasons laid out below, it also augurs for a higher sentence under the factors laid out in 18 U.S.C. § 3553(a).

## II.    The 3553(a) Factors Support a Sentence Commensurate with the Terrorism Enhancement

The government's recommendation that the Court sentence Rehl to 30 years of incarceration is supported by the nature and circumstances of the offense (including Rehl's personal participation in the offense), his history and characteristics, and the need for general deterrence, as well as the need to specifically deter Rehl from committing future crimes.

### A.   The Nature and Circumstances of Rehl's Offense

The nature and circumstances of this offense are some of the most serious in our nation's history. Rehl and his co-conspirators led a conspiracy to prevent the peaceful transfer of Presidential power by force. This Court has described the effort by these co-conspirators as a "conspiracy to effectively steal one of our Nation's crown jewels: the peaceful transfer of power." *United States v. Pezzola*, 531 F. Supp. 3d 139, 149 (D.D.C. 2021) (Kelly, J.). The jury's verdict establishes, beyond a reasonable doubt, that the conspirators intended to steal that crown jewel corruptly and by force.

Rehl deliberately used violence to recruit members of the Proud Boys and tied that violence to attempts to overturn the election. He led a fighting force to the Capitol on January 6, 2021, and he directed that force against those he had previously called "traitors" deserving of "firing squads." Ex. 602-29. Rehl had closely followed the post-election litigation and knew precisely the solemnity and importance of what was occurring in the Capitol on January 6, 2021. When, in Rehl's view, the Constitution had not "done its thing," it was time to be violent. *See* Ex. 602-33. Rehl denigrated the very police whose lineage he claims to be a part of, imploring other rioters to "Fuck [the U.S.

12

Capitol Police]! Storm the Capitol!" After crossing the trampled police line and charging up the Pennsylvania Walkway, Rehl yelled at the police guarding the next set of barricades. Ex. 417x. He watched, gleefully recording, as rioters clashed with police, leading to Pezzola stealing a riot shield. *See*, *e.g.*, Ex. 229x, 444-Ax, and 1108-30; Tr. 12356-363 (Miller). He recognized that police and rioters were at a "standstill," Ex. 547-5, and shortly thereafter assaulted law enforcement who were trying to prevent rioters from breaking that standstill by spraying them with an irritant spray.

Rehl entered the building and went immediately to a private office that included maps of Oregon on the walls, where he smoked and posed for pictures while flashing the Proud Boys hand gesture. Tr. 12639:16 – 12640:24 (Miller); Ex. 415x and 402-B. After he left the building, he again posed for celebratory photos on the Upper West Terrace while flashing the Proud Boys' hand gesture. Ex. 401-CC; Tr. 12691:9-11 (Miller).

After January 6, Rehl alternated between celebrating the conspiracy's success and lamenting that it had not gone further. Examples include:

- January 6, to his mother: "Seems like our raid of the capital set off a chain reaction of events throughout the country. i'm so fucking proud." Ex. 557-29.

- January 7, to MOSD Members: "I'm proud as fuck what we accomplished yesterday." Ex. 510-52.

- January 7 to a text chain that included Proud Boys, "We lost our country, we shoulda held the capital," continuing that he "was hoping we all sent a message yesterday, I guess that was the message to ben[d] the knee, its depressing." Ex. 547-8

- January 7, in a private message with a Philadelphia Proud Boy, Rehl said he was working on the next move. He later deleted that message. Rehl Ex. 3.

- January 7, to a fellow member of the Philadelphia Proud Boys executive board: "yup," in response to a statement that they "should have let them finish the counting and when they didn't accepted the challenges, Rush in and set fire to that shit." Ex. 544-3.

13

- January 7, to the Philadelphia Proud Boys executive board: The reason why it feels like a waste is because instead of all these politicians getting scared and realizing they need to answer for this fraud, they are all turning on Trump and cucking, they are doubling down on their actions. Everyone shoulda showed up armed and took the country back the right way." Ex. 544-4.

Rehl led an army to attempt to stop the certification proceeding, was proud that they got as close as they did, and his only regret in the immediate aftermath was that they did not go further.

### B. Rehl's History and Characteristics

Zachary Rehl joined the Proud Boys in 2018, having served in the U.S. Marine Corps and earned a Master's degree from Temple University. Rehl PSR ¶ 157; Tr. 18460:16-18. He soon thereafter recognized that the members of the group were ready hit the streets, with Rehl leading the way, Ex. 560-2, and just one year later had recognized that violence was not detrimental to his political aspirations for the Proud Boys, so long as that violence was not "all they were about." Ex. 561-1. He soon thereafter looked to get his men "jacked" and fast-tracked one who was ready to "crack skulls." Ex. 560-4 and -5. By November 2020, as detailed above, Rehl was using violence to recruit and glorifying that violence as it relates to attempts to overturn the results of the 2020 Presidential election.

Neither the defendant's time in the military nor his educational credentials, nor his lineage from the Philadelphia Police Department, prevented him from weaponizing a fighting force against the government on January 6, 2021, nor from participating in that violence himself. That they did not prevent the defendant from taking the actions he did weighs in favor of a lengthy sentence of incarceration.

Rehl's criminal history likewise supports a significant sentence here. In 2006, Rehl was convicted of a DUI, which involved colliding with another vehicle, damaging that vehicle and injuring its driver. Rehl PSR ¶ 128. Rehl was convicted of a second DUI and Reckless

14

Endangerment in 2015. That offense involved an intoxicated Rehl accelerating his vehicle in the direction of the victim, with whom Rehl had had a prior dispute, while yelling slurs at him. In the process of doing so, Rehl hit two parked cars and pushed them in the direction of the victim. *Id*, ¶ 129. Whatever substance abuse issues may have led to Rehl's two DUIs, including one in which he used his car as a weapon and was fortuitous to strike other vehicles before his intended target, appear to still have been ripe in 2021. Rehl used ecstasy and LSD through his arrest, *id.*, ¶ 154, his messages frequently referenced the use and distribution of cocaine, and he testified at trial that he got "lit" after protests, and that he was doing shots on December 30, to "pregame" and get his "tolerance up a little bit" for New Years Eve. Tr. 17813:15-21; 17880:10-17 (Rehl).

### C. Adequate Deterrence and Protection of the Public from Rehl

As this Court recognized from the outset of this case, the election may be over, but all politics is not. Free and democratic elections are a bedrock principle of this country, and a significant sentence furthers the legitimate goals of general and specific deterrence of political violence. An organized assault like the one led by Rehl cannot simply be treated like all other crimes on January 6. By intentionally and systematically recruiting those who were willing to engage in violence, and then overwhelming officers with their force, Rehl and his co-conspirators re-established the outer limit for political violence. Any individual or group that would consider an organized attack on our government in the future must know that these are crimes that will result in a significant prison sentence.

There is likewise a need to deter Rehl individually. As noted above, Rehl did not come to his willingness to engage in violence against the government overnight. It has been building since at least 2018, and it built to a crescendo from November 2020 to January 2021. Rehl did not rest

on his laurels in the aftermath of January 6, but instead lamented how rioters had not gone far enough and told others that he was planning next steps.

Rehl has given multiple interviews after the jury's verdict, and those interviews have spread misinformation about what happened in the trial. For example, in an interview published in *The Gateway* Pundit on August 3, 2023, Rehl stated, "These trials have no transparency, especially ours. Ours was blacked out." *See* https://www.thegatewaypundit.com/2023/08/j6-political-prisoner-zachary-rehl-faces-10-12/ (last visited August 12, 2023). As the Court is well aware, Rehl's trial was public and received a significant amount of media coverage, including two journalists live-tweeting nearly every witness's testimony and most legal arguments that occurred over the 4-month trial. Rehl's willingness to continue to spread misinformation, to stoke unjustified anger among those who read his words, show that, far from being contrite, he continues to engage in the same type of behavior, even after being convicted and even while awaiting sentencing.

Rehl has compared the prosecution, in a post-trial interview on May 12, 2023, to something that would happen in Communist China or Cuba. Rehl Ex. 4 at 19:25-20:05.[2] He also called the trial "one-sided" before saying he did not want bash the judge. *Id.* at 23:20-24:05). He has leveled accusations of a politically motivated jury, with unsupported claims of juror misconduct, *id.* at 21:24-22:50, and that the Court was reluctant to dismiss the case because of its high profile nature and the House Select Committee Hearings. *Id.* at 24:30-25:25. Rehl has in short blamed everyone except for himself for the situation he is in. Rehl's willingness to perjure himself on the stand, and his continuing to spread misinformation and attack the legitimacy of the conviction after trial

---

[2] Rehl Ex. 4 is an excerpt of a longer program that featured interviews and discussion among multiple people. Citations are to the time counter on the file itself.

16

demonstrates that the fact of being convicted alone will not deter Rehl from committing future offenses. The Court must incarcerate Rehl for a significant amount of time to both protect the public and deter Rehl from committing similar crimes in the future.

## **Dominic Pezzola Additional Sentencing Arguments**

Dominic Pezzola should serve 20 years (240 months) in prison for his role in advancing a seditious conspiracy to oppose by force the lawful transfer of Presidential power. Pezzola was an enthusiastic foot soldier in that conspiracy, and he was one of its most violent members on January 6, 2021. Pezzola assaulted a U.S. Capitol Police officer and forcefully robbed him of his shield, told others that they "better be fucking scared" because "we ain't stopping," smashed open the window to the Capitol building while Congress was still in session, allowing the first rioters to enter the building, and filmed a celebratory video from inside the building, proclaiming that he "knew we could take this motherfucker over if we just tried hard enough. Proud of your motherfucking boy."

### I.   Sentencing Guidelines Analysis

Dominic Pezzola was convicted of Counts Three through Seven, along with Nine and Ten. The Sentencing Guidelines are applied for each of the convictions as follows:

***Count Three*** **(Obstruction of an Official Proceeding)**
***Count Four***  **(Conspiracy to Use Force, Intimidation, or Threats to Prevent Officers of the United States from Discharging Their Duties)**

| Base Offense Level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Total | 27 | |

***Count Five*** **(Interference with Law Enforcement During a Civil Disorder)**

| Base Offense Level: | 14 | §2A2.4(c) → §2A2.2 |
|---|---|---|
| Specific Offense Characteristic | +2 | §2A2.2(b)(1) (more than minimal planning) |
| Specific Offense Characteristic | +6 | §3A1.2(b) (official victim) |
| Total | 22 | |

***Count Six*** **(Destruction of Government Property)**

| Base Offense Level: | 6 | §2B1.1 |
|---|---|---|
| Adjustment | +26 → 32 | §3A1.4 (terrorism) (increase by +12 or to level 32) |
| Total | 32 | |

***Count Seven*** **(Destruction of Government Property)**

| Base Offense Level: | 8 | §2B1.5 |
|---|---|---|
| Specific Offense Characteristic | +2 | 2B1.5(b)(2)(B): "offense involved a cultural heritage resource… that, prior to the offense, was on, in, or in the custody of… a National Historic Landmark"<br>The damaged window at the Senate Wing door was part of the United States Capitol, which was designated as a National Historic Landmark in December 1960 and the National Park Service continues to recognize that designation to this day.[1] |
| Adjustment | +22 → 32 | §3A1.4 (terrorism) (increase by +12 or to level 32) |
| Total | 32 | |

***Count Nine*** **(Assaulting, Resisting, or Impeding Certain Officers)**

| Base Offense Level: | 14 | §2A2.4(c) → §2A2.2 |
|---|---|---|
| Specific Offense Characteristic | +2 | §2A2.2(b)(1) (more than minimal planning) |
| Specific Offense Characteristic | +6 | §3A1.2(b) (official victim) |
| Total | 22 | |

---

[1] See List of NHLs by State - National Historic Landmarks (U.S. National Park Service) (nps.gov), https://www.nps.gov/subjects/nationalhistoriclandmarks/list-of-nhls-by-state.htm (last visited September 9, 2022) (listing the United States Capitol as a National Historic Landmark and noting its December 1960 designation date; see also 36 CFR § 65.1(c) ("The National Park Service (NPS) administers the National Historic Landmarks Program on behalf of the Secretary").

***Count Ten***    **(Robbery of Personal Property of the United States)**

| Base Offense Level: | 20 | §2B3.1 |
|---|---|---|
| Total | 20 | |

All of these counts group. Accordingly, the total adjusted offense level for Pezzola is 32 for the federal crime of terrorism in Counts Six and Seven. As explained in the government's Sentencing Memorandum, under Section 3A1.4(b), Pezzola's Criminal History Category is increased to VI, which results in a Guidelines range of 210-262 months (17.5 – 21.8 years) of incarceration.

The application of the terrorism enhancement under Section 3A1.4 captures the severity of Pezzola's actions and the danger posed by Pezzola and his co-conspirators' conduct on January 6. A sentence within these Guidelines would be justified and entirely appropriate.

### A. Pezzola's Conduct Mandates Application of the Terrorism Enhancement

Pezzola's crimes were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. §3A1.4. The jury's guilty verdict on Count Four constitutes a specific finding—beyond a reasonable doubt—that Tarrio, Nordean, Biggs, Rehl, and Pezzola "agreed with at least one other person to, by force, intimidation, or threat," to "(a) prevent a Member of Congress or a federal law enforcement officer from discharging a duty," *and* (b) induce a Member of Congress or federal law enforcement officer to leave the place where that person's duties are required to be performed ECF 767 (Jury Instruction) at 25; ECF 804 (Verdict Form) at 4-5. This finding, consistent with the facts accurately summarized in the draft presentence report, plainly establishes that the defendants' crimes were calculated to influence or retaliate against the government by force or coercion. *See United States v. Dowell*, 430 F.3d 1100, 1110 (10th Cir. 2005) (holding that the jury made the factual finding that defendant had requisite intent to influence or affect the conduct of government by intimidation

3

or coercion necessary for application of the Section 3A1.4 enhancement when the jury convicted defendant of attempting to interfere with IRS, having been instructed that an element of the offense was that defendant knowingly and intentionally "endeavored to obstruct or impede the due administration of the Internal Revenue laws by the use of force").

Pezzola joined the Proud Boys to engage in political violence. In a journal entry recovered from a search of his residence that began, "There are many reasons why I want to join the PB's," Pezzola professed that he was "willing to fight until [his] last breath" to prevent his children from inheriting what he said would be a communist country, emphasized his physical fitness and his ability to be anywhere at anytime, and that he viewed the political situation as a "battle between good and evil," requiring patriots to "stand up and take back our god given liberties just like our Founders did." Ex. 23. Pezzola's common-law wife confirmed Pezzola's motivation, explaining that prior to the COVID-19 pandemic, Pezzola was not interested in politics. He then became "consumed" by them, focused on the split that was becoming apparent in the country. Tr. 17193:17-25, 17204:22-17205:1 (Magee).

On January 6, 2021, Pezzola's actions showed beyond a shadow of a doubt that he had intended to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. While sparring with police who were trying to quell the mob's advance, Pezzola robbed an officer of his riot shield. Rather than taking actions consistent with his self-professed motive of self-defense, Pezzola celebrated, posing with the shield while flashing the Proud Boys hand gesture, and chanting "USA! USA! While holding the shield above his head triumphantly. Ex. 475, 412-Ax.



**Image 1: Exhibit 475, Pezzola posing with riot shield**

Pezzola continued to advance with that shield. He carried it as he pushed up under the inaugural scaffolding, after his fellow Proud Boy "Milkshake" initiated a Breach 3, and he hid behind that shield while yelling at the police, "You better be fucking scared! Yeah, you better be fucking scared! We ain't [u/i] – we ain't fucking stopping! Fuck you! You better decide what side you're on motherfuckers. You think Antifa's fucking bad, just you wait." Ex. 429Cx.

Pezzola infamously smashed open a window to the Capitol with that riot shield, enabling the first breach by rioters of the Capitol building. He admitted on cross-examination that as he smashed open that window, he did so because he thought it was a way to get the government to listen to him. Tr. 19410:15-17. After being in the building for approximately 20 minutes, Pezzola,

wanting to record something he considered "profound," Tr. 19079:11-18, filmed a selfie-style video of himself from the Capitol Crypt, proclaiming "I knew we could take this motherfucker over if we just tried hard enough. Proud of your motherfucking boy!" Ex. 403G.

Pezzola's actions and testimony leave no doubt that he intended to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. He committed crimes of terrorism on January 6, and the Court should not hesitate to impose a sentence that reflects the seriousness of those crimes and its threat to our nation—as reflected in the Sentencing Guidelines.

## II.     The 3553(a) Factors Support a Sentence Commensurate with the Terrorism Enhancement

The government's recommendation that the Court sentence Pezzola to 20 years of incarceration is supported by the nature and circumstances of the offense (including Pezzola's role in the offense), his history and characteristics, and the need for general deterrence, as well as the need to specifically deter Pezzola from committing future crimes.

### A.  The Nature and Circumstances of Pezzola's Offense

The nature and circumstances of this offense are some of the most serious in our nation's history. Pezzola was a member of a conspiracy to prevent the peaceful transfer of Presidential power by force. This Court has described the effort by these co-conspirators as a "conspiracy to effectively steal one of our Nation's crown jewels: the peaceful transfer of power." *United States v. Pezzola*, 531 F. Supp. 3d 139, 149 (D.D.C. 2021) (Kelly, J.). The jury's verdict establishes, beyond a reasonable doubt, that Pezzola intended to prevent Members of Congress or federal law enforcement officers from discharging their duties and to prevent Members of Congress or federal law enforcement officers to leave the place where their duties were to be performed by force, threat, or intimidation.

6

Pezzola did not join the Proud Boys until November 2020, after the President told the group to "stand back and stand by," and during a time period when leaders like Tarrio, Biggs, Nordean, and Rehl were using violent imagery to recruit members. Pezzola embraced this approach. As the Court recognized early on in this case, Pezzola had "deep, if not long" involvement with the group. *Pezzola*, 531 F. Supp. 3d at 151. In his short time with the club, Pezzola certainly made an impression on leadership, prompting Tarrio to post a photograph of Pezzola from the December 12 rally to his influential Parler account, with the captions "Lords of War. . . . #J6 #J20." Ex. 600-51.

Pezzola took every opportunity he got to get closer to leadership of the Rally Boys wing of the Proud Boys, including by often responding within minutes to posts by Tarrio. *E.g.*, Ex. 604-10, -11, and -12. After Bertino was stabbed on December 12, 2020, Pezzola sprang into action and formed part of the mob of Proud Boys who restrained and beat the person they believed to be responsible. Ex. 270; Tr. 9979:3-17 (Bertino). Pezzola's star began rising within the Proud Boys after December 12, and although he claimed not to like the attention, his actions (including mugging for the cameras in a photograph that ended up on the front page of the Washington Post), belied those words. *E.g.*, Ex. 1906; Tr. 5387:12-5388:11 (Greene). A screenshot of Ex. 1906 is below.



**Image 2: Pezzola, Mugging for the Cameras**

As foreshadowed by the journal entry detailing how and why he wanted to join the Proud Boys, Pezzola believed that the country was on the brink of Civil War, and that he was preparing to be a soldier in that war. Pezzola expressed to Greene, between the December 12 rally and January 6, words to the effect that he should be "thinking about retirement, not fighting a civil war." Tr. 5389:4-11 (Greene). Greene's recollection of this statement made in person by Pezzola is corroborated by recorded statements by Pezzola on January 3, 2021, that he was recruiting "fighters" to come to January 6, and on January 5 that he hoped things would calm down soon, "unless we're in a full blown fucking war." Ex. 1104, 1107; Tr. 7723:8-7724:10; 7725:20-7726:9 (Cain).

Pezzola traveled from Rochester, NY to the Charlotte, NC area to bring MOSD leader Bertino a decorative shield intended for Tarrio around New Years 2020. Shortly after meeting that

included the two, Bertino invited Pezzola to join the Ministry of Self-Defense as a result of Pezzola being involved in the "scrum" with the person who stabbed him in December. Tr. 10075:16-10076:24 (Bertino). Pezzola was "proud as fuck" to have been invited to join MOSD, Ex. 507-7, and he used his connection with "leadership" to pass information about January 6 back to other Central New York Proud Boys who were looking for direction after Tarrio was arrested, Ex. 1105, and he offered to Boots on Ground his chapter-mates' services in programming radios on January 5. Ex. 512-4.

On January 6, Pezzola acted as a soldier in the civil war he had envisioned. He marched with the Proud Boys from the Washington Monument to the Capitol, before breaking off from the group and rejoining it near the Peace Circle. Once he re-joined, Pezzola picked right up where he left off, proceeding through and over the trampled police defenses with the assembled members of the Proud Boys just after the first breach. Ex. 1001 at 11:50; Joint Exhibit 4. From then on, Pezzola was continuously at the front, close to and often participating in the action. He was within feet of Biggs and Nordean as they ripped down the black fence. Ex. 492-G at 5:00. He was one of the first rioters in the West Plaza, where he positioned himself near the front of the police line, before forcibly robbing Officer Ode of his shield as described above. He was one of the first rioters under the scaffolding after a breach set off by fellow Proud Boys broke the police line there. Ex. 451x. He was near the front when yelled at police from behind his pilfered riot shield, "You better be fucking scared!" He was the first to break a Capitol window so thoroughly that other rioters could stream through it in the building. And he celebrated those achievements from in the building, proudly, and to him profoundly, declaring, "I knew we could take this motherfucker over if we just tried hard enough. Proud of your motherfucking boy!" His actions in breaking the window

caused Tarrio to remark to Bertino, "That looks like George Washington … Sam Adams … and Franklin." Ex. 530-7.

Dominic Pezzola embraced the conspiracy to stop the transfer of Presidential power on January 6, 2021, and he vigorously and proudly filled his role as a soldier in that conspiracy. The nature and circumstance of his offenses are of the upmost seriousness, and the Court should sentence him accordingly.

### B. *Pezzola's History and Characteristics*

Dominic Pezzola joined the Proud Boys in 2020, having served in the U.S. Marine Corps built a business capable of earning $250,000 per year. Pezzola PSR ¶¶ 172, 182. Unlike many defendants the Court sees, Pezzola described his childhood as "normal" and his parents as "good" to him, with an upper-middle class upbringing free of trauma and full of sports. *Id.*, ¶ 147. None of that supportive background, military service, and seemingly successful time running a profitable business prevented the defendant from being "consumed by politics," in the words of his wife, to the point where he willingly joined as a foot soldier in what he believed was a civil war. He appears to still be so consumed, as discussed in further detail below.

The defendant's military background—which he claims taught him honor, Tr. 19231:20-22 (Pezzola), likewise did not stop him from falsely accusing Joe Biggs of possessing and brandishing a gun on January 6. Pezzola, in the hopes of digging himself out from under the consequences of his own actions, provided the FBI, whom he knew was conducting a criminal investigation into January 6, information that he knew to be false about someone else's criminal involvement. *Id.* at 19243:11-24. The story Pezzola told was elaborate. It involved Biggs harassing someone in a BLM shirt, getting in a scuffle with Ryan Samsel, lifting his flannel in the direction of Samsel to reveal a pistol before telling Samsel that if Samsel was not Antifa, he would prove it

10

by pushing down police barricades, and that Biggs assigned a couple of Proud Boys to assist Samsel in that mission. *Id.* at 19243:25-19245:25. Pezzola knew that he had witnessed none of that at the time he tried to mislead the FBI. He continued to testify at trial as if he witnessed things he did not, for example, he first said that a Correctional Officer beat Ryan Samsel before admitting that he did not witness it. *Id.* at 19248:7-19249:10. He called Ray Epps a government informant based on wild rumors. *Id.* at 18997:14-15, 19357:12-19358:1.

Whatever might weigh in Pezzola's favor about his history and characteristics prior to 2020 is completely outweighed by the actions he took on January 6, in the lead-up thereto, and after the event. After his arrest, Pezzola showed his lack of character by falsely implicating Joe Biggs in the hopes it would free him. Given nearly two years to reflect on that decision, Pezzola doubled down on the stand. As he testified in his own defense in 2023, Pezzola continued to state as facts things he did not witness, insisted on inserting many nonresponsive answers to advance his narrative, and inflated his credentials, posing as a sort of crowd-control expert when, he admitted on cross-examination, he had no actual crowd-control training or experience. *E.g.*, *id.* at 19233:21-19237:17. Pezzola's history and characteristics weigh in favor of a lengthy period of incarceration.

### C. Adequate Deterrence and Protection of the Public from Pezzola

As this Court recognized from the outset of this case, the election may be over, but all politics is not. Free and democratic elections are a bedrock principle of this country a significant sentence furthers legitimate goals of general and specific deterrence of political violence. An organized assault like the one Pezzola participated in cannot simply be treated like all other crimes on January 6. By joining a group known for its use of force, and participating in that group's use of coordinated force in support of what he believed to be a civil war and a battle of good versus evil, Pezzola and his co-conspirators re-established the outer limit for political violence. Any

individual or group that would consider an organized attack on our government in the future must know that these are crimes that will result in a significant prison sentence.

There is likewise a need to deter Pezzola individually. Pezzola's intent to engage in political violence on January 6, 2021, as part of his strategy to get the government to listen to him, Tr. 19410:15-17 (Pezzola) did not manifest overnight. He became, in his wife's words, consumed by politics. That led to him deciding to join the Proud Boys, and at his first national rally he attracted the attention of national leadership by joining with dozens of other Proud Boys in neutralizing a perceived threat. For this, and for his showmanship, he was rewarded with a place in the Ministry of Self-Defense and a prominent shout-out on Tarrio's Parler feed, and he paid Tarrio's and Bertino's trust back in spades by turning into Washington, Jefferson, and Franklin on January 6.

Pezzola does not believe he did anything wrong (save for smashing one windowpane in what he states is a misdemeanor offense), and nothing about the jury's verdict alone will convince Pezzola to refrain from committing similar crimes in the future.  In a post-trial interview, a copy of which is submitted herewith as Pezzola Ex. 1, he called the trial a "complete sham," and stated his belief that the Constitution was "shredded" and "re-legislated from the bench so the prosecution could get their conviction" during trial. Pezzola Ex. 1 at 1:30-1:45. Pezzola continued that the jury was full of "all radical leftists, who were either a LGBTQ supporter or a BLM supporter . . . these are the type of people who hate everything that we stand for, they hate the fact that we love God, they hate the fact that we love our country, they hate the fact that we love our family. These people, they despise everything we stand for. I mean, the jury foreman was a drag queen for Christ sakes." *Id.* at 1:45-2:15. Pezzola continued, "I should probably keep my thoughts about the judge private until after sentencing, because you know I still gotta depend on the guy to kind of show a little

mercy, um, but I mean come on, just look at the way the trial was run. . . . The prosecution was granted everything they wanted, and we were denied everything we tried to use to exonerate ourselves." *Id.* at 14:51-15:45  If Pezzola does not respect the Court's rulings or the jury's verdict, even if he disagrees with them, he will not respect any conditions of release, and a lengthy period of incarceration is the only means available to protect the public.

Pezzola also used this interview to spread misinformation, including that he was barred from discovery and that the government used new videos during closing arguments that no one had seen. He claimed January 6 was a setup, with "feds and informants and Antifa." *Id.* at 22:00-22:15. "It's a complete fraud of a system. This isn't a judicial system. This isn't justice. . . . It's all a show trial, it's a sham." *Id.* at 17:16-17:40. Pezzola continued that the FBI is not law enforcement, it is "just the Stasi for the Democrat party." *Id.* at 18:25-18:30. Pezzola is of course entitled to his opinion. But these particular opinions, as expressed post-trial, reveal a distinct lack of remorse, a lack of belief that what he did was wrong, and a lack of respect for our criminal justice system and this Court's authority. The misinformation Pezzola helps spread only stokes the divide he saw when he joined the Proud Boys, ready for a civil war, in November 2020. The Court's only recourse is to sentence Pezzola to a lengthy period of incarceration, to specifically deter him from committing additional crimes.