## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 22CR0011-RJL** |
| | ) | |
| | ) | |
| **ALAN FISCHER III,** | ) | |
| | ) | |
| | ) | |
| **Defendant,** | ) | |

---

## DEFENDANT FISCHER'S MOTION TO TRANSFER VENUE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

The Defendant, **ALAN FISCHER III,** by undersigned counsel, respectfully moves the Court, pursuant to Federal Rule of Criminal Procedure 21, for a transfer of venue. His request is a basic one, that he simply be tried by an impartial jury as guaranteed by the Fifth and Sixth Amendments to the United States Constitution.

## I.

## INTRODUCTION

In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as "indifferent as he stands unsworn." Co. Litt. 155b. His verdict must be based upon the evidence developed at the trial. Cf. *Thompson v. City of Louisville*, 362 U.S. 199. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. *Irvin v. Dowd,* 366 U.S. 717, 722 (1961)

1

As the Court is well aware, this case is one of many that has arisen out of the events at the United States Capitol on January 6, 2021 (hereinafter "J6"), and that has now led to, as of December 16, 2023, 1,226 criminal prosecutions with hundreds of convictions in this District. This Court is likewise aware of the dozens of motions seeking change of venue in these cases.  Indeed, this Court referenced denials "from 20 different judges" in its MINUTE ORDER of 09/21/23. Every previously filed (and denied) motion relied almost exclusively upon opinion polls commissioned by the Federal Public Defender's Office.  The approach of the instant motion is much different.  Fischer advances comprehensive, uniquely purposed data outweighing any polling or study previously provided for this purpose.  Rejecting outdated polling methods, this motion utilizes the exact same data source as was introduced into evidence, at trial, last week in this District in ***Ruby Freeman, et al v. Rudolph W. Giuliani***, 21-CV-3354 (BAH).  The issue of venue change should be addressed considering this data.  To not do so would be to ignore the advances of technology and its usefulness in the adjudication of future court cases.

## II.

## PROCEDURAL  HISTORY

Alan Fischer ("Fischer") was first arrested in January 2022, along with co-Defendants Johnson and Rajewski.  On February 14, 2022, attorney Carolyn Stewart entered her appearance on behalf of Fischer.  (ECF 31).  On May 25, 2022, a Second

Superseding Indictment was returned adding co-Defendants Boele and Brett. (ECF 54).   On June 9, 2022, attorney Carolyn Stewart entered her appearance for co-Defendant Boele (ECF 62).   On July 24, 2023, co-Defendant Rajewski, through his attorney, Allen Orenberg, Esq., filed a Motion to Transfer Case to the Middle District of Florida. (ECF 126).   The motion was based upon a jury survey created by an expert hired by the Office of the Federal Public Defender in an effort to assess the federal jury pool in the District of Columbia. The motion was largely based on a similar motion filed in *U.S. v. Gieswein*, 21-CR-24-EGS and in *U.S. v. Sean McHugh*, 21-CR-453-JDB.

Attorney Stewart on behalf of Defendant's Fischer and Boele filed a Motion to Set Time for Transfer of Venue Motion (ECF 120), requesting a specific date to file a such motion believing that since the motion was pursuant to Rule 21 and not Rule 12, the Court's previous Minute Order was unclear as to when it should be filed.  The Court denied the request. On September 21, 2023, the Court denied the relief requested in co-Defendant Rajewski's Motion to Transfer.   In its Minute Order denying the transfer request, the Court opined: "Mr. Rajewski does not point to any evidence to suggest that he will be uniquely prejudiced but rather ***repeats the arguments made by many other January 6th defendants*** regarding the size and political views of the jury pool in Washington, D.C., the large share of Washington, D.C. residents with a connection to the federal government, the impact of January 6

3

on Washington, D.C. residents, and the extensive and continuing media coverage of the January 6th attack."

On October 31, 2023, undersigned counsel entered his appearance as the attorney of record for Fischer. (ECF 164).  On November 2, 2023, undersigned counsel appeared at the scheduled status conference, requested permission to file pretrial motions, assuring the Court that there would be no repetition of arguments previously presented.  The Court permitted undersigned counsel to file such motions with that proviso.

As will be demonstrated below, Fischer will establish by the latest available data that 1) the saturation of J6 coverage by media outlets in this District dwarfs that of any other District in the United States, 2) that residents of the District consume more J6 media stories than any other federal district in the United States, and  3) that implicit/inherent bias in this District is more pronounced on this issue due to the disproportionate exposure and consumption of media concerning the events of January 6.  The instant Motion is, therefore, respectfully submitted as set forth below.  The case is next set for status conference on February 9, 2024. There currently is no trial date scheduled for Fischer or co-Defendant Boele.

### III.

### METHODOLOGY AND FINDINGS

From the disastrous poll predictions of the 1948 Truman/Dewey

presidential race up to and including the wildly problematic predictions in the 2016 Clinton/Trump race, the accuracy, and therefore efficacy, of pollsters and their traditional polling methods has largely been called into question.  Suffice it to say, people are deeply skeptical of polls, often doubting the pollsters' methods (Did they ask the right questions?  Are they manipulating the wording of the questions to get the responses they want? And whom did they interview?).  Coupled with a deep mistrust of political parties, marketers, and media giants that pay for these polls, this distrust becomes understandable.    Rather than relying on surveys and polling and the obvious problems inherent in them, this motion employs cutting edge data that virtually eliminates the possibility of manipulation.

## A.  Analysis of Media Dissemination by Outlets and Markets

First, news coverage in the United States from **January 6, 2021, through November 2, 2023**, was compiled from **Meltwater**, the world's first online media monitoring company.  The company was founded in Oslo, Norway, by Jørn Lyseggen, in 2001, and is headquartered in San Francisco, California, with additional offices across Europe, North America, Asia/Pacific, Australia, and Africa.  The company serves as a trusted resource for allocating billions of dollars of marketing expenditures annually.   This data science research tool serves household name brands, PR firms, advertising giants and agencies to assess the influence of their advertising and as a guidepost to formulate future strategic planning.

Media data collection focused on nation-wide coverage (national/regional/local) and included TV, Online, Print and Radio outlets.  Search terms relating to the Capitol protest in Washington, D.C. were identified and summarized by geography to identify if there are systemic differences in media exposure across markets. There was a total of **1,494,847** unique media mentions included in the study.

The ultimate findings are dramatic and are summarized below:

1.     The quantity of **media mentions** in the District of Columbia is significantly and uniquely **higher** than the rest of the country.

2.     The media influence in the District of Columbia is **82% higher** than the US average.

3.     Local media in the District of Columbia for January 6 reports account for **51%** of total media influence, compared to **11%** nationally.

4.     Washington D.C. had significantly higher media influence across time. This continues through 2023.

5.     Every search term relating to January 6 shows that Washington, D.C. has a higher level of prominence than the US as a whole –**57% higher**.

6.     All comparison geographies have similar total media influence, except for Washington, D.C.

The examination of the **Meltwater** data certainly is helpful in demonstrating the extent to which the media was disseminated in each examined market, and a benchmark of media consumption.  This is important context on its own, as it shows the prominence of relevant news coverage pertaining to January 6

in the District of Columbia.   Similarly important, however, is the extent to which individuals engage with the topics they may see in the media.  The main channel that individuals use, to learn more about a topic, is the internet.  Google, which has a 90%+ market share among search engines, provides access to aggregated search history.  This data, when combined with both the Meltwater study and timing of events relating to January 6, adds a powerful component in terms of potential juror awareness of and interest in topics relating to January 6.

## B.  Analysis of the Consumption by the Consumers of the Disseminated Media

**Google Trends** is a website by Google that analyzes the popularity of top search queries in Google Search across various regions and languages. The website uses graphs to compare the *search volume* of different queries over time. **Google Trends** also allows the user to compare the relative search volume of searches between two or more terms.

**Google Trends** has been used to forecast economic indicators, and financial markets, and analysis of Google Trends data has detected regional flu outbreaks before conventional monitoring systems.  **Google Trends** is increasingly used in ecological and conservation studies, with the number of research articles growing over 50% per year.  **Google Trends** data has been used to examine trends in public interest and awareness on biodiversity and conservation issues, species bias

in conservation project, and identify cultural aspects of environmental issues.  As mentioned above, the introduction into evidence, at trial, of data obtained from **Google Trends** and testimony concerning that data has been permitted at least once in this District.  ***Ruby Freeman, et al v. Rudolph W. Giuliani***, 21-CV-3354 (BAH).

**Google Trends** is used for monitoring search interest over time for a particular topic or keyword based on search volume.  Unlike the **Meltwater** research, search volume does not measure the saturation of an area by media outlets.  Rather, it measures how many ***individuals*** in that broadcast area take the affirmative step of typing into their search bar and clicking on a link.  It shows how potential jurors in this District (and other geographical areas) exposed themselves to information by willfully consuming the data by searching and clicking.  If **Meltwater** is the measuring of the spread of a gallon bucket of different colored marbles being poured into a 9 by 12 foot room, **Google Trends** is the measuring of how many people actually knelt down and picked up the yellow ones or the green ones or the blue ones, in that area.

A benign search term, such as "ice cream," will yield results which are fairly consistent across the fifty-one (51) regions thus demonstrating that the nation has a realistically equal consumption of the data:



On the other hand, localized or regional events, such as Hurricane Ian in September of 2022, impact an affected area which naturally generates more interest in searching the topic in that area.  As such, the **Google Trends** search term

will indicate more regional consumption of media in the affected area, *i.e.,* "spikes" in the search frequency at relevant times:





The analysis reviewed search terms relating to January 6, and quantified the extent of bias that exists.  That is, is a search term more like "Ice Cream", or "Hurricane Ian?"

Politically charged references to the Capitol protest on January 6 yield more telling results. Search terms such as "Capitol Terrorist," "January 6th Capitol Attacks," and even "Jan 6th" consistently rank 100 in the District of Columbia for all three search terms, meaning the District of Columbia had the highest ranking of searches across all states. By contrast, Ohio is at 34 for "Capitol Terrorist," Massachusetts is at 54 for "January 6th Capitol Attacks," and Iowa is at 60 for "Jan 6th."

The findings of the Google Trends data, contained in Exhibit B and as summarized below, are likewise dramatic:

1.  Residents of the District of Columbia are **twice as likely** to search for "Capitol Attack" and "Seditious Conspiracy" since January 6.

2.  D.C. has the highest level of current searches (in the last six months) for "Seditious Conspiracy," almost **80% higher** than the next state

3.  Residents of D.C. are **twice as likely** to search for "White Nationalist," and **25%** more likely to have searches directly related to "Racism."

4.  Residents of D.C. were **three times as likely** to search for information about the House Select Committee on the January Attack and **eight times as likely** to search for the Committee's final report.

## C.  Implicit Bias:  Is Justice Blind Simply Because We Say It Is?

The Government has previously argued that *voir dire* is the mandatory answer to everything and that change of venue cannot be a permissible solution to unprecedented, negative pre-trial publicity. However, precedents like *Haldeman* in 1976 were decided before advances in modern neuroscience, psychology and social science revealed that this is wrong. This current research provides understanding and is summarized in the report attached as Exhibit C.

From the leading researchers and peer-reviewed studies, we now know that, first, implicit bias or unconscious bias is so deeply ingrained that jurors will answer incorrectly, even if unaware, that they can be unbiased when they actually cannot. The development of the human mind over time and embedded values make it impossible for jurors to set aside their preconceived judgments and biases, even if they are trying to do so. Consciously or unconsciously, jurors will declare they are unbiased when they are, in fact, biased that they have not made up their minds in advance, when, in fact, they have. The routine practice of asking prospective jurors if they can be unbiased or have made up their minds from pre-trial publicity was never based on any reality other than perhaps swearing an oath. However, scientific research aimed at understanding unconscious discrimination and providing an overview of how the mind works now proves that unconscious or implicit bias cannot be measured by asking even sincere jurors if they are biased. The study shows the subconscious mind ultimately prevails and cannot be remedied.

Along with countless institutions such as Universities and companies of all sizes, The United States government is a champion of these ideas, implementing the structure of such research into policy.

Second, instructing jurors to be unbiased cannot work. A Judge's instructions, even breaking down the steps in detail, cannot re-wire a prejudiced jurors' implicit bias. The latest analysis of research over the past three decades has proven that this is not how the human mind works. Implicit biases operate beneath the surface. They are deeply ingrained and developed based on the consumption of information over time, and the feelings one harbors or has learned to harbor. Conclusive findings support that implicit bias is innate, and with no limitations as an unconscious cognitive process that directly influences behaviors. These findings show that there are no known interventions that have been shown to have a lasting effect in mitigating implicit biases, nor cause any change to the resulting explicit behaviors they cause which lead to discrimination.

At least one United States Federal District now has an "Unconscious Bias Juror Video" created by a committee of judges and attorneys that is presented to jurors in every case with the intent of highlighting and combating the problems presented by unconscious bias.  https://www.wawd.uscourts.gov/jury/unconscious-bias.

While a worthy attempt at merging emerging science with the law, the Court fails to recognize the consensus of the last decade's research on implicit bias interventions. Anthony Greenwald, the leading authority on implicit bias initially offered the possibility of interventions to change our unconscious prejudices on which we act without knowing in his research in 1995, however, he has come to the conclusion along with other leading researchers in the field that no intervention has the ability to rectify existing implicit bias. He suggests instead to change the structures (venue, in this case) that can be affected by the discrimination that occurs from implicit bias, as outcomes will be affected without it.

Greenwald states: "Don't go for cures or remedies that claim to be eliminating implicit bias or eradicating automatic racial preferences or gender stereotypes in people's heads. There's no evidence that anything like that works. Those cures are of the snake oil variety. Go for the cures that involve redesigning procedures so that implicit bias, which can be assumed to be present in many people, just does not have a chance to operate." https://www.vox.com/identities/2017/3/7/14637626/implicit-association-test-racism Thus, attempts to counteract implicit biases can be counterproductive to the goal they seek to remedy.

Considering the massive and unrelenting pre-trial publicity in this district, as documented above with both the **Meltwater** and **Google Trends** data, asking a potential juror if he or she can be "fair" considering the overpowering sentiments of

the community is completely ineffective.  Indeed, a potential juror's ability to assure

the Court of their unbiased nature initially ***assumes*** that they are aware of their own

biases, which the scientific literature clearly says they are not.

## IV.

## LEGAL ARGUMENT
### A.  Introduction

January 6 prosecutions are simply like no other.  In reality, they are but a

"single" case with now well over 1,200 defendants and growing.  They have endured

over the span of three years and this "single" case has now been tried repeatedly *ad*

*nauseum* in this relatively small federal district.  Anecdotal evidence has indicated

that potential jurors have been called more than once for a January 6 trial.  It has

reached the point where many judges no longer need or want to see the videos in

bench trials, having viewed them so many times before.   This Motion to Transfer

Venue must be seen through that lens.

### B.  Federal Rule of Criminal Procedure 21(a)

The Fifth and Sixth Amendment of the United States Constitution mandate that

criminal defendants be afforded a fair trial by an impartial jury.  *See In re Murchison*,

349 U.S. 133, 136 (1955).  *Patterson v. Colorado*, 205 U.S. 454, 462 (1907). Justice

Hugo Black observed that the American justice system "has always endeavored to

Case 1:22-cr-00011-RJL   Document 179   Filed 12/18/23   Page 16 of 31


prevent *even the probability of unfairness*." *Id.* (emphasis added). Accordingly, Federal Rule of Criminal Procedure 21(a) codifies this sacred principle and instructs that district courts "***must*** transfer the proceeding . . . if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." (emphasis added).

In some cases, a potential jury pool can be determined to be irredeemably biased when the alleged crime results in "effects . . . on [a] community [that] are *so profound and pervasive* that no detailed discussion of the [pretrial publicity and juror partiality] evidence is necessary." *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996) (summarily finding that a trial of Oklahoma City bombing suspects in federal court in Oklahoma City [Western District of Oklahoma] would be constitutionally unfair)(emphasis added)(*see also Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality [during *voir dire*] might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."). "[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, *the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity*." *Sheppard v. Maxwell*, 384 U.S. 333, 362-363, 86 S. Ct. 1507, 1522, 16 L. Ed. 2d 600, 620, (1966). (emphasis added).

When the threatened harm is prejudice to a fair trial, several alternatives, less

restrictive of expression, may be available, which include:

> (a) change of trial venue to a place less exposed to . . . intense publicity . . . ; (b) postponement of the trial to allow public attention to subside; (c) searching questioning of prospective jurors . . . to screen out those with fixed opinions as to guilt or innocence; (d) the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court(;) (e) sequestration of jurors (to) . . . enhance() the likelihood of dissipating the impact of pretrial publicity and emphasize() the elements of the jurors' oaths.

*In re Halkin*, 598 F.2d 176, 195, (D.C. Cir. 1979) (*citing Nebraska Press Ass'n*, 427 U.S. at 563-64; s*ee also Sheppard,* 384 U.S. at 333).

The Court further recognized that ***the presumption of prejudice overrides juror declarations of impartiality during voir dire*** because such attestations may be insufficient to protect a defendant's rights in particularly charged cases.  Where pervasive pretrial publicity has "inflamed passions in the host community" and "permeat[es] the trial setting . . . [such] that a defendant cannot possibly receive an impartial trial," the district court must presume local prejudice and transfer the proceeding. *United States v. Quiles- Olivo*, 684 F.3d 177, 182 (1st Cir. 2012); *Cf. Mu'Min v. Virginia*, 500 U.S. 415, 429-430 1991) (*citing Patton*, *supra*, at 1035) ("Under the constitutional standard, on the other hand, 'the relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant.'").

## C.  *Skilling v. United States*, 561 U.S. 358 (2010)

When examining a Rule 21 motion to transfer venue, a court should consider (1) the size and characteristics of the community; (2) the nature and extent of pretrial publicity; (3) the proximity between the publicity and the trial; and (4) presumed prejudice. *Skilling v. U.S.*, 561 U.S. 358, 378-81 (2010). In *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963), the Supreme Court held that a murder defendant's due process rights were violated where pretrial publicity included an interview broadcast three times locally. *Id.* The Court in *Skilling* distinguished the facts before it from the "[i]mportant differences separate Skilling's prosecution from those in which we have presumed juror prejudice." *Skilling v. United States*, 561 U.S. 358, 381-382, 130 S. Ct. 2896, 2915, 177 L. Ed. 2d 619, 643, (2010).

A review of the *Skilling* factors makes apparent that the Court should transfer the Fischer's case from the District of Columbia. Respectfully, Fischer's request that his cases be transferred to the United States District Court for the Middle District of Florida. By so doing, Fischer stands a significantly better chance of being tried before a constitutionally mandated impartial jury.

### D. Size and Characteristics of the Community

The first *Skilling* factor to consider is the size of the population eligible for jury duty. *Skilling*, 561 U.S. at 382 (comparing Houston's 4.5 million potential jury pool with the smaller Louisiana parish with 150,000 residents in *Rideau*). The District of

Columbia has less than 700,000 in total population[1], but because of its more transient population, the potential jury pool is likely much smaller than a comparable federal district.[2] [3]

The **Meltwater** study reviewed the data from six regions: the United States of America, Washington, D.C., D.C. Metro, the Middle District of Florida, the state of Florida,and North and South Dakota.   While the non-D.C. test areas registered remarkably similar total media influence amongst each other, the study found that D.C. inhabitants were an outlier and had a quantity of media mentions significantly higher than the rest of the country.

Notably, the media influence in D.C. is **82% *higher*** than the US average. Moreover, local media in D.C. for January accounts for **51%** of total media influence compared to **11%** nationally.

Above and beyond the unquestionable media influence, the D.C. community was personally affected by the events of J6 and its aftermath.   As this Court undoubtedly recalls, the National Guard was deployed in D.C. for more than four

---

[1] This total is not broken down to those eligible for jury duty.

[2] See 2020 Census Data Shows DC's Population Growth Nearly Tripled Compared to Previous Decade, DC.gov (Apr. 26, 2021) (DC population recorded by census as 689,545) https://dc.gov/release/2020-census-data-shows-dcs-population-growth-nearly-tripled- compared-previous-decade

[3] See US Census, Quick Facts - District of Columbia, https://www.census.gov/quickfacts/DC (last visited December 16, 2023)(671,803)

months after the J6.[4]   Mayor Bowser declared a state of emergency and implemented

a 6 p.m. curfew for weeks subsequent to J6.[5]   The District implemented significant

road and public space closures in direct response to J6.[6]   The Department of

Homeland Security declared that government offices were potential targets of

violent domestic extremists who were allegedly emboldened by the "mob assault"

on the Capitol.[7]   Additionally, nearly 15,000 individuals work for Congress directly,

and many more D.C. residents have friends and family work on The Hill.[8]   Finally,

many D.C. residents have friends and family employed by law enforcement groups

who took part in responding to J6.[9]

---

[4] *See National Guard troops leave US Capitol more than 4 months after January 6th riot,* FOX5
Washington DC, https://www.fox5dc.com/news/national-guard-troops-leave-us-capitol-
morethan-4-months-after-january-6th-riot (last visited March 28, 2022).

[5] Press Release, Mayor Muriel Bowser, January 6, 2021,
https://mayor.dc.gov/release/mayorbowser- issues-mayor's-order-extending-today's-public-
emergency-15-days-a1 (last visited March 28, 2022).

[6] *DC Inauguration Updates: 4 Bridges Between DC, Virginia Closing; National Mall Closed*;
NBC4 Washington, https://www.nbcwashington.com/news/local/dc-inauguration-updates-
fridayclosures-threats- national-mall/2542719/ (last visited March 28, 2022)
[7] *DHS Warns of Heightened Threats from Violent Domestic Extremists,* NPR,
https://www.npr.org/2021/01/28/961470061/dhs-warns-of-heightened-threats-from-violent
domestic- extremists (last visited March 28, 2022).
[8] Vital Statistics on Congress, Brookings Institute (July 11, 2013),
https://www.brookings.edu/wp-content/uploads/2016/06/Vital-Statistics-Chapter-5-
Congressional-Staff-and-Operating-Expenses_UPDATE.pdf.
[9] As reported in the Human Capital Strategic Plan, as of early 2021, 2,250 individuals were
employed by the U.S. Capitol Police Force. Human Capital Strategic Plan 2021- 2025,
U.S.Capitol Police (2020),
https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/USCP%20H
uman%20Capital%20Strategic%20Plan%20for%202021-2025.pdf. 4,400 individuals are
employed by the Metropolitan Police Force, and 2,700 individuals are active members of the
D.C. National Guard. See Metropolitan Police Force Annual Report 2020, DC.gov (2020),

Most potential jurors in the District of Columbia were ***personally*** impacted in some way by the events on Capitol Hill on J6.   This deep-seated impact can hardly be miraculously washed away by even extensive *voir dire*, particularly considering what we now know regarding implicit bias. The District of Columbia is an unsuitable venue for trial for yet another reason.   A juror who is personally a victim, directly or indirectly, of the crime being prosecuted cannot sit on the jury deciding the case of which he or she is a victim.   Yet, the Attorney General of the District of Columbia has sued various perceived leaders of events on January 6, 2021, on behalf of all residents of the District of Columbia.   *District Of Columbia, V. Proud Boys International, LLC*, et al., Case No. 1:21-CV-03267-APM.    In the original Complaint, the District of Columbia Attorney General claims that all citizens of Washington, D.C. are personally or, as taxpayers, financially, victims harmed by the events of January 6, 2021.   While some counts were subsequently dismissed, an Amended Complaint remains pending as a claim over the events of January 6.   The Attorney General originally claimed that every D.C. resident and business was affected, indeed terrorized, by January 6 demonstrators.

Thus, no juror can be seated who lives in or has any interests in Washington, D.C.  Even those who have moved into the district after the fact would, according to

---

https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR20
20_lowr es_a.pdf

its Attorney General, be financially affected.

The leading case in this District, *United States v. Haldeman*, 559 F.2d 31 (DC Cir 1976)(*en banc*) must now, after decades of application, be re-examined in light of the advances in societal research.



Although the Court in that case declined to invoke its "supervisory powers" to require a change of venue, (assuming there would be no denial of a fair trial amounting to a denial of due process), it did not instruct the District Courts to disregard situations where "a fair jury cannot be selected."  On the contrary, it directed the lower courts to use "all appropriate measures to minimize pretrial publicity."  This is manifestly impossible in this district in view of the hard data thus far presented to this Court.    There is nothing that compares with the massive

publicity in these cases.

Thus, the *Haldeman* court opined:

> In short, unlike the situation faced by the Court in *Rideau*, we find in the publicity here no reason for concluding that the population of Washington, D. C. was so aroused against appellants and so unlikely to be able objectively to judge their guilt or innocence on the basis of the evidence presented at trial that their due process rights were violated by the District Court's refusal to grant a lengthy continuance or a change of venue prior to attempting selection of a jury.

It is a certainty that the population of Washington, D.C. has been immensely and intensively "***aroused***" against this J6 Defendant.

These factors weigh heavily in favor of transferring the instant cases to the Middle District of Florida.   D.C. is a city that, as a whole, feels that it has been the victim of a crime.  As shown, J6 was a substantially more impactful event than the Enron's *financial* collapse in *Skilling*, which personally affected a few hundred families in a city of 4.5 million residents. And the sustained and unrelenting publicity regarding the J6 "attack on democracy," which has permeated this community for the last three years, far outweighs the seeming lack of "arousal" in the *Haldeman* case.

The District of Columbia is an unsuitable venue for trial for yet another reason.  A juror who is personally a victim, directly or indirectly, of the crime being prosecuted cannot sit on the jury deciding the case of which he or she is a victim.  Yet, the Attorney General of the District of Columbia has sued various perceived

leaders of events on January 6, 2021, on behalf of all residents of the District of Columbia. *District Of Columbia, v. Proud Boys International, LLC*, et al., Case No. 1:21-CV-03267-APM. In the original Complaint, the District of Columbia Attorney General claims that all citizens of Washington, D.C. are personally or, as taxpayers, financially, victims harmed by the events of January 6, 2021. While some counts were subsequently dismissed, an Amended Complaint remains pending as a claim over the events of January 6. The Attorney General originally claimed that every D.C. resident and business was affected, indeed terrorized, by January 6 demonstrators.

Thus, no juror can be seated who lives in or has any interests in Washington, D.C. Even those who have moved into the district after the fact would, according to its Attorney General, be financially affected.

### E.  Nature and Extent of Pretrial Publicity

The next *Skilling* factor pertained to the adverse publicity ***against the former Enron executive defendant personally.*** *Skilling*, 561 U.S. at 382 ("Second, although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight.). The nature and extent of ***pretrial publicity against Fischer in particular*** weighs heavily in favor of transferring venue.

After jury selection in December, 2022, the notorious Proud Boys conspiracy

trial began in earnest earlier this year.  *United States v. Nordean*, 21CR 00175-TJK. This trial, bar none, was undoubtedly the most covered J6 trial in this district.  It culminated in guilty verdicts in May 2023, and the imposition of double-digit sentences, for each defendant, in September 2023.    During this public trial, testimony and video evidence were introduced claiming and naming Fischer as a ***"tool"*** of the charged conspiracy in that case.   This tool evidence was elicited over several days of trial in March 2023.    In May 2023, the presiding judge issued an 8-page memorandum (ECF 792) detailing this evidence again and admitted that "the Court allowed the government to highlight Fischer's…conduct."  Thus, the Court in that case permitted "an inference that [his] conduct was relevant evidence of the charged conspiracies."

The prejudice personal to Fischer is apparent.  Fischer is not charged herein with any conspiracy count yet he has already been branded, ***not by the media, but by a fellow District Judge.***  While this Court concluded that co-Defendant Rajewski could not point to any evidence indicating that he was "uniquely prejudiced," the situation regarding Fischer is quite the opposite.  A public document exists, authored by a sitting District Judge, in a case where Fischer had no opportunity to be heard, concluding mere months ago, that Fischer is a co-conspirator in the most notorious J6 conspiracy to date.  That bell cannot be unrung. The negative implication of that is compelling, highly prejudicial, and completely unfair.

## D. Proximity of Publicity to Trial

The *Skilling* Court distinguished *Rideau*, where a trial was conducted in close proximity to prejudicial news coverage, with Skilling's trial, where "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383. Again, this factor weighs heavily in favor of relocating the trial from D.C.

Ongoing negative publicity as evidenced by the attached studies of data up to and including November 2, 2023, creates a presumed prejudice for Fischer. Close to three years later, the events of January 6 are not yet in the rear-view mirror. On the contrary, the looming trial of a former President for his conduct ***on that day*** has dialed up the intensity. Fischer respectfully submits that requiring him to go to trial in this District in the shadow of these ongoing events would be highly prejudicial to him.

## F.  Presumed Prejudice

In *Skilling*, the Supreme Court explained presumed prejudice, and explained why it was lacking in that case:

> Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts. Similarly, earlier instituted Enron-related prosecutions yielded no overwhelming victory for the Government. In *Rideau*, *Estes*, and *Sheppard*, in marked contrast, the jury's verdict did not undermine in any way the supposition of juror bias. It would be odd for an appellate court to presume prejudice in a case in which jurors' actions run counter to that presumption  *Skilling*, 561 U.S. at 383.

.

Of course, Fischer's trial has not begun, much less concluded. As such, we don't have the benefit of the hindsight that the Supreme Court had in *Skilling*. Nevertheless, an unscientific perusal of January 6 jury trials to date lead to an overwhelming conviction rate of J6 defendants.

There is little burden to this District Court to transfer venue. Indeed, this District has been suddenly swamped, on top of its normal case load, with approximately 1,219 extra cases arising from the events of January 6, 2021. There is no downside to transferring venue unless the Government truly believes that the juries and judges of the District of Columbia actually are the only ones who can fairly decide a J6 case. What would be the reason for objecting?

The balance is all in one direction: Change of venue. The public's confidence in the Judiciary and the likelihood of a fair trial are greatly improved by a change of venue. And this must be contrasted against there being little reason to deny a change of venue.

In *Skilling*, Justice Sotomayor, J. wrote,

> I respectfully dissent, however, from the Court's conclusion that Jeffrey Skilling received a fair trial before an impartial jury. Under our relevant precedents, the more intense the public's antipathy toward a defendant, the more careful a court must be to prevent that sentiment from tainting the jury. In this case, passions ran extremely high. The sudden collapse of Enron directly affected thousands of people in the Houston area and shocked the entire

community. The accompanying barrage of local media
coverage was massive in volume and often caustic in tone.
As Enron's one-time chief executive officer (CEO,
Skilling was at the center of the storm. Even if these
extraordinary circumstances did not constitutionally
compel a change of venue, they required the District Court
to conduct a thorough voir dire in which prospective
jurors' attitudes about the case were closely scrutinized.
The District Court's inquiry lacked the necessary
thoroughness and left serious doubts about whether the
jury empaneled to decide Skilling's case was capable of
rendering an impartial decision based solely on the
evidence presented in the courtroom. Accordingly, I
would grant Skilling relief on his fair-trial claim.

*Skilling*, 561 U.S. at 427.  (Justice Sotomayor, J. concurring in part and dissenting in part).

### a.  Alternate Venue

Fischer cannot obtain a constitutionally mandated trial by an impartial jury in the District of Columbia.  He submits that the Middle District of Florida would be an appropriate alternate venue.  The Middle District of Florida offers potential jurors, ***shown by the data,*** to be significantly less biased.  While this change of venue would result in some inconvenience for the Court, it would actually be a more convenient location for some participants in the trial.  For example, both Fischer and co-Defendant Boele, who live in the district, were arrested (separately) in the Middle District by agents from that District.  It is likely that each agent will be called to testify.  Similarly, both Fischer and co-Defendant Boele had their residences, which

are located in the Middle District, searched by agents from the district who would

be needed at trial to introduce any evidence seized as a result of those searches.

Finally, one of the prosecutors handling this case is a detailee to the Capitol Siege

Unit from the Middle District of Florida.  The Court would avoid the very distinct

risk of having to potentially try the instant cases twice, or to begin *voir dire* in the

District of Columbia only to find, as the data show, substantial prejudice exists in

D.C.'s jury pool.   Depending when this case is tried, an unprecedented and highly

publicized trial of a former President, currently scheduled for March, 2024, could

generate sufficiently negative headlines against J6 participants such as Fischer

*during his trial* which could necessitate the granting of a mistrial or a new trial on

appeal.

    While pretrial publicity of the Capitol incident exists in other areas of the

country, the personal impact J6 had on District residents requires a transfer.  The

District of Columbia is further shown to Fischer should not have to prove that he is

not a domestic terrorist or the tool of a seditious conspiracy.  He should not have to

prove anything.

    As shown, there is prejudgment and prejudice to Fischer.

## V.
## CONCLUSION

Based on the foregoing, Fischer has demonstrated that he faces significant prejudice in the District of Columbia and will be unable to have a fair and impartial jury as guaranteed by the Fifth and Sixth Amendments to the United States Constitution.  Accordingly, he requests that this Honorable Court transfer this matter to the United States District Court for the Middle District of Florida, pursuant to Fed. R. Crim. P. 21(a).

Respectfully submitted,

GEORGE T. PALLAS, P.A
Counsel for Alan Fischer III
Bar No:  348694
2420 SW 22nd Street
Miami, FL 33145
305-856-8580
305-860-4828 FAX
gpallas@beckhamsolis.com

By:/s/_____
    GEORGE T. PALLAS, ESQ.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been electronically filed with the Clerk of Court using CM/ECF system which will send notification of such filing.

By:/s/ *George T. Pallas*
GEORGE T. PALLAS, ESQ