**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 1:22-CR-11 (RJL)** |
| **v.** | : | |
| | : | |
| **ALAN FISCHER III,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO TRANSFER VENUE**

Defendant Alan Fischer, who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to transfer venue in this case to the Middle District of Florida, where he resides. Fischer fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny his motion.[1]  Many of Fischer's arguments,

---

[1] In the two and a half years that have passed since the first January 6-related arrests, dozens upon dozens of defendants have filed motions seeking to transfer or change venue (including Mr. Fischer, once previously). None have been granted. Indeed, 19 judges in this district, including this Court, have considered such motions, and all 20 have denied them. *See, e.g., United States v. Rajewski*, 22-cr-11, Minute Entry (D.D.C. September 21, 2023) (RJL); *United States v. Wren*, Minute Entry (D.D.C. April 11, 2023) (RBW); *United States v. Ramey*, 22-cr-184, Minute Entry (D.D.C. Jan. 30, 2023) (DLF); *United States v. Eckerman, et al.*, No. 21-cr-623, Minute Order (D.D.C. Jan. 26, 2023) (CRC); *United States v. Pollock, et al.*, No. 21-cr-447, Minute Entry (D.D.C. Jan. 25, 2023) (CJN); *United States v. Gossjankowski*, No. 21-cr-12, ECF No. 114 (D.D.C. Jan. 25, 2023) (PLF); *United States v. Adams*, No. 21-cr-212, ECF No. 60 (D.D.C. Jan. 24, 2023) (ABJ); *United States v. Rhine*, No. 21-cr-687, ECF No. 78 (D.D.C. Jan. 24, 2023) (RC); *United States v. Oliveras*, No. 21-cr-738, ECF No. 52 (D.D.C. Jan. 17, 2023) (BAH); *United States v. Sheppard*, No. 21-cr-203, ECF No. 62 (D.D.C. Dec. 28, 2022) (JDB); *United States v. Samsel, et al.*, No. 21-cr-537, ECF No. 227 (D.D.C. Dec. 14, 2022) (JMC); *United States v. Sandoval*, No. 21-cr-195, ECF No. 88 (D.D.C. Nov. 18, 2022) (TFH); *United States v. Vargas Santos*, No. 21-cr-47, Minute Entry (D.D.C. Nov. 16, 2022) (RDM); *United States v. Nordean, et al.*, No. 21-cr-175, ECF No. 531 (D.D.C. Nov. 9, 2022) (TJK); *United States v. Ballenger*, No. 21-719, ECF. No. 75 (D.D.C. Oct. 28, 2022) (JEB); *United States v. Eicher*, No. 22-cr-38, ECF No. 34 (D.D.C. Oct. 20, 2022) (CKK); *United States v. Schwartz, et al.*, No. 21-cr-178, ECF No. 142 (D.D.C. Oct. 11, 2022) (APM); *United States v. Hale-Cusanelli*, No. 21-cr-37, Minute Entry (D.D.C. Apr. 29, 2022) (TNM); *United States v. Alford*, 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL).

1

moreover, parallel those already raised by his co-defendant, Rajewski, and correctly rejected by the Court.  Fischer also provides a study consisting mostly of a media analysis performed by a company led by a convicted January 6 defendant.  This analysis provides nothing that should disturb the conclusion that courts across the district have reached: that voir dire is the appropriate mechanism to detect jury bias, and that the jury pool is not so tainted by pretrial publicity that a venue transfer is necessary.

## **BACKGROUND**

Based on his actions at the U.S. Capitol on January 6, 2021, Fischer has been charged civil disorder, in violation of 18 U.S.C. §§ 231(a)(3) and 2 (Counts 1 and 16); assaulting, resisting, or impeding certain officers using a deadly weapon (Count X), in violation of 18 U.S.C. §§ 111(a)(1) and(b), and 2, and other offenses.  On that day, Fischer breached the restricted perimeter on the west side of the Capitol, engaged in two coordinated pushes against police, and threw a chair and cone at police.

Fischer now moves to transfer venue to the Middle District of Florida, where he lives. *See* ECF No. 179. He contends that prejudice should be presumed in this District Court based on: (1) the results of a media analysis (prepared by a company headed by a convicted January 6 defendant)[2] and an analysis of Google Trends and some information about implicit bias; (2) the characteristics of the D.C. jury pool; (3) the pretrial publicity surrounding the events of January 6; (4) and Fischer's convenience; . All the defendant's arguments are meritless. The Court should deny his motion accordingly.

---

[2] The Media Bias Analysis was prepared by Watchpost Analytics, whose CEO is Brad Rukstales. ECF 179 AT 13.  Rukstales pleaded guilty to violating U.S.C. 40 § 5104(e)(2)(G) in connection to his conduct on January 6, 2021. *United States v. Brad Rukstales*, 21-cr-41-CJN, ECF No. 90. Specifically, he has admitted that he followed retreating officers into the Capitol Visitor's Center and threw chairs at them.  *Id.* at 3-4.

**LEGAL STANDARD**

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3. The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958). Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted). Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (*en banc*) (*per curiam*). And, after *voir dire*, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during *voir dire*. *See Rideau v. Louisiana*, 373 U.S. 723 (1963). In *Rideau*, the defendant's confession—obtained while he was

in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting). The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726. Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process. *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity. *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same). In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history. *In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (*per curiam*) (unpublished) (September 11, 2001 attacks, including on the Pentagon); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston,

where Enron was based. *Skilling*, 561 U.S. at 382-83. First, the Court considered the "size and characteristics of the community." *Id.* at 382. Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service. *Id.* at 382. Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* at 383. "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias." *Id.*

Although the *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity. *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011). Indeed, the bulk of Fischer 's motion is structured around the first three *Skilling* factors, arguing that they support transferring his case to the Middle District of Florida. *See generally* ECF No. 179. Fischer is wrong; the *Skilling* factors do not support a presumption of prejudice in this case.

## ARGUMENT

I.     **Fischer's motion treads little new ground aside from the study he attaches, whose most significant portion was prepared by a fellow January 6 rioter's company.  This biased analysis gives the Court no reason to depart from the many well-reasoned decisions previously issued denying similar motions.**

Unlike the polls other defendants have consistently cited in January 6 venue motions, Fischer relies on what he proclaims to be "cutting edge data" that "virtually eliminates the possibility for manipulation" that one would expect with polls. ECF No. 179 at 5. Both the reliance and the proclamation are incorrect. Courts have routinely rejected pre-voir dire polls and surveys as unpersuasive. *See e.g., United States v. Causey*, 2005 WL 8160703, at *7 (S.D. Tex. 2005), *Haldeman*, 559 F.2d at 64, *United States v. Campa,* 459 F.3d 1121, *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009). The data provided by Fischer is not immune from issues almost identical to the ones that plague polls.  In order to reach their conclusions, the studies'  authors needed to make a series of assumptions about the relationship between responses and an individual's actual opinions, about what is "local media" and "national media," and about who consumes media – that they do not substantiate.  Particularly given the lack of underlying data, the authorship, and the terms chosen, the conclusions of these studies raise questions about bias.  The Watchpost media reach study (the main study upon which Fischer relies) does not explain why it includes North Dakota media consumption and not, say, an arguably comparable metro area. Nor does it explain why there is such disparities between two similar media markets: D.C. and the D.C. metro area. And it suffers from issues of representation and sampling (for example, the population used appears limited to registered voters, which may not accurately represent the jury pool).

The WatchPost analysis methodology does not, in fact, revolutionize jury-pool analysis and escape the well documented issues with polling, but simply draws from a different data source: terms appearing in unspecified media sources, rather than responses to survey questions.  Fischer's

data may be even less predictive of prospective jurors' opinions than survey data. The fact that certain search terms appeared with a particular frequency in a given jurisdiction says little about the actual influence of those terms on prospective jurors.

In the end, for the same reasons that courts often reject polling data, there are good reasons to rely on voir dire, rather the materials Fischer submitted, when assessing whether prejudice should be presumed.  First, the material lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating the questions or search terms.  Second, just as surveys lack the formality that attends in-court proceedings under oath and do not afford the court the "face-to-face opportunity to gauge demeanor and credibility," *Skilling*, 561 U.S. at 395, so too the defense analysis lacks the kind of scrutiny and specificity that is needed to determine whether prejudice should be presumed.  Third, the material assumes that "media reach" –a term that the study does not define, but which seems to refer to the number of articles published on a topic – translates to intractable bias within the jury pool when present at certain levels.  This conclusion relies on numerous questionable intermediate assumptions, such as the actual readership of media coverage and the ability of the media to actually influence prospective jurors, and the inability of jurors to set aside material they may have seen.  A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723.

In sum, federal courts have shown an overwhelming preference for assessing prejudice through court-supervised voir dire rather than outside material.  And the defendant has not offered any reason to depart from that usual practice here.  Thus, this Court need not give substantial

weight to the materials presented when considering whether to presume prejudice. But, as explained below, the "data" submitted by the defendant does not support a presumption of prejudice in any event.

### A. The Watchpost Media Bias analysis does not demonstrate pervasive prejudice in the District of Columbia.

Fischer first relies on an analysis of media dissemination, across media markets, in a failed attempt to prove prejudice. *See* ECF No. 179 and 179-1. The seventy slides worth of graphics analyzing buzz words boil down to the same point: D.C. jurors are purportedly exposed to January 6 media coverage at a higher rate than anywhere else in the country and that exposure ("reach") must equate to bias. Touting data called the "Meltwater study" (ECF No. 179 at 7 and 19), Fischer claims this study proves potential juror bias and is trustworthy because it is free from manipulation. That claim is highly questionable given that the analysis of the Meltwater data was conducted by Watchpost, a company controlled by Brad Rukstales, who threw a chair at Capitol Police officers on January 6. See *Rukstales*, 21-cr-41-(CJN), ECF No 130 at 5-6.

Beyond the glaring concerns surrounding the potentially biased source of this media bias report, there are substantive issues within the study data itself. Watchpost is a company that claims to be an expert in digital marketing, not juror media influence. Apparently, Watchpost's first foray into providing data relating to juries comes in the context of January 6. The study lacks sufficient context and explanation to be considered reliable and make several unsubstantiated assumptions. And, in the end, the study cannot link media exposure to actual consumption and bias by D.C. jurors.

The first main issue with the study's data is that it is devoid of basic explanations and information that are essential to double-checking the work. There is no information on how the material was compiled by Meltwater and sourced by Watchpost. There are no calculations

provided, such that the study's conclusions could be confirmed.  There is no information regarding

how this study defined and measured "reach" beyond the generalities listed on slide 3. ECF No.

179-1 at 4. There is no demonstration that the "reach" of DC-based media outlets is limited to D.C.

jurors. Many people from outside the district (especially those in the greater DC area) likely read

about January 6 on local DC news sources. There is also no definition of 'local media' nor

breakdown of what media is actually considered (newspaper, magazines, TV, online sources,

social media, etc.) and what was not, nor does the study explain whether all instances of media

reach – a two-paragraph online article or a 60-minute television episode – are treated similarly

For example, many Americans now get their news from social media feeds.  Is that a national or

local news source?  Will it even be identified as a news source?  And despite seventy pages of

slides, there is no actual proof that potential jurors have been reached, let alone influenced

negatively or rendered unable to set aside their biases. To that point, the term "media influence"

is also misleading. Just because "local media" in D.C. may feature January 6 stories at a higher

rate that other venues does not mean prospective jurors in D.C. are actually "influenced" by that

media at a higher rate. There is no guarantee that any given potential juror is "influenced" by

exposure to news stories, only a fraction of which the person may have hear or read. In the end,

slide 6 (ECF No. 179-1 at 7) acknowledges that January 6 media mentions have declined in D.C.,

a fact that further weakens Fischer's argument that potential D.C. jurors have been irreversibly

influenced due to over-exposure.

　　　　Second, the study attempts to prove its point through assumptions rather than provable

facts. These assumptions are crucial. For example, due to the "complicated" nature of converting

"reach" into viewership," Watchpost assumed that "2.5% of 'reach' is considered to be influential"

(ECF No. 179-1 (slide 4)) because "exact viewership of each article/mention. . . is outside the

scope of this study." ECF No. 179-1 at 19 (slide 18). Knowing exact viewership is absolutely essential. The fact that PR agencies might rely on a 2.5% "reach" for purposes of advertising does not guarantee it is a reliable estimate for purposes of venue litigation. Furthermore, on slide 16, Watchpost admits to manually recalibrating data to account for secondary domains. ECF No. 179-1 at 17. The study does not indicate whether the same manipulation was done for sources such as the *Washington Post*, that serve as both a local and national media source.

D.C.'s comparatively small population can have a large impact on these numbers. The "reach" and "media influence" numbers were significantly higher in the Middle District of Florida than in D.C., but the calculated "media influence per potential juror" was higher in D.C. because the Middle District of Florida, according to this analysis, has more than 18 times as many potential jurors as D.C. ECF 179-1 at 25. And D.C. media reach is higher even on non-D.C.-specific topics, such as hurricanes. Id. at 10-11 and 67-70. It seems that the D.C. market may simply have more media, with a smaller number of residents. The "media influence per potential juror" calculation rests on at least two assumptions that have not been adequately established: (1) that the "reach" of D.C.-based sources was limited to D.C. residents (i.e., that residents elsewhere do not use what the study deems "local" D.C. news stories to read about events happening in D.C.) and (2) that potential jurors in D.C. and the Middle District of Florida viewed local January 6-related stories at the same rate (2.5% of total "reach"). This survey does not account for the reach of specific national media compared to local media. For example, the Middle District of Florida could consume January 6-related content from Fox News or CNN at a higher rate than D.C.; but it appears that stories in "national" sources are given an even distribution across the country.

The cracks become chasms when comparing D.C. to the D.C. Metro area (see three examples below). It is hard to understand why there would be such a large discrepancy in media

reach between two areas that share the same media market. It may simply be that there are fewer local news outlets in the D.C. metro area (compared with D.C.), while D.C. itself has a smaller population than the metro area.  And the study's conclusions do not comport at all with common sense: it cannot be that there is such a dramatic difference in bias between people living in D.C. and people living in the D.C. metro area.  This stark difference in results for the two relatively similar areas completely undermines the study's attempt to draw juror bias conclusions from this data.

The presence of local media is much higher in Washington, D.C. than elsewhere.  Most news about January 6 has come from national media.  In addition, local media in many parts of the country include syndicated national stories, so even "local media"  includes national news and articles.

Beyond the national coverage, the local media in Washington, D.C. has had extensive influence when it comes to January 6.

| TOTAL | | All Search Terms | | | | | |
|---|---|---|---|---|---|---|---|
| | State | US | Washington, D.C. | DC Metro | FL Middle District | Florida | Dakotas |
| **Total Media Influence** | TMI (est) in MM | 150,642 | 616 | 2,788 | 5,926 | 10,651 | 646 |
| | Per Potential Juror | 792 | 1,451 | 845 | 764 | 774 | 773 |
| | Index | 55 | 100 | 58 | 53 | 53 | 53 |
| **Local Media Influence** | LMI (est) in MM | 16,781 | 317 | 464 | 463 | 959 | 58 |
| | % Local | 11% | 51% | 17% | 8% | 9% | 9% |
| | Per Potential Juror | 88 | 747 | 141 | 60 | 70 | 69 |
| | Index | 12 | 100 | 19 | 8 | 9 | 9 |

*Local media in D.C. for Jan 6 accounts for 51% of total media influence, compared to 11% nationally.*

The average potential juror has likely been exposed to 88 local media mentions since January 6, 2021.  In Washington D.C., it is 746.

*Graph from 179-1 at 6 (slide 5) showing a large, unexplained gap in all terms between D.C. and D.C. Metro*



*Graph from ECF 179-1 at 35 (slide 34) showing another large disparity in the term "1/6/21" between D.C. and D.C. Metro.*



*Graph from ECF 179-1 at 55 (slide 54) showing another large disparity in the term "Proud Boys" between D.C. and D.C. Metro.*

### B.  The Google Trends analysis does not demonstrate pervasive prejudice in the District of Columbia.

Next Fischer relies on Google search trends within the District of Columbia. *See* ECF No. 197-2. Fischer argues that the high rate with which certain January 6 related buzz terms are Googled within D.C. demonstrates potential jurors are reached and therefore biased. The first main issue with this claim is that it presumes potential jurors are the ones "Googling" these buzz terms. Google Trends can only show where and what topic is being searched, not *who* is searching for the topic. ECF No. 179-2 at 2. Reliance on Google Trends therefore fails to account for an important factor: D.C. is a massive transient hub. Every day, thousands of non-residents enter D.C. to attend school, work, or to site-see. Visitors within the District could be searching for terms related to January 6th while at work, at school, or while on a tour bus, driving up the Google Trend numbers. These visitors could double or even triple the amount of people using Google in D.C. on any given day; therefore, it skews the data relied upon by defense.  The study fails to show that it is representative of the actual D.C. jury pool.

Another major issue is that Fischer incorrectly assumes that searched terms automatically create bias. Even if the Court is to assume that D.C. potential jurors have googled buzz words related to January 6 at a somewhat higher rate than other venues, it is a huge leap to conclude that such searches demonstrate entrench bias. Much like the media bias analysis, the Google Trends data does not indicate what, if any, articles are even read, let alone absorbed. Furthermore, Fischer's trends data focuses on words that are marginally, if at all, relevant to the actual evidence at Fischer's trial, such as "white nationalist", "seditious conspiracy", and "Jan 6 Committee". Fischer also ignores the infinite number of sources that may appear when a buzz term is Googled. Potential jurors have equal access to information from pro and anti-January 6 sources. Fischer simply presumes the Googler is clicking on stories that would specifically bias a juror against a

January 6 defendant. Voir dire is the perfect function with which the Court can screen out any potential jurors who have been exposed to substantial pre-trial publicity and are unable to set aside any prejudices.

### C. Implicit bias research does not demonstrate pervasive prejudice in the District of Columbia.

Fischer contends that that voir dire is ineffective at addressing bias created from pretrial publicity.  ECF No. 179 at 12, 16-1, and 21. Fischer cites quotes from multiple dated articles on implicit bias. ECF No. 179-3. Though none of these articles even focuses on (or evene mentions) the impact of implicit biases on jurors, Fischer argues the mere fact that implicit biases exist creates an irrevocable harm that cannot be remedied by voir dire. ECF No. 179 at 12-13. These articles do not support, the defendant's claim that a careful voir dire cannot ensure an impartial jury in this case – by, for example, asking questions designed to root out implicit biases of concern.

Fischer's argument, moreover, is not specific to D.C.  If *voir dire* cannot correct for implicit bias in D.C., then it can do no better in the Middle District of Florida.  Fischer's point is that implicit bias is everywhere; he provides no indication that implicit biases are more or less extensive in his preferred district.  This undermines his request to move the trial elsewhere in search of a less biased pool.  Fischer has not attempted to quantify or measure implicit bias in D.C. compared to elsewhere. To adopt Fischer's view of implicit biases, moreover, and the lack of remedy, would have radical implication on jury selection in any case where there is a claimed bias. To say implicit biases are everywhere and that a juror cannot put aside an implicit bias is to say there is no place for the jury process period. That is not the case.

The Supreme Court and the D.C. Circuit have long made clear that a careful voir dire is the appropriate way to address prejudicial pretrial publicity, except in those extreme cases where prejudice is presumed.  *See Skilling*, 561 U.S. at 381-82.  The Supreme Court observed in *Skilling*

that voir dire was "well suited to th[e] task" of probing the crime's "widespread community impact." *Id.* at 384.  And the Court has said that "[i]t is fair to assume that the method we have relied on since the beginning"—*i.e.* voir dire—"usually identifies bias." *Patton v. Yount*, 467 U.S. 1025, 1038 (1984) (citing *United States v. Burr*, 25 F. Cas. 49, 51 (C.C.D. Va. 1807) (Marshall, C.J.)).  Similarly, the D.C. Circuit has said that "voir dire has long been recognized as an effective method of routing out [publicity-based] bias, especially when conducted in a careful and thoroughgoing manner." *In re Nat'l Broadcasting Co.*, 653 F.2d 609, 617 (D.C. Cir. 1981); *see Haldeman*, 559 F.2d at 63 ("[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire.").  Fischer's vague, general claims about implicit bias rendering voir dire ineffective cannot justify setting aside binding precedent holding otherwise.

Moreover, the Supreme Court has clearly indicated that the passage of time can reduce the prejudicial effect of pretrial publicity.  *See Skilling*, 561 U.S. at 383 ("[U]nlike cases in which trial swiftly followed a reported crime, over four years elapsed between Enron's bankruptcy and Skilling's trial."); *Patton*, 467 U.S. at 1034 ("That time soothes and erases is a perfectly natural phenomenon, familiar to all.").  Neither the articles about implicit bias nor the claims about media exposure supports a conclusion that such an extreme prejudice exists potential biases cannot be addressed by voir dire.

## II.     The argument that the size and characteristics of the district of Columbia's jury pool supports a change of venue has been routinely rejected by every court in this District

### A.  Size and Characteristic of Jury Pool

Fischer first contends that an impartial jury cannot be found in Washington, D.C., due to its size (ECF 179 at 19-24), characteristics ECF 179 at 20), and potential harm of the pool (179 at 21-24) These arguments have been routinely rejected by courts in this District including this Court. See *United States v. Rajewski*, 22-cr-11, Minute Entry (D.D.C. September 21, 2023) (RJL).

III.    **The Pretrial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District.**

A.  **Nature and Extent of January 6 Pretrial Publicity**

Next, Fischer contends that a change of venue is warranted based on pretrial publicity. ECF No. 179 at 24-26. This is yet another argument this Court has heard and rejected. Fischer has not pointed to one article that focuses on his conduct from January 6, 2021. Fischer contradicts his argument, admitting that the media has not "branded" Fischer. ECF No. 179 at 25. Instead, he contends the pretrial prejudice comes from a ruling made by another judge on this court.  ECF No. 179 at 25. Specifically, Fischer points to a evidentiary ruling by Judge Kelly that Fischer claims "branded" him a co-conspirator to the Proud Boy leadership defendants. *Id*. Judge Kelly's ruling simply referenced the relevance and admissibility of communications (the content of which was not published in the document) between the defendants, Fischer, and *twenty-one* named others. *United States v. Ethan Nordean*, et al, (21-cr-175), ECF No. 792. Fischer incorrectly presumes that a significant percentage of the public will navigate ECF, locate one document amongst 937 filings (plus docket entries), connect the ruling to Fischer, investigate the background behind Judge Kelly's ruling, differentiate Fischer from the dozens of other individuals whose conduct was at issue, pay for the trial transcripts, read the thousands of pages of transcripts, and become biased. This is farfetched.

Focusing instead on pretrial publicity in the media, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope.  *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893, at *3 (D.D.C. Jan. 12, 2022) ("The fact that there has been ongoing media coverage of

the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (internal quotation marks omitted)).  A quick Google search of 'Alan Fischer' does not even result in the Defendant as a top result. A search under the "News" section first produces articles not related to this Defendant. After scrolling, the first article about Fischer is from 2022 and authored by '10 Tampa Bay', a local Tampa Bay news source – an outlet located in the venue to which Fischer seeks transfer (available at https://www.wtsp.com/article/news/crime/alan-fischer-model-arrested-capitol-riot/67-9eb9a39d-2a6d-4a6e-9468-62104516fe1a). Thus, the nature and extent of the pretrial publicity do not support a presumption of prejudice, especially in the District of Columbia.

## B. Passage of Time Before Trial

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383. In this case, 36 months have already elapsed since the events of January 6, and more time will elapse before trial. Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383. The defense points to no stories, recent or old, mentioning Fischer. In fact, much of the reporting on Fischer has been national in scope, or local to Florida, rather than limited to Washington, D.C. Indeed, the large amount of time that has passed since January 6, 2021, further supports *keeping* the case in this District, not transferring it, as Fischer suggests. Which is presumably why Fischer attempts to claim the impending trial of the former President will somehow impute attention on Fischer. ECF No. 197 at 26. It is hard to comprehend how the first ever criminal trial of a former United States President (and current presidential candidate) will direct attention towards Fischer rather than detract.

### C.  The Jury Verdict

As the Court pointed out in its denial of Rajewski's motion because Fischer has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply.  But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial.  Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice.  In short, none of the *Skilling* factors supports the defendant's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

The defendant suggests that this factor actually *supports* his claim of prejudice because the other jury trials involving January 6 defendants have resulted in prompt unanimous guilty verdicts.  ECF No. 179 at 25.  But although the *Skilling* indicated that a split verdict could "undermine" a presumption of prejudice, it never suggested that a unanimous verdict—particularly a unanimous verdict in a separate case involving a different defendant—was enough to establish prejudice.  The prompt and unanimous guilty verdicts in other January 6 jury trials resulted from the strength of the government's evidence.

This indicates that D.C. jurors are carefully weighing the evidence and not reflexively convicting January 6 defendants on all charges.  And, as explained below, the jury selection in those cases actually indicates that impartial juries can be selected in this district.

### IV.   A Change of Venue Is Not Warranted Based on Convenience or the Interest of Justice.

Last, the defendant argues that this Court should transfer venue to the Middle District of Florida.  Such a motion would fall under Rule 21(b), which allows transfer to another district "for

the convenience of the parties, any victim, and the witnesses, and in the interest of justice."  Fed. R. Crim. P. 21(b).  The defendant asserts that a change in venue would allow for the trial to be held closer to Fischer's home and that he cannot receive a fair trial in the District of Columbia. The defense argument about convenience and a fair jury is unfounded, and these arguments do not support a transfer of venue under Rule 21(b).

"There is a general presumption that a criminal prosecution should be retained in the original district."  *United States v. Bowdoin*, 770 F. Supp. 2d 133, 138 (D.D.C. 2011) (quoting *United States v. Baltimore & Ohio R.R.*, 538 F. Supp. 200, 205 (D.D.C. 1982)).  That presumption is rooted in the Constitution, which states that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. Art. III, § 2, cl. 3.  And it is reflected in the Federal Rules of Criminal Procedure, which state that, "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."  Fed. R. Crim. P. 18.  To obtain a change of venue under Rule 21(b), a defendant must demonstrate that trial in the district where the crime occurred "would be so unduly burdensome that fairness requires the transfer to another district of proper venue where a trial would be less burdensome."  *Bowdoin*, 770 F. Supp. 2d at 138 (quotations marks omitted).  Factors a court considering a motion to transfer venue are:

> (1) location of the defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of the defendant's business; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district of division involved; and (10) any other special elements which might affect the transfer.

*Id.* at 137-38.

Those factors strongly support keeping the prosecution in this District.  The events at issue took place in the District of Columbia.  Most of the government's witnesses, except the case agent,

are based in the District of Columbia, including, potentially, officer victims from the U.S. Capitol Police and Metropolitan Police Department, a representative from the Secret Service, and a representative from Congress.  Holding a trial in the Middle District of Florida would require a significant expenditure of government funds for the prosecution team[3] and witnesses to travel to that district.  Moreover, none of the defendant's reasons for transfer under Rule 21(b) supports an interest of justice transfer.  A trial in the Middle District of Florida would undoubtedly be more convenient for the defendant.  But that fact alone is not sufficient to justify transfer, particularly considering that the defendant chose to travel to Washington, D.C. to commit his crimes at the U.S. Capitol.

Fischer's claim that venue should be transferred under Rule 21(b) because the Middle District of Florida would provide him with a fairer jury pool, is similarly unavailing.  As explained in the above sections, the defendant cannot obtain a change of venue based on prejudicial publicity under the constitutional standard or Rule 21(a).  And the defendant cannot use Rule 21(b)'s "interest of justice" standard as an alternative way to raise a claim of "local community prejudice." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).  In *Jones*, the D.C. Circuit denied a petition for mandamus which challenged the presiding judge's denial of his motion to transfer under Rule 21(b) based on a claim of prejudicial publicity.  *Id.* at 1234, 1238-39.  The court of appeals held "that the standard of Rule 21(a) is the exclusive gauge by which circumstances of that character (prejudice) are to be measured."  *Id.* at 1239.  Moreover, if anything, coverage specific to Fischer has been greater in his home district; the idea of moving the trial there to escape potential bias is illogical.  The defendant has failed to establish that he cannot receive a fair trial in this District,

---

[3] Fischer points to the fact that one of the AUSA's home district is in the Middle District; however, AUSA Gordon's detail to the U.S. Attorney's Office in D.C. has ended, and he will not be trying this case.

and the defendant has failed to articulate a basis for transfer under Rule 21(b).

**V.   The January 6-Related Jury Trials That Have Already Occurred Have Demonstrated the Availability of a Significant Number of Fair, Impartial Jurors in the D.C. Venire.**

At this point, dozens of January 6 cases have proceeded to jury trials, and the Court in each of those cases has been able to select a jury without undue expenditure of time or effort. *See Murphy*, 421 U.S. at 802-03 ("The length to which the trial court must go to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality."); *Haldeman*, 559 F.2d at 63 (observing that "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire"). Instead, the judges presiding over nearly all of those trials were able to select a jury in one or two days. Moreover, juries in some January 6 trials have either been unable to reach a verdict on certain counts, *see United States v. Williams*, No. 21-cr-618; *United States v. Gillespie* (22-cr-60)*,* or have acquitted on some counts, *see United States v. Rhodes, et al.*, No. 22-cr-15, ECF No. 410 (D.D.C. Nov. 29, 2020) *United States v. Alexander Sheppard* (21-cr-203)*, United States v. Vitali Gossjankowski* (21-cr-123)*, United States v. Kenneth Thomas* (21-cr-552)*, United States v. Ralph Celentano* (22-cr-186). Of particular note, even the jury trying the leaders of the Proud Boys acquitted on certain counts – and deliberated for approximately 10 days. *Nordean*, et al, (21-cr-175), Minute Entry (D.D.C May 4, 2023).

## **CONCLUSION**

The Court should deny the defendant's request for a venue transfer and should instead rely on a thorough voir dire to protect the defendant's right to an impartial jury.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

*/s/ Rebekah E. Lederer*
Assistant United States Attorney
Pennsylvania State Bar No. 320922
601 D St., NW
Washington, D.C. 20530
(202) 252-7012
rebekah.lederer@usdoj.gov