# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 22CR0011-RJL** |
| | ) | |
| **ALAN FISCHER III,** | ) | |
| | ) | |
| | ) | |
| **Defendant,** | ) | |

_____

## REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION
## TO DEFENDANT'S MOTION TO TRANSFER VENUE

The Defendant **ALAN FISCHER, III,** by and through undersigned counsel, files this Reply and Memorandum of Law in support of his Motion for Change of Venue, which also seeks to overturn, modify, or clarify erroneous and scientifically unsupported judicial precedent.

## I.      INTRODUCTION

Fischer questions why the Government, *his government*, has chosen to oppose a change of venue, raising at least the inference that the Government believes it has a distinct, tactical advantage in holding trial in the District of Columbia. The Government, at once, claims that it would make *no difference* if the trial were held in Washington, D.C., in Florida, or in a District showing the least concerns of bias, South Dakota. Yet the Government *opposes* transfer. It is disappointing that the Government claims that there would be *no bias* and the results would be the same, yet, in the same breath, claims some unarticulated reason to oppose the transfer.

In this case, at least one prosecutor, Assistant U.S. Attorney Michael Matthew Gordon, is detailed to this case from the Middle District of Florida. The Defendant lives in that District and was arrested there. The FBI agents who arrested Fischer – who have *first-hand knowledge* of the location, evidence collected, statements by the Defendant, etc. – are all from that area. None of

Fischer's social media or other communications are stored at or originated from D.C.  Why does the Government then so doggedly oppose transfer?

## II.  THE GOVERNMENT'S RESPONSE

The Government's primary attack on venue transfer is that a portion of one study presented in the Defendant's motion "was prepared by fellow January 6 rioter."  While the author, Bradley Rukstales, did indeed plead guilty to the petty, Class B misdemeanor of 'Parading' arising from the January 6 protest, the Government fails to reveal how that, in any meaningful way, voids his analysis.  Notably, the Government attacks neither his credentials (an MBA from the University of Michigan) nor his career accomplishments.  More telling is the fact that the Government offers **no expert** of their own, leading to the conclusion that **either** any expert the Government, in fact, contacted validated the study's findings **or** that no qualified expert could be located to dispute the study's findings.    Nevertheless, to eliminate any doubt, the WatchPost findings were reviewed by a prominent scholar in the field, **WALTER C. DAUGHERITY**, Harvard graduate and Emeritus Senior Lecturer in the Texas A&M University Department of Computer Science and Engineering.    He is a frequent consultant and has published 26 research articles.  He has previously testified in court as an expert witness in addition to classified government work.  See, Declaration and Curriculum Vitae, <u>Exhibit 1</u>; *infra.*

The Government next quibbles with the study's data source.  Contrary to the government assertions of novelty and "density" of data (as set forth in its two motions for extensions to respond, ECF 182, 185), the government **now boldly claims that it is neither!**  Again, with no expert to buttress what it posits, the government simply complains of the following:

> *"A lack of underlying data."*  Fischer used a commercially available (and respected) data source, Meltwater, provided search terms and time frames, and stated all assumptions.  The analysis is easily duplicable, yet the Government chooses to offer only unsupported opinions and conjecture.

*"Terms chosen"*   The search terms include phrases regularly mentioned in the media regarding January 6.  Again, no alternate or "better" search terms are offered by the government or their non-existent expert.

*"Authorship"*   By attacking the author, and not the data, the Government commits a logical fallacy.  If an expert on the harm of cigarette smoking is later seen smoking at a social event, does that then mean smoking is good for you?

*"Markets chosen"* Current venue of D.C., defendant's home district, a market close to the venue but different in geography, and an example of an unaffiliated geography so there can be multiple comparisons.

Again on page 6 the Government opines:

```
The WatchPost analysis methodology does not, in fact, revolutionize
jury-pool analysis and escape the well documented issues with polling,
but simply draws from a different data source: terms appearing in
unspecified media sources, rather than responses to survey questions.
```

However, this data source is very different – it quantifies the amount of media that has been exposed to potential jury pools.  This brings to the fore the saturation of pre-trial publicity and its impact on potential and actual jurors.  With respect to the "unspecified media sources," the government evidences a surprising ignorance regarding the Meltwater Company.

On page 7 the Government speculates:

```
    Fischer's data may be even less predictive of prospective jurors'
opinions than survey data. The fact that certain search terms appeared
with a particular frequency in a given jurisdiction says little about
the actual influence of those terms on prospective jurors.
```

The Government overlooks the fact that during this period, the incidence of Google searches, *as demonstrated by the Google Trends analysis*, shows a significant presence in D.C. compared to the rest of the country, indicating potential juror engagement with the search terms used in *both* studies.   Indisputably, residents of D.C. show engagement in the media at an astronomically higher rate than the industry standard.

On page 8 the Government continues its *ad hominem* attack:

```
    Fischer first relies on an analysis of media dissemination, across
media markets, in a failed attempt to prove prejudice. See ECF No. 179
and 179-1. The seventy slides worth of graphics analyzing buzz words
boil down to the same point: D.C. jurors are purportedly exposed to
January 6 media coverage at a higher rate than anywhere else in the
country and that exposure ("reach") must equate to bias. Touting data
```

```
called the "Meltwater study" (ECF No. 179 at 7 and 19), Fischer claims
this study proves potential juror bias and is trustworthy because it is
free from manipulation. That claim is highly questionable given that the
analysis of the Meltwater data was conducted by Watchpost, a company
controlled by Brad Rukstales, who threw a chair at Capitol Police
officers on January 6. See Rukstales, 21-cr-41-(CJN), ECF No 130 at 5-6.
```

Lamentably, the Government continues its innuendos and false statements about the
author, a professional with impeccable credentials over a 30-year career in the field, and in so
doing, ***fails to identify any bias whatsoever.***

At the bottom of page 8, the Government claims, again with no support:

```
     The study lacks sufficient context and explanation to be
considered reliable and make several unsubstantiated assumptions. And,
in the end, the study cannot link media exposure to actual consumption
and bias by D.C. jurors.
```

The methodology is provided.  The context and explanation are plain to see.  The media
saturation data combined with the Google Trends data, when viewed together, show the link
between media exposure and the actual consumption of that media as actively searched by
potential jurors.

```
     The first main issue with the study's data is that it is devoid of
basic explanations and information that are essential to double-checking
the work. There is no information on how the material was compiled by
Meltwater and sourced by Watchpost.
```

The data source is Meltwater, an industry standard, reliable data provider, with many
published articles concerning the compilation of data.  ***They compile an additional 1 billion
records per day!*** Unlike the prosecutor's lack of understanding, Watchpost Analytics provided
an explanation of methodology which included data layouts, fields used, business rules, search
criteria and results, so that the findings could be both duplicated and verified (without producing
gigabytes of raw data which are subject to licensing agreements).

The Government again complains, on page 9:

```
There is no information regarding how this study defined and measured
"reach" beyond the generalities listed on slide 3. ECF No. 179-1 at 4.
```

The Government miscomprehends "reach" to mean the number of articles published. This is incorrect.  Reach estimates the potential viewership of any particular article based on the number of visitors to the specific source.  Literally, ***billions of dollars*** of advertising is purchased based on this number. While the mode of delivery may vary, (*i.e.,* print, radio, TV, or online), all seek to identify the number of individuals ***consuming*** the media over a defined period.  This is a very basic measure to assess the cost effectiveness of media.  Had the government located an expert in this field, that person could have easily explained this to them.

Also on page 9, the Government continues:

> There is no demonstration that the "reach" of DC-based media outlets is limited to D.C. jurors. Many people from outside the district (especially those in the greater DC area) likely read about January 6 on local DC news sources. There is also no definition of 'local media' nor breakdown of what media is actually considered (newspaper, magazines, TV, online sources, social media, etc.) and what was not, nor does the study explain whether all instances of media reach — a two-paragraph online article or a 60-minute television episode — are treated similarly For example, many Americans now get their news from social media feeds. Is that a national or local news source? Will it even be identified as a news source?

The study unambiguously indicates that it includes news from Print, Online, TV and Radio broadcasts.  The breakdown is as follows:

| | Total | | |
|---|---|---|---|
| | # sources | # articles | Total Reach (MM) |
| *Used in Analysis* | *12,328* | *3,054,481* | *14,863,484* |
| Online | 1,595 | 447,223 | 9,918,951 |
| Print | 6,679 | 1,317,258 | 2,512,308 |
| Radio | 2,220 | 304,538 | 186,019 |
| TV | 1,834 | 985,462 | 2,246,206 |

As for how different sources were analyzed, here is a breakdown based on category of source and what was excluded from analysis:

| | # sources | # articles | Total Reach (MM) |
|---|---|---|---|
| **Total** | 16,031 | 3,382,649 | 16,812,723 |

| | # sources | # articles | Total Reach (MM) | Reason |
|---|---|---|---|---|
| **Excludes** | **3,703** | **328,168** | **1,949,238** | |
| *Percent of Total* | *23%* | *10%* | *12%* | |
| Gaming | 31 | 99 | 368 | misclassified articles, i.e., article is about a game called "insurrection day" |
| Blogs | 103 | 4,079 | 5,835 | Inconsistent availability of blogs and reach data. Most unbiased treatment is to exclude all. |
| College | 259 | 2,132 | 614 | Mix of campus publications and alumni news. Most likely not going to potential jury pool, and inconsistent availability. |
| Government | 69 | 2,900 | 3,775 | Publications related to a very specific group or function. Not able to classify as local or national. Examples: Air Force Magazine, CBO, Library of Congress. This removed many potential local sources for D.C. |
| No Geography Present | 2,864 | 305,595 | 1,847,699 | Cannot classify without knowing state |
| Other | 377 | 13,363 | 90,947 | Mix of corporations, sources without reach, religious, travel, marketing, and other. |

| | # sources | # articles | Total Reach (MM) |
|---|---|---|---|
| **Used in Analysis** | **12,328** | **3,054,481** | **14,863,484** |
| *Percent of Total* | *77%* | *90%* | *88%* |
| Online | 1,595 | 447,223 | 9,918,951 |
| Print | 6,679 | 1,317,258 | 2,512,308 |
| Radio | 2,220 | 304,538 | 186,019 |
| TV | 1,834 | 985,462 | 2,246,206 |

- Radio stations were considered local, except where "reach" is greater than 1 million, in which case further research is conducted to identify if it is truly a local or national station.

- Sources with a city, state, or regional name in them are considered local.

- Regardless of that rule, any source with a large reach (1M+) is manually reviewed and categorized. Regarding social media, news primarily includes a link to a news article. That news article, and its corresponding reach, would be included in the study. The comments are not.

Again, on page 9:

```
    And despite seventy pages of slides, there is no actual proof that
potential jurors have been reached, let alone influenced negatively or
rendered unable to set aside their biases. To that point, the term
"media influence" is also misleading. Just because "local media" in D.C.
may feature January 6 stories at a higher rate that other venues does
not mean prospective jurors in D.C. are actually influenced" by that
media at a higher rate. There is no guarantee that any given potential
juror is "influenced" by exposure to news stories, only a fraction of
which the person may have hear or read. In the end, slide 6 (ECF No.
179-1 at 7) acknowledges that January 6 media mentions have declined in
D.C., a fact that further weakens Fischer's argument that potential D.C.
jurors have been irreversibly influenced due to over-exposure.
```

The term "media influence" is a calculation of the number of mentions/articles that an individual, on average, encounters over the period of time. When D.C. media devotes more time to January 6-related news, it does so at the expense of other news items. It is this concentration

effect that is the influence.  Outside of D.C., the concentration is much lower, which is the point

of the study.  A decline in mentions alone does not mean that cumulative messaging has been

ineffective in influencing potential jurors.

```
        Second, the study attempts to prove its point through assumptions
rather than provable facts. These assumptions are crucial. For example,
due to the "complicated" nature of converting "reach" into viewership,"
Watchpost assumed that "2.5% of 'reach' is considered to be influential"
(ECF No. 179-1 (slide 4)) because "exact viewership of each
article/mention. . . is outside the scope of this study." ECF No. 179-1
at 19 (slide 18). Knowing exact viewership is absolutely essential. The
fact that PR agencies might rely on a 2.5% "reach" for purposes of
advertising does not guarantee it is a reliable estimate for purposes of
venue litigation.
```

The **industry standard** is to calculate viewership as 2.5% of reach.  Most social media

marketing experts agree that a good viewership or "engagement rate" is between 1% to 5%.

This standard has come from years of work in the industry.  However, one should note that the

actual percentage used is of little analytical significance.  This common multiplier is constant

and is used across all media and markets, so the *relative* relationship between markets will be the

same, regardless.  However, using an industry standard allows for a better conceptual

interpretation of media exposure and influence.

## II.    ARGUMENT

The Government in its Response repeats the mistake of many by misconstruing *United

States v. Haldeman, et. al.*, 559 F.2d 31, (DC Cir. 1976), as creating a mandatory or nearly

mandatory set of rules on change of venue.   That is an error.   This is not what this precedent

says.  See, also, *United States v. Delaney*, 199 F.2d 107 (1st Cir. 1952), in which the legislature

held a public hearing before the case went to trial.    The Court of Appeals vacated the

convictions because of extensive pre-trial publicity where there were parallel legislative hearings

and criminal prosecution.

*Haldeman* and its progeny never claimed that change of venue is disfavored nor that *voir*

*dire* is the panacea.  Later courts have incorrectly seen it that way.  Such precedents allowed

decisions of trial courts to stand, finding in those individual cases no compelling reason to disturb the trial court decisions. [1]  Later cases overlook the clear mandate that change of venue would become mandatory if, as here, bias and pre-trial publicity were so serious and overwhelming as to threaten due process.

And venue is not a procedural, administrative or house-keeping matter.

The dictates of *Haldeman* should now be reexamined to the extent that that they are not merely misunderstood or misapplied by the lower courts.

### A.  THERE IS NO VALID REASON TO WITHHOLD THE EASY REMEDY OF A CHANGE OF VENUE

Of course, there is no burden to this District Court to transfer venue.  Indeed, this District has been suddenly overrun, with approximately 1,300 additional cases, *many mere misdemeanors*, arising from the events of January 6, 2021.  There is no downside for the Government for transferring venue unless the Government truly believes that the juries and judges of the District of Columbia are biased in the Government's favor.  Can the prosecution advance any reason how or why it would be disadvantaged in a different venue?  Incorrectly suggesting that *voir dire* is to be preferred, that is, that it would be better to spend days or weeks, conducting an extensive *voir dire* and then abort the proceedings in this District, rather than just doing the obvious, efficient, and proper thing consistent with judicial economy and Due Process, is mind-boggling.  ***Change venue from the start***.   A preference for a train wreck scenario of pursuing *voir dire* to the bitter end before throwing the entire trial schedule into chaos, sending the D.C. jury panel home, wasting all the work invested, and then to start all over again in another District defies all sense and cannot possibly reflect what venue precedents actually say.

---

[1]    *Haldeman* alleged widespread publicity but the Circuit analyzed that as having faded with time to the point where it no longer presented a significant threat of impact on the jury pool.

In fact, they do not.  If any precedent says that, that precedent should be re-examined, clarified, modified, or overturned as Constitutionally and logically flawed.

It may be thought that most of the evidence is in the District of Columbia.  Again, this is not true.  In hundreds of prosecutions, the Government consistently **(a)** plays a "montage" video recording for "context" in which typically the Defendant on trial is not even seen;  **(b)** presents CCTV recordings, which can be authenticated by any U.S. Capitol Police technician and is often stipulated to by the parties; **(c)** depends mostly upon FBI "case agents" who simply read from the FBI file and cannot answer questions in cross-examination on the grounds that they have no personal knowledge; **(d)** argues a "raindrops theory" that the Defendant subjectively "chose" to "join" a "mob" and is therefore collectively guilty of everything anyone in the mob did, and  **(e)** presents officers who rarely remember anything about the individual Defendant and can only testify to the general "context" of events.

> *In other words, the typical January 6 trial could be held anywhere . . .*

The key issue in the criminal cases is intent, motive, and/or advance planning.  That evidence is largely not in Washington, D.C., but in conversations and social media posts of a Defendant, both before and after January 6, and on his phone or device, that has usually been seized during his arrest in his home state.  To the best of counsel's knowledge, no judge in this District has allowed a jury viewing of the U.S. Capitol building or grounds.  Typically, large aerial map suffices.  So, in this context, location is unimportant.

Does the Government lose an unfair advantage of jury bias against Defendant by opposing transfer?  Are there compelling non-bias reasons for objecting to transfer of venue?

## B.  *HALDEMAN* PRECEDENTS MISCONSTRUED AND MISAPPLIED

*Haldeman* and its progeny dominate the issues on change of venue.  However, that rests almost entirely on failing to read carefully or understand *Haldeman.*  See, dissent, Mackinnon.

**(a)**  First, in *Haldeman*, pp. 61-62, the Court of Appeals of this Circuit began by doing us the favor of distinguishing that case from this case at bar now.  The Circuit Court set the stage:

> "In short, unlike the situation faced by the Court in Rideau[2], we find in the publicity here no reason for concluding that the population of Washington, D. C. was so aroused against appellants and so unlikely to be able objectively to judge their guilt or innocence on the basis of the evidence presented at trial that their due process rights were violated by the District Court's refusal to grant a lengthy continuance or a change of venue prior to attempting selection of a jury."

Clearly, the instant case is not *Haldeman*.  Here, the population of Washington, D.C. has been immensely and intensively "aroused" against the Defendants and the focus is not fading but arguably growing both as a major issue in the 2024 presidential election and due to the steady stream of weekly J6 arrests.  (Just since the filing of the instant original motion herein, more than 100 additional J6 defendants have been charged). And this "arousal" has been deliberately engineered for partisan political purposes by politicians, journalists, and activists.

**(b)**  *Haldeman* then emphasizes, pages 62-63, that the Circuit Court upheld the decisions made by the District Court.  *Haldeman* did not mandate that changes of venue be disfavored.

> "The federal courts can, of course, establish more rigorous standards for their own governance than those minimum guarantees of fairness imposed on the state courts by the Constitution.  See, e. g., Ristaino v. Ross,424 U.S. 589, 597 &  nn.9-10, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976); Murphy v. Florida, supra, 421 U.S. at 797-798; id. at 804, 95 S.Ct. 2031 (Burger, C. J., concurring); cf. United States v. Williams, 523 F.2d 1203, 1209 n.11 (5th Cir. 1975).

*Haldeman* does not hinder changing of venue in order to promote fairness, ***and the appearance of fairness***, in a trial. Standards higher – such as a change of venue to ensure a fair trial ***and the appearance of*** a fair trial – are entirely in order.

**(c)**   Continuing on Page 62:

> We believe, however, that it is inappropriate to attempt to formulate a supervisory power standard for concluding that a fair jury cannot be selected.

And continuing on Page 63 *(emphasis added)*:

---

[2]    *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).

> Invocation of an appellate court's supervisory power to require a continuance or a change of venue, ***although failure to do so did not constitute a denial of due process***, would therefore introduce additional unguided discretionary line-drawing and consequent uncertainty into the process of litigating controversial cases.

Thus, *Haldeman* recognized that considering whether a fair jury can be selected in a venue continues to be proper, and that power remains, as it should, with the trial court.

Again, *Haldeman* did not disfavor a change of venue.

**(d)** Furthermore, the Circuit Court in *Haldeman* lays out another circumstance not present in the case at bar, at Page 63:

> "Moreover, this uncertainty would not guarantee a commensurate increase in the fairness of federal criminal trials. ***When the trial court has taken all appropriate measures to minimize pretrial publicity, as was the case here,*** a supervisory fair trial standard, however stated, could not stimulate the court to additional vigilance in protecting the defendant's right to be tried on the evidence presented in court."

*Haldeman's* analysis presupposes that "**the trial court has taken all appropriate measures to minimize pretrial publicity,**" which is manifestly not true for the case at bar.

Likewise, rarely has a candidate for office made prosecution a key issue in a pending political campaign. The pre-trial publicity of January 6 has ***not*** faded. On the contrary, the 92.1% of the jury pool who voted for Joe Biden have an incentive, conscious or unconscious, to advantage their chosen candidate on November 5, 2024, by how they view and judge these cases.

Moreover, Fischer, in his original motion, has already outlined how he was specifically named, by a fellow District Court Judge, as a "tool" in the Proud Boys' case, a far-reaching conspiracy. The Government's response that members of the public would not navigate the Court filings to discover the Judge's findings, borders on myopic. This argument falls flat in the digital age. The Judge Kelly's ruling went viral on the internet with hundreds of thousands of views. One popular blog, emptywheel.net, mentioned Fischer and the "tools" ruling in at least four (4) different articles. The actual memo mentioning Fischer was linked in one article.

Notably, the government fails to respond, at all, to the pending civil lawsuit by the District of Columbia Attorney General in which the Proud Boys are the named defendant, an affiliation the Government is quick to point out in filings in this case.

Government officials in the District of Columbia, including those aforementioned members of the judiciary, can hardly claim they bear no responsibility for the pervasive negative sentiment toward J6 defendants.

### C. DISTRICT COURT IS ITSELF ONE OF MANY CAUSES OF PRE-TRIAL PUBLICITY, RENDERING *HALDEMAN* INAPPLICABLE

Change of venue is mandatory when this District has, itself, perpetuated the bias and prejudgment.[3] Where the District Court, on its own, is a major source of biased pre-trial publicity, this case, and related January 6 prosecutions, are placed in a unique category unlike any other.  Intent, motivation, pre-planning, etc., are crucial issues.  Yet a mere 22 days after January 6, 2021, then Chief Judge Beryl Howell pre-judged motive, intent, the events, and the guilt or innocence of individual Defendants in violation of the Canons and Due Process:

The chief judge of the federal court in Washington scorched Capitol riot suspects during a hearing on Thursday, calling their actions an assault on American democracy and ruling that a man who had bragged about putting his feet on a desk in House Speaker Nancy Pelosi's office should stay in jail as he awaits trial.

> "**This was not a peaceful protest. Hundreds of people came to Washington, DC, to disrupt the peaceful transfer of power**," Chief Judge Beryl Howell of the DC District Court said in the hourlong hearing for Capitol riot defendant Richard Barnett on Thursday.  Howell's remarks are some of the first from a federal district judge over the more than 150 criminal cases that resulted from the siege.
>
> * * *
>
> Howell made clear she believes the crowd was trying to thwart the federal legislative branch from carrying out its duties.
>
> * * *

---

[3]     Compare requirement that the District has "***taken all appropriate measures to minimize pretrial publicity,***" in  *Haldeman* at 63, *supra*.

Katelyn Polantz, "**Chief federal judge in DC scorches Capitol riot suspects and keeps man who was in Pelosi's office in jail**," CNN, January 28, 2021, *(emphases added)*. https://www.cnn.com/2021/01/28/politics/capitol-beryl-howell-richard-barnett-pelosi/index.html

Of course, neither Judge Howell, nor any other District Judge, could possibly know why "hundreds of people came to Washington, D.C." only 22 days after those events.  Having yet to hear from any witnesses and seeing no evidence, Howell declared "Hundreds of people came to Washington, DC, to disrupt the peaceful transfer of power."  Howell pre-decided intent and motive, declaring that "she believes the crowd was trying to thwart the federal legislative branch from carrying out its duties."

The then-leader of this District Court told potential jurors that Defendants are: A "disgrace to our country." "The tyranny we rejected." "An embarrassment to every American."  In presiding over the cases of hundreds of people accused of breaching the US Capitol on January 6 in support of then-President Donald Trump, federal judges have not held back when describing the unprecedented nature of the events of that day. *Id.*

Eight months later on October 28, 2021, then Chief Judge Howell continued public condemnation of **_all_** January 6 demonstrators, including those awaiting trial:

> Howell then made clear that she considered **_all_** participants in the Jan. 6 Capitol breach — which the Justice Department now estimates at 2,000 to 2,500 people — enablers of an assault against the republic.
>
> * * *
>
> "The rioters attacking the Capitol on Jan. 6 were not mere trespassers engaging in protected First Amendment conduct or protests," Howell added.  "They were not merely disorderly, as countless videos show the mob that attacked the Capitol was violent. **_Everyone participating in the mob contributed to that violence._**"[4]
>
> * * *  She has taken a leading role in pressing prosecutors to consider the broader threat to democracy that the riot presented when considering charges and punishment for participants. **_And her words, as the chief of the District Court blocks_**

---

[4]        Thus the Chief Judge broadcast the conclusion of collectivist guilt, where the individual actions of Defendants are not considered, only what some in a mob did.  Everyone is guilty by association.  She declared to prospective jurors that "all" and "everyone participating" was equally guilty.

*__from the Capitol, often carry more weight than those of her colleagues.__* She has consistently expressed alarm and skepticism about prosecutors' ginger language and approach to some of the initial cases before her court — and she attributed public "confusion" about the seriousness of the Capitol attack to the government's approach.

Kyle Cheney and Josh Gerstein, "'Almost schizophrenic': Judge rips DOJ approach to Jan. 6 prosecutions: Chief District Court Judge Beryl Howell criticized "petty offense" plea deals for defendants who she said tarnished America's reputation in the world," <u>POLITICO</u>, October 28, 2021, *(Emphases added),* <u>https://www.politico.com/news/2021/10/28/almost-schizophrenic-judge-rips-doj-approach-to-jan-6-prosecutions-517442</u>

Judge Howell explicitly influenced public perception, including that of potential jurors.

The current Chief Judge of the District Court, James E. Boasberg, has continued this public declaration of condemning and finding guilty *"ALL"* January 6, 2021, defendants.

"__*All of the people charged with offense*__s related to the Jan. 6 insurrection are serious. You attempted, along with others, to undermine one of our government's bedrock acts: the peaceful transfer of power," Boasberg said. "There are few actions as serious as the ones this group took on this day."

Samantha Hawkins, "Ohio-based insurrection buds handed 45-day sentences," <u>Court House News</u>, September 29, 2021, *(emphasis added),* <u>https://www.courthousenews.com/ohio-based-insurrection-buds-handed-45-day-sentences/</u>

### D.  PRE-TRIAL PUBLICITY DOES EQUAL BIAS

The Government argues the unpersuasive idea that "pre-trial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial." *Nebraska Press Assn. v. Stuart*, 427 U.S. 359, 565 (1976).  However, concerning January 6 prosecutions, no one can seriously suggest with candor that the pre-trial publicity has not caused extreme bias and prejudice.  So extreme has been the negative publicity about January 6 as to make it a national day of mourning every year with the President, Vice President, Attorney General, U.S. Attorney, Congressional leaders all making highly inappropriate remarks knowing that hundreds of trials are still pending in the District.  So "over-the-top" has this national orgy of negative publicity been that the satirical Babylon Bee has mocked them as "January 6:  The Musical" and "January 6 On Ice" featuring Nancy Pelosi – a

story milked for all its worth.  Those officials having influence over the Department of Justice have repeatedly described January 6 publicly as worse than the attack on Pearl Harbor, worse than the terrorist attack of September 11, 2001, etc., etc.

No serious comparison can be made between adverse publicity about January 6 and some hypothetical case in which it is imagined that pre-trial publicity might be neutral.

Meanwhile, in *Irwin v. Dodd*, 366 U.S. 717 (1961), 81 S. Ct. 1639, the U.S. Supreme Court reversed lower courts for failing to transfer venue, thus violating the Defendant's Constitutional rights to a fair trial.  Yet venue dead-enders mischaracterize *Irwin v. Dodd* for the opposite of its holding, that there is some "presumption of a prospective juror's impartiality." Defendant contends that there can be no such presumption consistent with the U.S. Constitution and contrary precedents must be corrected.  As *Irwin v. Dodd* itself explains:  "The adoption of such a rule, however, 'cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law.' *Lisenba v. California*, 314 U.S. 219, 236."  Courts must ensure a very strong likelihood that jurors will in fact be impartial, not rigid presumptions or what appears to be mere stubbornness.

## E.  REFUSING CHANGE OF VENUE ADDS APPEARANCE OF BIAS

The Judicial Code of Conduct [5] mandates that court proceedings not only be fair and impartial but to every extent possible reassure the public in appearance and give confidence that court trials and other decisions are fair and impartial.[6]  In conflict, Federal Courts have doggedly

---

[5]     **Canon 2: A Judge Should Avoid Impropriety and the Appearance of Impropriety in All Activities**
    A. *Respect for Law.* A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. * * *
[6]     **COMMENTARY:  Canon 2A.** An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's honesty, integrity, impartiality, temperament, or fitness to serve

pursued a concept that changes of venue are to be disfavored and that all defects can be magically cured by a wave of the wand of *voir dire*.  Far from promoting public trust and confidence in the Judiciary, the resistance of courts to use the relatively simple cure of a change of venue raises a flurry of red flags in contradiction to the Judicial Code of Conduct.

One reason why the public does not always trust the courts is the perceived intensity with which a judge will grab a case and refuse to let it go.  Courts at all levels disavow or should disavow "judge shopping" or "forum shopping" but also judicial clinging to a case.

## F.  CHANGE OF VENUE IS THE ONLY SOLUTION, NOT VOIR DIRE

The Government argues that "The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729-730 (1992) (italics omitted).  However, that is not true.  Only when there is no strong likelihood of bias is there any hesitation to employ change of venue.  *Morgan v. Illinois* actually says:

> The Constitution, after all, does not dictate a catechism for *voir dire,* but only that the defendant be afforded an impartial jury. Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors. *Dennis* v. *United States,* 339 U. S. 162, 171-172 (1950); *Morford* v. *United States,* 339 U. S. 258, 259 *(1950). "Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales Lopez* v. *United States,* 451 U. S. 182, 188 (1981) (plurality opinion). Hence, "[t]he exercise of [the trial court's] discretion, and the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness." *Aldridge* v. *United States,* 283 U. S. 308, 310 (1931).
>
> The adequacy of *voir dire* is not easily the subject of appellate review, *Rosales-Lopez, supra,* at 188, but we have not hesitated, particularly in capital cases, to find that certain inquiries must be made to effectuate constitutional protections, see, *e. g., Turner* v. *Murray, supra,* at 36-37; *Ham* v. *South Carolina,* 409

as a judge is impaired. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges, including harassment and other inappropriate workplace behavior. A judge must avoid all impropriety and appearance of impropriety. This prohibition applies to both professional and personal conduct. A judge must expect to be the subject of constant public scrutiny and accept freely and willingly restrictions that might be viewed as burdensome by the ordinary citizen. * * *

U. S. 524, 526-527 (1973).

Really, the Government's argument cannot be complete unless the Government convinces us that the *voir dire* actually will be "adequate."   The Government also relies upon *Jones v. Gasch*, 131 U.S.App.D.C. 254, 261, 404 F.2d 1231, 1239 (1967), which recites that:

> "Jurors manifesting bias may be challenged for cause;33 peremptory challenges may suffice to eliminate those whose state of mind is suspect.34 Frequently the problem anticipated works itself out as responses by prospective jurors evaporate prior apprehensions.35..."

But – in every January 6 case – the *voir dire* turns out to be far from adequate.  There are too few peremptory challenges to filter out biased citizens.  The judge conducts the questioning, and resists Defendant's counsel, in conflict with Rule 24(2).

Similarly, the Government argued in *United States v. Kenneth Joseph Owen Thomas*, Case No. 1:21-cr-00552 (DLF), Dkt. #52,  January 6, 2023:

> Additionally, a careful voir dire—rather than a change of venue—is the appropriate way to address potential prejudice from the Select Committee hearings. "[V]oir dire has long been recognized as an effective method of routing out [publicity-based] bias, especially when conducted in a careful and thoroughgoing manner." *In re Nat'l Broadcasting Co.*, 653 F.2d 609, 617 (D.C. Cir. 1981). After a careful *voir dire,* this Court can select a jury from those residents who either did not watch the hearings or who, despite having watched the hearing, give adequate assurances of their impartiality.

However, this requires that the *voir dire* be "careful," which it rarely is.  Once the *venire* is waiting out in the hall or in the next room, the understandable pressure is to move the prospective jurors through as quickly and simply as possible, feeling their inconvenience.

* * *

> Examination of prospective jurors is a step vital to the fairness of jury trials. The information elicited on voir dire serves the dual purpose of aiding counsel in the exercise of challenges and the court in the determination of competence to serve.[22]  Without knowledge bearing on the qualifications of the *veniremen*, neither function can be performed intelligently.[23]  To the extent that the examinatorial process is deficient, the impartiality of the jury could be compromised.[24]
>
> To achieve its wholesome goals, *voir dire* examination must be given a wise and liberal scope.[25]  Reasonable latitude must be indulged to inquiry into attitudes and inclinations in order to assure the objectivity of the jurors ultimately chosen.[26]  To be

sure, the trial judge retains a broad discretion as to the questions which may be addressed.[27]  But, as the Supreme Court has declared, " [t]he exercise of this discretion, and the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness."[28]

Peterson argues that the refusal of the three questions he submitted constituted reversible error. * * *

* * *

*United States v. Peterson*, 483 F.2d 1222 (D.C. Cir. 1973) (but finding that the judge had adequately addressed the same topics in other ways).  And the Government argues:

> "[I]f an impartial jury actually cannot be selected, that fact should become evident at the *voir dire*." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (*en banc*) (*per curiam*).  And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).[7]

But the Government does not mention that the U.S. Supreme Court in *Morgan v. Illinois* overturned the trial court, finding the jury *voir dire* to be constitutionally defective and inadequate.  The *voir dire* process offended the Due Process Clause because it was shallow and unprobing, as happens here in January 6 cases.

And proceeding with trial all the way up to the first day, with the potential jurors in the building, only to then reluctantly decide that the very easy, simple, efficient option should have been employed months earlier by a change of venue would be wasteful, chaotic, and disruptive.

## G.  IMPLICIT BIAS CANNOT BE CURED BY *VOIR DIRE*

The thrust of the Government's main arguments against the relevance of Fischer's implicit bias research claim is that he fails to demonstrate that implicit bias can't be rooted out with careful *voir dire* thus ensuring an impartial jury; and that he provides no indication that implicit biases are more or less prevalent in D.C. as compared to Florida's Middle District or elsewhere.  These claims are easily disproven by analysis of the research provided in the initial

---

[7]  See *Mu'Min* v. *Virginia*, 500 U. S. 415, 425-426 (1991): ``To be constitutionally compelled . . . it is not enough that such questions might be helpful.  Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair.''

motion. The Meltwater and Google Trends data prove that D.C. is the number one consumer of January 6th related media. When this data, which shows the startling disparity between D.C. 's consumption of Jan 6 media compared to the rest of the country, is analyzed through the lens of neuroscience and these unconscious cognitive functions; it becomes clear that the DC jury pool would be the *most biased jury pool* in the United States, and therefore would lead to the most prejudicial and therefore unconstitutional outcomes for the defendant. The latest research into implicit bias interventions, cited in the motion's **Exhibit C**, clearly show that *voir dire* and jury questions, tools considered to be interventions, would have little to no effect on identifying or rooting out these biases, and ensuring an impartial jury.

Former District Judge, Mark W. Bennett, who was the first federal judge to incorporate implicit bias jury instructions into his courtroom, published a paper in the Harvard Law & Policy Review, detailing his experience, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection*, which was then cited in the study *Judges' Experiences With Mitigating Jurors' Implicit Biases* (2020), which concluded:

> Other existing methods to reduce juror biases such as voir dire might also be ineffective. Although a judge-dominated voir dire might remove explicitly prejudiced or racist jurors, it likely does not remove jurors who hold implicit biases (Bennett, [2010]). Judges commonly ask potential jurors whether or not they can be fair and impartial in relation to the case. Because jurors are unaware of their implicit biases, such a question is ineffective in removing implicitly biased jurors.

This leading research in the field of implicit cognition, overwhelmingly proves that no intervention; such as a jury instruction, can effect any meaningful change in altering a jurors bias. Coupled with the fact that implicit biases are not generally known to the individual, as opposed to explicit biases, which also factor into decision making and behavior, *voir dire* cannot possibly fix this permanently poisoned and tainted jury pool. The only remedy available to this

Court in the interests of justice is to change venue, moving this trial to a less exposed jury pool and away from the number one consumer of January 6th publicity in the nation.

To respond to the Government's attack on this science, Defendant located a tremendously qualified and impressive expert in implicit or unconscious bias, Dr. Christine L. Ruva, Exhibit 2. Dr. Ruva, a professor and campus chair at the University of South Florida, holds a Ph.D. in psychology and has studied cognitive science, focusing on the effects of pretrial publicity on jurors, for over 25 years. With a focus on cognitive science in the legal system, Ruva has researched and analyzed the effect of pretrial publicity on jurors' decisions, perceptions, emotions, memories, interpretation of trial evidence, and deliberation behavior; and has published 29 heavily cited, peer reviewed works in her career, all focused on the acute issue at hand. Notably, Ruva has conducted mock trials which have shown that 1) jurors biased with negative pre-trial publicity cannot separate the biasing information from the information presented at trial, and 2) jurors exposed to negative pre-trial publicity were unable to correct the influence of the media on their decisions. In her 2015 study F*rom the Shadows into the Light: How Pretrial Publicity and Deliberation Affect Mock Jurors' Decisions, Impressions, and Memory*; Ruva found that **when jurors were presented with a prosecution case devoid of enough evidence to actually convict; a majority of jurors biased with negative pretrial information choose to convict anyway**.

Dr. Ruva's conclusion, after reviewing the journal article citations listed in Exhibit 8, and evaluating Fischer's motion to change venue and its various exhibits on implicit bias agrees with Fischer's position, asserts that:

> "Unfortunately, once the jury pool is tainted, remedies to reduce or eliminate this taint have been found to be ineffective" […] "even if PTP-exposed jurors want to abide by jury instructions and base their verdict decisions only on evidence presented at trial, they are likely to be unable to do so due to predecisional distortion, source memory errors, and emotion—all of which are outside of jurors' conscious control. It is my

conclusion that there is evidence that the media coverage surrounding the January 6th cases will make it difficult to seat an impartial panel of jurors from the D.C. area for the Fischer trial."

Our motion, and Ruva's work on implicit cognition has referenced research from another highly respected authority in the field, Dr. Calvin K. Lai, Associate Professor of Psychological & Brain Sciences at Washington University in St. Louis, who has, for more than a decade, studied implicit bias, and the success and failure of interventions aimed at reducing, or altering it, and has published some of the most heavily referenced research on the topic in dozens of peer reviewed papers. While Ruva's focus is the effect of biased media on jurors, her work intersects with Lai's focus on the tools to influence, and thereby reduce, implicit biases, frequently referred to in the field as "interventions." Calvin Lai's latest studies have been focused on conducting large scale meta-analyses to discover what tools and de-biasing strategies show effectiveness in altering implicit bias. Lai's results were conclusive. His first meta-analysis in 2016 *Reducing Implicit Racial Preferences: II Intervention Effectiveness Across Time* examined if changes to implicit preferences last:

> We tested 9 interventions [...] to reduce implicit racial preferences over time. In 2 studies with a total of 6,321 participants, all 9 interventions immediately reduced implicit preferences. However, none were effective after a delay of several hours to several days. We also found that these interventions did not change explicit racial preferences and were not reliably moderated by motivations to respond without prejudice.

Lai's second meta-analysis, A Meta-Analysis of Procedures to Change Implicit Measures, in 2019 expanded on his 2016 work evaluating the effectiveness of nearly 500 previous studies:

> The study analyzed 492 studies involving 87,418 participants, and found that interventions to reduce implicit bias had only a small effect and were not long-lasting [...] the study found little evidence to show that these changes lead to a shift in people's explicit attitudes (the beliefs and attitudes they're conscious of and can express) or their actual behaviors. This means that even if we manage to alter these hidden biases, it doesn't necessarily result in people acting differently or changing what they consciously believe

Dr. Lai found that virtually no intervention produced any meaningful change to bias. Any changes that were initially observed had vanished within a few hours to days, with little evidence that observed changes could lead to changes in actual behaviors.

Not only has Dr. Ruva referenced Dr. Lai's work in her research, but the Federal Government too has endorsed and relied on his work, with DOJ citing him as an "expert in bias" in their November 2022 DOJ training program "Managing Bias for Law Enforcement: A New Training Course for Policing Agencies," and in the Federal Judicial Center study, "*Federal and State Court Cooperation: Effectiveness of Implicit Bias Trainings*."   In addition to these two government studies, the cognitive phenomenon of implicit bias has been widely adopted across the whole of the US Federal Government, from Federal Courts, to FBI, USDA, NIH, EEOC, DOD, and DHS training and policy, to name a few. It is contradictory for the Government to now argue implicit social cognition has no significance in this case, while it is widely adopted across the Federal Government, including their own DOJ.

Having examined the limitations of *voir dire* in addressing implicit bias, we now turn to the Government's broader assertion that there is no proof implicit bias would be greater in D.C.:

> Fischer's argument, moreover, is not specific to D.C. If voir dire cannot correct for implicit bias in D.C., then it can do no better in the Middle District of Florida. Fischer's point is that implicit bias is everywhere; he provides no indication that implicit biases are more or less extensive in his preferred district.

Implicit biases are indeed everywhere, *in general*, affecting situations in a wide range of ways, such as how a name on a job application is judged, or how someone treats another based on the physical attributes of the person they interact with, etc.; but the data in Fischer's change of venue motion is *specific* in proving a substantially higher percentage of exposure to January 6th pre-trial publicity in D.C., as compared to every other Federal District in the country. Implicit biases are fostered by *exposure*, and because the pre-trial publicity related to January 6th cases

is, according to the Meltwater analysis, overwhelmingly negative, substantial formed negative biases can be assumed. The Government's argument fails to recognize that biases are developed through exposure. The obvious difference between the jury pool in D.C. and in the Middle District of Florida is the vast disparity in pre-trial publicity surrounding the events of January 6th, between D.C., ranked #1 in per capita media exposure, and the Middle District of Florida, comparatively ranked #21. (original Exhibit A).  Individual residents of D.C. were exposed to January 6th media at a rate 1060% higher than individuals in Florida's Middle District. This shocking disparity evidenced in the Meltwater data leads to the obvious conclusion that the D.C. jury pool is exponentially more prone to implicit biases. However, hypotheses are not needed. Studies of how implicit biases are formed support this conclusion. One study, *Effects Of Long-Term Exposure To News Stereotypes On Implicit And Explicit Attitudes* (2015)*,* set out to prove, or disprove, the hypothesis that "**long-term exposure to news stereotypes can influence implicit attitudes**" and found that "empirical data generally confirmed this prediction" as "previous exposure to mass-mediated stereotypical cues promote the formation and entrenchment of stereotypes in individuals' memory, making them easily accessible as cognitive shortcuts." In another study examining implicit biases in police officers, *The Stability of Implicit Racial Bias in Police Officers* (2017), it was found that:

> If an officer is consistently exposed to information that confirms their attitudes, then those attitudes (and subsequent influences on behavior and decisions) will likely get stronger. For example, if an officer works in a predominately African American neighborhood with a high crime rate, they may begin to believe African Americans are more dangerous than Whites. This bias could be explicit (i.e., they would claim it when asked about their attitudes) or it may be subtle and implicit (i.e., they may not be aware they have an association between African Americans and crime)

Another meta-analysis, referenced by Dr. Ruva in her work, *The Effects of Pretrial Publicity on Juror Verdicts: A Meta-Analytic Review* published in 1999, explains how juror's

behaviors are influenced by pre-trial publicity, as compared to less exposed jurors. They studied the different influences of pretrial publicity on verdicts by performing 44 empirical tests representing 5,755 participants, and found that:

> The data support the hypothesis that negative pretrial publicity significantly affects jurors' decisions about the culpability of the defendant. Jurors exposed to publicity which presents negative information about the defendant and crime are more likely to judge the defendant as guilty than are jurors exposed to limited PTP.

They also found that when examining "the opinions of residents from communities in which crimes have occurred", that "residents who recalled greater amounts of PTP information [were] also more likely to prejudge the defendant as culpable for the crime compared to those residents who recall lesser amounts of information." Another study *Authoritarianism, Pretrial Publicity, And Awareness Of Bias In Simulated Jurors* from back in 1975, before implicit cognition was identified and fully understood, was able to measure these effects while not yet identifying the mechanisms by which they occurred. The study found that individuals who had been exposed to negative pre-trial publicity yet said they could render a fair and impartial verdict, were more likely to convict than those who had not been exposed to PTP. These exposed jurors viewed the prosecution's case to be stronger, based on the pre-conceived implicit biases influencing their perception of reality:

> With respect to pretrial publicity, subjects in the damaging condition were more likely to render guilty verdicts than those in the neutral condition. Thus, subjects who were exposed to damaging pretrial publicity returned more guilty verdicts than those exposed to neutral pretrial publicity, despite their claims that they had not been biased by the damaging but inadmissible evidence. [...] Negative pretrial publicity may serve to affect jurors' perceptions of how convincing the courtroom evidence is. [...] Subjects in the damaging condition rated the prosecution's case as being stronger than those in the neutral condition. They also rated the defense's case as less convincing than did subjects in the neutral condition. Thus, the total effect of negative pretrial publicity was to increase ratings of the prosecution's case and to lower the defense's case.

Analysis of media exposure and the direct correlation to development of implicit biases support the notion that with increased exposure, comes increased bias. This study, *Confirming Bias Without Knowing? Automatic Pathways Between Media Exposure and Selectivity*, focused on examining the automatic pathways between media exposure and reinforcing stereotypes and biases, and analyzed the effect of repeated exposure on both implicit bias, and explicit bias. They found that while repeated exposures to media initially increased *explicit biases*, the increase in bias had a leveling off effect or diminishing returns. Thus, future increased exposures over time did not *necessarily* increase explicit, overt bias; describing this relationship between the increased exposure and increased explicit bias as curvilinear. However, in contrast, repeated exposure's effect on *implicit bias* had an entirely different effect. The study proved that implicit biases increased consistently with each exposure and had no leveling off effect or diminishing return; meaning that future increased exposures over time *did necessarily* increase implicit, unconscious bias, describing this relationship between the increased exposure and increased bias as monotonic. While explicit stereotypes may plateau or diminish after a certain threshold of media exposure, implicit stereotypes do not, indicating a more insidious and persistent form of bias that continues to grow with increased media exposure.

> "Research examining the effects of news primes on the activation of stereotypes demonstrates "dose-dependent effects" such that a curvilinear relationship appears to exist between exposure frequency and explicit stereotypes whereas a monotonic relationship best describes the relationship between exposure and implicit stereotype activation. In other words, the effect of media priming on explicit stereotype activation seems to deteriorate at high frequency levels, with no such decay emerging for implicit priming" […] "This does not negate the well-documented ability of even a single media exposure to prompt overt and explicit forms of bias; however, it reveals that there may be exposure thresholds [...] in the context of explicit stereotype activation that do not exist for implicit bias. Accordingly, recognizing implicit stereotypes in this context is critical as they appear to better predict both prejudice and discrimination as well as affective responses to outgroup members, than explicit views."

To further support the research in the initial motion, the Defendant located an expert in the Forensic Psychiatrist field, Dr. Carole Lieberman, resume attached as <u>Exhibit 3</u> and declaration attached as <u>Exhibit 4</u>, to review the motion and exhibits. Dr. Leiberman, a Medical Doctor and Board Certified psychiatrist for over 35 years, and a Diplomate of the American Board of Psychiatry and Neurology, upon reviewing the motion and exhibits, had found that: "because the events of J6 took place in the District of Columbia [...] the jury pool would feel as though they were in – and still are in – danger [and] would feel the threat more directly." and that "The Capitol Building has been a constant reminder of J6, as D.C. jury pool members walk and ride about the city. Add to this the number of D.C. politicians who have made it their goal to never let D.C. residents forget the horror of that day, so that the jury pool still feels personally attacked." Dr Lieberman also supports the conclusions as relates to implicit bias, stating that:

> Implicit Bias is the biggest threat to a fair trial. Implicit bias – or unconscious bias – cannot be willed away. It is the favorable or unfavorable feelings that people have towards others that come from their own life experiences, since childhood. There are three parts to the human psyche: conscious, pre-conscious and unconscious. Things in our unconscious mind – like implicit biases – cannot be made conscious by sheer will or by *voir dire*. By definition, we cannot make that which is unconscious, conscious. [and] *Voir Dire* has been used to try to elicit biases when selecting a jury, but it has had poor results at best. This is because *voir dire* is an intellectual, logical or cognitive process, whereas implicit or unconscious bias has to do with feelings, not thoughts. Potential jurors are asked questions and they try to think of the answers. Even when they are trying their best to be honest, they are answering from their intellectual brain – not their feeling brain that deals with emotions. So, D.C. jurors can't be expected to ignore everything they've experienced related to J6 from having been bombarded by negative media exposures to fear of being attacked themselves. Therefore, it is impossible for them to clear their mind of all implicit bias in order to consider only the evidence presented at trial in order to come to a fair and accurate verdict.

As Dr. Liberman confirms in the attached affidavit, it was never scientifically sound to imagine that judges could ask prospective jurors – to their logical minds as opposed to emotional nature – if the jurors can be unbiased. Scientific discovery post-Haldeman has revealed that the conscious mind is not capable of understanding the internal motivations and emotional currents stirring beneath the surface – even in one's own mind. Furthermore, research now shows that

instructing a biased person not to be biased can have the opposite effect, inflaming and irritating the listener, or bringing bias to the surface.

Moreover, this type of bias is mostly group-oriented.  While there are cases where one individual defendant is the subject of massive pre-trial publicity, such as domestic bomber Timothy McVeigh, more commonly is bias between groups, whether Irish vs. Italians in the late 1800s in Boston, the enduring grudges of the Hatfields vs. the McCoys, Protestants vs. Catholics in Northern Ireland, civil wars in Serbia and Bosnia, whatever the group conflicts might be.  The applicability to Fischer is apparent. J6 prosecutions have become collectivized, so that everyone at some unidentified distance from criminal behavior becomes guilty of those crimes due to "joining a mob" in unspecified, ambiguous ways.  The prosecutions involve names unknown to the public, but are dominated by associations:  Proud Boys, 3 Percenters, Oath Keepers, Antifa, Insurrectionists.  These terms alone are impactful and resurrect biases, both implicit and explicit.

### H.  MELTWATER/WATCHPOST ANALYSIS DEMANDS VENUE TRANSFER

The Government first misunderstands and then responds amiss to the data presented in the motion.  The presentation of Watchpost Analytics by Brad Rukstales is a streamlined and shortened version of the highly credible information provided by Google Trends and Meltwater. See, declarations and analyses of Brad Rutkastales, WatchPost Analytics, at Exhibits 5, 6, and 7. It was intended to stand upon the credibility and qualifications of unimpeachable (identified) sources like Google without requiring the Court to wade through the weeds.

*First*, the Government does not notice that its concerns would be identical for all forms of pre-trial publicity or legal analysis.  On Page 7, the Opposition states:

> Fischer's data may be even less predictive of prospective jurors' opinions than survey data. The fact that certain search terms appeared with a particular frequency in a given jurisdiction says little about the actual influence of those terms on prospective jurors.

But this "may be" is a statement of untethered possibility.   Overwhelming pre-trial publicity – sought out by potential jurors – raises near certainty that the data is highly predictive.

_Second,_ the Government misses that jurors are seeking this information out, *actively*.

_Third,_ we confront the fact that the thirst for information about January 6 and prosecutions of January 6 defendants is vastly different throughout the nation than the high concentration in Washington, D.C., where the events occurred.   Why is that?

_Fourth,_ the Government cannot escape the content and nature of the pre-trial publicity, being nearly entirely negative in the extreme, and even of a hysterical end-of-the-world nature insisting that the United States of America almost ended on January 6, 2021.   Those present at the Capitol report an irreconcilable disparity between news coverage and what they saw.

In evaluating the desire for the pre-trial publicity unique to Washington, D.C., one must look to what the content was.   It was not balanced or nuanced nor even consistent with America's traditions of due process.   All defendants were declared guilty, guilty by association, and guilty of the worst possible crimes called in the news essentially treason.   In contradiction to even the charging decisions of the Department of Justice, the pre-trial publicity falsely submerged D.C. with the "fact" that 100% of all persons in or around Capitol Hill on January 6, 2021, behaved in exactly the same way, that all were violent, all battled with police, and everyone damaged the U.S. Capitol.   The content of the pre-trial publicity that D.C. residents hungered to consume included false claims that five (5) police officers died, when zero (0) died.

The Government would have us turn a blind eye to _what_ the pre-trial publicity was.   The Opposition argues that mere exposure does not prove bias.   But it does.   We know _what_ pre-trial publicity the jury pool received.   The pre-trial publicity was not even-handed or non-committal.

_Fifth_, the Opposition would discard all precedents, claiming that the data "says little about the actual influence of those terms on prospective jurors."   This is inconsistent with all precedents on Due Process and change of venue.  Massive pre-trial publicity is presumed to have an "actual influence … on prospective jurors."   And note that even seemingly benign publicity, not applicable here, may prejudice the nuances of affirmative defenses, mistaken identity, state of mind requirements, or other issues important to the trial but obscured in pre-trial publicity.

On page 8, the Opposition states that

> Fischer first relies on an analysis of media dissemination, across media markets, in a failed attempt to prove prejudice. See ECF No. 179 and 179-1. The seventy slides worth of graphics analyzing buzz words boil down to the same point: D.C. jurors are purportedly exposed to January 6 media coverage at a higher rate than anywhere else in the country and that exposure ("reach") must equate to bias.

This is sufficient to demand a change of venue.  Again, the core fact here is that, in addition to the clearly demonstrated media saturation, prospective jurors are _choosing_ to seek out this reporting.  That makes this like no other case of venue.  The statement made by the Opposition is proof that a change of venue is required.

Also, in this attempt to wish away the data, the Opposition confuses an absolute certainty of bias with an unacceptable risk of a violation of constitutional Due Process.   The data shows that the risk is unacceptably high and cannot be reconciled with the Sixth Amendment and Due Process requirements of the U.S. Constitution.

III.    **CONCLUSION**

Notwithstanding past practice or precedents, the easy, simple, low-cost solution of transferring venue is the best safeguard to ensure a fair trial for Fischer in this case.

The potential D. C. juror pool has been inundated with January 6, from the event itself, to Congressional proceedings of the January 6th Select Committee, to incendiary, often inaccurate, language by government officials.  This incessant feedback loop has created a synergy and

further fueled the perception among D.C. residents that they are victims. The civil lawsuit by Attorney General Racine on behalf of *all residents* of D.C. further reinforces this notion of victimhood. Self-perceived victims simply *cannot* serve on a jury in a prosecution of the very alleged crime for which they perceive themselves to be victims.

The profound impact of technology on juror biases, epitomized by the revealing insights from the digital data in this case, urgently calls for a change of venue. The stark reality of potential constitutional rights deprivation, notably the right to a fair trial, demands immediate recognition.  Change of venue upholds the required appearance of impartiality in addition to upholding the actual constitutional right to trial by a jury of your peers.

Dated:  February 29, 2024          Respectfully submitted,

                                         GEORGE T. PALLAS, P.A
                                         Counsel for Alan Fischer III
                                         Bar No:  FL0108
                                         2420 SW 22nd Street
                                         Miami, FL 33145
                                         305-856-8580   305-860-4828 FAX
                                         gpallas@beckhamsolis.com

                                         By:/s/ *George T. Pallas*
                                         GEORGE T. PALLAS, ESQ.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been electronically filed with the Clerk of Court using CM/ECF system which will send notification of such filing.

                                         By:/s/ *George T. Pallas*_____
                                         GEORGE T. PALLAS, ESQ.