9355(a), the Speaker had appointed Mr. ROGERS, of Colorado; Mr. FLYNT, of Georgia; Mr. MINSHALL, of Ohio; and Mr. BROTZMAN, of Colorado as members of the Board of Visitors to the U.S. Air Force Academy, on the part of the House.

The message also informed the Senate that, pursuant to the provisions of 10 U.S.C. 4355(a), the Speaker had appointed Mr. TEAGUE, of Texas; Mr. NATCHER, of Kentucky, Mr. RHODES, of Arizona, and Mr. PIRNIE, of New York as members of the Board of Visitors to the U.S. Military Academy, on the part of the House.

The message further informed the Senate that, pursuant to the provisions of 10 U.S.C. 6968(a), the Speaker had appointed Mr. FLOOD, of Pennsylvania; Mr. MACHEN, of Maryland; Mr. LIPSCOMB, of California; and Mr. MORTON, of Maryland, as members of the Board of Visitors to the U.S. Naval Academy, on the part of the House.

The message also informed the Senate that, pursuant to the provisions of 14 U.S.C. 194(a), the Speaker had appointed Mr. ST. ONGE, of Connecticut, and Mr. WYATT, of Oregon, as members of the Board of Visitors to the U.S. Coast Guard Academy, on the part of the House.

The message further informed the Senate that, pursuant to the provisions of 46 U.S.C. 1126(c), the Speaker had appointed Mr. CAREY, of New York, and Mr. BURKE, of Florida, as members of the Board of Visitors to the U.S. Merchant Marine Academy, on the part of the House.

---

## AUTHORITY FOR SECRETARY OF THE INTERIOR TO ENGAGE IN FEASIBILITY INVESTIGATIONS OF CERTAIN WATER RESOURCE DEVELOPMENTS—CONFERENCE REPORT

Mr. JACKSON. Mr. President, I submit a report of the committee of conference on the disagreeing votes of the two Houses on the amendments of the House to the bill (S. 1788) to authorize the Secretary of the Interior to engage in feasibility investigations of certain water resource developments. I ask unanimous consent for the present consideration of the report.

The PRESIDING OFFICER. The report will be read for the information of the Senate.

The bill clerk read the report, as follows:

The committee of conference on the disagreeing votes of the two Houses on the amendments of the House to the bill (S. 1788) entitled "An act to authorize the Secretary of the Interior to engage in feasibility investigations of certain water resource developments," having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate to the amendments of the House to the text and title of the bill; and agree to the same.

HENRY M. JACKSON,
CLINTON P. ANDERSON,
T. H. KUCHEL,
*Managers on the Part of the Senate.*
HAROLD T. JOHNSON,
JAMES A. HALEY,
ED REINECKE,
*Managers on the Part of the House.*

The PRESIDING OFFICER. Is there objection to the present consideration of the report?

There being no objection, the Senate proceeded to consider the report.

Mr. HANSEN. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The bill clerk proceeded to call the roll.

Mr. HANSEN. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

Mr. LONG of Louisiana. Mr. President, I object.

The PRESIDING OFFICER. Objection is heard.

The rollcall was continued.

Mr. JACKSON. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Is there objection? The Chair hears none, and it is so ordered.

Mr. JACKSON. Mr. President, the managers on the part of the House at the conference on S. 1788, to authorize the Secretary of the Interior to engage in feasibility investigations of certain water resource developments, voted to recede from the disagreement of the House to the Senate amendment to the previous House amendments.

When the bill, S. 1788, first passed the Senate it authorized the Secretary of the Interior to conduct investigations to determine the feasibility of four potential reclamation projects. Such authorization is required by section 8 of the act of July 9, 1965—79 Stat. 213, 217. The bill was amended in the House to include two additional feasibility investigations and to provide for the preparation of a reconnaissance report—a step which is normally preliminary to a feasibility investigation—on what was described as the "California coastal diversion project," consisting of subsurface offshore conveyance of water from the Eel-Klamath River areas to an appropriate terminal point in southern California.

Upon return of the bill to the Senate, the Senate in effect concurred in the first of these amendments—that providing for additional feasibility investigations—but declined to accept the second—that providing for the reconnaissance study. The Senate was not opposed to this particular reconnaissance study, but we based our disagreement on the belief that specific authorization for a study of this type might set an undesirable precedent. We believe it is wrong to attempt to set priorities for reconnaissance surveys by statute. The Secretary of the Interior is already authorized to make these surveys under his general investigative authority, subject to availability of funds.

It was the unanimous belief of the members of the conference committee and the recommendation of the members from the House that the House should recede from its disagreement to the Senate's amendment to the House amendments to S. 1788. In so doing, all members of the conference committee agreed that acceptance of this amendment to the amendments is not to be taken as in any way indicating a lack of interest in seeing the reconnaissance survey go forward. On the contrary, it was agreed by the conferees that, particularly in view of its relation to certain feasibility investigations authorized in section 2 of the act of September 7, 1966—80 Stat. 707, 710—the survey should be given a priority position by the Department of the Interior and the Bureau of Reclamation. It is our hope that the Department will sumbit a report on its study to the two Houses of Congress not later than December 31, 1970.

Mr. President, I move the adoption of the conference report.

The PRESIDING OFFICER. The question is on agreeing to the motion of the Senator from Washington.

The motion was agreed to.

---

## INTERFERENCE WITH CIVIL RIGHTS

The Senate resumed the consideration of the bill (H.R. 2516) to prescribe penalties for certain acts of violence or intimidation, and for other purposes.

Mr. LONG of Louisiana. Mr. President, those of us who rise in objection to H.R. 2516 do so in a sincere effort to preserve the American constitutional and legal system for all Americans of all races and all generations. This measure comes before us at a time of never-ending agitation on racial subjects by both designing and sincere men, impairs our national sanity and diminishes in substantial measure the capacity of our public men to see the United States steady and to see it whole. It is as indefensible a legislative proposal as was ever submitted to any legislative body in this country. The bill before this body today is based on the rather strange thesis that the best way to promote the civil rights of some Americans is to set them off as a privileged group entitled to special treatment by Federal authorities and in so doing, reduce the supposedly sovereign States to meaningless entities on the Nation's map.

In urging passage of H.R. 2516, the proponents advance as their justification an insulting and insupportable indictment of a whole people.

They say that southern officials are generally faithless to their oaths as public officers and for that reason can and should be justifiably denied their right and duty to protect the rights of our citizens guaranteed them under our laws.

If this bill should be allowed to slip by Congress and successfully run the constitutional gauntlet, it would vest in a single fallible human being, namely the temporary occupant of the office of the Attorney General, regardless of his character or qualifications, autocratic and despotic powers which have no counterpart in American history and which are repugnant to the basic concepts underlying and supporting the American constitutional and legal systems. H.R. 2516 has as its stated purpose to create a whole new sphere of jurisdiction for action in enforcement and vindication of the civil rights of private persons at public expense, and to confer upon the Attorney General the despotic power to grant or withhold the supposed benefits of the new procedure at his uncontrolled discretion.

In consequence, the bill offends the basic American concepts that ours is a

government of laws rather than a government of men and that courts are created to administer equal and exact justice according to certain and uniform laws applying alike to all men in like situations.

H.R. 2516 is deliberately designed to vest in the Attorney General the autocratic and despotic power to supersede the State laws duly enacted by State legislatures in the undoubted exercise of the legislative power reserved to the States by the 10th amendment. As a consequence, the bill is wholly incompatible with the constitutional doctrine of the sovereignty and indestructibility of the States. Even apart from this consideration, H.R. 2516 is inimical to proper Federal-State relations because it proposes to place in the hands of the Attorney General a legal club by which he can browbeat State and local officials into submission to his will and thus assume control of what are essentially State or local governmental matters.

We would do well to appraise at its full value the everlasting truth embodied in Daniel Webster's assertion that:

Whatever government is not a government of laws is a despotism, let it be called what it may.

Consequently, our ancestors based the governmental and legal systems of America upon these fundamental concepts:

First. That our Government should be a government and not a government by men—a government in which laws should have authority over men, not men over laws.

Second. That our courts should administer equal and exact justice according to certain and uniform laws applying in like manner to all men in like situations.

In writing our fundamental legal document those great Americans at the Constitution Convention of 1787 comprehended in full measure the everlasting political truth that no one man or set of men can be safely trusted with governmental power of an unlimited nature. To prevent the exercise of arbitrary power by the Federal Government, they inserted in the Constitution of the United States the doctrine of the separation of governmental powers.

In so doing, they utilized the doctrine of the separation of powers in a twofold way.

They delegated to the Federal Government the powers necessary to enable it to discharge its limited functions as a central government and left to the States all other powers. It was this use of the doctrine of the separation of powers which prompted Chief Justice Salmon P. Chase to make these memorable remarks in his opinion in *Texas* v. *White* (7 Wall 700):

Not only, therefore, can there be no loss of separate and independent autonomy to the States through their union under the Constitution, but it may be not unreasonably said, that the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National Government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States. (*Texas* v. *White*, 7 Wall 700.)

In their other utilization of the doctrine of the separation of powers, the members of the Convention of 1787 vested the power to make laws in the Congress, the power to execute laws in the President, and the power to interpret laws in the Supreme Court of the United States and such inferior courts as the Congress might establish. Moreover, they declared, in essence, that the legislative, the executive, and the judicial powers of the Federal Government should forever remain separate and distinct from each other.

Since the two governments, Federal and State, exist within the same territorial limits, it is obviously indispensable to the proper functioning of both of them for each of them to exercise its powers in such a manner as not to interfere with the free and full exercise of the powers of the other.

History makes it crystal clear that the Constitution of the United States would never have been ratified by the requisite number of States if they had not been assured that it would be so amended as to embrace the principle enunciated by the 10th amendment.

The amendment declares that—

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively or to the people.

The legislatures of the several States have adopted laws which I dare say adequately cover all of the wrongdoing which the bill before us today purports to correct.

Happily for America, one may search the legislative annals of our country without finding anything corresponding to the monstrous proposal that a single Federal executive officer, to wit, the Attorney General, should be given the autocratic and despotic power to supersede valid State laws in particular cases to be selected by him. It is submitted in all sincerity that the proposal is utterly repugnant to the constitutional doctrine of the indestructibility and sovereignty of the States.

Congress itself is without authority to nullify State statutes enacted by State legislatures in the undoubted exercise of the legislative powers reserved to the States by the 10th amendment, and that Congress cannot delegate to a Federal executive officer an authority not possessed by it.

It would be well for our country if those who advocate this unprecedented proposal would pause and ponder these words from the Supreme Court decision in Carter against Carter Coal Co.

Every journey to a forbidden end begins with the first step, and the danger of such a step by the Federal Government in the direction of taking over the powers of the States is that the end of the journey may file the States so despoiled of their powers, or—what may amount to the same thing—so relieved of the responsibilities which possession of the powers necessarily enjoins as to reduce them to little more than geographical subdivisions of the national domain. It is safe to say that if, when the Constitution was under consideration it had been thought that any such danger lurked behind its plain words, it would never have been ratified.

That is the Supreme Court of the United States speaking, Mr. President.

The contents of the bill before the Senate today carries implicit in it, unwise and unwarranted tampering with this constitutional concept of divided governmental authority. This does violence to one of the hallowed principles on which this Government is constituted and has so long endured. Before taking such a drastic step we would do well to ponder these eloquent words of Daniel Webster:

Other misfortunes may be borne, or their effects overcome. If disastrous wars should sweep our commerce from the ocean, another generation may renew it; if it exhausts our treasury, future industry may replenish it; if it desolate and lay waste our fields, still, under a new cultivation, they will grow green again, and ripen to future harvests.

It were but a trifle even if the walls of yonder Capitol were to crumble, if its lofty pillars should fall, and its gorgeous decorations be all covered by the dust of the valley. All these may be rebuilt. But who shall reconstruct the fabric of demolished government? Who shall rear again the well-proportioned columns of constitutional liberty?

Who shall frame together the skillful architecture which united national sovereignty with State Rights, individual security, and Public prosperity?

No, if these columns fall, they will be raised not again. Like the Colosseum and the Parthenon, they will be destined to a mournful and melancholy immorality. Bitterer tears, however, will flow over them than ever were shed over the monuments of Roman or Grecian art; for they will be the monuments of a more glorious edifice than Greece or Rome ever saw—the edifice of constitutional American liberty. (Daniel Webster, 1832).

As just one example of a number of absurdities in this bill, let me cite the following:

Some Members of the House of Representatives, in an effort to assure that the bill contain nothing in its provisions which would in any way hamper the national guardsmen and law enforcement officers, engaged in the fulfillment of their responsibility for keeping the public order. These people, who have been on the front lines of numerous riots and disorders in recent years, deserve every bit of aid we can give them in performing their thankless task. To do anything which would further tie the hands of those sent into pitched battle to quell these senseless riots would be the very height of folly.

Realizing this, the House added a floor amendment to this bill which said:

Provided, however, That nothing within this section shall be construed so as to deter any law enforcement officer from lawfully carrying out the lawful duties of his office or enforcing lawful ordinances and laws of the United States or their political subdivisions.

Mr. President, one searches in vain in the bill before us for any such guarantee. In fact, I find nothing in the language of the Committee version of H.R. 2516 which in any way seeks to keep this entangling web of legal double-talk anything which would keep this bill from ensnaring the local officials and thwarting their efforts to keep the peace.

Let me cite an example of what could develop should this bill unwisely be written into law. My example comes from a case which grew out of a Negro demonstration in Baton Rouge, La., a few years ago. Known as Cox against Louisiana, this case—which was mentioned on this

floor prior to the time of this debate—was ultimately decided by the U.S. Supreme Court.

In this case, the Supreme Court reversed the Louisiana Supreme Court which has affirmed the conviction of the appellant Cox as a leader of a large group of some 2,000 Negro students who had assembled near the courthouse in Baton Rouge, in protest of the arrest the previous day of other Negro students for picketing stores that maintained segregated lunch counters.

In their march on the courthouse, the mob of 2,000 was halted near the courthouse by officers and were told by the police chief to stay on the west side of the street, where they sang songs, displayed banners, clapped their hands, and listened to a speech by Cox. The sheriff construed as inflammatory Cox's concluding remark to "sit in" at uptown lunch counters and ordered dispersal of the mob.

When it was not forthcoming, officers dispersed the mob and arrested Cox the next day for disturbance of the peace, obstructing public passages, and courthouse picketing—all of which was contrary to the State law. It was brought out in the record that the exhortations of the mob had elicited responses from the students who were in jail. Cox was convicted and it was affirmed until the Supreme Court of the United States reversed the conviction.

The Court held that the breach of the peace statute was unconstitutional because of vagueness—get this, Mr. President—vagueness in its overly broad scope and that because local officials had allowed other groups on occasions to parade, there was no unlawful obstruction of traffic or the streets. Thus, the Court ruled that Cox and the whole group were lawfully assembled.

An appropriate question can be raised as to what could have happened had the present civil rights bill, H.R. 2516, been in effect when the sheriff broke up the mob and arrested Cox.

This would have been not only an attempt but an actual interference with persons because of race, and so forth, attempting to engage in the activities covered in the bill, and Cox made a speech along this line which is protected specifically in the bill. This in itself could be up to a 1-year crime for anyone who interfered with Cox and his followers. If there were any allegations of club swinging, and so forth, in breaking up the mob the 10-year felony aspects of the instant bill would apply. Tear gas was used, and that might be called bodily injury, depending on how that term would be construed in the courts.

As a matter of fact, to my certain knowledge in that particular case, the police used police dogs to back the mob off. I would assume that in some particular instances the dogs might have torn some persons' trousers, or at least come in contact with them, but no one was seriously injured, and the sheriff preserved the peace and enforced the laws, which, insofar as he knew, were valid up to that time, and were laws which previous Supreme Courts of the United States would have held valid.

CXIV——82—Part 1

Under such a law, half of the Baton Rouge Police Force could have been thrown into jail and/or fined for performing the duty which the laws of Louisiana imposed on them.

Such a situation would be ridiculous and completely intolerable. To the already intimidated and hamstrung law enforcement officials of this Nation, such a law would appear to prove that the last vestiges of sanity have been removed from the rules they live by.

Just what does it presage—this bill that would make it a Federal crime to interfere with or "intimidate" anyone seeking to exercise his rights in the form of voting, running for office, or other such prerogatives? If this pending legislation should become law, then a Federal prison term might become the consequence of interference with such activities.

At first blush, this might not seem unreasonable. At least, not to me. For I believe that activities are basic tenets of the free democratic system, and should not be tampered with. But the great danger with legislation of this type is not the underlying ideal or motive, but the machinery which it creates and utilizes to effect such an ideal.

As the Senator from North Carolina [Mr. ERVIN] has already so ably pointed out in this debate, it is folly to believe, with respect to civil rights enforcement, that the Department of Justice is always just. My concern is that this measure could be misinterpreted and stretched by some overzealous Federal official as a vehicle for intrusion into every city, county, and State in the Union in areas ranging from elections to juries.

And my greatest immediate concern is the unwitting stumbling block it could place before State and local officials in their honest attempts to detain and prosecute the incendiary rabblerousers who seem bent on destroying the great cities of America.

Mr. President, as I pointed out earlier, my best information on this subject is that we have today about 50,000 vacancies on police forces in the United States. These vacancies exist because the police have been discouraged from doing their jobs. They have not received the kind of public support to which they are entitled. Further, they are not even adequately compensated in pay. But even more than that, they are frustrated when they seek to enforce the law, as a result of decisions that they have seen recently from the Supreme Court—decisions which further and further have protected the criminal from society, rather than moving in the other direction, the protection of society from criminals. The police arrest these culprits or criminals only to see them turned loose by technicalities, particularly technicalities invented in recent years by the Supreme Court of the United States.

So it is difficult to attract competent people to apply for law-enforcement jobs and qualify themselves to take over these positions.

Here we have a proposed law before us that would make it even more difficult, especially in Southern States, to have people with knowledge take those jobs. Why, because they would have a duty to protect society on one hand, and

then, on the other hand, be required to act at their peril in the event the court did not uphold the statutes they would be asked to enforce. It is bad enough to turn the culprits loose, but this law would cause, not the criminal, but the police officer, to be put in jail or fined because he was doing his duty in enforcing the laws of the State or ordinances of the city.

In addition, Mr. President, to the extremely valid points that some of my colleagues have made against this bill, I recently came across a column by the nationally syndicated columnist, Mr. James J. Kilpatrick, which appeared in the Washington Star of November 2, 1967. Mr. Kilpatrick raises questions that I believe all of us here today should take the time to ponder:

There was a time, in the earlier days of the Republic, when such debates were everyday affairs. They come along quite seldom now. The general theory seems to be that the Congress can enact whatever laws it pleases; not much is heard of the old doctrine, spelled out in the Tenth Amendment, that the powers of the federal government are limited by the Constitution.

Addressing himself to the deficiencies of the bill, Mr. Kilpatrick continues:

On the face of it, the House bill seems plausible. On closer examination, it becomes evident that the measure goes far beyond the powers of Congress. The bill would establish an entirely new class of federal crimes based in part upon the enforcement of a non-existent federal right, i.e., the right to be protected from acts of private discrimination. No such right is known to the law. The Fourteenth Amendment surely does not convey it.

The bill's punitive provisions, ranging up to life in prison, would be triggered when any person by force or threat of force interfered with another person by reason of his race, color, religion, political affiliation, or national origin.

Mr. President, how far do people propose to go with some of these things? I can recall so well in days of politics in my own State when it was almost traditional at election time for both sides to have a good, first-class fist fight around some of the ballot boxes on election day. The State administration would be supporting one candidate and the city administration would be supporting another, and the State wanted to see to it that the city policemen did not interfere with the polls, and the city policemen wanted to see that the State officials did not interfere with the polls. The result was that they would have a first-class donnybrook. This, of course, over a period of time we have managed to iron out, but it could conceivably happen again.

But of what possible interest is it to the Federal Government that a hotly contested election between two different groups, one a city organization and another a State organization, both Democratic, have a first-class, knockdown fight? Of what possible interest should that be to the Federal Government? Yet here we have a proposed statute providing that, because of a difference in religion or political affiliation, the Federal Government must step in and act because someone has interfered, by force, with another person. It was never even

**1290**                    CONGRESSIONAL RECORD — SENATE                    *January 29, 1968*

suggested, so far as I can recall, that because one man might be a Catholic and the other might be a Protestant, it was any concern of the Federal Government that they became involved in a fracas, which would be the proper concern of the Federal Government and the Federal courts and the Attorney General should intervene.

Continuing the quote of Mr. Kilpatrick:

But force is not defined, and interfere with is not defined. The bill applies to all employment by any private employer, thus leaping beyond the boundaries of interstate commerce fixed in existing law.

As Senator Ervin points out, the House bill creates a special class even in areas, such as voting rights and federally financed activities, where a valid congressional power can be acknowledged. Thus it would be a crime for a white man to threaten a Negro seeking to vote, but it would not be a crime for a white man to threaten another white man seeking to vote.

Why? If the right to vote is sacred, why should it be a crime for one to threaten another merely because of race? Why should it not be a crime merely to threaten another man? Is this not an assault—subject to both civil and criminal sanction?

I continue to quote Mr. Kilpatrick:

The bill would protect a Negro rabble-rouser on a federally subsidized campus; it would not protect a Navy recruiter or a member of the Cabinet on the same campus.

In brief, despite some qualifying language inserted on the floor of the House, the administration's proposal is tailor-made for Negro extremists who would be protected, by reason of their race, from the natural consequences of extremism.

As I say, as concerned as the people of this country are about Stokely Carmichael or H. Rap Brown, here is a bill to help Stokely Carmichael and H. Rap Brown carry on their conduct and to stir up hatred and ill will among people of their race and put cities to the torch, as has been known to happen in the past with men of this type of attitude.

I was particularly pleased to note that Mr. Kilpatrick cited the fine arguments that the distinguished Senator from North Carolina [Mr. ERVIN] has propounded to enlighten the Members of the Senate as to such ill-advised legislation.

Let me take this opportunity to express my gratitude to the Senator for his tireless efforts over the years in bringing to the attention of the Senate the grave dangers posed by such plastic interpretations of the Constitution.

In the 19 years that I have served here, I have fought these measures with all my will.

Even so, I have often relied on the legal wisdom, insight, and advice of those who have served on the committee and had an opportunity to study the problem, such as the Senator from North Carolina [Mr. ERVIN].

His experience has given him the extraordinary ability to cite, in the most succinct of terms, the constitutional fallacies of these so-called civil rights bills. As this debate began more than a week ago, the Senator discussed the pending bill with such clarity that it bears at least reference:

This is a criminal statute without parallel in this Nation, he warned. It is a criminal statute which would make criminality depend either upon the race or the religion or the national origin of the alleged victim of the acts or threats of the accused.

This bill would be a very dangerous statute for a government which found it to be politically profitable to practice tyranny, because it would create literally hundreds of new crimes which do not exist either under Federal law or the laws of the States. I say that because it would provide whoever, whether or not acting under color of law, by force or threat of force, does certain things under certain circumstances.

So we would have a statute, for all practical purposes, saying this: If a white man uses force or threat of force against a colored man because of racial motivations and because he is engaging in one of these activities, or if a colored man uses force or threat of force against a white man because he is seeking to engage in one of these activities and because of his race, religion, or national origin, then it is a case for the Federal court; but if a white man uses force or threat of force to keep another white man from exercising his constitutional rights or his legal rights, the Federal court would have no jurisdiction; and if a colored man should use force or threat of force to keep another colored man from exercising his constitutional or legal rights, the Federal court would have no jurisdiction.

Is it not absurd to make the jurisdiction of a court depend, not upon the character of the acts committed, but upon the race or the religion or the national origin of the accused or of the prosecuting witness? Why should we fragmentize our society on the basis of race, religion, or national origin and give the Federal courts jurisdiction where there is a difference between the prosecuting witness and the accused in those respects, but leave the cases in the State courts where no such differences exist, but where the acts committed are identically the same?

What the Senator from North Carolina argued, and what I am saying, is that the rights of all Americans should be protected—and that is what his substitute amendments would achieve.

It is absurd and unwise to put on the statute books a law that allows local authorities to prosecute a white man accused of killing another white man, but calls for the long arm of the Federal Government, should they be of different race. Indeed, under this law, it would be a local matter if a Baptist were to intimidate another Baptist; but let him intimidate one of his Methodist neighbors, and Uncle Sam would have a duty to intervene.

In my years here, I have seen far more insidious civil rights bills, but I have never come across one with such a low enforceability quotient.

Imagine, if you will, some of the ludicrous situations that could arise under its provisions. It was the distinguished Senator from Florida [Mr. HOLLAND] who has talked already about the heinous murders of some years ago in Philadelphia, Miss. Two of the victims were white, the other a Negro. It is safe to assume the murderers were white men.

Under this law, an unprecedented mess would be wrought in trying to prosecute the the murderers.

As I best understand it, those men who killed the Negro would be subject to Federal prosecution. But those who murdered the white boys would be prosecuted only by the State or by existing

Federal machinery. Or, in a case like this, when it is unknown who did the actual firing, would they all be prosecuted under State law, then again under this new gadget that the collective mind of the Justice Department has contrived?

Never before have so many put their heads together to concoct such a clumsy, slapdash scheme to guarantee unequal justice under the law.

Those Senators from the North and East are not the only ones whose consciences have been offended and stung by such monstrous crimes as the one I have described. It is an understatement for me to say that all thinking and decent Americans deplore such an act. No reason or emotion in the world can excuse such conduct.

But my great fear is that in reacting emotionally to such things as the violation of those three men's civil rights, we are apt to create laws that erode the rights of other Americans.

Another situation that could arise easily under this proposed law intrigues me even more than the one I have just cited.

Mr. HART. Mr. President, will the Senator yield very briefly?

Mr. LONG of Louisiana. Mr. President, I ask unanimous consent that I may yield to the Senator from Michigan without prejudice to my rights.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. HART. Mr. President, I regret interrupting the able and always interesting Senator from Louisiana, but to return again to that case in Philadelphia, Miss., I repeat the answer I made last week in the exchange with the Senator from Florida and the Senator from North Carolina: The bill that the committee reports does cover the deaths both of the two white men and of the one Negro. I doubt, even if I obtain unanimous consent to have the language of the bill printed in the RECORD, that we will not hear the same argument tomorrow; but I ask unanimous consent to have printed at this point in the RECORD section 245(b) of the committee reported bill.

There being no objection, the excerpt from the bill was ordered to be printed in the RECORD, as follows:

§ 245. Interference with civil rights

Whoever, whether or not acting under color of law, by force or threat of force—

•        •        •        •        •

(b) knowingly injures, intimidates, or interferes with, or attempts to injure, intimidate, or interfere with any person (1) to discourage such person or any other person or any class of persons from lawfully participating or seeking to participate in any such benefits or activities without discrimination on account of race, color, religion, or national origin, or (2) because he is or has been urging or aiding others to so participate, or is or has been engaging in speech or peaceful assembly opposing any denial of the opportunity to so participate;

Mr. LONG of Louisiana. Will the Senator read that?

Mr. HART. Yes. It makes it a crime for anybody, by force or threat of force——

Mr. LONG of Louisiana. From what

*January 29, 1968*   CONGRESSIONAL RECORD — SENATE   **1291**

page is the Senator reading, may I ask? I am trying to find what the Senator is reading.

Mr. HART. Let us begin with page 7 of the bill, section 245, and excerpt a little for purposes of both brevity and simplicity:

Whoever, whether or not acting under color of law, by force or threat of force—

Then turn to page 9, line 7:

(b) knowingly injures, intimidates, or interferes with, or attempts to injure, intimidate, or interfere with any person (1) to discourage such person or any other person or any class of persons from lawfully participating or seeking to participate in any of the benefits described in items (1) through (8) in section (a).

The bill goes on to provide: "or because the person that is interfered with has been aiding others to participate, or is or has been engaged in speech or peaceful assembly opposing any denial of the opportunity to participate."

As I understand the situation in Philadelphia, Miss., two northern white men had been actively encouraging citizens of that county in Mississippi to register to vote. And they, together with a Negro, were shot down on the road. A conviction was obtained in that case under the old conspiracy statute.

The case made was that there had been a decision on the part of a group of whites, as the Senator has said, "to stop this business of these northerners, these outside agitators, coming in here and getting these people to register to vote."

The Senator is probably a better judge as to whether that effort was successful or not. However, my hunch is that there was a very substantial fallout effect from the murders and that there was very much lessened support for the registering and voting of people from that community.

However, whatever the effect—whether the killing of those men did or did not have the effect of deterring people from exercising their rights to register—that was the purpose of the killing of both the whites and the Negro. That would be proceeded with as a Federal crime in the Federal court under the committee bill.

Mr. LONG of Louisiana. Mr. President, we were discussing the general subject and the Senator had to leave the floor when I responded to the comment he made a few days ago. Perhaps he did not read my response.

It has not been established at all that these persons were intimidated or that they were interfered with to discourage them or any other person from lawfully participating or seeking to participate in any such benefits or activities without discrimination because of race, color, religion, or national origin.

It is obvious that they were not trying to discourage them from conducting that activity. They killed them. We could not distinguish whether they wanted to discourage them or not. That would have nothing to do with it.

The bill goes on to say: "because he is or has been urging or aiding others to so participate, or is or has been engaging in speech or peaceful assembly opposing any denial of the opportunity to so participate."

That was not proved. What was proved in this case, as I understand it, was that these people were killed. And when someone takes the life of another, we do not have to prove what was in the back of his mind. About all we have to prove is that he did not have a justifiable basis upon which to kill another person, but that he did it knowing what he was doing, and that he did not do it accidentally but did it, according to the legal language, with malice aforethought, which usually implies that he knew what he was doing when he killed the other man.

Nobody has proved to this date that what was in the back of the minds of these people when these men were killed was that these men had been urging people to participate in certain conduct. That was not established at all.

For all we know, they might have done it because the man who was the head of the Ku Klux Klan told them to do it. Perhaps he said, "Here is your job. You do it."

How would we know that? That is one of the points that has been made here. A statute, to make any sense, should not try to discern between unworthy motives as to what is responsible for the crime. It should seek to say that it is a crime to do so-and-so, and if the individual has the requisite intent, then he is guilty of such a crime.

The other day we talked about this subject, and I suggested that when the Ku Klux Klan burned a cross on the mayor's front lawn, if we are going to pass a law of this kind, we ought to protect the mayor with some provision of that kind.

The Senator then said that the mayor would be covered. However, that is not so. The mayor would have to be covered under the theory that the mayor was or had been urging people to participate or was or had been engaged in speaking or peaceful assembly opposing any denial of the right to participate.

However, Mr. President, I myself have known what it is to find that somebody was upset because there was an act in the State legislature having to do with whose name ought to be at the head of the ballot—whether it ought to be the name of President Johnson or Gov. George Wallace. And, perhaps I might have taken the attitude that the traditional party leader's name ought to be used rather than the name of someone selected by a State group.

If one gets a Ku Klux cross burned on his lawn, that situation would not be covered by the proposed statute. However, that burning of the cross would be an invasion of one's privacy. It would tend to terrorize one's wife and children.

Some time ago we had an unpleasant incident occur on the premises of our home. We did not know who was responsible. However, we can reasonably assume that it resulted from views expressed by me with reference to certain legislative measures in the Senate.

Even though I might be on the opposite side of a bill from the Senator from Michigan, one who might feel very strongly opposed to my position might want to burn a cross on my lawn and say that I should have done more than merely oppose the bill. They might say that I should have gone the limit and engaged in a fist fight on the floor of the Senate, for example.

As a matter of fact, some of the Senators from Southern States frequently find that some members of the extreme segregationist party are up in arms and outraged at us because we take a reasoned and moderate approach to a problem, even though we do take the opposite view from that of the Senator from Michigan. We differ, but we differ in somewhat different ways.

I recall some time back when we were discussing a civil rights matter that I explained that I had been urging all of the local officials to cooperate in registering the qualified Negro voters in my State. I said that in these civil rights debates we should not be required to justify the action of any local official who declined to register qualified Negro voters.

That statement caused an emergency meeting of half of the citizens councils in Louisiana. They denounced me for the attitude I took, and said that on the merits my views were similar to those of the Senator from Michigan.

With the procedure as to who should do it or how it should be done, I did not agree; I felt that on the merits no qualified person, regardless of his color, should be denied the right to vote.

But at that particular time, in some parishes, few Negroes were permitted to vote. There was a meeting of the local officials, and they unanimously signed a resolution condemning the junior Senator from Louisiana for making the statement that, on the merits of the question, he thought those who differed with him on the measure were right, but that he merely differed as to who should do it and how it should be done. It is not at all unusual for things like that to happen.

The other illustration that I gave the Senator would not be covered at all; that is, when a klansman is indicted for violating the law. That has happened. A klansman went before a regular public official, a man who held a minor office. In Louisiana, we would call it a police jury office. The klansman went to that respected citizen, who, I believe, if I correctly recall the story, was a minor official in the parish government. The klansman asked the official to sign a bond so that he could be released from jail. The local official did not sign the bond, and a couple of days later his house was dynamited. But the local official was not trying to get anybody the equal protection of the laws; he just did not trust the credit of the man who wanted him to sign the bond. And he would not have been protected for a moment by this bill. If you are going to pass a bill of this sort, it seems to me that the fellow who did not want to sign on the bond for the Ku Klux Klansman should be protected, also. He certainly would not be protected under this bill; and if he would, will the Senator from Michigan kindly point out how.

Mr. HART. We always hate to be the device which encourages extended debate

Case 1:22-cr-00011-RJL   Document 208-1   Filed 04/23/24   Page 6 of 11

and to keep willing participants in the extension of the debate, so let me reply very briefly.

In most of the actions—indeed, I venture to say in every one of the acts of violence or threats of violence that this bill would reach—there is a violation of State law.

I would assume—though I certainly do not know Louisiana law—that trespass on a mayor's property or anyone else's front lawn and the structuring of a cross and the burning of it would be a violation of State law.

Mr. LONG of Louisiana. I am not sure it is, frankly, but I assume it is.

Mr. HART. Let us make that assumption.

Generally speaking, law enforcement is colorblind. But sometimes it is not. We attempt, by this bill, to supply Federal jurisdiction for those situations where it has not been provided. Let us hope that very soon it will be colorblind everywhere. But whenever it is not colorblind, in these areas we make provision.

The Senator from Louisiana, who earlier was bewailing the extension of Federal criminal law to the point where we would have a national police force, now is arguing for the extension of the bill so as to cover every violation, every intrusion, and—as earlier the Senator from Mississippi said—every scuffle in a schoolyard. We believe that would be unwise, imprudent, and unnecessary.

(At this point, Mr. HOLLINGS assumed the chair as Presiding Officer.)

Mr. LONG of Louisiana. If one is going to enact meaningful legislation, he should not discriminate. We are talking about a section against discrimination. If we are going to do it equitably, we should do it for everybody and to everybody. We should not do it for some and to some. Everyone should be treated the same. So I am making the argument against discrimination in this case.

I believe it would be better to junk the entire statute and forget about it; but if we must pass the bill, it does seem to me that everyone should be protected under the bill instead of just a few.

I was visiting just a few days ago here with the mayor of Baton Rouge, and his visit brought to mind an incident—or, should I say, a series of incidents.

The mayor of that city has several times taken a position that he thought that justice, honor, and his conscience required him to take as an elected official of that city. On some three occasions, the Ku Klux Klan visited his home to burn a cross on his lawn.

If that man is to be intimidated and discouraged from his duty as he sees it, it seems most patently correct that he would be denied the benefits of this proposed law because he is a white man being intimidated by white men. Why should it be necessary that he be a Negro to be protected in the right of doing his duty as his honor and his conscience require him to do it?

I hope it will not test the patience of other Senators for me to cite another incident that occurred in Baton Rouge. I believe it serves the same illustrative point.

Recently, a dedicated member of the school board sat with other members of the school board, and he felt that they had no choice but to go along with a court order requiring them to integrate. They had exhausted all of their legal remedies. They had no other choice, and they would have to think in terms of complying with the court order.

Some time in the next day or so, members of the Ku Klux Klan called at his home when he was not there, and they terrified his wife and children—intimidating the man and scaring his family because he was doing what he felt his duty required of him as an elected public official. Why should the proposed statute require that there must be an incident of a black man threatening a white man or a white man threatening a black man, when it is wrong in any event?

Over 100 years have passed since the terrible and bloody conflict which divided this country in bitter camps, each side fighting and dying for causes which it held dear.

From that low point in our history we have become a strongly united people, forming the greatest Nation in all the world. Along with such a development, terrific responsibility has become an integral part of the duties of this Nation, and of every individual fortunate enough to live within this country. As a united people, side by side, we have fought in two gigantic world wars. Every responsible person in this country today must realize that, had the North and South become separate nations in the 1860's, ultimate reunification of our people would nevertheless have been compelled by subsequent unforseen and unsuspected circumstances.

Faced by today's inner problems and outside enemies, a unification of this country now is indispensable if we are to continue as a nation.

As we thus strive for a continuation of this vital unity, it becomes the duty of everyone of us in this body to study the proposed legislation, the reasons, if any, for such legislation, and to determine in our hearts and minds what should be done in the best interest of our country. If we are seriously to do this, I think it becomes imperative that we consider history; previous legislation on this subject; the evils that proponents claim this legislation will cure, and the actual curative powers of the suggested remedies. It is also absolutely necessary to study the constitutionality of the proposed legislation.

The 13th amendment simply provides that neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to its jurisdiction, with the added provision that Congress shall have power to enforce that amendment by appropriate legislation.

The 14th amendment might be divided into four parts: First. That all persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and the States wherein they reside.

Second. No State shall make or enforce any law which shall abridge the privilege or immunities of citizens of the United States.

Third. Nor, shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Fourth. Congress shall have power to enforce, by appropriate legislation, the provisions of that amendment.

It should be abundantly plain that part 2, enumerated herein, applies to State action only, and to citizens of the United States only. The word citizen becomes of prime importance.

Only in part 3 of that amendment herein, is it made applicable to any person and certainly that part refers to State action.

It follows that, with reference to part 4, Congress does have the power to make appropriate legislation, covering the provisions of the 14th amendment, but certainly such legislation must be in conformity to the amendment itself.

The 15th amendment simply provides:

The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

Further, it provides that Congress shall have power to enforce this amendment by appropriate legislation. The power that Congress has to enact legislation under the 15th amendment is to legislation in behalf of citizens of the United States as defined in the 14th amendment, so that no citizen will be deprived of his right to vote, or that such right be denied or abridged by the United States or by any State, because of the race, color, or previous condition of servitude of that citizen.

It certainly must be noted that the 15th amendment applies to any citizen of the United States who is denied his rights, or had had his rights abridged by State action, on account of his race, color, or previous condition of servitude.

This amendment says nothing whatever about "unwarranted economic pressures" or "social" aspects, and says nothing whatsoever concerning "religion." As a matter of fact, constitutional amendment 1 provides:

Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof.

Thomas Jefferson and the other fathers of our Constitution would be appalled to find that Congress had entertained any idea of legislating to any extent whatsoever upon religion or prohibiting the free exercise thereof.

Shortly after the War of the States, Congress did enact certain civil rights bills. These measures were enacted over the violent protect of the President of the United States, and that is a matter of history. The majority of these laws were enacted at a time when 11 Southern States had no representation in Congress. Over the years a number of these statutes were nullified by decisions of the Supreme Court. In one such case, United States against Cruikshank, the Court said:

The 14th amendment prohibits a state from denying to any person within its jurisdiction the equal protection of the law; but this provision does not any more than the one which precedes it, and which we have just considered, add anything to the rights which one citizen has under the Constitution against another. The equality of the rights of citizens is a principle of republicanism. Every republican government is in duty bound to protect all its citizens in the enjoyment of this principle, if within its power. That duty was originally assumed by the States; and it still remains there.

The Court has further said the 14th amendment does not invest Congress with the power to legislate upon subjects which are within the domain of State legislation or State action. That it does not authorize Congress to create a code of municipal law for the regulation of private rights; but to provide modes of redress against the operation of State laws, and the actions of State officers, executive or judicial, when these are subversive of the fundamental rights specified in the amendment.

In the case of United States against Stanley, et al., the Court said:

And so, in the present case, until some State law has been passed, or some State action by its officers or agents has been taken, adverse to the rights of citizens sought to be protected by the 14th amendment, no legislation of the United States under said amendment, nor any proceeding under such legislation, can be called into activity; for the prohibitions of the amendment are against State laws and acts done under State authority.

On page 14, the Court wisely said:

If this legislation (meaning civil rights legislation of 1875) is appropriate for enforcing the prohibitions of the amendment, it is difficult to see where it is to stop. Why may not Congress with equal show of authority enact a code of laws for the enforcement and vindication of all rights of life, liberty, and property? If it is supposable that the States may deprive a person of life, liberty, and property without due process of law (and the amendment itself does suppose it), why should not Congress proceed at once to prescribe due process of law for the protection of everyone of these fundamental rights, in every possible case, as well as to prescribe equal privileges in inns, public conveyances, and theaters? The truth is that the implication of a power to legislate in this manner is based upon the assumption that if the States are forbidden to legislate or act in a particular way on a particular subject, and power is conferred upon Congress to enforce the prohibition, which gives Congress power to legislate generally upon that subject, and not merely power to provide modes of redress against such State legislation or action. The assumption is certainly unsound. It is repugnant to the 10th amendment of the Constitution, which declares that powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to the people.

On page 17 of this decision, the U.S. Supreme Court made this pertinent observation:

The wrongful act of an individual, unsupported by any such authority (State authority), is simply a private wrong, or a crime of that individual; an invasion of the rights of the injured party, it is true, whether they affect his person, his property, or his reputation; but if not sanctioned in some way by the State, nor not done under State authority, his rights remain in full force and may presumably be vindicated by a resort to the laws of the State for redress. An individual cannot deprive a man of his right to vote, to hold property, to buy and sell, to sue in the courts, or be a witness or a juror; he may, by force or fraud, interfere with enjoyment of the right in a particular case; he may commit an assault against the person, or commit murder, or use ruffian violence at the polls, or slander the good name of a fellow citizen; but, unless protected in these wrongful acts by some shield of State law or State authority, he cannot destroy or injure the rights; he will only render himself amenable to satisfaction or punishment; and amenable therefore to the laws of the State where the wrongful acts are committed.

This case can be read with much profit, and with assurance that neither the 13th nor the 14th amendment authorizes legislation except as against State action, and can never descend to the individual in any State. It should be a matter of interest that these cases just referred to and discussed were rendered on October 15, 1883, and at a time when many of those who had a part in the passage of the 13th, 14th, and 15th amendments were living.

Now, Mr. President, from this short elementary recitation of the constitutional law covering the matter before the Senate today, it must become evident to those willing to see the facts that the measure we are being asked to vote for could not itself pass a valid test of constitutionality. It violates the Constitution by going beyond the limits prescribed by the 14th amendment. It violates the spirit of the 14th amendment to the Constitution by extending certain protections to certain classes of citizens while ignoring other citizens similarly situated.

In pointing up how this so-called civil rights bill discriminates against certain classes of people or against certain classes of activities, let me quote my colleague from North Carolina on this subject when he spoke of it in the 1959 civil rights hearings. The Senator from North Carolina [Mr. ERVIN], who has well presented the case against the bill before us today, was at that time discussing with the then Attorney General Rogers some proposed civil rights legislation in which the Attorney General would sue in behalf of certain persons denied equal protection of the laws and in which it would be a Federal crime to oppose with violence school desegregation. And he was stating how this legislation sought rights for some while neglecting the rights of others and punished some and neglected the punishment of others. I now quote the distinguished Senator from North Carolina [Mr. ERVIN]:

The two pending bills do not seem to be concerned about securing the equal protection of the laws for all people. They are concerned solely with certain selected groups. . . . doesn't the due-process clause of the Fifth Amendment prohibit Congress from passing a law applicable to some people and not applicable to other people in exactly the same situation?

These bills—S. 456 and S. 810—restrict the power of the Attorney General to bring suits for the benefit of persons who have been denied the equal protection of the laws on account of certain things, and not on account of other things. They don't apply to all in the same situation—to all denied the equal protection of the laws.

To pass these bills would be just about as bad constitutionally as to pass a law providing that the federal government should sue at taxpayers' expense to secure the equal protection of the laws for redheaded people, but not for baldheaded people. I can't see how the federal government can pick out certain groups and make them the favorites of the law under constitutional provisions which apply to all people equally.

I also think it will be unwise from now on until such time as the last lingering echo of Gabriel's horn trembles into ultimate silence for the Congress to pick out special groups of people and make them favorites of the law in a country whose proud boast it is that everybody stands equal before the law.

What I wonder about it why you pick out one group of citizens in this bill and exclude all other groups of citizens in like circumstances doing the same thing and provide for the punishment of one group, but all the other group to remain exempt.

You say that the people that resort to violence to prevent the enforcement of a particular kind of a decision of the Federal court shall be guilty of a Federal criminal offense, whereas other people who resort to violence to prevent the enforcement of other decrees of the Federal court shall not be punished by Federal courts for a crime.

To those of us who fervently wish to, at long last, see the end of the racial strife which divided our people, eroded our institutions, inflamed our passions, and preoccupied our national life for so long, it is distressing to see once again efforts, motivated by honest intentions, which would rekindle the worst fears of racial consciousness which today we are well on the way to overcoming without the assistance of Federal bayonets or the FBI.

Good will and tolerance in the South have grown and are growing voluntarily under the leadership of the good people of both races, and should continue to increase, provided there is not the continued interference by the Federal Government. Unfortunately, there has already been too much interference.

And so I say, Mr. President, if the Senators who propose this type of legislation are really sincere, if they are acting from truly altruistic considerations, and are not merely making a grandstand play motivated by political considerations, then they will reconsider, study the facts, and have the courage to withdraw this unnecessary, meaningless, and dangerous proposed legislation.

By and large, the people of my part of the country have shouldered the responsibility of setting their communities on the path of progressive moderation. Racial integration is a fact in the South. Our people have made great strides in setting aside old prejudices and are pitting their every resource to bringing about a social and economic renaissance which holds promise of a better life for every citizen, regardless of his race.

We of the South have been much maligned for our opposition to the various civil rights proposals down through the years. By their proponents we have been accused of the grossest of things. But the one thing of which no one can justifiably accuse us is a lack of sincerity in our dedication to our Constitution and the freedoms which it guarantees. Southern

Senators and Representatives hold honored positions in the history of this country, and their contributions to the good of the Nation are too great to be detailed at this time.

It is always with a certain amount of regret that I hear of someone questioning the motives of southerners in their resistance to civil rights legislation. My prime motivation in opposing all such legislation has been the abiding hope of preserving for the people the constitutional principles upon which this Nation was founded. For perseverance in this regard, I am prepared to put my record alongside that of any Southern Senator.

One will search in vain to find that my remarks have ever been disrespectful of the Negro or unsympathetic to his problems. It would be folly to contend that some of the most misguided of southerners have not exploited and mistreated the Negro, but my colleagues know very well the record of the Senator from Louisiana on this matter. And I am proud to say that has been the attitude of other members of my family in public service, including my father. We have always believed the Negro's thinking was very much akin to that of other less-privileged Americans, and we have constantly sought to provide him, along with other less-privileged Americans, the social and economic opportunity and capability to improve his lot.

I number among my good friends many Negroes whose good will I esteem and appreciate. I have discussed this subject with them many times and do not know of a single one who considers me intolerant of, or indifferent to, their natural desires to improve their situation and attain all the benefits our society has to offer.

Few people in this country are dedicated to keeping 20 million Negro Americans at a subservient and inferior social and economic level; indeed, most of us would like to see the Negro advance and take his rightful place, fully enjoying all the rights and privileges of American citizenship. The question that locks this great body in argument year after year is how best to approach that goal. Negroes have made phenomenal progress in this country in the past few decades, but I for one question whether such measures as that before us today will accelerate or impede that progress.

Surely, Mr. President, this bill's proponents are conscious of these very conspicuous shortcoming that I and some of my colleagues have tried to bring to light during the course of this debate.

I believe they do, but they apparently are willing to gloss over these failings in their unending quest to placate and pamper this minority group. The truth is that, though such a law has been proved unnecessary, matters have reached the point that the administration must undertake some gesture, I suppose, no matter how idle, to keep its stock high among Negro militants.

The Federal Government, through its permissive attitude in recent years, has only itself to blame for the spiraling disregard for the law now so rampant in this country.

The hundreds of senseless riots which have seriously scarred scores of our already ailing urban communities have their origins in the less destructive but morally corroding "civil disobedience" demonstrations of a few years ago.

Just as a single diseased cell develops into a killing cancer, so has the entreaties of a misguided few to ignore those laws one does not agree with, spawned a widespread disregard for law and order generally. The material and inevitable result has been the ultimate in lawlessness, wanton killing, and senseless, destructive rioting in the streets.

We might trace this ominous development from a so-called civil rights march led by Dr. Martin Luther King in the streets of Birmingham in March of 1963. At that time, Dr. King addressed a tense crowd with inflammatory words saying that they should "break the laws which one considers unjust."

At the time of this act, Dr. King was defying a court order as he led a march of more than a thousand Negroes, marching, singing, and shouting through the streets of Birmingham, Ala.

For his efforts, Dr. King was charged with violation of a city ordinance in parading without a permit and also with defying a State court injunction against demonstrations.

There had been a great deal of opposition in the Birmingham Negro community of more than 100,000, since the demonstration came just as a new and moderate city administration was taking office in that city.

From the Birmingham jail, where he landed for his efforts, King wrote an inflammatory letter which gained wide recognition in its pleas for Negroes to disobey those laws they felt to be unjust.

Many Negroes reacted to this dubious leadership by setting off a string of racial demonstrations throughout the United States. An article in the Shreveport Times of July 31, 1963, lists 135 communities in 32 States plus the District of Columbia where these racial incidents took place. To quote this article:

There have been many more than 135 demonstrations—in some cities they take place day after day and several times a day.

Demonstrations range in scope from Hampton, Va., where two Negroes were escorted from a privately-owned amusement park, to Detroit where more than 100,000 paraded downtown in a massive walk for freedom.

Generally, however, the number of demonstrators ranged from a few dozen to several hundred, though in some, participants were numbered in the thousands.

In possibly a dozen of the communities, the only demonstration held was a memorial march or service for Jackson, Miss., NAACP leader Medgar Evers. On the other hand, some, including Cambridge, Md., and Savannah, have been under virtual siege.

In New York City, seven demonstrations, including a sit-in at governor's office, were held in two-day periods (July 9–10). In addition to several Negro demonstrations in Atlanta during the period covered, white citizens on July 1, picketed several restaurants which recently had admitted Negroes.

In what must go down as the outstanding non sequiter of all time, Dr. King's contribution to the disruption of the internal peace and good will of a nation of 200 million people resulted in his being tapped for the Nobel Peace Prize in 1964.

Mr. President, can you imagine that? Here is a man who starts a drive to put the great cities of America to the torch by urging people to disobey laws, saying, "If you think the law is unjust, you should not obey it." Having started this trend, Dr. King received the Nobel Prize for his efforts.

In Dr. King's acceptance speech, he told the world, "I accept this prize on behalf of all men who love peace and brotherhood." But one must consider the results—not just the words.

What we once called demonstrations turned by 1965, under preachments of violence by Negro leaders, to what can only be described as riots or criminal disorders. Statistics tell the story of how these riots developed in succeeding years to a national shame and a veritable catastrophe, for the relations between people of different races.

In 1965, five major riots occurred; two in the South at Bogalusa, La., and Selma, Ala. The other 1965 major riots were in Philadelphia, Chicago, and in the Watts area of Los Angeles. Out of this violence 36 people died—three of these law officers and 33 civilians. A total of 1,206 persons were injured. The types of crimes committed covered sniping, looting, vandalism, arson, interference with firemen, and a host of others. Police made 10,245 arrests. The property damage during these 1965 riots amounted to over $40 million.

In the following year of 1966, the riots spread to 20 different serious incidents. Ten persons were killed, 467 persons injured. Over 2,000 arrests were made. The toll in property damage was over $10 million.

With the 1966 experience as a point of reference, the press began predicting early in 1967 that in the coming summer months, the country would be torn with racial strife on a much larger scale. To quote the magazine, U.S. News & World Report, of May 1, 1967:

The summer of 1967 is likely to be another "long, hot summer" of rioting and racial conflict.

That is the forecast from many people in positions to know the situation all across the country.

Last year, it is remembered, was a record riot year, with outbreaks in 38 cities—small cities as well as big ones.

This year, it is reported, the mood among Negroes is no better and may, in fact, be worse. Their leaders are described as growing more militant.

"Black power" advocates such as Stokely Carmichael are accused of stirring Negro youth to anger.

Violence already has erupted this spring: in Nashville, after a series of Carmichael speeches; in Cleveland, the scene of a massive riot last summer; in Louisville, and in Massillon, Ohio.

I pause at that place in the quotation to point out that this bill will protect Stokely Carmichael, when he goes to these places, sowing the seeds of hatred, violence, murder, sniping, arson, the worst of violence. The last thing the people of America want is the passage of a bill that would benefit Stokely Carmichael in his conduct.

I continue the quotation:

To get a first-hand report of the nationwide situation and outlook, "U.S. News and

World Report" sent members of its staff into potential trouble spots in all parts of the country. They talked to national and local Negro leaders, officials and police in more than 25 cities.

What this survey showed was widespread alarm.

In some cities there is optimism that outbreaks will be avoided. Even optimists agree, however, that the potential for racial trouble exists and it would take only a spark—such as the arrest of a Negro—

Mr. President; this is indeed a very prophetic article—

to set off an explosion.

That means a legal arrest of someone who should be apprehended—would end in a holocaust.

Further quoting:

Virtually all the causes of Negro bitterness that existed last year remain—and other irritants are found to have been added. New battlefronts are seen developing, with danger spreading more widely—from Negro neighborhoods into white areas of big cities, from large cities to smaller towns and from coastal areas into the midlands.

Danger also is believed to be growing that more whites will turn to violence—fight back against rioters or attack Negro demonstrators. This could lead to growing bitterness among people of Puerto Rican and Mexican backgrounds who feel that their problems are being neglected while Negroes get aid.

Where are riots most likely to erupt?

"Hardly any community in this country can call itself immune to trouble this coming summer," says Floyd McKissick, national director of the Congress of Racial Equality (CORE), which has 200 branches in 43 states.

It was Mr. McKissick who called the turn last spring by naming in advance eight cities where riots occurred and predicting the likelihood of trouble in as many as 40 cities.

One can only surmise that Mr. McKissick and some of his associates did their best to make sure riots would occur in the cities which he designated had the possibility of having riots.

This year, when asked to name the most likely trouble spots, Mr. McKissick told U.S. News & World Report:

"Cleveland stands out like a very sore thumb. Nearly every city in New Jersey is in bad trouble. I'd bet that New Jersey will never get through the summer without trouble.

"Among other cities, I'd name New York, Detroit, Omaha, Kansas City, St. Louis and especially East St. Louis, Chicago—

Where Dr. King did his best to stir people up—

Gary, Ind., San Francisco and Oakland, Los Angeles, of course, and also Washington, D.C."

The Rev. Dr. Martin Luther King, Jr., warned on April 16 that at least 10 cities are "powder kegs" that could "explode in racial violence this summer." He named among those cities: New York, Cleveland, Chicago, Los Angeles, Oakland, Washington and Newark, N.J.

As head of the Southern Christian Leadership Conference, Dr. King says:

"I'll still preach nonviolence with all my might, but I'm afraid it will fall on deaf ears. The intolerable conditions which brought about racial violence last summer still exist."

Roy Wilkins, executive director of the National Association for the Advancement of Colored People (NAACP), told U.S. News & World Report:

"I will not say that we are going to have a 'long, hot summer,' or that there are explosive spots in this country, because, honestly, I don't know. I can't name any cities that are more explosive than others.

"But I know that in urban concentrations where one of three Negro teen-agers is unemployed you have the potential for irresponsible violence—violence that is illogical, not traceable to any one spark or underlying reason."

The spread of rioting into smaller cities last year is widely read as a warning of more widespread trouble this year.

"The danger spots are no longer confined to the ghettos in large Northern cities, nor to the suburbs around big cities," says Mr. McKissick.

"The danger exists in any city where there are sizable numbers of Negroes whose hopes have been denied and who feel they are pawns in this system. The danger is spreading to smaller towns in many parts of the country."

In the past, major riots have occurred outside the South. This year Dr. King reports he is fearful of riots in Southern cities, and Mr. McKissick says:

"I wouldn't name any one city in the South as a danger spot. But I wouldn't gamble on any city being safe—even in the South."

It was in Nashville, a Southern city, that the riot season of 1967 got off to an unusually early start on April 8.

Jackie Robinson, first Negro to play baseball in the major leagues, warns that rioting this year is likely to move out of Negro neighborhoods into white areas of big cities. He put it this way: "If we don't end our problems, I'm very much concerned with what could be a very hot summer—riot in Harlem or in Watts, but a hot summer on 42nd Street; in Beverly Hills and in the suburbs."

Why? Mr. Robinson reports this:

"People have been saying to me, 'Why should we run around shooting and looting in our areas? If we are going to create the problem, we'll create it in other areas.'

"In riots of past years, white people have tended to stay away from the scene, leave the trouble to police and National Guard troops. Direct confrontations between white mobs and black mobs have been largely avoided. This year, in some cities, you hear talk that things will be different. If rioting starts, says Jackie Robinson, 'I think whites are definitely at the point where there's going to be fighting back.'

"When Negroes demonstrated against rejection of an open-housing ordinance in Louisville in mid-April, they were heckled and stoned by whites.

"Dr. King talks of leading new Negro marches into white neighborhoods of Chicago and Cicero, Ill., where similar marches drew white attacks last year."

As a matter of fact, Mr. President, I am fully convinced that when marches of this sort are organized, it is the intention of those who organize them to provoke just that kind of reaction. If they do not provoke it, they do not get the publicity they seek; so they have to provoke it in order to gain the kind of recognition and attention that they desire.

"Revival of the Ku Klux Klan in some areas of the country is stirring fear of provocative action by whites."

I pause here, Mr. President, to say that there is evidence these Ku Klux Klan klaverns actually were organized because of this very thing. These people move forward, encouraging Negroes to demonstrate, to violate the rights of others, and to refuse to obey the laws that they do not like; and persons, finding themselves imposed upon, organize to defend themselves against it. I suppose sooner or later people will find it necessary to organize in all parts of the country to defend themselves against the kind of mischief some of these activities create.

Unfortunately for all Americans, the prediction of racial violence for the summer of 1967 came true in full measure. In a total of 76 major incidents spread over practically every State in the Union, North, South, East, and West, wholesale Negro violence was an almost nightly affair in the streets of our cities. Nearly 100 persons were slain.

Here is a situation where, in the last year, nearly 100 people were killed. Nearly 2,000 were injured. Police reported 4,289 cases of arson alone. Over 16,000 rioters were arrested. The estimated property loss was in the neighborhood of $160 million. The estimated economic loss to riot-torn businesses was over $504 million.

Here is Congress, talking about passing a law which deals in part with the deaths of three civil rights workers in Mississippi. However, their culprits have been prosecuted under existing State and Federal law and found guilty by a jury, and yet Congress now proposes to completely ignore this situation that the whole Nation is stirred up about, which, in 1967 alone, resulted, as I have stated, in 100 people being killed and 2,000 injured, 4,289 cases of arson, 16,000 rioters arrested, property damage in the neighborhood of $160 million, and economic loss to riot-torn businesses of $504 million.

That is something the public of this country is very much concerned about. Mr. President, as a matter of putting first matters first, I shall insist, before we come to a final vote on this matter, that the Senate have an opportunity to vote on doing something about these riots. Think of that: 100 people killed, 2,000 people injured—many of them innocent bystanders. Consider also that this kind of mischief required the police and the National Guard to arrest 16,000 rioters.

Mr. President, that is more than a whole division of U.S. Army. What are we coming to in this country?

I have here, Mr. President, a proposed amendment that I will send to the desk, after I have read it, and ask that it be printed so that it will be available so that Senators can consider it.

This proposal would strike at the very thing which really concerns the people of this country: the rights and the safety of 200 million Americans whose property and whose very lives have been seriously endangered in the year 1967 and prior years as a result, in my judgment, of this doctrine, first proposed and advocated by Martin Luther King and his group, that one should not obey the laws that stand in the way of alleged "civil rights"; if one does not like the law, just disobey it. That advocacy enhanced by the Nobel Peace Prize in my judgment has in large measure brought on all these riots and presented the need for action.

Let me read what I believe should definitely be in this bill, whether it is there as a substitute for the original bill or as an amendment to it. I would say this, in

CONGRESSIONAL RECORD — SENATE *January 29, 1968*

my judgment, is even more essential than the Ervin amendment. In fact, I think this amendment, either as such or as a substitute for the bill, would be a good bill, or, as an amendment, would put some good in here to offset some of the mischief I find in the present bill.

The substantive provisions of my amendment reads as follows:

### AMENDMENT NO. 517
### TITLE II—CIVIL OBEDIENCE
#### SHORT TITLE

SEC. 201. This title may be cited as the "Civil Obedience Act of 1968".

#### CRIMINAL PENALTIES FOR ACTS COMMITTED IN CIVIL DISORDERS

SEC. 202. (a) Title 18, United States Code, is amended by inserting after chapter 101 thereof the following new chapter:

"Chapter 102.—Civil Disorders
"Sec.
"2101. Civil Disorders.
"2102. Definitions.
"2103. Preemption.
"§ 2101. Civil disorders:

"(a)(1) Whoever (A) travels in commerce or uses any facility or instrumentality of commerce with intent to incite or instigate a civil disorder, or (B) incites or instigates a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function; or

"(2) Whoever (A) travels in commerce or uses any facility or instrumentality of commerce with intent to teach or demonstrate to any other person the use, application, or making of any firearm or explosive or incendiary device, or technique capable of causing injury or death to persons, knowing or having reason to know or intending that the same will be unlawfully employed for use in, or in furtherance of, a civil disorder, or (B) teaches or demonstrates to any other person the use, application, or making of any such firearm, device, or technique knowing or having reason to know or intending that the same will be unlawfully employed for use in, or in furtherance of, a civil disorder which may in any way or degree obstruct, delay, or adversely affect commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function; or

"(3) Whoever transports or manufactures for transportation in commerce any firearm, or explosive or incendiary device, knowing or having reason to know or intending that the same will be used unlawfully in furtherance of a civil disorder; or

"(4) Whoever (A) travels in commerce or uses any facility or instrumentality of commerce with intent to commit or threaten to commit any unlawful act of violence against persons or property in furtherance of a civil disorder, including, but not limited to, sniping or shooting at persons with any firearm or using any explosive or incendiary device to destroy or damage property, or (B) commits or threatens to commit any such unlawful act of violence against persons or property in furtherance of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any Federally protected function; or

"(5) Whoever (A) moves or travels in commerce or uses any facility or instrumentality of commerce with intent to commit or threaten to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer engaged in the performance of his official duties incident to and during the commission of a civil disorder, or

(B) commits or threatens to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer engaged in the performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any Federally protected function; or

"(6) Whoever, in the course of or incident to the occurrence of a civil disorder, unlawfully takes anything of value (A) from any establishment if such establishment sells or offers for sale to interstate travelers a substantial portion of the articles, commodities, or services it sells or if a substantial portion of the articles or commodities which it sells have moved in commerce (B) from any commercial warehouse, building, or other structure if a substantial portion of the articles or commodities contained therein have moved in commerce or are intended for use in an establishment which sells or offers for sale to interstate travelers a substantial portion of the articles or commodities which such establishment sells, or (C) from any automobile, truck, or other motor vehicle which is engaged in commerce; or

"(7) Whoever uses any firearms to snipe or shoot at any person or motor vehicle moving or traveling on, or within the limits of any highway (including the entire right-of-way of any highway) located on the Federal-aid primary system or the Interstate System, as designated pursuant to title 23 of the United States Code, or throws or uses any brick, rock, or object of any kind with intent to impede or interfere with any person or motor vehicle moving or traveling on, or within the limits of, any such highway—

"Shall be fined not more than $10,000 or imprisoned not more than five years, or both.

"(b) Nothing contained in this section shall make unlawful any act of any law enforcement officer which is performed in the lawful performance of his official duties.

"§ 2102. Definitions

"For purposes of this chapter:

"(1) The term 'civil disorder' means any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual.

"(2) The term 'commerce' means commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; or (C) wholly within the District of Columbia.

"(3) The term 'facility or instrumentality of commerce' includes, but is not limited to, the United States mail, telephone, or telegraph.

"(4) The term 'federally protected function' means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof; and such term shall specifically include, but not be limited to, the collection, and distribution of the United States mails.

"(5) The term 'firearms' means any weapon which is designed to or may readily be converted to expel any projectile by the action of an explosive; or the frame or receiver of any such weapon.

"(6) The term 'explosive or incendiary device' means (A) dynamite and all other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of or includes a breakable container including a flammable liquid or

compound and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone.

"(7) The term 'fireman' means any member of a fire department (including a volunteer fire department) of any State, any political subdivision of a State, or the District of Columbia.

"(8) The term 'law enforcement officer' means any officer or employee of the United States, any State, any political subdivision of a State, or the District of Columbia, while engaged in the enforcement or prosecution of any of the criminal laws of the United States, a State, any political subdivision of a State, or the District of Columbia; and such term shall specifically include, but shall not be limited to, members of the National Guard, as defined in section 101(9) of title 10, United States Code, members of the organized militia of any State, or territory of the United States, the Commonwealth of Puerto Rico, or the District of Columbia, not included within the definition of National Guard as defined by such section 101(9), and members of the Armed Forces of the United States, while engaged in suppressing acts of violence or restoring law and order during a civil disorder.

"§ 2103. Preemption

"Nothing contained in this chapter shall be construed as indicating an intent on the part of Congress to occupy the field in which any provisions of the chapter operate to the exclusion of State or local laws on the same subject matter, nor shall any provision of this chapter be construed to invalidate any provision of State law unless such provision is inconsistent with any of the purposes of this chapter or any provision thereof."

(b) The table of contents to "Part I.—Crimes" of title 18, United States Code, is amended by inserting after

"101. Records and reports_____2071"
a new chapter reference as follows:

"102. Civil disorders_____2101"

Amend the title so as to read: "An Act to prescribe penalties for certain acts of violence or intimidation and for certain acts committed in civil disorders, and for other purposes."

Title II contains the substantive provisions of the proposed amendment and is entitled "Civil Obedience Act of 1968." It is designed to give balance to the pending civil rights bill by recognizing that not only do citizens have rights which may have to be protected but citizens have obligations and duties to respect the rights of others.

Title II enumerates certain acts occurring during civil disorders which constitute Federal crimes and become punishable by imprisonment or fines or both.

The following acts relating to or committed during civil disorders would be considered as Federal crimes—the term "civil disorder" means any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual:

First. Intention to incite a riot by an individual, traveling in commerce, or actually inciting a riot which adversely affects the free flow of goods or interferes with a governmental function such as the mails.

Second. Intention by persons traveling in commerce to teach other individuals

how to discharge a gun or to use any other dangerous weapons with the purpose in mind to create a civil disorder or engaging in such acts so as to adversely affect the free flow of goods in interstate commerce.

Third. The transporting or moving of firearms, so-called Molotov cocktails, or other dangerous weapons for use in connection with riots.

Fourth. Sniping or shooting at persons or using so-called Molotov cocktails during a riot which impedes or delays the free flow of goods.

Fifth. Interfering with the lawful performance of the duty of a fireman or police officer during a civil disorder. This would also include any assaults attempted on members of the National Guard units and members of the Armed Forces—such as those activated during some of the summer riots in 1967.

Sixth. Looting during a civil disorder from establishments engaged in the sale of or stocking interstate goods as well as looting from any automobile, truck, or other motor vehicle engaged in commerce.

Seventh. Sniping and shooting at any person or automobile or other motor vehicle which is traveling on a Federal-aid highway. Also throwing bricks or rocks or any other object with the intent to interfere with the travel of that person or vehicle on such highways.

Conviction of any of the foregoing crimes would subject the individual to a fine of not more than $10,000 and imprisonment of not more than 5 years, or both.

In the event that a murder results from any of the foregoing acts, the State law would necessarily become operative and the penalties prescribed by the State for such a murder would come into play.

Title II also contains a protection clause for law enforcement officers which specifically exempts them from the criminal penalties should any of their actions during a riot result from the lawful performance of official duties. This protection is designed to give police officers of the country assurance that lawful performance of their duties will not subject them to conviction of the Federal offenses contained in title II.

It is important to note that this proposed amendment reaches both the individual who travels between States as well as the individual who resides in a specific State.

It achieves this objective by making it a crime for an individual traveling between States to intend to incite a riot, to assault, or to interfere with lawful authority.

On the other hand, an individual who resides in a State and who engages in sniping, looting, arson, or any of the other criminal acts set forth in the amendment need only interfere by his actions with goods shipped in interstate commerce or activities of a governmental nature to be guilty of the proposed prescribed Federal crimes. This amendment therefore would reach not only the Rap Browns and Stokely Carmichaels but individuals whom they persuade to engage in riotous action and who otherwise might not be subject to criminal sanctions.

There are a number of other thoughts which occur to me concerning ways in which our citizens can be safe on the streets and protected from the violence and mischief that they have suffered as a result of the hatred and ill will existing between races, hatred and ill will that has been stirred by such people as Stokely Carmichael, Rap Brown, Mr. McKissick, and others.

I shall perhaps enlarge my proposal later, to make these people responsible for what occurs as a result of their conduct, and to try to make those people themselves liable for civil damages, as well as criminally liable, for the great injury they have done to society. I invite other Senators to review my proposal and perhaps consider offering suggestions on how to expand it to afford greater protection to our defenseless and unprotected citizenry.

A matter comes to mind that might be considered. It happened in my hometown recently. After the inflammatory speeches of Rap Brown and Stokely Carmichael, while most of our Negro community did not heed them, a few people seemed to have been stirred up by them, to the extent that we have had sniping at cars traveling on the interstate highway and brickbats being thrown through windshields of cars traveling on the interstate highway.

Recently, at one of the principal street corners, where a great deal of traffic passes, some young Negroes kept throwing rocks at cars, until finally one of the rocks hit a white boy on a motorcycle and killed him. That was a very unfortunate event. The people who did it have been arrested. But the people who are responsible for it, who are fundamentally responsible for it, are not so much the persons who threw those stones as are the Carmichaels and the Rap Browns, who stirred those people to engage in that type of conduct and persuaded them that that is what they should do.

If we are going to seek to pass a civil rights bill, it should be a bill that would protect the public from irresponsible rabble rousers, instead of a bill that would protect such persons from the public.

So we have an opportunity here to strive to protect everybody's civil rights—the rights of 200 million people, rather than the rights of a limited number.

Mr. President, I have quite a bit of material that I should like to discuss, I believe it will take several hours, and I do not believe I should seek to do it all at this late hour, because not many Senators will be present in the Chamber to hear it.

Therefore, I ask that the amendment I discussed be received and printed and lie on the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

## ADJOURNMENT

Mr. LONG of Louisiana. Mr. President, if no other Senators desire to speak at this time, I move that the Senate stand in adjournment until 12 o'clock noon tomorrow.

The motion was agreed to; and (at 6 o'clock and 3 minutes p.m.) the Senate adjourned until tomorrow, Tuesday, January 30, 1968, at 12 o'clock meridian.

## NOMINATIONS

Executive nomination received by the Senate January 29, 1968:

### U.S. DISTRICT JUDGE

Edward J. Schwartz, of California, to be U.S. district judge for the southern district of California, vice James M. Carter, elevated.

### POSTMASTERS

The following-named persons to be postmasters:

#### ALABAMA

Shelton C. Alexander, Theodore, Ala., in place of S. E. Harding, retired.

#### ARIZONA

Benjamin A. Munoz, Solomon, Ariz., in place of M. W. Kempton, retired.

#### CONNECTICUT

Joseph G. Vallo, Canton, Conn., in place of W. G. Adams, retired.
Ralph G. Gidlund, Canton Center, Conn., in place of G. C. Case, retired.

#### FLORIDA

Astrid O. Mascoe, Bokeelia, Fla., in place of C. C. Knight, deceased.
Harry E. Cathell, Elfers, Fla., in place of E. A. Boyd, retired.
Leo A. Acree, Kissimmee, Fla., in place of F. S. Ledbetter, Jr., retired.

#### INDIANA

V. Thomas Fettig, Seymour, Ind., in place of I. R. Love, deceased.

#### IOWA

Maurice L. Clark, Panora, Iowa, in place of D. D. Dygert, decline.

#### MISSOURI

Rex L. Luallin, Conway, Mo., in place of J. C. Smith, retired.
Ernest Wing, Sunrise Beach, Mo., in place of L. J. Thickstun, retired.

#### NEW YORK

Edgar J. Yelle, Au Sable Forks, N.Y., in place of J. J. Murphy, retired.
Richard W. Dennelly, Great Neck, N.Y., in place of J. O. Kline, deceased.
Frank V. Farsetta, Pearl River, N.Y., in place of J. V. Lynch, retired.
Florence E. Green, Piffard, N.Y., in place of Anna Torcello, retired.
Mason A. Gossoo, Shandaken, N.Y., in place of F. P. Platz, deceased.

#### NORTH DAKOTA

Donald L. Hertz, Mandan, N. Dak., in place of J. J. Murray, retired.

#### OHIO

Paul R. Behun, Campbell, Ohio, in place of John Galida, retired.
Karl R. Maul, New Washington, Ohio, in place of Joseph Yanka, retired.

#### VIRGINIA

Marion H. Meador, Jr., Cumberland, Va., in place of G. W. Garrett, retired.

#### WISCONSIN

Carol M. Hudson, Green Valley, Wis., in place of Lydia Sievert, deceased.
Arthur C. Howell, Palmyra, Wis., in place of M. L. Sollars, resigned.
Robert W. Walton, Platteville, Wis., in place of L. V. Newman, retired.
Bradford S. Croeker, South Milwaukee, Wis., in place of W. J. Corry, retired.